IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 19-cv-01088-LTB-NRN

SHERY POER, as Administratrix of the Estate of Christopher Poer, Deceased, and
G.P. and M.P. as Surviving Minor Children of Deceased,

        Plaintiffs,

v.

THE CITY OF COMMERCE CITY,
SHERIFF TIM NORTON, in his official capacity,
DEPUTY CHRIS DICKEY, and
SERGEANT TRAVIS TURNER, both of whom are sued in their individual capacities.

        Defendants.

---

## MOTION FOR SUMMARY JUDGMENT FROM ELBERT COUNTY DEFENDANTS

---

        Defendants Sheriff Tim Norton, in his official capacity, Deputy Chris Dickey, and Sergeant Travis Turner (collectively, the "Elbert County Defendants"), by their counsel, Gillian Dale and Mark S. Ratner of Hall & Evans, L.L.C., hereby move for summary judgment in this matter pursuant to Fed. R. Civ. P. 56, as follows:

### INTRODUCTION AND PROCEDURAL HISTORY

        Plaintiff Sherry Poer filed her original Complaint and Demand for Jury Trial in this matter on April 12, 2019. [ECF 1]. Following conferral regarding the proper defendants, Plaintiff filed her First Amended Complaint on May 13, 2019. [ECF 5]. After additional conferral regarding inadequately pled claims, the Elbert County Defendants filed their Partial Motion to Dismiss and Partial Answer on July 15, 2019. [ECF 21, 22]. On August 6, 2019, Defendant Commerce City

moved to stay these proceedings pending a ruling on its Motion to Dismiss and the Partial Motion to Dismiss filed by the Elbert County Defendants. [ECF 27]. The motion to stay was granted by this Court on August 7, 2019. [ECF 29].

On August 23, 2019, Plaintiff filed her response to the Elbert County Defendants' Partial Motion to Dismiss, admitting the deficiencies raised in the motion and agreeing to amend her complaint to address those deficiencies. [ECF 32]. Plaintiff moved to amend the complaint a second time on September 5, 2019, [ECF 39], and the Court granted the motion on September 6, 2019. [ECF 42]. The Second Amended Complaint and Demand for Jury Trial (the "Complaint") is now the operative complaint in this matter and brings the following claims against the Elbert County Defendants: (1) a wrongful death claim against Deputy Dickey and Sergeant Turner (First Cause of Action); (2) a Fourth Amendment excessive force claim against Deputy Dickey and Sergeant Turner (Second Cause of Action); (3) a §1983 claim for deliberately indifferent hiring against Sheriff Norton in his official capacity (Fourth Cause of Action); (4) a negligence claim against Deputy Dickey and Sergeant Turner (Fifth Cause of Action); (5) an assault claim against Deputy Dickey and Sergeant Turner (Sixth Cause of Action); and (6) a battery claim against Deputy Dickey and Sergeant Turner (Seventh Cause of Action). On April 24, 2020, Sheriff Norton in his official capacity filed a Stipulation for Municipal Liability, admitting that Deputy Dickey and Sergeant Turner acted pursuant to the Sheriff Office's policies and customs, and that any finding of a constitutional violation on the part of the individual officers will result in a finding of municipal liability on the part of the Sheriff's Office. [ECF 52].

At this time, the case remains stayed as a motion for sanctions brought by Commerce City is being decided, and no discovery has been conducted. However, the Sheriff's Office has

voluntarily produced the bodycam video depicting the incident, and it appears Plaintiff previously obtained the incident and investigation reports from the Elbert County Sheriff's Office and the Eighteenth Judicial District. Based on this evidence, Plaintiffs can state no claim for any constitutional violation or any willful and wanton conduct, and the Elbert County Defendants are entitled to summary judgment as a matter of law.

**STATEMENT OF UNDISPUTED MATERIAL FACTS**

1.     On April 2, 2018, Christopher Poer traveled to Denver from Rhode Island to get a service dog from Elaine Holt, who lived in rural Elbert County. [Summary for the District Attorney's Office, Critical Response Team, Case #18-2 (Exhibit 1), at p.4].

2.     On April 11, 2018, Mr. Poer told Ms. Holt that he had been off his medication for three days, and that she should hide her .380 handgun because he was having a tough day. [Letter from Elizabeth A. Oldham to Sheriff Shayne Heap, Re: April 12, 2018 – Officer Involved Tasing of Christopher Poer (DOB: 94/71) (Exhibit 2), at p.4].

3.     On April 12, 2018, at 5:54 p.m., Mr. Poer called 9-1-1 from Ms. Holt's home and reported that he was being surveilled by unnamed individuals who had installed recording devices and cameras in the house, in a trailer on the property, and in his phone. [Exhibit 1 at p.3; Exhibit 2 at p.2; *see also* Douglas County 911, Call For Service Detail Report – CFS 555, 4/12/2018 (Exhibit 3), at pp.3, 8].

4.     At 7:37 p.m., Mr. Poer called back and told the dispatcher he was getting robbed. The dispatcher was struggling with the address and he put Ms. Holt on the phone. [Exhibit 3 at pp.2, 8; Exhibit 1 at p.5; Exhibit 2 at p.2].

5. Ms. Holt told the dispatcher Mr. Poer was seeing things and hearing voices, and she thought he was having a delusional episode. [Exhibit 2 at p.2]. She told the dispatcher that Mr. Poer had her gun and had pointed it at her, and she asked for someone to come because she did not know what was going to happen. [*Id.*] She said that the gun was loaded and she would be staying in her bedroom. [*Id.*]

6. Ms. Holt later reported that Mr. Poer had retrieved the gun from her bedroom himself but asked her for the magazines, and although she initially hid the magazines she later gave them to him because she was afraid of what he would do if she refused. [Exhibit 1 at pp.7-8; Exhibit 2 at p.4].

7. Three officers were dispatched to the scene and Ms. Holt stated that she was in her room and would stay there until the deputies arrived. [Exhibit 3 at p.2].

8. The response was considered "priority one" because it involved a man with a gun. [Incident Report 2018-00000738, Cherry Hills Village Police Dept., 4/18/2018 (Exhibit 4), at p.3].

9. Ms. Holt reported to the dispatcher that Mr. Poer had gone into a field outside her home and reported hearing multiple gun shots while the officers were trying to locate him. [Exhibit 3 at p.2; Exhibit 2 at p.2].

10. Deputy Dickey was the first to arrive on the scene and reported hearing gun shots. [Video of Bodycam 4/12/2018 (conventionally submitted as Exhibit 5), at 2:00-2:25].

11. Ms. Holt reported to the dispatcher that the gun had an 8-round magazine and she had possibly heard 5 shots so far. [Exhibit 3 at p.5].

12.     Deputy Dickey located Mr. Poer walking in an open field, stated they would have to approach "tactically," and advised the other responding officers to enter the property by his truck. [Exhibit 5 at 3:50-4:30].

13.     Deputy Dickey reported hearing Mr. Poer yelling at the top of his lungs, sounding drunk, and then lost sight of him. [Exhibit 3 at pp.2, 6; Exhibit 2 at p.2; Exhibit 5 at 6:15-6:25].

14.     Sergeant Turner and Deputy Joshua Bjork arrived on scene, and Deputy Dickey pointed out Mr. Poer's location. Because it was getting dark and they did not have a shield, the three officers made plans to cross the field towards Mr. Poer's location using Sergeant Turner's truck as cover. [Exhibit 4 at p.3; Exhibit 2 at p.2; Exhibit 5 at 6:50-11:10].

15.     After a few minutes, the officers located Mr. Poer lying in the grass, partially concealed, and when they approached, he rolled to his side, facing the officers with what was described as a "thousand yard stare." [Exhibit 4 at pp.3-5; Exhibit 1 at p.6; Exhibit 2 at p.3].

16.     The officers approached Mr. Poer with their weapons drawn, stating "Sheriff's Office," giving repeated commands to put his hands up, and threatening to shoot him if he did not comply. Instead, Mr. Poer began reaching out with his left hand, and Deputy Dickey kicked him in the hip area to stop the forward movement of his hand. [*Id.*; Exhibit 5 at 11:10-12:10].

17.     Deputy Dickey can be heard telling Mr. Poer "don't do it" four times in between multiple directions to put his hands up. [Exhibit 5 at 11:30-12:05].

18.     The officers spotted a gun to the right of Mr. Poer's foot and Deputy Bjork secured it. [Exhibit 4 at p.3-5; Exhibit 1 at p.6; Exhibit 2 at p.3; Exhibit 5 at 11:50-12:00].

19.     Mr. Poer continued to disregard commands to comply and struggled to keep his hands under his mid-section. Concerned that he might have another weapon, the officers attempted

to get control of his arms but were unable to handcuff him due to his active resistance. [Exhibit 4 at pp.3-5; Exhibit 1 at p.6; Exhibit 2 at p.3; Exhibit 5 at 11:15-12:15, 27:05-27:55].

20. Sergeant Turner told Deputy Dickey to deploy his Taser due to Mr. Poer's continued resistance, and Deputy Dickey deployed two 5-second deployments, one in prong mode and one in drive stun mode. [Exhibit 4 at pp.3-5; Exhibit 1 at p.6; Exhibit 2 at p.3; Exhibit 5 at 12:10-12:35].

21. Even after the Taser was deployed, the officers had to continue giving Mr. Poer directions to give up his hands and one of them is heard saying "he's still fighting." [Exhibit 5 at 12:15-12:40].

22. It was unclear to Sergeant Turner if the Taser strike actually hit Mr. Poer because he continued to resist and would not allow the officers to place him in handcuffs. [Exhibit 4 at pp.3, 5]. Sergeant Turner then struck Mr. Poer several times on the side of the face and they were finally able to gain control of his hands and place him in handcuffs. [*Id.*; Exhibit 1 at pp.6-7; Exhibit 2 at p.3].

23. Deputy Dickey asked Mr. Poer if he had any other weapons, directed the officers to roll him over, and ordered medical to "come check him out." Sergeant Turner asked Mr. Poer if he was o.k. and stated he might have knocked him out. [Exhibit 5 at 13:10-50].

24. Deputy Dickey said to Mr. Poer: "You were so close, dude, why did you do that?" [Exibit 5 at 13:50-55].

25. Deputy Dickey and Sergeant Turner began searching Mr. Poer and when they rolled him over, they noticed he was foaming at the mouth, called for an expedited medical response, and attempted to wake him. They checked for a pulse, and when they were unable to find one, they

removed the handcuffs and begin performing CPR. [Exhibit 4 at pp.4-5; Exhibit 1 at p.7; Exhibit 2 at p.3; Exhibit 5 at 13:50-17:20].

26.    Because they were in the middle of a field and the ambulance arrived on an adjacent road blocked by a fence, the officers decided to lift Mr. Poer into the back of the patrol truck to drive him to the road. [Exhibit 4 at pp.4-5; Exhibit 2 at p.3; Exhibit 5 at 18:00-21:00].

27.    Sergeant Turner and Deputy Dickey took turns performing chest compressions as they moved across the field. They met the ambulance at the road and the paramedics took over the medical treatment. [Exhibit 4 at pp.4-5; Exhibit 2 at p.3; Exhibit 5 at 21:00-24:40].

28.    Mr. Poer was transported to Parker Adventist Hospital where he was pronounced dead. [Exhibit 1 at p.7; Exhibit 2 at p.3].

29.    The coroner's report listed the cause of death as sudden death associated with amphetamine intoxication, dilated cardiomyopathy and taser deployment. [Incident Report #020183819, Elbert County Sheriff's Office (Exhibit 6), at p.4]. Other factors included obesity, mild to moderate coronary atherosclerosis (hardening of the arteries), hepatic steatosis (fatty liver), and early decompositional changes. Other significant medical conditions included hypertension, obesity, chronic alcohol abuse, congestive heart failure, and chronic kidney disease. [Exhibit 1 at p.8].

30.    Lethal levels of amphetamine and citalopram were found in Mr. Poer's system. [Parker Police Department Supplemental Report, #2018-001595 (Exhibit 7), at p.2; Exhibit 2 at p.4].

31.    Because of the involvement of Elbert County Sheriff's Officers, the Critical Incident Response Team ("CRT") from the 18th Judicial District was called in to investigate the

incident and assess whether there was any illegal use of force by the county officers. [Exhibit 1; Exhibit 2]. Detective Shannon Brukbacher from the Parker Police Department was the lead CRT Investigator, and the team also included Greenwood Village Investigator Lenny Abeyta, Colorado Bureau of Investigation Analyst David Yocum, and District Attorney Investigators Brian Ahlberg, Mike Heylin, Matthew Stoneberger, Amber Urban, and Marc White. [Exhibit 2 at p.4].

32.     The investigators determined Mr. Poer had a history of pulmonary edema, acute respiratory failure, heart failure, alcoholism, and seizures, was in a coma for two weeks the prior October, and was dying of congestive heart failure. [Exhibit 1 at pp.1, 7]. He had multiple prescribed medications for depression/anxiety, high cholesterol, heart problems, and blood clots. [*Id.*]

33.     Interviews with Mr. Poer's friends and family revealed that Mr. Poer's former supervisor was advised a month previously that he should go see Mr. Poer if he wanted to because he was going to die. [Exhibit 1 at p.8].

34.     Mr. Poer struggled with alcoholism, was estranged from his family, and was self-destructive. [*Id.*]

35.     Mr. Poer had an active restraining order against him after he threatened to kill his ex-wife's father, and a condition of the restraining order was that he was not allowed to possess firearms. [Exhibit 1 at p.3].

36.     Mr. Poer had two documented reports with the Middletown, Rhode Island Police Department in the year before the incident. One involved a verbal intoxicated altercation with a friend and another involved him repeatedly entering a stranger's house without permission after the person found Mr. Poer's phone. [Exhibit 2 at p.3].

37.     Elizabeth Oldham, Chief Deputy District Attorney for the 18th Judicial District Attorney's Office, reviewed the evidence collected by the CRT (including the bodycam video) and issued her conclusions in a letter dated August 9, 2018. [Exhibit 2]. Among the relevant findings from the independent investigation are the following:

- "The deputies knew that Mr. Poer was armed with a firearm, that he had pointed the firearm at Elaine Holt, and that Mr. Poer had discharged the firearm. The Deputies heard gunshots and Mr. Poer yelling when they arrived. Thus, the deputies appropriately approached the situation with extreme caution." [*Id.* at p.3].

- "It should be noted that police officers often use forceful language like this with armed subjects in order to get them to comply, which is aimed at preserving the life of both the officers and the armed subject. But, instead of putting his hands up, Mr. Poer[] extended his hand as if reaching for something." [*Id.*]

- A Taser is not considered to be a deadly weapon because the intended, natural, and probable consequence of Taser use is not to produce death. [*Id.* at p.6].

- Under Colorado law, "a peace officer is justified in using reasonable and appropriate physical force upon another person when and to the extent that he reasonably believes it necessary: (a) To effect an arrest or to prevent the escape from custody of an arrested person unless he knows that the arrest is unauthorized; or (b) To defend himself or a third person from what he reasonably believes to be the use or imminent use of physical force while effecting or attempting to effect such an arrest ...." [*Id.* at p.6 (quoting C.R.S. §18-1-707)].

- "Based on the fact that Mr. Poer had a deadly weapon, namely a handgun, had pointed the weapon at another person, had been firing the weapon when the police arrived, and had disregarded police instructions, and had physically resisted arrest, any peace officer confronting Mr. Poer would have been justified in using a Taser device in the course of arresting Mr. Poer." [*Id.* at p.6].

- "Instead of using their own firearms and employing deadly force against Mr. Poer, the deputies sought to use less-than-lethal force by using the Taser device on him. Even after being subjected to the Taser device, Mr. Poer continued to resist." [*Id.* at p.7].

Ms. Oldham concluded that the use of force was reasonable, necessary, and appropriate to defend against the threat posed by Mr. Poer and take him into custody. [*Id.* at p.1].

38.     The Sheriff's Office Incident Report lists the charges against Mr. Poer as menacing with a deadly weapon (a class 5 felony), resisting arrest, obstructing a peace officer, domestic violence, and reckless endangerment. [Exhibit 6 at p.1].

**ARGUMENT**

### I.  Plaintiff Cannot Establish His Claim for Excessive Force Under the Fourth Amendment

Plaintiffs' Second Cause of Action alleges Deputy Dickey and Sergeant Turner used excessive force in violation of the Fourth Amendment during their encounter with Mr. Poer. "Determining whether the force used to effect a particular seizure is objectively reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion of the individual's Fourth Amendment interests against the countervailing governmental interests at stake." ***Graham v. Connnor***, 490 U.S. 386, 396 (1989) (citations and internal quotations omitted). The Supreme Court "has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." ***Id.*** (citing ***Terry v. Ohio***, 392 U.S. 1, 22-27 (1968)). "Because the test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application, however, its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." ***Id.*** (citing ***Tennessee v. Garner***, 471 U.S. 1, 8-9 (1985)).

"The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." ***Id.*** (citing ***Terry***, 392 U.S. at 20-22. "The calculus of reasonableness must embody allowance for the fact that police

officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Id.* at 396-97; *see also Phillips v. James*, 422 F.3d 1075, 1080 (10th Cir. 2005) (recognizing that officers have to make split-second judgments in uncertain and dangerous circumstances). The question is an objective one: "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 397 (citing *Scott v. United States*, 436 U.S. 128, 137-39 (1978)).

In assessing the degree of threat a suspect poses to officers, a court may consider factors such as whether the officers ordered the suspect to drop his weapon, whether the suspect complied with police commands, the distance separating the parties, and the manifest intentions of the suspect. *Thomson v. Salk Lake County*, 584 F.3d 1304, 1314 (10th Cir. 2009); *see also Mecham v. Frazier*, 500 F.3d 1200, 1205 (10th Cir. 2007) (suspect's refusal to comply with instructions may be considered in assessing whether physical force was needed to effect compliance). A reasonable officer need not await the "glint of steel" before taking self-protective action, as by then it is often too late to take safety precautions. *Estate of Larsen v. Murr*, 511 F.3d 1255, 1260 (10th Cir. 2008).

In this case, Deputy Dickey and Sergeant Turner used objectively reasonable force in light of the facts and circumstances confronting them. The officers were aware through the dispatch calls that Mr. Poer had pointed a gun at Ms. Holt and was shooting a gun outside her home. [SUMF ¶¶5-9]. These actions supported a charge of felony menacing with a deadly weapon. [SUMF ¶38]. When the officers first approached Mr. Poer, they did not know where the gun was, and even after

they secured the gun, they could not see Mr. Poer's hands and could not determine if he had another weapon. [SUMF ¶¶15-19]. Mr. Poer refused repeated orders to show his hands, and when the officers attempted to take him into custody, he struggled to keep his hands underneath himself so that he could not be handcuffed. [SUMF ¶¶16-22]. Mr. Poer actively resisted arrest by refusing to give up his hands and by struggling as the officers attempted to place the handcuffs on him, even after he was tased in both prong mode and stun mode. [*Id.*]

Therefore, under each of the factors outlined by the Supreme Court, *Graham*, 490 U.S. at 396, Deputy Dickey and Sergeant Turner were justified in first using a Taser and then using strikes to the head when Mr. Poer continued to struggle, all in an effort to effectuate his arrest and protect themselves and others in the vicinity from the obvious threat he posed. *See Wilson v. City of Lafayette*, 2010 U.S. Dist. LEXIS 31442 (D. Colo. Mar. 31, 2010) (use of Taser resulting in death of suspect did not constitute excessive force when suspect was ordered to keep his hand away from his pocket but did not comply, only about 15 feet separated him from officers and distance was closing, and he "showed no intention of complying with the police") (aff'd *Wilson v. City of Lafayette*, 510 Fed. Appx. 775 (10th Cir. 2013)); *Hinton v. City of Elwood*, 997 F.2d 774, 781 (10th Cir. 1993) (granting summary judgment on excessive force claim where officers wrestled plaintiff to ground and used stun gun on him three times after he shoved one officer and actively resisted efforts to handcuff him); *Lord v. Hall*, 520 Fed. Appx. 687, 692-93 (10th Cir. 2013) (no excessive force where police officers prevented driver from re-entering his car after determining he did not match description of robbery suspect, took him to the ground, and struck him four times in the shoulder and head area, causing permanent brain damage); *Mobley v. Palm Beach Cty. Sheriff Dept.*, 783 F.3d 1347, 1351, 1355 (11th Cir. 2015) (officers' actions in striking and kicking

plaintiff, including in his face, breaking his nose, teeth, and dental plate, and repeatedly tasing him while he was on the ground, did not constitute excessive force where he refused to surrender his hands to be cuffed).

Because the actions of Deputy Dickey and Sergeant Turner were objectively reasonable, Plaintiffs can state no claim for excessive force under the Fourth Amendment, and this claim should be dismissed as a matter of law.

## II. Deputy Dickey and Sergeant Turner are Entitled to Qualified Immunity

Even if the Court determines there is a triable issue of fact as to whether Deputy Dickey and Sergeant Turner used excessive force, this claim should nevertheless be dismissed on the bases of qualified immunity. Qualified immunity is immunity from suit, as well as a defense to liability. *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). The doctrine permits the resolution of claims against government officials before subjecting them "'either to the costs of trial or to the burdens of broad-reaching discovery' in cases where the legal norms the officials are alleged to have violated were not clearly established at the time." *Id.* (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 817-18 (1982)). A "heavy" two-part burden applies when a defendant asserts qualified immunity. *Mick v. Brewer*, 76 F.3d 1127, 1134 (10th Cir. 1996). First, a court assesses whether the state actor's conduct violated a constitutional right, with contours sufficient for a reasonable state actor to understand his conduct was unlawful. *Saucier v. Katz*, 533 U.S. 194, 201-01 (2001). Second, even if a violation occurred, a court assesses whether the law was clearly established such that the state actor is not entitled to immunity. *Id.* at 207-09. The reviewing court may consider these prongs in any order. *Pearson v. Callahan*, 555 U.S. 223, 226 (2009).

For the law to be "clearly established," generally there must be a Supreme Court or Tenth

Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains. *Medina v. City & Cnty. of Denver*, 960 F.2d 1493, 1498 (10th Cir. 1992). "Because the focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct." *Brosseau v. Haugen*, 543 U. S. 194, 198, 125 S. Ct. 596, 160 L. Ed. 2d 583 (2004) (per curiam). Although the Supreme Court does not require a case directly on point, existing precedent must have placed the constitutional question beyond debate. *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). "In other words, immunity protects all but the plainly incompetent or those who knowingly violate the law." *White v. Pauly*, 137 S.Ct. 548, 551 (2017) (citation and internal quotation marks omitted).

The Supreme Court has repeatedly told courts not to define clearly established law at a high level of generality. *Kisela v. Hughes*, 138 S.Ct. 1148, 1152 (2018) (per curiam) (citations omitted). "The dispositive question is whether the violative nature of *particular* conduct is clearly established," in light of the specific context of the case, and not as a broad general proposition. *Mullenix v. Luna*, 136 S.Ct. 305, 308 (2015) (per curiam) (citations and internal quotations omitted) (emphasis in original). "Such specificity is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Id.* (citations and internal quotations omitted). "Use of excessive force is an area of the law 'in which the result depends very much on the facts of each case,' and thus police officers are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue." *Kisela*, 138 S.Ct. at 1153 (quoting *Mullenix*, 136 S.Ct. at 309). "Precedent involving

similar facts can help move a case beyond the otherwise 'hazy border between excessive and acceptable force' and thereby provide an officer notice that a specific use of force is unlawful." *Id.* (quoting *Mullenix*, 136 S.Ct. at 312).

Here, the Elbert County Defendants are unaware of any Supreme Court or Tenth Circuit case establishing that it is a constitutional violation to use a Taser and fists on a suspect that was wanted for commission of a felony with a dangerous weapon, refused orders from the police to show his hands, and struggled with officers trying to put him in handcuffs. To the contrary, case law in this and other jurisdictions made clear that this level of force was warranted in these circumstances. *See, e.g.,* **Hinton v. City of Elwood**, 997 F.2d 774, 781 (10th Cir. 1993) (affirming grant of qualified immunity on excessive force claim where officers wrestled plaintiff to the ground and used a stun gun when he was actively resisting efforts to handcuff him); *Aldaba v. Pickens*, 844 F.3d 870, 876 (10th Cir. 2016) (no violation of clearly established law where officers tased patient who refused to get on his knees after several warnings); *Wilson*, 2010 U.S. Dist. LEXIS 31442, at *23 ("Mr. Wilson was suspected of a felony and, at a minimum, failed to comply with commands to stop reaching toward his right pocket. Less than twenty feet separated Officer Harris from Mr. Wilson as the two approached a fence. In the moment Officer Harris had to make a decision, it was objectively reasonable for him to decide to discharge his TASER once to subdue Mr. Wilson. Plaintiff has identified, and the Court is aware, of no authority for the proposition that a single TASER discharge in such circumstances is excessive."); *Hoyt v. Cooks*, 672 F.3d 972, (11th Cir. 2012) (qualified immunity granted to officers who repeatedly used Taser on arrestee who was on the ground but continued to struggle to avoid being handcuffed and later died). As such, Deputy Dickey and Sergeant Turner are entitled to qualified immunity even if Plaintiffs had stated

a claim for a constitutional violation against them.

### III. Without a Constitutional Violation There Can be No Municipal Violation

Plaintiff's Third Cause of Action claims Sheriff Tim Norton, in his official capacity, acted with deliberate indifference in hiring Deputy Dickey and thereby caused the claimed constitutional violation. However, without an underlying constitutional violation, there can be no claim for municipal liability on the part of the Sheriff. **Hinton**, 997 F.2d at 782 ("A municipality may not be held liable where there was no underlying constitutional violation by any of its officers."). Therefore, for all the reasons discussed above in Section II, the §1983 claim against the Sheriff should be dismissed as a matter of law.

### IV. Plaintiff Cannot Establish Willful and Wanton Conduct on the Part of the Individual Officers, and as a Result His State Law Claims Fail

Under their First, Fifth, Sixth, and Seventh Causes of Action, Plaintiffs attempt state law claims for wrongful death, negligence, assault, and battery against Deputy Dickey and Sergeant Turner. [ECF 43 at pp.8, 12-14]. These claims are subject to the Colorado Governmental Immunity Act ("CGIA"), C.R.S. §24-10-101 *et seq.*, which immunizes public entities and employees from tort claims except as provided in the statute. Plaintiff does not claim there is any applicable waiver under the CGIA, and as a result his tort claims can survive only if he demonstrates the officers' actions were willful and wanton. C.R.S. §24-10-118(2).

"In any action in which allegations are made that an act or omission of a public employee was willful and wanton, the specific factual basis of such allegations shall be stated in the complaint." Colo. Rev. Stat. § 24-10-110(5)(a). "[F]ailure to plead the factual basis of an allegation that an act or omission of a public employee was willful and wanton shall result in dismissal of the claim for failure to state a claim upon which relief can be granted." Colo. Rev. Stat. § 24-10-

110(5)(b). Alleging in conclusory fashion the defendant engaged in willful and wanton conduct is not sufficient to overcome immunity from suit under the CGIA. ***Gray v. Univ of Colo. Hosp. Auth.***, 284 P.3d 191, 199 (Colo. App. 2012).

"Although the CGIA does not define the term 'willful and wanton,' the majority of Colorado courts to address the issue have applied the following definition contained in Colorado's exemplary damages statute: willful and wanton conduct is 'conduct purposefully committed which the actor must have realized as dangerous, done heedlessly and recklessly, without regard to consequences, or the rights and safety of others, particularly the plaintiff.'" ***Lord v. Hall***, 2012 U.S. Dist. LEXIS 106237, *37 (D. Colo. July 31, 2012) (citing Colo. Rev. Stat. § 13-21-102(1)(b) and collecting cases) (dismissal modified to be without prejudice in ***Lord v. Hall***, 520 Fed. Appx. 687, (10th Cir. 2013)). Other divisions of this Court have held that where an officer's actions are found to be objectively reasonable for purposes of a Fourth Amendment claim, they are not willful and wanton for purposes of the CGIA. *See, e.g.,* ***Wilson***, 2010 U.S. Dist. LEXIS 31442, at *36 (dismissing state law battery and negligence claims where officer's use of force was objectively reasonable and plaintiff did not demonstrate officer failed to use reasonable and appropriate physical force to effect an arrest or otherwise acted in a willful and wanton manner); ***Lord***, 2012 U.S. Dist. LEXIS 106237, at *39 (officers' actions in pushing plaintiff into back of truck, tackling him, and punching him four times were objectively reasonable and did not constitute willful or wanton conduct); ***Sisneros v. Taylor***, 2011 U.S. Dist. LEXIS 26045, *26 (D. Colo. Mar. 10, 2011) (summary judgment granted in favor of police officer on state law claims of assault, battery, brutality, and outrageous conduct where plaintiff failed to show officer's conduct was objectively unreasonable).

Here, while the Complaint contains generic assertions of willful or wanton conduct, it fails to provide the specific factual basis for such allegations and instead relies on the same conduct forming the basis for the alleged torts. *See* Colo. Rev. Stat. § 24-10-110(5)(a); ***Drake v. City & Cnty. of Denver***, 953 F. Supp. 1150, 1160 (D. Colo. 1997) (where "allegations regarding the willfulness and wantonness of a governmental official's conduct are the same as form the basis of the underlying tort itself, plaintiff will not avoid application of the CGIA"). As discussed above in Section II, the actions of Deputy Dickey and Sergeant Turner were objectively reasonable given the facts and circumstances they were presented with, and there is no evidence that either officer acted heedlessly and recklessly, and without regard to consequences or to the rights of Mr. Poer. Because Plaintiffs' conclusory assertions of willful and wanton conduct do not withstand scrutiny, all of their state law claims should be dismissed pursuant to the CGIA as a matter of law.

## CONCLUSION

Plaintiffs state no claim for excessive force against Deputy Dickey and Sergeant Turner because their actions were objectively reasonable under the facts and circumstances at issue. Moreover, even if Plaintiffs could state a claim for a constitutional violation, Deputy Dickey and Sergeant Turner are entitled to qualified immunity as there was no violation of clearly established law. Because there is no underlying constitutional violation, there can be no municipal liability based on such claimed violation. Finally, Plaintiffs describe no willful and wanton conduct on the part of either of the officers, and their state law claims are therefore barred by the CGIA. As a result, the Elbert County Defendants are entitled to summary judgment on all the claims against them, and request that this case be dismissed in its entirety, as a matter of law.

Respectfully submitted this 22nd day of May, 2020.

/s/ Gillian Dale
Gillian Dale, Esq.
Mark S. Ratner, Esq.
Hall & Evans, L.L.C.
1001 17th Street, Suite 300
Denver, CO 80202
Telephone:     (303) 628-3300
Facsimile:     (303) 628-3368
daleg@hallevans.com
ratnerm@hallevans.com

**ATTORNEYS FOR DEFENDANTS TIM NORTON, CHRIS DICKEY, AND TRAVIS TURNER**

<u>**CERTIFICATE OF SERVICE (CM/ECF)**</u>

     I HEREBY CERTIFY that on the 22nd day of May, 2020, I electronically filed the foregoing **MOTION FOR SUMMARY JUDGMENT FROM ELBERT COUNTY DEFENDANTS** with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

     David N. Fisher
     Fisher & Byriaslen, PLLC
     4900 S. Syracuse Street, 9th Floor
     Denver, CO 80237

                             */s/ Denise Y. Gutierrez, Legal Assistant to*
                             Gillian Dale
                             Mark S. Ratner
                             Hall & Evans, L.L.C.
                             1001 17th Street, Suite 300
                             Denver, CO 80202
                             Phone: 303-628-3300
                             Fax: 303-628-3368
                             daleg@hallevans.com
                             ratnerm@hallevans.com
                             **ATTORNEYS FOR DEFENDANTS**
                             **TIM NORTON, CHRIS DICKEY, AND**
                             **TRAVIS TURNER**