

**OFFICE OF THE DISTRICT ATTORNEY**
GEORGE H. BRAUCHLER, DISTRICT ATTORNEY
18TH JUDICIAL DISTRICT
SERVING ARAPAHOE, DOUGLAS, ELBERT AND LINCOLN COUNTIES

6450 S. REVERE PARKWAY
Centennial, CO 80111
720-874-8500
FAX 720-874-8501

August 9, 2018

Sheriff Shayne Heap
Elbert County Sheriff's Office
751 Ute Ave
P.O. Box 486
Kiowa, CO 80227

RE:   April 12, 2018 – Officer-Involved Tasing of Christopher Poer (DOB: 94/71)

Dear Sheriff Heap,

On April 12, 2018, the 18th Judicial District Critical Response Team ("CRT") responded to and investigated an officer-involved use of force by Elbert County Sheriff's Office deputies. Deputy Dickey used a Taser device when taking Christopher Poer into custody. Mr. Poer was armed with a handgun at the time of his arrest, was actively resisting arrest, and was suspected of felony menacing and other erratic and criminal behavior, including multiple shots fired at approximately the same time as the arrival of Elbert County Deputies. Following his arrest, Mr. Poer died while in custody. The Elbert County Coroner ultimately found Mr. Poer's sudden death was due to a combination of amphetamine intoxication, dilated cardiomyopathy and the impact of the use of the Taser device. I have reviewed the evidence provided by the 18th Judicial District's Critical Response Team to determine whether there was any illegal use of force by the deputies who arrested Mr. Poer.

## EXECUTIVE SUMMARY

Applying the law to the facts of this incident, as described below, I conclude that Deputy Dickey was legally justified in his use of force. The use of force, including the use of the Taser device, was a reasonable, necessary, and appropriate use of force in order for Deputy Dickey to defend himself and other deputies from the threat posed by Mr. Poer, and take him into custody on April 12, 2017.

## MATERIALS REVIEWED AND INFORMATION CONSIDERED

Parker Police Department Detective Shannon Brukbacher is the lead Critical Response Team ("CRT") Investigator. I reviewed all materials provided by Detective Brukbacher including 911 calls and dispatch notes, reports regarding interviews with involved officers, deputies' body camera footage, written reports, and photographs.

1



## SUMMARY OF THE FACTS

On April 12, 2018, at 5:54 pm, Christopher Poer called the dispatch telephone number for the Elbert County Sheriff's Office. Mr. Poer stated that he had a strange story for the dispatcher. In my opinion, the version of events relayed by Mr. Poer can only be described as delusional, erratic, and bizarre. He said that he was being surveilled by unnamed people in a trailer, and that these mysterious individuals had placed recording devices and cameras everywhere, including inside the house in which Mr. Poer was calling from. Mr. Poer claimed that he had turned things around on these people and was now surveilling them.

After completing an unrelated call for service, Sgt. Turner called Mr. Poer back at approximately 6:57 pm and left a message for Mr. Poer. At 7:37 pm, Mr. Poer called dispatch again and now claimed that he had been robbed. Mr. Poer then put an individual named Elaine Holt on the phone. Ms. Holt told the dispatcher that Mr. Poer was seeing things and hearing voices, and she thought he was having a delusional episode. She told dispatch that Mr. Poer had her gun. She asked for someone to come because she did not know what was going to happen. She said that the gun was loaded and she would be staying in her bedroom. Ms. Holt stayed on the phone with dispatch and continued to describe what was happening while she watched Mr. Poer.

Deputy Dickey and Sgt. Turner, from the Elbert County Sheriff's Office, responded with lights and siren to Ms. Holt's residence, located at 4570 Private Road 188, Elizabeth CO, which is near the intersection of Private Road 188 and Hillside Trail. Deputy Bjork also responded. During the lights and siren response, Ms. Holt advised that Mr. Poer had her gun in his hand, that he had the gun pointed at her, and that Mr. Poer then went into the field outside her home where she could hear shots being fired as deputies arrived. Deputy Dickey also reported shots being fired from the field as he came on scene but that he could not tell where they were coming from in the field. He could also hear Mr. Poer yelling at the top of his lungs and noted that Mr. Poer sounded intoxicated.



Location of 911 call and use of force.

At approximately 8:00 pm, Deputy Dickey, Sgt. Turner and Deputy Bjork entered the field using Sgt. Turner's truck as cover. The field is described as being North of Private Road 188. Initially the Deputies and Sergeant could hear Mr. Poer yelling, but they could not see where he was due to darkening night. Two minutes later Deputy Dickey observed Mr. Poer lying on his back, partially concealed. When they approached, he rolled to his side and faced the deputies. Deputy Dickey stated Mr. Poer looked right at them with what he described as "a thousand yard stare[1]" and "looked straight through" them.

The deputies knew that Mr. Poer was armed with a firearm, that he had pointed the firearm at Elaine Holt, and that Mr. Poer had discharged the firearm. The Deputies heard gunshots and Mr. Poer yelling when they arrived. Thus, deputies appropriately approached the situation with extreme caution. On the body cam, a deputy yelled, "Get your fucking hands up, mother fucker. Put your hands up or I will shoot you. Put your fucking hands up or I'm gonna shoot your ass. Hands up mother fucker. Now. Hands up now or I'm going to shoot you. Sheriff's Office. Hands up or I'm going to shoot. Hands up do it now. Put your hands up...." It should be noted that police officers often use forceful language like this with armed subjects in order to get them to comply with their commands, which is aimed at preserving the life of both the officers and the armed subject. But, instead of putting his hands up, Mr. Poer's extended his hand as if reaching for something.

Sgt. Turner and Deputy Dickey later stated that they felt that Mr. Poer was trying to make the deputies shoot him. Deputy Dickey kicked Mr. Poer in his hip/torso area in an attempt to roll him onto his back. At this point Deputy Dickey observed a handgun near Mr. Poer's foot. As Deputy Dickey and Sgt. Turner attempted to take control of Mr. Poer, Deputy Bjork picked up the gun and secured it in the back of his waistband.

Mr. Poer continued to disregard commands to comply and struggled to keep his hands under his mid-section. The deputies were concerned that he had another gun – they fought to control his arms but were initially unable to handcuff Mr. Poer due to his active resistance. Deputy Dickey deployed his Taser device and the prongs entered both sides of Mr. Poer's back at his waistband. Deputy Dickey then also delivered a drive stun by placing the Taser against Mr. Poer's leg. The Taser report indicated two 5 second deployments were utilized. Mr. Poer continued to resist despite the use of the Taser device. Sgt. Turner then struck Mr. Poer in the head to subdue him and the deputies were finally able to handcuff him.

Almost immediately the deputies noticed that Mr. Poer was foaming at the mouth and they called on the radio for an emergency medical response. Shortly after this call was made, Sgt. Turner radioed that Mr. Poer did not have a pulse and began rendering CPR. The deputies put Mr. Poer in their patrol truck and continued CPR as they drove him to an ambulance waiting outside the field. At about 8:15 pm, Mr. Poer was turned over to Rattlesnake Fire Department for continued life-saving measures. During transport to the hospital Mr. Poer was intubated.

At 9:06 pm, Mr. Poer was pronounced deceased by Dr. Nathan Scherer at the hospital.

Dr. Daniel Lingamfelter of the El Paso County Coroner's Office conducted an autopsy of Mr. Poer. Mr. Poer had two contused puncture sites in his lower back consistent with Taser injuries.

---

[1]. A "thousand yard stare" is described as a "blank, unfocused gaze."

3

He also had a toxic-lethal level of amphetamine in his blood. The El Paso County Coroner noted Mr. Poer's significant medical conditions included hypertension, obesity, chronic alcohol abuse, congestive heart failure, and chronic kidney disease (stage III). The Coroner found Mr. Poer's cause of death was sudden death associated with amphetamine intoxication, dilated cardiomyopathy, and Taser deployment. The manner of death was a homicide[2]. The mechanism of his death was drug abuse and Taser deployment.

## SCENE DOCUMENTATION AND EVIDENCE COLLECTION

Detective Brukbacher collected and photographed Ms. Holt's Sig Sauer .380 handgun that Deputy Bjork retrieved near Mr. Poer. Detective Brukbacher noted the magazine in the handgun was empty and the slide was locked back.

David Yocum, Colorado Bureau of Investigation (CBI) Analyst, photographed the scene around Ms. Holt's home and the field. He also photographed the deputies involved in the incident. He photographed Sgt. Turner's handgun, rifle, and marked pickup truck. He also photographed call and text information on Ms. Holt's phone with her consent.

Deputy Dickey provided the Taser used in the incident. District Attorney Investigator Derrick Stuckey collected the Taser cartridge and attached wires that were deployed. Ms. Holt provided the police with Mr. Poer's personal belongings, including medications.

## WITNESS INTERVIEWS

Detective Shannon Brukbacher, Greenwood Village Investigator Lenny Abeyta, and DA Investigators Brian Ahlberg, Mike Heylin, Matthew Stoneberger, Amber Urban, and Marc White assisted in interviewing all involved deputies. Their accounts are consistent with the summary provided above.

Investigator Michael Garnsey interviewed Ms. Holt. Ms. Holt raises service dogs. She stated that a month prior, Mr. Poer contacted her because he wanted to obtain a service dog. She did not know him previously. She stated he was retired Special Forces and she found him a suitable dog in Rhode Island. About a week prior to this incident, they made plans for him to come to Colorado to see the dog and meet his friend in Grand Junction.

Mr. Poer told her that he had severe medical problems, including pulmonary edema, acute respiratory failure, heart failure, alcoholism and that he had been in a coma for two weeks in October of 2017. Ms. Holt provided sixteen bottles of Mr. Poer's pills to Investigator Garnsey.

On April 11, 2018, Mr. Poer told her he had been off his medication for three days. He told Ms. Holt that he was having a tough day and told her to hide her .380 handgun.

---

[2]. It should be noted that the term "homicide" when used by coroners is a term of art, meaning that death was caused, at least in part, by the actions of a human being, as opposed to other manners of death, such as accident, suicide, or natural causes. The classification of the death as a homicide by the coroner is not in any way indication by the coroner of criminal culpability, just that the death was caused, at least in part, by human intervention.

4

On April 12, 2018, Mr. Poer was acting very paranoid according to Ms. Holt. He was convinced Ms. Holt's phone was tapped and that people in an RV parked in the driveway were looking at them through the window. He told her to give him her gun. She was concerned what would happen if she did not cooperate so she gave him the gun. He went outside, yelling at the RV and pointing the gun at it. He was convinced people were surveilling him so he called the Elbert County Sheriff's Office.

DA Investigator Daniel Steele conducted a follow-up interview with Ms. Holt. During this interview, she added that Mr. Poer asked for magazines after she gave him the gun. Ms. Holt had previously hidden the magazines, but she gave them to him because she was afraid what he would do if she refused.

Mackenzie Gannon, a neighbor, provided a written statement to Deputy Bjork. Around 7:50 to 8:00 pm, she observed Mr. Poer walking up and down the fence line carrying a gun. He was stumbling, falling down, sitting down and sitting back up. He was mumbling. At one point, Mr. Poer laid down in the grass like was hiding from something. The police then came and got him.

Weston Shellanbarger, who was living in a trailer on a neighbor's property, also provided a written statement to Deputy Bjork. He observed Mr. Poer wildly shooting a handgun and yelling near the property line. At one point, Mr. Poer stumbled and fell down. He was shooting in the air, towards Mr. Shellanbarger's home and other nearby residences. When the police responded down the road, Mr. Poer ducked and laid down in the grass. The police located him and attempted to arrest him.

## APPLICABLE LAW

My review of this event is guided by the Colorado staututes pertaining to the use of force. Colorado law applies different standards to the use of force depending on whether the force can be described as "deadly physical force" or not. Deadly physical force is described as "force, the intended, natural, and probable consequence of which is to produce death, and which does, in fact, produce death." The question of whether the use of a Taser device constitutes deadly physical force determines which statutory standard applies to a peace officer's use of force. So, the first legal question that must be answered is whether the use of the Taser device constituted the use of "deadly physical force." In order for the use of the Taser device to constitute deadly physical force, the use of the device must have the intended, natural, and probable consequence of producing death.

### Does Use Of A Taser Device Constitute "Deadly Physical Force?"

Tasers can be described as a conducted energy device ("CED"). CEDs work by incapacitating volitional control of the body by creating involuntary contractions of muscle, causing subjects to lose the ability to directly control their voluntary muscles. CEDS stimulate motor nerve and muscle tissue, overriding central nervous system control and causing incapacitation. The effect terminates after the electrical discharge stops. In 2011 the United States Department of Justice released a report titled "Study of Deaths Following Electro Muscular Disruption."[3]

---

[3] https://www.ncjrs.gov/pdffiles1/nij/233432.pdf

According to the study:

> There is no conclusive medical evidence in the current body of research literature that indicates a high risk of serious injury or death to humans from the direct or indirect cardiovascular or metabolic effects of short-term CED exposure in healthy, normal, nonstressed, nonintoxicated persons. Field experience with CED use indicates that short-term exposure is safe in the vast majority of cases. ***The risk of death in a CED-related use of-force incident is less than 0.25 percent, and it is reasonable to conclude that CEDs do not cause or contribute to death in the large majority of those cases.***
>
> Law enforcement need not refrain from using CEDs to place uncooperative or combative subjects in custody, provided the devices are used in accordance with accepted national guidelines and appropriate use-of-force policy. The current literature as a whole suggests that deployment of a CED has a margin of safety as great as or greater than most alternatives. Because the physiologic effects of prolonged or repeated CED exposure are not fully understood, law enforcement officers should refrain, when possible, from continuous activations of greater than 15 seconds, as few studies have reported on longer time frames.

Additionally, appellate precedent that I have found indicates that CEDS such as a Taser device are not considered to be deadly weapons. *Fils v. City of Aventura*, 647 F.3d 1272, 1276 (11th Cir. 2011) ('A 'taser; is a non-deadly weapon commonly carried by law enforcement"); *Bryan v. MacPherson*, 630 F.3d 805, 810 (9th Cir. 2010) (Describing the use of a Taser as an "intermediate" level of force"); *McKenney v. Harrison*, 635 F.3d 354, 362 (8th Cir. 2011) ("the Taser, in general, is more than a non-serious or trivial use of force but less than deadly force.")

All of this leads me to conclude that the use of a Taser device does not constitute the use of deadly physical force because the intended, natural, and probable consequence of Taser use is *not* to produce death.

The use of physical force other than deadly physical force by a peace officer is described in C.R.S. 18-1-707, which states in relevant part:

> (1) . . . a peace officer is justified in using reasonable and appropriate physical force upon another person when and to the extent that he reasonably believes it necessary:
> (a) To effect an arrest or to prevent the escape from custody of an arrested person unless he knows that the arrest is unauthorized; or
> (b) To defend himself or a third person from what he reasonably believes to be the use or imminent use of physical force while effecting or attempting to effect such an arrest or while preventing or attempting to prevent such an escape.

Based on the fact that Mr. Poer had a deadly weapon, namely a handgun, had pointed the weapon at another person, had been firing the weapon when police arrived, and had disregarded police instructions, and had physically resisted arrest, any peace officer confronting Mr. Poer would have been justified in using a Taser device in the course of arresting Mr. Poer.

## ANALYSIS AND CONCLUSION

Based on my review of all the evidence in this case, I find that Deputy Dickey acted appropriately when he used the Taser device on Mr. Poer and that he complied with all Colorado statutes with respect to the use of force by a peace officer.

Instead of using their own firearms and employing deadly force against Mr. Poer, the deputies sought to use less-than-lethal force by using the Taser device on him. Even after being subjected to the Taser device, Mr. Poer continued to resist.

Mr. Poer had consumed a toxic-lethal level of amphetamines and the use of the Taser, combined with his drug consumption and health issues, caused his death. According to the toxicology report, Mr. Poer had 565 ng/mL of amphetamine, 36 ng/mL of diazepam, 36 ng/mL of nordiazepam, and 773 ng/ml of citalopram in his system. At the time of the use of the Taser, none of the deputies were aware of the toxic level of amphetamines in his system. Nor were they aware of his medical conditions such as his chronic stage III kidney disease and congestive heart failure. It was only afterwards that law enforcement learned from Ms. Holt about his medical conditions.

*Elizabeth A. Oldham*
Elizabeth A. Oldham
Chief Deputy District Attorney
18th Judicial District Attorney's Office