**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**


Civil Action No. 19cv01088 (LTB)(NRN)


SHERRY POER, as Administratrix of the Estate of Christopher Poer, Deceased, and
G.P. and M.P. as Surviving Minor Children of Deceased,
Plaintiffs,

v.

SHERIFF TIM NORTON, in his official capacity,
DEPUTY CHRIS DICKEY, and
SERGEANT TRAVIS TURNER,

　　　　Defendants.

---

**PLAINTIFFS' RESPONSE TO**
**AMENDED RENEWED MOTION FOR SUMMARY JUDGMENT**

---

**<u>Introduction</u>**

Christopher Matthew Poer was a distinguished and decorated former member of the

Green Berets.  He served with distinction in Iraq and Afghanistan and he received the Bronze

Star with V device for gallantry while single handedly fighting off a counterattack by Mullah

Omar's bodyguards.  After he came home from war, Mr. Poer suffered from PTSD.

On April 12, 2018, Mr. Poer was experiencing paranoid delusions due to his PTSD.  Mr.

Poer called the police looking for help.  The Defendant police officers knew that Mr. Poer may

1

have been delusional and suspected that he was in the throes of a mental health crisis.  The

Defendants were trained that, when dealing with a person in a mental crisis, they should deal

with that person in a calm and reassuring way and let the person know that they are there to help.

In contradiction to that training, the Defendants decided to use stealth in order to sneak up on

Mr. Poer and to surprise and ambush him, thus creating a chaotic atmosphere where extreme

force might have to be used to bring the situation to a close.

When the Defendants approached Mr. Poer, they immediately secured the only gun in

question, thus obviating the need for deadly force to protect themselves and others.  *After* the

Defendants secured the gun, they used unreasonable and excessive force in order to take Mr.

Poer into custody.  *After* they secured the gun, the Defendants proceeded to stomp Mr. Poer on

his back.  *After* they secured the gun, the Defendants proceeded to tase Mr. Poer for more than

10 seconds delivering the maximum force capable with the taser by delivering a "drive stun" in

addition to the taser prongs coursing electricity through Mr. Poer's body.  The Defendants then

failed to give Mr. Poer an opportunity to give his hands and proceeded to knock Mr. Poer

unconscious by punching him "hard" in his face and head at least five times.  Mr. Poer died that

evening due to this excessive force.

At least one of the defendants was no stranger to such situations.  Recently forced to

resign from a different Sheriff's Department in large part because of his penchant for the use of

excessive force, Deputy Chris Dickey was hired by the Elbert County Sheriff through hiring

practices that permitted his hire despite his extensive record of excessive force, including (as in

this case) taserings and beatings of subdued persons.

## RESPONSE TO DEFENDANTS' INTRODUCTION

Defendants make several statements in their "Introduction" that are factually disputed in this case:

1.     Defendants claim that "just prior to [the] arrival [of Dickey and Turner, Poer "feloniously menaced another individual with their own loaded gun."  In fact, the actions that prompted police to be called occurred not "just prior" to their arrival, but approximately 30 minutes prior.  When the Defendants decided to ambush Mr. Poer, he was in a rural open field without a single person within hundreds of yards from him and he had not fired the gun in over eight minutes.

2.     Defendants claim that Mr. Poer "refused to obey lawful commands by the deputies."  In fact, Mr. Poer was following commands:  The gun was on the ground by his feet, he put his hands outstretched in front of him, he allowed his one hand to be cuffed and he couldn't get his other hand out from under his body because Deputy Bjork was pining his right hand under his weight and Poer could not move his body and give his hand while being incapacitated by the Taser.

3.     Defendants claim that Mr. Poer "refused"...."to show his hands."   In fact, Mr. Poer did show his hands.

4.     Defendants claim Deputy Dickey and Sergeant Turner used reasonable means "to force an otherwise non-compliant suspect to surrender." In fact, by the time the Defendants tased and punched Mr. Poer in his face and head, he was compliant and had already surrendered and the gun had already been safely secured.  The force employed thereafter was not to compel his compliance, rather, Mr. Poer was already disarmed and completely subdued. When he was tased

and beaten, he was lying face down on the ground and Deputy Bjork was aggressively kneeling on his back pinning his right hand below his body.

5.      Defendants claim that they "tas[ed] and punch[ed] him in the face, only after verbal commands were ineffective." In fact, by the time Defendants tased and beat Mr. Poer, he was compliant and had already surrendered. Lying face down with Deputy Bjork kneeling on his back, he was completely subdued.

6.      Defendants claim that Mr. Poer's "death was largely due to a myriad of health issues, including an enlarged heart and a litany of drugs in his bloodstream, including a lethal level of amphetamines."  In fact, Mr. Poer's death was caused by the Defendant's kneeling on his back aggressively, stomping on his back and then Tasing and beating him about the head and face.

7.      Defendants claim that "the record is completely devoid of any custom, practice, policy, or procedure, which might establish constitutional liability against Sheriff Tim Norton, in his official capacity."  As explained further below, Sheriff Heap decided to hire Defendant Dickey despite being aware that Dickey had been found to have violated the use of force policy several times in his prior job at Commerce City and Commerce City had to pay out close to one million dollars in excessive force lawsuits related to Dickey's prior uses of force.

## RESPONSE TO DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS

1. Admit.

2. Admit

3. Admit

4. Admit

5. Admit

6. Admit

7. Admit

8. Admit

9. Admit

10. Admit

11. Admit

12. Admit

13. Admit

14. Admit

15. Admit

16. Admit

17. Admit

18. Admit

19. Admit

20. Admit

21. Admit

22. Admit

23. Admit

24. Admit

25. Admit

26. Admit

27. Admit

28. Admit

29. Admit

30. Admit

31. Admit

32. Admit, however, it should be noted that this decision to approach Mr. Poer was approximately 8 minutes after the last shot had been fired.

33. Admit, however, Sergeant Turner expressed reservations about approaching Poer at this point and in this manner.

34. Admit.

35. Admit.

36. Admit.

37. Admit.

38. Admit.

39. Admit.

40. Admit, that this is what Defendant Dickey said happened.

41. Admit.

42. Admit.

43. Admit.

44. Deny.

45. Deny.

46. Admit.

47. Deny.

48. Admit.

49. Admit.

50. Admit.

51. Deny.

52. Admit that this is what Defendant Dickey said, however, there was no actual reason to believe that Mr. Poer had more than one weapon which was already secured by Deputy Bjork.

53. Admit that they said this, however, see above.

54. Deny.

55. Admit.

56. Admit.

57. Admit.

58. Deny that the taser deployments were unsuccessful.  Admit that Turner punched Mr. Poer in his face/head area five times.

59. Admit.

60. Admit.

61. Admit.

62. Admit.

63. Admit.

64. Admit.

65. Admit.

66. Admit, however, the level of amphetamine was not necessarily lethal (see SADF below).

67. Admit that this was the Coroner's Final Diagnosis, but Deny that this was the actual cause of death.

68. Admit that this was in the Coroner's report.

69. Admit that this was in the Coroner's report.

70. Admit that the manner of death was homicide.  The rest of this paragraph is legal argument.

71. Admit, however, this is irrelevant as this is not something that the Defendants knew at the time they confronted Mr. Poer.

72. Admit, however, this is irrelevant as this is not something that the Defendants knew at the time they confronted Mr. Poer.

73. Deny.

74. Deny.

75. Deny.

76. Admit that Oldham wrote these things in her report.

77. Admit that this is listed in the Sheriff's Office Incident Report.

## **Statement of Additional Disputed Facts (SADF)**

1.      Christopher Matthew Poer was a veteran of the Green Berets and served as an 18C Engineer Sergeant at the 5th Special Forces Group. (Ex. A, Poer Biography.)

2.      Following the attacks of 9-11, Mr. Poer deployed to Afghanistan in support of Operation Enduring Freedom. (*Id*.)

3.      Mr. Poer played a key role on the mission to kill or capture Mullah Omar in January of 2002.  (*Id*.)

4.      For his actions on this mission, Mr. Poer was awarded the Bronze Star with V device for gallantry while single handedly fighting off a counterattack by Mullah Omar's bodyguards. (*Id*.)

5.      SFC Poer went on to serve in Operation Iraqi Freedom as well as serving as a Master Breacher for the 5th Special Forces group crisis response hostage rescue team. (*Id*.)

6.      After being recruited by the Central Intelligence Agency, Mr. Poer left active duty military service and served in a counter-terrorism capacity throughout the world. (*Id*.)

7.      Mr. Poer worked with the United States Military Academy Department of Military Instruction and guest lectured on Ethics in War classes given to cadets. SFC Poer also served as a cadet mentor and earned a Master's degree from Framingham State University. (*Id*.)

8.      SFC Poer is survived by his daughter MP (19) and his son GP (17); parents, Doug and Sherry Poer and sister, Ashley Poer. (*Id*.)

9.      Mr. Poer struggled with PTSD after returning home from war. (*Id*.)

10.     On April 12, 2018, Mr. Poer was suffering from delusions associated with his PTSD and he called the police for help. (*Id*. and Doc. 82, MSUMF 3).

11.     Mr. Poer was telling the police dispatcher that people were surveilling him and he believed that they had bugged his phone and set up surveillance in his home. (MSUMF, 3 - 5).

12.     Defendants Dickey and Turner were relayed this information from the police dispatcher in real time. (*Id*., 6).

13.     These calls were labeled in the dispatch system as a CIT Assist. (Ex. B, Dickey Deposition, 24: 18-25).

14.     Deputy Dickey knew that the initial calls from Mr. Poer was regarding a call for service from someone who was experiencing mental health issues and needed help. (*Id.*, 20: 9-15).

15.     Deputy Dickey was a Crisis Intervention Trained ("CIT") officer and he had been certified and trained in how to deal with people who were suffering from bouts of emotional crisis. (Ex. B, 25: 1-22).

16.     Defendant Dickey had never met Mr. Poer before this day, and he did not know anything about Mr. Poer other than the radio runs that he had heard from dispatch. (*Id*., 20: 18-21).

17.     Defendants Dickey and Turner were also given Mr. Poer's phone number as part of the dispatch information that they received that day. (*Id*., 26: 19-23).

18.     As part of his CIT training and certification, Defendant Dickey was trained that he should deal with a person in crisis by talking to that person in a calm and reassuring way. (*Id*., 30: 1-5).

19.     That CIT training also teaches that the officer should identify themselves as a member of law enforcement and tell the person that they are there to help. (*Id*., 30:6-15).

20.     When the defendants arrived on the scene that evening, they did not follow that CIT training.  Defendant Dickey admits that he had Mr. Poer's phone number and *chose* not to call him to identify himself as an officer and that he was there to help and that Mr. Poer should come to them slowly after putting the gun down. (*Id*., 66:21-25, 67:1-16).

21.     Defendant Dickey also agreed that he and Turner could have attempted to use the PA system in their police vehicle to attempt to contact Mr. Poer and *chose* not to do so. (*Id*.).

22.     Instead, Defendant Dickey devised a plan to use stealth to ambush Mr. Poer despite his CIT Training and despite the fact that he already knew that Mr. Poer was suffering from paranoid delusions and wanted help from the police. (*Id*., 63-64).

23.     When the Defendants arrived on the scene, Mr. Poer was in a wide-open field in a very rural area in Elbert County. (*Id.*, 38:7-25, 39:1-8).

24.     Ms. Holt was inside of her house and Mr. Poer was not close to any other people. (*Id.,* 38:3-9).

25.     This was not an active shooter situation or a hostage situation and, although Mr. Poer had fired several rounds into the air, there were no people close by or in immediate danger. (Id. 57-62).

26.     Despite his CIT training to the contrary, Defendant Dickey devised a plan to approach Mr. Poer by stealth without first trying to make contact with him and this was approximately eight minutes since Mr. Poer last fired a shot into a field in a rural area with no other people in close proximity. (Id. 69:8-25, 70:1-8).

27.     Defendant Turner was the Sergeant on the scene, and he was Defendant Dickey's superior officer. (Id. 52:5-7).

28.     Defendant Dickey devised the plan to approach Mr. Poer using stealth and his superior officer Defendant Turner expressed appropriate reservations about proceeding with such a plan. (*Id*., 49: 17-20).

29.     Such a plan was not in line with police training in dealing with people suffering from an emotional crisis and is not what a reasonably trained and prudent police officer would have done in this situation. (Ex. E, Powers Report, Page 16).

30.     The proper course of action would have been to, "set up behind the truck at a further distance, and to attempt to verbally de-escalate the situation with Mr. Poer. That would have given them the advantage of time, distance, and cover." (Ex. E,  pg. 16).

31.     The Defendants also failed to comply with their training when they failed to have an ambulance waiting close by which caused a longer gap in time until Mr. Poer could get medical treatment.  (Ex. E, pg. 14)

32.     When the Defendants approached Mr. Poer in the open field he was lying on his right side, down on the ground, with his arms extended out in front of him. (Defendants' Ex. H, Body Worn Camera, at 11:36).

33.      The flashlight of Defendant Dickey shifted and Poer is no longer in view of the BWC until the 11:41 mark of the video. It is clear that Poer did not move from the original position he was in at the 11:38 mark. (Id).

34.     During this initial approach, Mr. Poer had his hands outstretched in front of him and the gun in question was down below his feet closer to his right foot. (Ex. C, drawing made by Defendant Dickey, and Ex B, 79: 4-20).

35.     Defendant Dickey then kicked Mr. Poer in his hip in order to get him flat on his stomach on the ground. (*Id*., 81:24-25, 82: 1- 5).

36.     Once Mr. Poer was on his stomach, Defendant Dickey saw the gun by Mr. Poer's feet and instructed Deputy Bjork to grab the gun. (Ex. D, Bjork Deposition, 14: 1-16).

37.     Deputy Bjork grabbed the gun and secured it in his waistband. (*Id.*).

38.     Defendant Turner then stomped "plenty hard enough" on Mr. Poer's back with his booted foot. (Ex. F, Turner Deposition, 63-64).

39.     There was only one gun reported as being involved in this situation and the officers had now secured that gun before they used a taser on Mr. Poer and before they punched him in the head five times. (*Id.*).

40.     The officers did not see any other weapons during this entire encounter. (Ex. D, Bjork Deposition, 28:14-23).

41.     The officers had no specific reason to believe that Mr. Poer had any other weapons other than the gun that they had already secured. (Ex. B, 70:21-25, 71:1-14 and Ex. F, 63: 1-6).

42.     After the officers secured the only gun in question, Mr. Poer was laying face down in the prone position and Deputy Bjork had his knee on Mr. Poer's back. (Ex. D, 21: 13-22).

43.     Deputy Bjork weighed 205 pounds at the time and he was purposely placing his weight on Mr. Poer's back. (*Id.*, 22: 9-22).

44.     Defendant Dickey then tased Mr. Poer for two five second cycles while also using a drive stun technique. (Ex. B, 137-138).

45.     Deputy Bjork was able to secure Mr. Poer's right hand in a handcuff while Mr. Poer was being tased by Defendant Dickey. (*Id.*, 20: 2-15).

46.     Defendant Dickey delivered this taser deployment using the drive stun while the taser prongs were in place in order to deliver the maximum amount of electrical current spread throughout Mr. Poer's large muscles in order to make the deployment most effective. (*Id*.).

47.     At the time Defendant Dickey deployed the taser in this fashion on Mr. Poer, Deputy Bjork and Defendant Turner were each holding one of Mr. Poer's arms. (*Id*., 140 -141).

48.     This tasing was taking place *after* the gun had already been secured. (*Id*., 140: 3-5).

49.     The police never found a second weapon. (Ex. B, 140: 6-8).

50.     *"Immediately"* after the tasing, Defendant Turner hit Mr. Poer in his head and face five times. (Ex F, Turner Deposition, 80:14-21).

51.     At the time of the incident, Defendant Turner was 6 feet 4 inches tall and weighed approximately 230 pounds. (*Id.*, 14: 3-7).

52.     When he punched Mr. Poer in the face and head, Defendant Turner admits that he hit him "hard".  (Ex. F, 75: 2-3)

53.     In fact, Defendant Turner believes that his blows to the head and face rendered Mr. Poer unconscious. (*Id*., 75: 9-10).

54.     Such a use of force is considered to be a use of deadly force. (Ex. E, Powers Report, pg. 16.)

55.     Defendant Turner did not give Mr. Poer enough time to give his hands between the time that he was tased and the time he applied this deadly force. (Ex F, 80: 14-21, and Exhibit E, pg. 16).

56.     Police are trained that when using a taser, this physically incapacitates a person's muscles, and they must give a suspect time and opportunity to comply with commands after applying such incapacitation through the use of a taser. (Ex. E,  pg. 16).

57.     At the time Defendant Turner delivered these five blows to Mr. Poer's head, Turner had no reason to believe that Poer had any other weapon other than the one that had already been secured by Deputy Bjork. (Ex. F, 63: 1-6).

58.     At the time that Defendant Dickey used his taser on Mr. Poer, Mr. Poer was, at most, using passive resistance in not giving his hands, and perhaps already unconscious. (Ex. E, pg. 16).

59.     At the time that Defendant Turner used deadly force by hitting Mr. Poer "hard" in the face and head five times and knocking him out, Mr. Poer was, at most, using passive resistance by not giving his hands and perhaps already unconscious. (Ex. E, pg. 16).

60.     Mr. Poer may not have even been passively resisting at this point because the combination of Deputy Bjork putting his weight on Mr. Poer's back and the incapacitating effects of the taser deployment may have rendered Mr. Poer completely incapable of getting his hand from under his body and the officers did not afford him the chance to comply with their demands that he give his hands. (Ex. E, pg. 16).

61.     According to Dr. Judy Menick, Mr. Poer died from the "combined effects of blunt trauma to the head, restraint, and Taser deployment in the setting of underlying amphetamine intoxication, dilated cardiomyopathy from chronic alcoholism, and hypertensive arteriosclerotic cardiovascular disease with morbid obesity". (Ex. G, Dr. Melnick Report, pg. 3).

62.     According to Dr. Judy Menick, the levels of amphetamine in Mr. Poer's bloodstream may not have in fact been a "lethal" dose because of the level of decomposition of Mr. Poer's body at the time his blood was tested may have likely caused a falsely elevated level of the drug in his bloodstream. (*Id.*, pg. 4).

63.     According to Dr. Melnick, Mr. Poer's death would not have occurred absent the conduct of the Defendant police officers. (*Id.*, pg. 6).

64.     Defendant Dickey was employed as a police officer at the Commerce City Police Department ("CCPD") before he was hired by the Elbert County Sheriff's Office ("ECSO"). (Ex B, 5: 8-21).

65.     While at the CCPD, Defendant Dickey was involved in several uses of force. (*Id.* 10:4-7).

66.     There was one instance where Defendant Dickey tased a man 5 times who was in the throes of a diabetic shock medical emergency while Defendant Dickey mistakenly thought that the man was drunk. (*Id.*, 10: 4-24).

67.     Dickey also hit this man with a baton. (Ex. H, Dickey Dep Tr. from Leadholm Case, 58: 3-6).

68.     The man suffered a broken bone and various other injuries.  (*Id.* 108: 12-21).

69.     CCPD had to pay over $700,000 to resolve this case in court. (No. 16-cv-2786-MEH Docs. 166 and 190).

70.     This lawsuit was public record and Sheriff Heap knew about this incident when he decided to hire Defendant Dickey. (Ex. I, Heap Dep. Tr., pgs. 18-20).

71.     According to Ms. Powers, it should have been plainly obvious to Sheriff heap that hiring Deputy Dickey after CCPD instructors had concluded that Dickey had violated CCPD use of force policy several times and had recommended his termination for these violations, that the hiring of Deputy Dickey would again lead to another use of force violation by Deputy Dickey while working for the ECSO. (Ex. E, pg. 18).

72.     While at CCPD, Defendant Dickey also had an incident where he tased an unarmed man during a protest despite his superior officer telling him not to do this. (Ex. B, 117:10-15).

73.     CCPD had to pay $175,000 to resolve this incident. (*Id*.).

74.     Sheriff Heap was aware of this matter when he hired Defendant Dickey. (Ex. I. pgs. 18-20).

75.     While he was at CCPD, Defendant Dickey was chasing a teenager in an apartment complex. (Ex. B, 11:1-12).

76.     This incident was caught on Defendant Dickey's body worn camera. (*Id*.).

77.     At one point in the video, Defendant Dickey came around the corner and saw the man prone on the ground with his hands spread out to his sides and he was already covered by his partner at gunpoint. (*Id*.).

78.     Defendant Dickey can be heard on the BWC saying oooh, let me tase him. (*Id*.).

79.     Defendant Dickey then approached the man, took out his gun and placed the gun into the man's back and neck area so hard that the gun came out of battery and left a mark on the man's back and neck. (*Id*.).

17

80.     CCPD instructors concluded that Dickey had violated CCPD's Use of Force policy for all three of the above incidents and decided they were going to terminate him for these three uses of force violations. (Ex. B, 11-12).

81.     However, CCPD gave Dickey the option to quit in lieu of termination and Dickey did so. (*Id*.).

82.     At the time Sheriff Heap hired Defendant Dickey, he was aware of all of the above misconduct by Defendant Dickey and chose to hire him despite this knowledge. (Ex. I., (18-20).

## RESPONSE TO DEFENDANTS' LEGAL ARGUMENT

Summary judgment is appropriate only if the record shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists when "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The moving party -- here, the defendants -- must show the absence of a genuine issue of material fact, *see Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986), with the evidence taken in the light most favorable to the non-moving party -- here, Mr. Poer. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). Defendants fail to meet these standards:

A.     The officers' use of force was excessive and unreasonable;

B.     Clearly-established law put the officers on notice that their conduct would violate Mr. Poer's constitutional rights; and

C.      Disputed issues of fact preclude summary judgement on Mr. Poer's official capacity claim.

Defendants also move to dismiss Mr. Poer's state law claims under Rule 12(b)(6).  As discussed below, however, the defendants cannot satisfy their burdens and this Court should deny their request.

## A.      THE OFFICERS' USE OF FORCE WAS EXCESSIVE AND UNREASONABLE.

Defendants rely upon caselaw that largely concerns the level of force that is reasonable when the goal is to subdue a suspect.  Here, however, the issue is different:  The question is whether the defendants violated the Fourth Amendment by using excessive force *after* the threat of serious physical harm to the officers had passed. *McCoy v. Meyers*, 887 F.3d 1034, 1050 n. 19 (10th Cir. 2018)((("[F]orce justified at the beginning of an encounter is not justified *even seconds later* if the justification for the initial force has been eliminated." (alteration in original). Because the facts are disputed on this issue, the officers are not entitled to summary judgment. Cf.  *Weigel v. Broad*, 544 F.3d 1143, 1151–52 (10th Cir. 2008).

In assessing whether "officers' actions are objectively reasonable in light of the facts and circumstances confronting them," *Graham v. Conner,* 490 U.S. 386, 388 (1989), reasonableness is evaluated under a totality of the circumstances considering the following factors: "the severity of the crime at issue, ***whether the suspect poses an immediate threat to the safety of the officers*** or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Conner,* 490 U.S. 386, 396 (1989) (emphasis added).

1.      *The defendants did not face an immediate threat to their safety at the time they used excessive force.*

The second *Graham* factor -- whether there was an immediate threat to the officers' safety -- is undoubtedly the most important and fact intensive factor in determining the objective reasonableness of an officer's use of force." *Reavis Estate of Coale v. Frost*, 967 F.3d 978, 985 (10th Cir. 2020)(internal quotations omitted). The question is, *at the time the force is applied*, does the suspect pose an *immediate* threat to the safety?

In evaluating the second *Graham* factor, courts must look at whether the officers [or others] were in danger "'at the precise moment that they used force.'" *Vette v. K-9 Unit Deputy Sanders*, 989 F.3d 1154, 1170 (10th Cir. 2021), quoting *Emmett v. Armstrong*, 973 F.3d 1127, 1136 (10th Cir. 2020).

In assessing reasonableness, this court "looks at the facts and circumstances as they existed at the moment the force was used, while also taking into consideration the events leading up to that moment." *Emmett v. Armstrong*, at 1135. "'The reasonableness of [the officers'] actions depends both on whether the officers were in danger at the precise moment that they used force and on whether [their] own reckless or deliberate conduct during the seizure unreasonably created the need to use such force.'" *Reavis estate of Coale, supra*, at 699 (quoting *Sevier v. City of Lawrence*, 60 F.3d 695, 699 (10th Cir. 1995) (footnote omitted). If the danger has passed, the use of force is excessive.

In *Estate of Smart by Smart v. City of Wichita*, 951 F.3d 1161 (10th Cir. 2020), the Tenth Circuit reversed the district court's grant of qualified immunity under circumstances

instructive of the issue here. In *Smart*, several facts, taken in the light most favorable to the plaintiffs, could have enabled a reasonable jury to conclude that the defendant police officer, "had the opportunity to perceive that any threat [posed by Mr. Smart] had passed by the time [the officer] fired his final shots":

> The plaintiffs' biomechanics expert opined Mr. Smart's bullet wounds could not have been inflicted while he was hunched forward as Officers Froese and Chaffee described Mr. Smart's posture when fleeing. Also, the plaintiffs' medical expert explained that Mr. Smart's three 'shored' bullet wounds indicated he had been shot three times in the back, while on the ground. From this evidence, a reasonable jury could conclude that by the time Officer Chaffee fired his final shots, Mr. Smart was lying face down on the ground with his arms stretched out, was unarmed, and had time to 'look[ ] back' at Officer Chaffee and shake his head.

*Id.* at 1175 (citation omitted). The Tenth Circuit reversed the district court's grant of qualified immunity with respect to the final shots because "Officer Chaffee violated clearly established law if he shot Mr. Smart after it would have been clear to a reasonable officer that the perceived threat had passed." *Id.* at 1176. That is the factual question here. Ample evidence exists for a jury to conclude that a reasonable officer would have found it clear that "the perceived threat had passed."[1]

In *Vette v. K-9 Unit Deputy Sanders*, 989 F.3d 1154, 1170 (10th Cir. 2021), there were facts showing Mr. Vette did not pose an immediate threat to Sergeant Sanders or to anyone else at the time Sergeant Sanders struck him in the face and released his canine to bite Mr. Vette; rather, Mr. Vette had already been apprehended by two officers. Moreover, it is

---

[1] This is not a situation, such as *Thomson v. Salt Lake County*, 584 F.3d 1304, 1318–19 (10th Cir. 2009), in which at the moment that the officer fired his gun, the plaintiff was pointing his gun at the officer and was about to shoot him.

undisputed he was unarmed. The Tenth Circuit found not only that there was no immediate

threat, but also that Mr. Vette was not fleeing at the time (because he was subdued). On this

latter point -- the third *Graham* factor -- the Tenth Circuit again drew on *Emmett*, 973 F.3d

at 1136 (concluding "the third *Graham* factor ... weighs against the use of significant force"

because "in the precise moment th[e officer] tased [the plaintiff], [the plaintiff] was no longer

fleeing" and "was not actively resisting"). The Tenth Circuit found that, "[e]ven though it is

undisputed on appeal that Mr. Vette initially fled from law enforcement, he had been

apprehended by the point Sergeant Sanders allegedly used force against him. Accordingly,

[the third *Graham*] factor also favors Mr. Vette." *Vette*, at 1171.

In *Weigel v. Broad,* the trooper applied pressure to Mr. Weigel's upper body even after

he was handcuffed. Officers claimed that was because Weigel was still struggling.  The

evidence, though, showed that officers continued to apply force after Mr. Weigel presented

no danger. He died from asphyxiation attributable to the weight of the trooper's body on his

back.   The Tenth Circuit explained why the facts, if true, would constitute a Fourth

Amendment violation:

> there is evidence that for three minutes the troopers subjected Mr. Weigel to
> force that they knew was unnecessary to restrain him and that a reasonable officer
> would have known presented a significant danger of asphyxiation and death. If true,
> this constitutes an unreasonable use of force under the Fourth Amendment. *See*
> *Gutierrez v. City of San Antonio,* 139 F.3d 441, 449 (5th Cir.1998) ("material dispute
> of fact exists as to whether Gutierrez posed a threat of death or serious bodily injury
> to the officers or to others," in hog-tying excessive force case).

*Weigel*, at 1153.  The Tenth Circuit had no trouble finding that by 2002 (the time of Weigel's

in-custody death), clearly-established law held "that it is unreasonable to use deadly force

when the force is totally unnecessary to restrain a suspect or to protect officers, the public, or the suspect himself." *Weigel*, at 1154. This continues to be the law today. See e.g. *McCoy v. Meyers*, 887 F.3d 1034, 1052 (10th Cir. 2018)("the use of force on effectively subdued individuals violates the Fourth Amendment.")

In *Dixon v. Richer*, 922 F.2d 1456 (10th Cir. 1991), the Tenth Circuit affirmed a Colorado federal court's denial of defendant's motion for summary judgement. The plaintiff alleged that the police officer defendants had used excessive force by kicking, beating, and choking him in the course of an investigative stop. *Id.*, at 1458–59. When stopped, the plaintiff initially submitted to a frisk by putting his hands up against his van. *Id.* at 1458. But when one of the defendants kicked him during the frisk, the plaintiff turned toward them and asked, "Is that f---ing necessary?" *Id.* The defendants called for backup and told the plaintiff to put his hands back up against the van. *Id.* The defendants began to pat the plaintiff down again and suddenly kicked him without warning. *Id.* The plaintiff began to fall, and the defendants then hit him in the stomach with a metal flashlight. *Id.* Once the plaintiff was on the ground, the defendants got on top of him and beat and choked him. *Id.* After another officer arrived on the scene, the defendants handcuffed the plaintiff. *Id.* at 1458–59. The Tenth Circuit held that the plaintiff had sufficiently shown a Fourth Amendment violation to survive summary judgment. *Id.* at 1463.

In *Perea v. Baca*, 817 F.3d 1198, 1201 (10th Cir. 2016), the Tenth Circuit again affirmed denial of an officer-defendant's motion for summary judgment. Officers approached the defendant based on a claim that he was a person with mental illness in distress.  As officers tried to subdue Perez, he struggled and thrashed while holding a crucifix. After Perea began to struggle, Baca told

Jaramillo to use his taser against Perea, and Jaramillo did so. When the initial shot proved ineffective, Jaramillo continued to tase Perea nine additional times, for a total of ten taserings in less than two minutes. At some point before the taserings stopped, Baca and Jaramillo were able to get Perea on the ground on his stomach, with both officers on top of him, effectively subduing him. The Tenth Circuit found that the officers' repeated tasering of Perea after he had been subdued constituted a violation of the Fourth Amendment right to be free of excessive force. *Id.*, at 1202. Because it was clearly established "that using disproportionate force, in this case a taser, against a subdued misdemeanant is a violation of the Fourth Amendment," the Tenth Circuit affirmed the denial of qualified immunity.

*Dixon v. Richer* is a good example of why this Court must analyze each alleged act of excessive force separately. 922 F.2d 1456, 1462-1463 (10th Cir. 1991) Regarding the officer's initial kicking of the plaintiff, the Tenth Circuit determined—even though the plaintiff "w[as] not suspected of committing any crime" and "did not resist being frisked"—that the defendants acted reasonably "in an uncertain, and potentially dangerous circumstance." *Id.* at 1462. The Court deferred to the defendants' judgment that such force may have been necessary to affect the frisk. *Id.* But the Tenth Circuit determined that the defendants' continued use of force after the plaintiff "had already been frisked, had his hands up against the van with his back to the officers, and was not making any aggressive moves or threats" was unreasonable. *Id.* at 1463. The Tenth Circuit reached this conclusion even though the plaintiff's "response to being kicked the first time (turning around and swearing at [the defendants] ) could reasonably have been interpreted as an act of resistance." *Id.* at 1462. In *Dixon,* the Tenth Circuit held that the post-arrest kicking, beating, and

choking of the plaintiff was constitutionally excessive in light of the fact that the plaintiff had made no additional "aggressive moves or threats" toward the officer. *Id.*, 922 F.2d at 1463. See *Est. of Smart by Smart v. City of Wichita*, 951 F.3d 1161, 1177 (10th Cir. 2020)("But the evidence here, taken in the light most favorable to the plaintiffs, would also allow a reasonable jury to conclude that Officer Chaffee should have reacted to the changed circumstances and stopped shooting.")

This same analysis applies here. Once Mr. Poer was lying on the ground, face down with his hands above his head, the record shows that the gun was at his feet. A reasonable jury could reject the officers' claim that there might have been a gun near Mr. Poer's hands:  there was only ever a report of a single gun, it was laying on the ground by Mr. Poer's feet. Bjork picked up the gun and put it in his waistband. The gun was secure and this was no longer a deadly force scenario. Yet, even after Mr. Poer was subdued and on the ground, the use of force on this subdued individual continued.

Defendants admit that they continued to use force on Mr. Poer even as he lay on the ground, face down, with an officer on his back. They try to justify this use of force by saying that only one of Mr. Poer's hands was out from under him, and the other hand was under his body.  However, the record makes clear, that in fact, Mr. Poer's other hand was trapped under him and that the officer's application of tremendous force on his back, or the Tasing itself, prevented him from complying further with the order to pull his hand out.

Asking this court to rely on sheer speculation, defendants allege that, even after they could see Mr. Poer no longer had the gun, after he was on the ground, face down, with an officer on top of him it was "unknown whether Mr. Poer had multiple weapons." However, there has never been

any evidence that there was more than one weapon, and defendants point to none and admit that they had no information that there was ever more than one gun.  If courts could rely on speculation such as this, there would be no body of caselaw finding excessive force after an armed suspect has been disarmed because there could always *possibly* be another unknown weapon despite no evidence that such a second weapon exists.

### 2. Even if officers knew Mr. Poer was "unstable," that does not make their use of excessive force reasonable.

In support of their use of force, defendants state that "the deputies knew Mr. Poer was acting erratically and displaying odd behavior. Specifically, it is undisputed the deputies knew Mr. Poer had made complaints of being surveilled by individuals who had installed recording devices and cameras in his residence, and as a result, he had "reversed the reception and had been listening to them talk all day, and furthermore Mr. Poer was not making sense and talking rapidly."  That does not mean that there is no factual dispute about whether their use of force was reasonable throughout the entire encounter. The standard is objective, not subjective.  In *Estate of Smart, supra*, the Tenth Circuit followed an analysis that should guide this court:

> Taking the facts in the light most favorable to the plaintiffs, a reasonable jury could conclude Officer Chaffee shot Mr. Smart after it became clear Mr. Smart no longer posed a threat. Mr. Wheaton described Mr. Smart as lying "on the ground [with] arms stretched out ... looking back [shaking] his head ... like I give up or something," when Officer Chaffee fired his final shots.[13] …. From this evidence, a reasonable jury could conclude that by the time Officer Chaffee fired his final shots, Mr. Smart was lying face down on the ground with his arms stretched out, was unarmed, and had time to "look[ ] back" at Officer Chaffee and shake his head. App.

at 201. A reasonable jury could also conclude, based on the witnesses' testimony that they had time to perceive Mr. Smart no longer posed a threat, that Officer Chaffee likewise had the opportunity to perceive that any threat had passed by the time he fired his final shots.

*Estate of Smart, supra*, at 1175.

> **3.     *The officers approached the situation in a manner they knew or should have known would result in escalation of the danger.***

This Court considers whether, under the totality of the circumstances, the officers approached the situation in a manner they knew or should have known would result in escalation of the danger. *See e.g., Allen v. Muskogee*, 119 F.3d 837, 839, 841 (10th Cir. 1997) (officers responded to a potential suicide call by sprinting toward a parked car, screaming at the suspect, and attempting to physically wrest a gun from his hands; a rational jury could conclude officers' reckless conduct created a lethal situation in violation of Allen's Fourth Amendment rights).  Viewing the totality of the circumstances means taking into account unreasonable police conduct prior to the use of force that foreseeably created the need to use it.

In *Allen*, the decedent, Terry Allen, "left his home after an altercation with his wife and children." 119 F.3d at 839. The altercation was reported to police, along with information that Mr. Allen had several guns and ammunition with him and had threatened family members. *Id.* Shortly thereafter, Mr. Allen's sister reported that Mr. Allen was parked in front of her house and was threatening suicide. *Id.* When police arrived, Mr. Allen was "sitting in the driver's seat with one foot out of the vehicle. He had a gun in his right hand, which was resting on the console between the seats." *Id.* After removing the bystanders,

Lieutenant Smith repeatedly told Mr. Allen to drop the gun, but he refused. *Id.* Two additional officers arrived on the scene, and the situation soon escalated:

> Lt. Smith then reached into the vehicle and attempted to seize Mr. Allen's gun, while Officer [McDonald] held Mr. Allen's left arm. Officer Bryan Farmer, who arrived with Officer [McDonald], approached Mr. Allen's car from the passenger side, and attempted to open a passenger side door. Mr. Allen reacted by pointing the gun toward Officer Farmer, who ducked and moved behind the car. Mr. Allen then swung the gun toward Lt. Smith and Officer McDonald, and shots were exchanged. Lt. Smith and Officer McDonald fired a total of twelve rounds into the vehicle, striking Mr. Allen four times. The entire sequence, from the time Lt. Smith arrived to the time Mr. Allen was killed, lasted approximately ninety seconds.

*Id.* Mr. Allen's estate sued, asserting that the officers used excessive force. After the district court granted the individual officers summary judgment on the ground their actions did not violate the Fourth Amendment, the Tenth Circuit reversed, holding that "the officers' preceding actions were so 'immediately connected' to Mr. Allen's threat of force that they should be included in the reasonableness inquiry," and that "a reasonable jury could conclude ... that the officers' actions were reckless and precipitated the need to use deadly force." *Id.* at 841 (quoting *Romero*, 60 F.3d at 705 n.5).

The Tenth Circuit reached a similar conclusion in *Estate of Ceballos v. Husk,* 919 F.3d 1204 (10th Cir. 2019). There, Quianna Vigil called police to report her husband Jamie Ceballos "was in their driveway with a baseball bat 'acting crazy,' and that he was drunk and probably on drugs." *Estate of Ceballos*, 919 F.3d at 1208–09. Ms. Vigil indicated she had left the home but wanted Mr. Ceballos removed so she could return to put her seventeen-month-old child to bed. *Id.* at 1209. Defendant William Husk and several other police

officers responded, finding Mr. Ceballos alone in the driveway. *Id.* at 1209–10. They repeatedly ordered Mr. Ceballos to drop his bat, but instead he went into his garage. *Id.* at 1210. Officer Husk drew his firearm, and another officer drew a taser. *Id.* Mr. Ceballos then came out of the garage and began advancing toward the officers, who did not retreat. *Id.* at 1210–11. Instead, they repeatedly ordered him to drop the bat. *Id.* at 1210. When Mr. Ceballos did not comply, Officer Husk fired, killing him. *Id.* at 1211. Mr. Ceballos's family sued, claiming the officers acted recklessly, thereby creating the need for deadly force. The Tenth Circuit  agreed, and further concluded that its prior decision in *Allen* "would have put a reasonable officer on notice that the reckless manner in which Husk approached Ceballos and his precipitous resort to lethal force violated clearly established Fourth Amendment law." *Id.* at 1220.

In this case, there was no need for officers to move in to rush Mr. Poer.  He was in an open field, hundreds of yards away from any person. He had not fired the gun for at least eight minutes. The officers had time to employ Crisis Intervention Training techniques and to deescalate the situation and slow things down. Just as in *Allen*, a reasonable jury could conclude that the officers' actions were reckless and that they precipitated and exacerbated the situation.

### 4.      *Summary judgement is not warranted.*

There are multiple issues of fact that must be resolved in order to determine whether Mr. Poer posed an immediate threat to the safety of the officers or others at the time the officers stomped, tased, and punched him and applied substantial pressure to his back even though he was

already lying face down unarmed and in a prone position. In this motion, this Court must resolve factual disputes in favor of Mr. Poer.  A reasonable jury could conclude that the post-restraint force inflicted upon Mr. Poer was objectively unreasonable under the totality of the circumstances and thus violated his Fourth Amendment rights.  Likewise, a reasonable jury could determine that the defendants unreasonably escalated the situation and created the need for their use of force.

**B.    CLEARLY-ESTABLISHED LAW PUT THE OFFICERS ON NOTICE THAT THEIR CONDUCT WOULD VIOLATE MR. POER'S CONSTITUTIONAL RIGHTS.**

A right is clearly established "when a Supreme Court or Tenth Circuit decision is on point, or if the clearly established weight of authority from other courts shows that the right must be as the plaintiff maintains." *Truman v. Orem City*, 1 F.4th 1227, 1235–36 (10th Cir. 2021). Thus, "the contours of the right must be sufficiently clear [so] that a reasonable official would understand that what he is doing violates that right." *Ibid*. But this Court's analysis "is not a scavenger hunt for prior cases with precisely the same facts, and a prior case need not be exactly parallel to the conduct here for the officials to have been on notice of clearly established law." *Reavis v. Frost*, *supra,* at 992 (internal quotation marks omitted). There can also be "the rare obvious case, where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances." *D.C. v. Wesby*, __U.S. __, 138 S. Ct. 577, 590 (2018) (internal quotation marks omitted).

At the time of the events in this case, the Tenth Circuit had made it clear in factually similar cases that the police conduct in this case (viewed in the light most favorable to Mr. Poer) would violate the Fourth Amendment.  *See Estate of Ceballos, supra,* finding that *Allen, supra,*

clearly-established the rule. *Allen v. Muskogee* was decided in 1997, long before the defendants' use of force against Mr. Poer. The law was established by at least 2012, the time of the events in *Estate of Smart by Smart, supra*, in which the Tenth Circuit reiterated the long-standing rule that "it is ... clearly established that officers may not continue to use force against a suspect who is effectively subdued." *Est. of Smart by Smart v. City of Wichita*, *supra,* 951 F.3d at 1176, citing *Perea*, 817 F.3d at 1204 (law was clearly established at the time of the 2011 conduct); *see also McCoy*, *supra* (same, 2011 conduct). "[F]orce justified at the beginning of an encounter is not justified *even seconds later* if the justification for the initial force has been eliminated." *Id.*, 887 F.3d at 1050 n. 19 (alteration in original) (quoting *Waterman v. Batton*, 393 F.3d 471, 481 (4th Cir. 2005)); *Gouskos v. Griffith*, 122 F. App'x 965, 977 (10th Cir. 2005) (unpublished)(2000 conduct); *Dixon v. Richer*, *supra* (1987 conduct). Thus, taking the facts in the light most favorable to Mr. Poer, the defendants violated longstanding clearly established law by using deadly force after it would have been clear to a reasonable officer that the perceived threat had passed. This is true in this case because in the light most favorable to Mr. Poer, the Defendants used deadly force on Mr. Poer when he was no longer armed and at most passively resisting by not giving the officers his left hand and possibly he was unable to give that other hand because of the effects of the taser and because his hand was pinned under his body from the weight of Deputy Bjork on his back.

Likewise, clearly-established law proscribes the police using excessive force if at the moment of their use of force, the plaintiff had been subdued and no longer presented an immediate risk of deadly force against the officer(s). *Tenorio v. Pitzer*, 802 F.3d 1160 (10th Cir. 2015), *Walker v. City of Orem*, 451 F.3d 1139 (10th Cir. 2006), and *Zuchel v. City & County of*

*Denver*, 997 F.2d 730 (10th Cir. 1993) all clearly establish that the use of deadly force is unjustified and violates the Fourth Amendment when there is no immediate risk to officers.  *E.g., Estate of Booker v. Gomez*, 745 F.3d 405, 428 (10th Cir. 2014) ("there undoubtedly is a clearly established legal norm precluding the use of violent physical force against a criminal suspect or detainee who already has been subdued and does not present a danger to himself or others"). "'[Tenth Circuit] precedent recognizes that '[t]he reasonableness of the use of force depends not only on whether the officers were in danger at the precise moment that they used force, but also on whether the officers' own 'reckless or deliberate conduct during the seizure unreasonably created the need to use such force.' " *Allen v. Muskogee, supra*, at 840, quoting *Pauly v. White*, 874 F.3d 1197, 1219 & n. 7 (10th Cir. 2017) ("This has been the law in our circuit since 1995.").

Mr. Poer was prone on the ground, with two deputies holding him down at the time the force was employed against him. He had been subdued and the gun had already been recovered. Mr. Poer could not harm the officers and could not flee. Even then, he was stomped, tased, kneeled on, punched, and beaten while he was being held face down on the ground. A reasonable jury could find sufficient facts that the use of force after Mr. Poer was disarmed and on the ground clearly constituted excessive force.

### 1.  Use of Taser on an unarmed individual

Numerous Tenth Circuit cases apply this rule explicitly to the use of Tasers on a person who has been disarmed (or never was armed) and subdued. *Perea v. Baca, supra*, 817 F.3d at 1205 n. 4 ("disproportionate use of a taser, and repeated use of a taser against an effectively subdued individual, are clearly established constitutional violations. …. under our precedent, no reasonable officer could conclude that continuing to taser a subdued detainee is constitutional.")

*See Estate of Booker, supra* (no qualified immunity when Sergeant Rodriguez used his taser on

Mr. Booker for three seconds longer than recommended when he was already handcuffed on the

ground and subdued by multiple deputies).

Under prevailing Tenth Circuit authority in effect since at least 2010, "'it is excessive to

use a Taser to control a target without having any reason to believe that a lesser amount of

force—or a verbal command—could not exact compliance.'" *Estate of Booker,* (quoting *Casey v.

City of Fed. Heights*, 509 F.3d 1278, 1286 (10th Cir. 2007).  This principle applies here. A

reasonable jury could conclude that Mr. Poer was effectively subdued with a lesser degree of

force and that after that point, defendants' use of force was disproportionate to the need. *See

Cavanaugh v. Woods Cross City,* 625 F.3d 661, 665 (10th Cir.2010) (use of taser

unconstitutional where jury could "conclude that [the victim] did not pose an immediate threat"

to officer or others).

*Cavanaugh* shares many factual features with Mr. Poer's case.  In *Cavanaugh*, police had

been called by a husband to help find his wife who had left the house after an argument; Ms.

Cavanaugh had tried to put Mr. Cavanaugh in a closet, then she grabbed a kitchen knife and left

the house. The officer knew she had been drinking and taking pain medications. At the time the

officer tased her, though, she no longer had the knife in her hands and, while she was eluding

him, she didn't pose a physical threat to the safety of the officer or anyone else. The Tenth

Circuit found that clearly established constitutional law put the officer on notice that tasing an

unarmed person under these circumstances would violate her constitutional rights. "It is not

objectively reasonable to ignore specific facts as they develop (which contradict the need for this

amount of force), in favor of prior general information about a suspect."  *Id*., at 666.

In this case the Defendants claim that the fact that officers believed Mr. Poer to be intoxicated "added to the urgency to resolve the situation." But there is no constitutional exemption based on whether a person is intoxicated -- even if that person is initially armed. Officers still cannot "ignore specific facts as they develop (which contradict the need for this amount of force), in favor of prior general information about a suspect." *Ibid.*

### 2. *Putting significant pressure on a suspect's back while he is in a face-down prone position.*

In addition to clearly established law finding unconstitutional the use of a taser on an unarmed person, clearly established Tenth Circuit law has also found unconstitutional the use of pressure on a subject's back after he is effectively subdued. In *Weigel,* supra, the Tenth Circuit "agreed with other circuits that it was 'clearly established that putting substantial or significant pressure on a suspect's back while that suspect is in a face-down prone position after being subdued and/or incapacitated constitutes excessive force.'" *Estate of Booker*, at 424, *quoting Weigel, supra*, 544 F.3d at 1155, which in turn cites numerous out-of-circuit cases, e.g. *Champion v. Outlook Nashville, Inc.,* 380 F.3d 893, 903 (6th Cir.2004) (it is "clearly established that putting substantial or significant pressure on a suspect's back while that suspect is in a face-down prone position after being subdued and/or incapacitated constitutes excessive force.").

### 3. *Beating a person in the head after he is subdued.*

The cases cited above, in addition to establishing that excessive force under the circumstances of this case constitutes a Fourth Amendment, also hold that the law has been clearly established in this Circuit for decades. See e.g., *Weigel v. Broad, supra* (By 2002, it was "clearly established that putting substantial or significant pressure on a suspect's back while that suspect is in a face-down prone position after being subdued and/or incapacitated constitutes

excessive force.")*; Dixon v. Richer, supra* (It was clearly established by 1987 that, "[w]hile it is reasonable to frisk a detainee suspected of carrying a weapon, *Terry v. Ohio,* 392 U.S. 1, 24 (1968)], it is not reasonable to hit him in the stomach with a flashlight, or choke and beat him, solely on the basis of that suspicion.")

### 4.  *Failing to utilize CIT Training or to call for specialized CIT officers*

To the extent that, in their motion, defendants repeatedly point out that they knew that Mr. Poer was "delusional," "seeing and hearing things which were not there," and "unstable," these facts establish that a reasonable officer would have utilized CIT Training or called for specialized CIT officers rather than taking active measures to escalate the situation. It has long been clearly established that rushing a potentially suicidal intervention and applying deadly force to him without attempting to defuse the situation violates the Fourth Amendment.  *Allen v. Muskogee, supra.*

The allegation that, at some point during the application of force, the defendants could not see one of Mr. Poer's hands arguably makes their conduct more egregious, not less. The officers in *Allen* saw that the plaintiff was armed and dangerous, yet their conduct violated clearly established law.

After *Allen*, the Tenth Circuit, in an unpublished decision, applied the clearly established Fourth Amendment principles recognized in *Allen* to uphold denying qualified immunity to four officers called to a home about a suicidal man. *See Hastings v. Barnes*, 252 F. App'x 197 (10th Cir. 2007) (unpublished).  Rather than using their training to de-escalate the situation, the officers chased the man into a small bedroom where, after he grabbed a samurai sword, they pepper sprayed him, causing him to lift the sword and move toward the officers. *Id*., at 198-200,

203-07. In a later case, *Ceballos v. Husk*, the Tenth Circuit observed that, by itself, *Hastings v. Barnes* would not have created the clearly-established law that would have governed the conduct in *Ceballos*, but *Hastings* "strengthen[ed] our conclusion that, in light of *Allen*, a reasonable officer in Husk's position would have known that his conduct (viewed in the light most favorable to Ceballos) violated his Fourth Amendment right to be free from excessive force.").[2]  So too, *Hastings* should strengthen this Court's conclusion that *Allen* represents clearly-established law putting defendants on notice that a reasonable officer would have known that rushing to Poer, a then-unarmed man, and applying excessive force against him would be unlawful.

Defendants do not cite a single case upholding the use of deadly force as reasonable even though the officer intentionally or recklessly provoked violent conduct.

**C.      DISPUTED ISSUES OF FACT PRECLUDE SUMMARY JUDGEMENT ON MR. POER'S OFFICIAL CAPACITY CLAIM.**

Defendants argue that there was no underlying constitutional violation and therefore, no municipal liability. Mr. Poer has more than demonstrated an underlying constitutional violation.

Defendants also argue that summary judgment should be granted on the official capacity claim because ECSO didn't have "some sort of knowledge … that the hiring of Deputy Dickey would result in a constitutional violation."  (Doc. 82, p. 23).  This misstates the issue. Mr. Poer's SAC  also properly alleges that the Sheriff acted with deliberate indifference to the risk that its

---

[2] *Ceballos v. Husk* was issued in 2019, after the 2018 conduct in this case. Thus, Mr. Poer does not rely on Ceballos as having established the law that applies here.  Its importance inures in the Tenth Circuit's conclusion that *Allen* clearly established the law governing the type of conduct that occurred in this case, *Ceballos* points the way for this Court's determination on defendants' the qualified immunity claim.

hiring practices would result in hiring officers likely to commit constitutional violations. (SAC, ¶ ¶ 55-59). This deliberate indifference is sufficient for municipal liability. *Board of the County Commissioners of Bryan County, Oklahoma v. Brown*, 520 U.S. 397, 407 (1997)("*Brown*"); *Kemp v. Harris*, No. CV WDQ-08-793, 2008 WL 11363697, at \*6 (D. Md. Nov. 12, 2008).

*Brown* discusses deliberate indifference and failure to train in a context involving an insufficient background check of a police officer who caused injury to the plaintiff. *Id.*, at 406-407. The Supreme Court ruled that municipal liability may lie for a municipality's hiring practices when those practices reflect deliberate indifference to third parties' rights and where there is a "strong" connection between "the background of the particular applicant and the specific constitutional violation." *Brown*, at 412-413. The Supreme Court did not, as Sheriff Norton suggests (without citation), require that the officer's prior misconduct must have been identical to the type of excessive force used in the case at hand. Defendants cite no case that so holds.

Sheriff Norton even suggests that, even if his hiring practices were deficient and even if he knew about Dickey's prior violent misconduct, ECSO may escape liability if the prior victims of Dickey's excessive force do not share the same features as Mr. Poer (by being "delusional" and "potentially intoxicated") it must have been the same time of day "in a dark field", and each of the prior individual(s) Dickey attacked must have stolen a loaded gun, fired off rounds, etc. (See Doc. 82, p. 24 ("none of the matters involve his interaction with a delusional, potentially intoxicated, felony menacing individual, who stole a loaded gun, and indiscriminately fired off rounds, in a dark field, all the while improperly ignoring lawful commands to show his hands and submit to arrest."). Norton cites no caselaw for the proposition that ECSO may escape

liability for its deliberately indifferent hiring practices so long as the officer hired targets a citizen with slightly different characteristics than those Dickey targeted in his prior misconduct.

To the contrary, *Brown* states: "To test the link between [the policymaker's] hiring decision and respondent's injury, we must ask whether a full review of [the officer's] record reveals that [the officer's] use of excessive force would be a plainly obvious consequence of the hiring decision." *Brown*, at 412-413. When this link is shown, the link between the Sheriff's hiring decision and the constitutional injury is sufficiently demonstrated.  Ibid.

In his deposition, former Sheriff Heap claimed that he knew about Dickey's prior use of force, but that he (Heap) didn't think it was a big deal. Ex. I, Heap Dep. Tr., (pp. 17-18). That does not mean a jury will agree with him.  Mr. Poer submits that sufficient facts exist to show that ECSO's hiring practices, which permitted Heap to disregard Dickey's prior misconduct, reflected a deliberate indifference to the rights of citizens like Mr. Poer.  Dickey's use of excessive force in the future was a plainly obvious consequence of the hiring decision made under these procedures and thus, satisfies the "moving force" requirement for ECSO liability.

As is outlined in paragraphs 64-80 above, Dickey's record at Commerce City was atrocious. He had committed misconduct similar to that he committed in this case, i.e., using excessive and sometimes deadly force against subdued individuals and those who presented no threat. This conduct included using a taser, beatings, use of a baton, and other excessive force. In one, like in this case, a teenager was lying prone on the ground, already restrained, and Dickey could be heard saying he wanted to Tase the teen. See paragraph 76, above. Then Dickey beat the restrained person anyway. See paragraph 77, above.

By employing hiring practices that permitted hiring of Dickey despite his atrocious record, ECSO demonstrated deliberate indifference to the risk that its hiring practices would result in infliction of excessive force and violations of the civil rights of individuals just like Mr. Poer. The result of ECSO's deliberate indifference was the death of a war hero, a family man, and a father.

**D.      THIS COURT SHOULD DENY THE DEFENDANTS' MOTION TO DISMISS MR. POER'S STATE LAW CLAIMS.**

At the outset, this Court must reject Sheriff Norton's motion to dismiss. He had the opportunity to file a Rule 12(b)(6) motion, but instead responded to the Second Amended Complaint.

In assessing Defendants' motion to dismiss under either Rule 12(b)(6) or Rule 12(c),[3] this Court must assume all of Mr. Poer's factual allegations to be true and draw all reasonable inferences in his favor. *Robbins v. Wilkie*, 300 F.3d 1208, 1210 (10th Cir. 2002). The complaint need contain only "enough facts to state a claim to relief that is plausible on its face." *Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007) (*quoting Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A plausible claim is a claim that "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Mr. Poer meets the threshold pleading standard so long as he offers sufficient factual allegations such that the right to relief is raised above the

---

[3] A motion to dismiss filed after the pleadings close will be treated as a motion for judgment on the pleadings. The same standard applies to motions made under either subsection 12(b)(6) or 12(c). 2 *Moore's Federal Practice* at § 12.38.

speculative level. *See, e.g., Twombly*, 550 U.S. at 556; *Bryson v. Gonzales*, 534 F.3d 1282, 1286 (10th Cir. 2008).

Mr. Poer's Second Amended Complaint ("SAC") more than satisfies the applicable standards. Plaintiff sufficiently alleges a sufficient factual basis to establish the factual basis for willful and wanton conduct, i.e., that the defendants were consciously aware that their acts and omissions created a substantial danger to Mr. Poer's safety. The SAC "set[s] forth specific facts to support a reasonable inference" that each officer was  "aware that his or her acts or omissions created danger or risk to [Mr. Poer's] safety: and that they acted (and failed to act) "without regard to the danger or risk." *Gray v. Univ. of Colorado Hosp. Auth.*, 2012 COA 113, ¶ 40, 284 P.3d 191, 198–99.

The Second Amended Complaint ("SAC") alleges that Dickey and Turner knew that Mr. Poer had called the police in the first place, in crisis, seeking help. They knew he was alone and in a mental health crisis. The SAC alleges that when Dickey and Turner approached, they saw Mr. Poer laying on the ground, explaining to officers that "I'm a vet… I need help." The SAC alleges that, knowing these facts, Dickey and Turner then kicked him, beat him in his head, and tased him.

This Court has found the types of claims made in the SAC to be more than sufficient to state a claim under Colorado state law.  *Cf. Flores v. City of Aurora,* No. 1:20-CV-00618-RBJ, 2021 WL 4033117, at *10 (D. Colo. Sept. 3, 2021)(Plaintiffs sufficiently stated Colorado state law claims for wrongful death and assault and battery against officers by making factual allegations that the officers knew Mr. Jackson was alone, non-threatening, and suffering from

mental health issues when they rushed into the apartment; "Such conduct would be 'willful and wanton,' exposing the officers to liability.").

At this stage, the burden on Mr. Poer "is a relatively lenient one, as there is no presumption of sovereign immunity, and plaintiffs should be afforded the reasonable inferences of their evidence." *Duke*, 456 P.3d at 44 (quoting *Tidwell v. City & Cnty. of Denver*, 83 P.3d 75, 85–86 (Colo. 2003)). The burden is "a lenient one because [courts] must narrowly construe statutes that grant governmental immunity." *Duke v. Gunnison Cty. Sheriff's Off.*, 2019 COA 170, ¶ 36, 456 P.3d 38, 44, citing *Tidwell v. City & Cty. of Denver*, 83 P.3d 75, 85-86 (Colo. 2003). Whether a defendant's actions are willful and wanton is generally a question of fact. *U.S. Fire Ins. Co. v. Sonitrol Mgmt. Corp.*, 192 P.3d 543, 549 (Colo.App.2008).

Courts interpreting the Colorado Governmental Immunity Act have held "a person engages in 'willful and wanton' conduct when that person 'purposefully pursue[s] a course of action or inaction that he or she consider[s] would probably result in harm' to the plaintiff." *Romero v. Denver Public School Dist. No 1*, No. 09-cv-01043-CMA-KLM, 2010 WL 1235635, at *3 (D. Colo. March 18, 2020) (quoting *Castaldo v. Stone*, 192 F. Supp.2d 1124, 1141 (D. Colo. 2001)). "An essential component of the definition of willful and wanton conduct is that the actor specifically contemplated that his or her actions may cause harm to another and thereafter proceeded to act heedless of that risk of harm." *Carani v. Meisner*, No. 08-cv-02626-MSK-CBS, 2009 WL 2762719, at *2 (D. Colo. Aug. 26, 2009). *Zerr v. Johnson*, 894 F. Supp. 372, 376 (D. Colo. 1995) ("Willful and wanton conduct is 'conduct purposefully committed which the actor must have realized as dangerous, done heedlessly and recklessly, without regard to consequences, or of the rights and safety of others, particularly the plaintiff.' ")(citing, *inter alia*,

*Moody v. Ungerer*, 885 P.2d 200, 204 (Colo. 1994)). "The 'willful and wanton' standard, in other words, requires that the actor 'act not only unlawfully, but with the intent to injure, or in conscious disregard of the probability that his acts would result in injury to the plaintiff.' " *Feltman v. Europe*, No. 18-cv-3113-WJM-STV, 2019 WL 6215445, at *8 (D. Colo. Nov. 21, 2019) (quoting *Navratil v. Parker*, 726 F. Supp. 800, 805 (D. Colo. 1989) (alteration omitted). There can be no doubt that Mr. Poer made sufficient allegations to meet this standard.

It is true, as Defendants observe, that for the state law claims (Claims I, V, VI, and VII), Plaintiff has the burden at trial to show that the officers' actions and/or omissions were willful and wanton.  Plaintiff will have no trouble doing so. There is substantial evidence of willful and wanton conduct and evidence that each defendant "acted heedlessly or recklessly, and without regard to consequences or to the rights of Mr. Poer."  Dickey and Turner exhibited a conscious disregard for the danger and took multiple deliberate actions that presented a grave risk of death and ultimately did cause Mr. Poer's death.

Defendants claim that if the facts that demonstrate willful and wanton conduct are the same facts establishing the underlying tort, then the Complaint is insufficient.  That theory is misguided. See *Flores v. City of Aurora, supra,* at *10 (Because on the facts alleged by plaintiffs, " it is plausible that these officers either actively violated Mr. Jackson's constitutional rights or acquiesced to a constitutional violation that they had the power to prevent," the allegation establishes that "[s]uch conduct would be 'willful and wanton,' exposing the officers to liability.... for wrongful death and assault and battery.").

The case on which defendants rely for their proposition that the facts showing "willful and wanton conduct" cannot be the same that establish excessive force is a defamation case,

*Drake v. City & Cnty. of Denver*, 953 F. Supp. 1150, 1160 (D. Colo. 1997), which is in turn

discussing the holding from a prior defamation case, *Zerr v. Johnson,* 894 F.Supp. 372, 376

(D.Colo.1995), *aff'd,* 85 F.3d 641 (10th Cir. 1996).  These defamation cases address a specific

issue related to the distinction between defamation ("knowingly or recklessly") and CGIA

"willful and wanton" (heedlessly and recklessly) conduct.[4]

In excessive force cases, the Colorado Supreme Court has not compelled any "magic

language" for inclusion in the complaint to show "willful and wanton" conduct. In *Moody v.*

*Ungerer*, 885 P.2d 200, 205 (Colo. 1994), the Court cited three definitions of willful and wanton

conduct from other contexts. While the Court found that the definitions were "not specifically

applicable" to the CGIA's definition of willful and wanton conduct, the Court nonetheless found

those definitions helpful in concluding that the defendant's conduct in that case did not rise to the

level of willful and wanton conduct. *Id.* Those three definitions respectively defined willful and

wanton conduct as: (1) "not only negligent, but exhibit[ing] [a] conscious disregard for [the]

safety of others," *id.* (citing Black's Law Dictionary 1434-35 (5th ed. 1979) ); (2) "purposefully

---

[4]  The elements for defamation are "that the defendant knowingly or recklessly published a false statement about him." *Drake*, at 1160.  To avoid CGIA immunity, the plaintiff had to show conduct done "heedlessly and recklessly, without regard to the consequences, or rights and safety of others, particularly plaintiff." *Ibid,* citing *Zerr,* 894 F.Supp. at 376. It was in this context that the *Drake* Court stated: "Where, as here, plaintiff's allegations regarding the willfulness and wantonness of a governmental official's conduct are the same as form the basis of the underlying tort itself, plaintiff will not avoid application of the CGIA." *Ibid, citing Zerr,* at 376. As the *Zerr* Court explained:

> Zerr attempts in this case to merge the two concepts. The facts upon which she bases her assertion of 'willfulness and wantonness' (if any) are precisely the same as those upon which she bases her claim for defamation. It is not possible to recognize a cause of action for 'willful and wanton' defamation under these circumstances.

*Zerr v. Johnson*, 894 F. Supp. at 376.

committed[,] which the actor must have realized as dangerous, done heedlessly and recklessly, without the regard to [the] consequences, or of the rights and safety of others, particularly the plaintiff," *id.* (citing Colo. Rev. Stat. § 13-21-102(1)(b) (exemplary damages statute) ); and (3) "wholly disregardful of the rights, feelings and safety of others ... at times even imply[ing] an element of evil," *id.* (citing *Pettingell v. Moede*, 271 P.2d 1038, 1042 (Colo. 1954) (defining the Colorado guest statute) ). Recently, the Colorado Supreme Court declined to choose one of these definitions, but nonetheless noted that willful and wanton conduct must include a "conscious disregard of the danger." *Martinez v. Estate of Bleck*, 379 P.3d 315, 323 (Colo. 2016).

All that is required is that Mr. Poer "sufficiently allege conduct by the defendant police officers that arguably falls within the applicable definition of willful and wanton conduct," *Bouchard v. Whetstone*, 772 F. Supp. 2d 1352, 1361 (D. Colo. 2011).  Mr. Poer certainly achieves that bar in his Second Amended Complaint. *See ibid* (finding language sufficient to allege willful and wanton conduct under the CGIA and observing that plaintiff included language in the complaint incorporating all of the previous paragraphs). See e.g., *Quintana v. City & Cty. of Denver*, No. 20-CV-0214-WJM-KLM, 2021 WL 229270, at *5 (D. Colo. Jan. 22, 2021)("Plaintiff has plausibly alleged that Defendants were on notice that the flammable CN/CS grenades were not designed for indoor use, but nonetheless heedlessly used the grenades. Such allegations are sufficient to establish a claim that Defendants' conduct was willful and wanton under Colorado law."); *Jackson v. Steinhour,* No. 04-CV-01418-LTB-PAC, 2005 WL 2293634, at *1 (D. Colo. Sept. 20, 2005)(denying motion for summary judgment and rejecting CGIA claim where the officers "blindsided" Plaintiff and "jumped him," threw him to the floor, and repeatedly kicked and beat him).

Mr. Poer made sufficient allegations to warrant this Court's rejection of defendants' arguments.  A jury could conclude Dickey and Turner undertook purposeful conduct committed recklessly with conscious disregard for the rights and safety of others.

## CONCLUSION

Mr. Poer requests that this Court deny Defendants' motion.


Respectfully submitted this 22nd day of October 2021.


**FISHER & BYRIALSEN PLLC**

*/s/ David N. Fisher*
David N. Fisher, Esq.
**Fisher & Byrialsen, PLLC**
4600 S. Syracuse Street, 9th Floor
Denver, CO 80237
(303) 256-6345
*Attorney for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that on the 22nd day of October 2021, I electronically filed a true

and exact copy of the above and foregoing **PLAINTIFF'S RESPONSE TO AMENDED**

**RENEWED MOTION FOR SUMMARY JUDGMENT** with the Clerk of the Court using the

CM/WCF system which will send notification of such filing to the following email addresses:

**Gillian Dale**
daleg@hallevans.com
*Attorney for County of Elbert,*
*Attorney for Defendant Sheriff Norton*
*Attorney for Defendant Turner*
*Attorney for Defendant Dickey*

**Jonathan Abramson**
*jonathan@kandf.com*
*Attorney for City of Commerce City*

*/s/ David N. Fisher*
David N. Fisher, Esq.
Fisher & Byrialsen, PLLC
4600 S. Syracuse Street, 9th Floor
Denver, CO 80237
T: (303) 256-6345
C: (845) 721-2157
David@FBLaw.org

46