Transcript of the Deposition Testimony of:

# William Dickey
### June 29, 2021

## Sherry Poer

## v.

## Sheriff Tim Norton in his official capacity, et al.

## Civil No. 19cv1088 (LTB)



14143 Denver West Parkway, Suite 100 • Golden, Colorado 80401
(303) 202-0210 • contact@milehighreporting.com
www.milehighreporting.com

Deposition of:  William Dickey - June 29, 2021
Sherry Poer v. Sheriff Tim Norton in his official capacity, et al.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action Number 19cv1088(LTB)

SHERRY POER, individually and as Administratrix of the
Estate of CHRISTOPHER POER, Deceased,
        Plaintiff,
vs.
SHERIFF TIM NORTON in his official capacity,
OFFICERS: DEPUTY CHRIS DICKEY, and
SERGEANT TRAVIS, both of whom are sued in their individual
capacities, in his individual capacity and official
capacity,
        Defendants.
---------------------------------------------------------
              DEPOSITION OF CHRISTOPHER DICKEY
                    June 29, 2021
---------------------------------------------------------

APPEARANCES:

ON BEHALF OF THE PLAINTIFF:
        DAVID N. FISHER, ESQ.
        Fisher & Byrialsen, PLLC
        4600 South Syracuse Street, Ninth Floor
        Denver, Colorado 80237
        Telephone: (303)256-6345
        Email: david@fblaw.org

ON BEHALF OF THE DEFENDANTS:
        MARK S. RATNER, ESQ.
        Hall & Evans, LLC
        1001 Seventeenth Street, Suite 300
        Denver, Colorado 80202
        Telephone: (303)628-3337
        Email: ratnerm@hallevans.com

Also Present:  Natasha Powers

Deposition of:  William Dickey - June 29, 2021
Sherry Poer v. Sheriff Tim Norton in his official capacity, et al.

2

1         PURSUANT TO WRITTEN NOTICE and the appropriate rules

2    of civil procedure, the deposition of CHRISTOPHER DICKEY,

3    called for examination by the Plaintiff, was taken at the

4    offices of Fisher & Byrialsen PLLC, 4600 S. Syracuse

5    Street, 9th Floor, Denver, Colorado 80237, commencing at

6    10:00 a.m. on June 29, 2021, before Sara A. Stueve,

7    Registered Professional Reporter and Notary Public in and

8    for the State of Colorado.

9

10                    I N D E X

11

     EXAMINATION:                              PAGE
12
     By Mr. Fisher                               3
13

14   EXHIBITS:                                 PAGE

15   1  Call For Service Detail Report - CFS 555     19

16   2  "Active shooter" definition from            59
        U.S. Department of Homeland Security
17
     3  Deputy Dickey's diagram of incident scene   79
18
     4  Deputy Dickey's body camera video           87
19

20

21

22

23

24

25

Deposition of:  William Dickey - June 29, 2021
Sherry Poer v. Sheriff Tim Norton in his official capacity, et al.

3

1          P R O C E E D I N G S
2          CHRISTOPHER DICKEY,
3 having been first duly sworn to state the whole truth,
4 testified as follows:
5          DIRECT EXAMINATION
6 BY MR. FISHER:
7     Q.  Good morning again, Mr. Dickey.  How are you?
8     A.  I'm well.
9     Q.  You and I have met before; correct?
10     A.  I believe so.
11     Q.  I deposed you once before in the
12 Leadholm case.  Do you remember that?
13     A.  Yes.
14     Q.  Have you ever been deposed other than that case?
15     A.  No.
16     Q.  So I'm just going to briefly go over the rules
17 of the deposition with you.  It's been a while.
18     A.  Okay.
19     Q.  Just wait for me to answer, obviously, so that
20 the court reporter can get us on the record so we don't
21 talk over each other.  Is that okay?
22     A.  Yes.
23     Q.  And just make sure you answer verbally.  You've
24 been doing a good job so far, but the court reporter is
25 not going to take down nods of the head and thing like

4

1 that.  Okay?
2     A.  Yes.
3     Q.  If you're not clear about my question, just ask
4 me to rephrase, and I'll try to do that.
5     A.  Okay.
6     Q.  Your counsel may object during the deposition.
7 He's likely going to.  If he does, just let him get his
8 objection on the record but, then you can proceed to
9 answer the question.
10     MR. RATNER:  Unless I tell him not to answer.
11     Q.  (By Mr. Fisher)  Unless he tells you not to
12 answer.
13     A.  Understood.
14     Q.  So as I said before, the last time I deposed you
15 was in December of 2017.  Does that sound about right?
16     A.  I believe so.
17     Q.  And that was in connection with the
18 Carl Leadholm case?
19     A.  Yes.
20     Q.  That deposition was transcribed, like it is with
21 the court reporter here; do you recall that?
22     A.  I believe so.
23     Q.  In that deposition and also in this one, you
24 understand that you'll be providing truthful answers, and
25 you've sworn to tell the truth; right?

5

1     A.  Yes.
2     Q.  When you were deposed by me in September 2007,
3 you were telling the truth then?
4     A.  Yes.
5     Q.  And you were giving full and complete answers to
6 the best of your ability?
7     A.  Yes.
8     Q.  Let's talk a little bit about your background.
9 I know that you were at the Commerce City Police
10 Department at some point.
11     A.  Yes.
12     Q.  Give us a date range there.
13     A.  I was hired in January of 2005, and left in
14 December of 2016.
15     Q.  And then your next job was at the El Paso County
16 Sheriff's Office?
17     A.  No.
18     Q.  Where did you work in the interim between the
19 two?
20     A.  I was not employed with the El Paso County
21 Sheriff's Office.
22     Q.  I'm sorry.  Elbert County Sheriff's Office.  I
23 apologize.
24     A.  Yes.
25     Q.  That was your next job?

6

1     A.  That's correct.
2     Q.  Was there any time in between those two?
3     A.  Approximately a month.
4     Q.  No work during that time?
5     A.  No.
6     Q.  And what about after leaving the Elbert County
7 Sheriff's Office?
8     A.  Self-employed.
9     Q.  Doing what?
10     A.  Custom woodworking.
11     Q.  Are you still doing that now?
12     A.  Yes.
13     Q.  Do you have, like, a company, like an LLC or
14 something?
15     A.  Yes.
16     Q.  What it is called?
17     MR. RATNER:  Hold on.
18     I'm going to instruct him not to answer, because
19 his past job as law enforcement in terms of privacy
20 interest, number one.  And number two, he's actually
21 received death threats that have been promulgated by your
22 client.  So the less identifying information we have on
23 the record, the better.
24     MR. FISHER:  My client who's deceased?
25     MR. RATNER:  No.  Sherry Poer s not deceased.

Deposition of:   William Dickey - June 29, 2021
Sherry Poer v. Sheriff Tim Norton in his official capacity, et al.

7

1      MR. FISHER:  Oh.  You mean the administrator of
2  the estate?
3      MR. RATNER:  Yeah.
4      Q.  (By Mr. Fisher)  What kind of death threats?
5      MR. RATNER:  Go ahead.  You can answer that.
6      A.  Posts from her Facebook page to my business
7  page calling me a murderer, calling me all kinds of foul
8  names, linking the Leadholm case, linking this case, to my
9  page via my posts, just inserting comments.
10      And then on her personal page and people
11  commenting from there about how I need to be taken care of
12  and, "Tell us where he is.  We'll take care of him," that
13  sort of thing.
14      Q.  (By Mr. Fisher)  Do you know who those people
15  are?
16      A.  No.
17      Q.  When was the last time you received any kind of
18  comments on your Facebook page like this?
19      A.  I blocked her after that, but that was,
20  approximately, a year ago.
21      Q.  Okay.
22      A.  In addition to threats on YouTube via
23  Eric Brandt's channel, who is familiar with this office,
24  and the followers of him who are here in Colorado who
25  would like to see me dead.

8

1      Q.  Based on the posts?
2      A.  Yes.
3      Q.  You said Eric Brandt is familiar with this
4  office.  What do you mean by that?
5      A.  I think -- sorry.
6      MR. RATNER:  Go ahead.  It's your deposition.  I
7  was going to provide an explanation, but if you don't want
8  me to, you can ask him.
9      Q.  (By Mr. Fisher)  You can go ahead if you can
10  answer the question.
11      A.  I believe his -- one of his people was
12  represented by you in regards to a use of force that I
13  had.  I could have the law firms mixed up.
14      Q.  Do you know who that person who was represented
15  there?
16      A.  Condiotti-Wade.
17      Q.  Okay.  In any event, so you're currently,
18  since -- when did you leave Elbert County
19  Sheriff's Office?
20      A.  November of 2018.
21      Q.  And since then, you have been in your own
22  private woodworking company, I guess?
23      A.  Yes.
24      Q.  Getting hired by people to do jobs, things like
25  that?

9

1      A.  Yes.
2      Q.  Okay.  What kinds of things do you make or do?
3      A.  Any sort of custom woodworking that people need
4  in their homes.
5      Q.  Okay.
6      A.  Cabinets, shelves, that sort of thing, yes.
7      Q.  Okay.  Did you have law enforcement before
8  Commerce City -- experience -- law enforcement experience,
9  I should say?
10      A.  As a police explorer.
11      Q.  Remind me; what is that?
12      A.  It's an under 21 age program for law
13  enforcement -- people interested in law enforcement.
14      Q.  And remind me; what is your educational
15  background?
16      A.  I have two college degrees: associate's degree
17  in criminal justice and a bachelor's degree in business
18  management.
19      Q.  Where did you receive those degrees?
20      MR. RATNER:  Hold on a second.
21      So again, I think that information is a way for
22  people to find out where he is.  It's a hook.  So I really
23  would prefer that's not on the record.
24      Q.  (By Mr. Fisher)  I mean, we can --
25      A.  I received when here in-state and one out of

10

1  state.
2      Q.  Okay.  At different universities?
3      A.  Yes.
4      Q.  Okay.  While you were at Commerce City, you had
5  several use-of-force allegations against you while you
6  were there; correct?
7      A.  Yes.
8      Q.  You had the case of Carl Leadholm; correct?
9      A.  Yes.
10      Q.  In that case you, tased Mr. Leadholm for five
11  separate taser cycles; correct?
12      A.  I don't recall.
13      Q.  Does that sound about right?  Do you think it's
14  a different number?
15      A.  Again, I don't recall the specifics.  That was
16  from 2014.
17      Q.  I'll represent to you that it was five.  Do you
18  think I'm wrong about that?  Do you think it's something
19  different?
20      A.  No.
21      Q.  Okay.  In that case, Mr. Leadholm was in the
22  middle of a diabetic shock at the time.  Are you aware of
23  that?
24      A.  I was made aware of that, yes.
25      Q.  You also -- while you were at Commerce City

Deposition of:  William Dickey - June 29, 2021
Sherry Poer v. Sheriff Tim Norton in his official capacity, et al.

11

1 Police Department, you had an incident where you were
2 chasing a teenager in an apartment complex, and you were
3 seen on video, and you said, "Let me tase him," on the
4 body-cam video.  Do you recall that?
5     A.  Yes.
6     Q.  You ended up putting your taser away and putting
7 your gun into his back until the gun came out of battery.
8 Do you remember that?
9     A.  Yes.
10     Q.  And there was a mark left on his back after
11 that; do you recall?
12     A.  Yes.
13     Q.  There were some other use-of-force allegations
14 in Commerce City Police Department as well; correct?
15     A.  I believe so, yes.
16     Q.  And several of the use-of-force incidents that
17 we were just talking about, they were investigated by
18 Commerce City Police Department; correct?
19     A.  Yes.
20     Q.  And eventually you were told by Commerce City
21 that several of those incidents were going to be sustained
22 against you; do you recall that?
23     A.  I believe only two of them were sustained.
24     Q.  But you were told, actually, that that was going
25 to happen.  They were going to be sustained, and you'd be

12

1 terminated.  However, you were given the option to resign
2 in lieu of termination; is that fair to say?
3     A.  Yes.
4     Q.  And that's the option you chose; correct?
5     A.  Yes.
6     Q.  And so that meant that there was no allegations
7 actually put on your permanent record of sustained
8 findings because you -- you resigned instead; correct?
9     A.  Yes.
10     Q.  And so next you went to Elbert County, we've
11 already established; right?
12     A.  Yes.
13     Q.  And so let's talk about the hiring process at
14 Elbert County Sheriff's Office.  What was that process
15 like?  What did you have to do to apply for that job?
16     A.  It was just like any other department.  You
17 submitted a written application for employment.  Mine was
18 for the position of patrol deputy.
19         From there, you go through an oral board process
20 with members of the agency asking you questions.  You then
21 go through an extensive background check, which you
22 complete a written background packet, and that gets
23 investigated and looked at.
24         You're then subjected to a polygraph and a
25 psychological evaluation through companies that the

13

1 department coordinates with.  And then you finally, after
2 passing through all those things, you go through an
3 interview with the sheriff himself.
4     Q.  That would have been Sheriff Heap at the time?
5     A.  Yes.
6     Q.  So in this entire process, were there any
7 questions on the application or through the process at all
8 that were asking about whether you'd had uses of force
9 investigated or sustained at your prior job?
10     A.  I don't recall any specific questions in the
11 background related directly to use of force.
12     Q.  So nothing about sustained findings or
13 allegations of use of force or anything like that?
14     A.  No.  It was all -- I mean, those questions were
15 asked during the oral board.
16     Q.  Okay.  So tell me about that.  Who was asking
17 those questions?
18     A.  Members of the panel.  I don't recall exactly
19 which -- which person on the oral board asked, but I was
20 asked to explain why I left Commerce City, what the
21 surrounding circumstances were.
22     Q.  And did you tell them about the use-of-force
23 allegations that were going to be sustained but were not
24 because you resigned?
25     A.  Yes.

14

1     Q.  Did he ask you follow-up questions about those
2 use-of-force allegations?
3     A.  In the oral board, yes.
4     Q.  And these were -- who were the people on the
5 oral board?  People who work for Elbert County
6 Sheriff's Office?
7     A.  Yes.  It was a mixture of command staff and
8 patrol deputies, detectives, command staff, et cetera.
9     Q.  So you told them everything about those
10 use-of-force allegations?
11     A.  Yes.
12     Q.  Did you tell them that the allegations were
13 going to be sustained if you didn't resign?
14     A.  Yes.
15     Q.  And what did they say about that, or what
16 follow-up questions did they ask about that?
17     A.  I don't recall any follow-up questions other
18 than just asking to explain the incidences.  And they all,
19 you know, made their separate notes.  But that's not --
20 they don't generally discuss their opinions of those
21 things during those oral boards.
22     Q.  Did you disclose to them the outcome of any of
23 the lawsuits involved with those cases?
24     A.  Well, there was only one.
25     Q.  The Leadholm case?

Deposition of:  William Dickey - June 29, 2021
Sherry Poer v. Sheriff Tim Norton in his official capacity, et al.

15

1     A.  The Leadholm case.  And that actually had not
2  been --
3     Q.  Finished yet?
4     A.  -- finished at the time of any oral board.
5     Q.  And so did you become a sheriff's deputy before
6  that case was finished?
7     A.  Yes.
8     Q.  So you were a sheriff's deputy, and then at some
9  point the -- Commerce City made an offer of judgment in
10 that case, which was accepted for roughly $350,000.  Does
11 that sound about right?
12    A.  I don't recall the dollar amount.  But yes, I do
13 know that it was -- or that it was resolved after I was
14 already hired.
15    Q.  Okay.  I'll represent to you that it was for
16 $350,000, plus attorneys' fees and costs.
17        After that had resolved, did you ever have a
18 discussion with anyone at Elbert County about the outcome
19 of that lawsuit?
20    A.  No.
21    Q.  Did they ask you about the incident with
22 Mr. Brandt in which you were sued -- with a taser?
23    A.  Yes.
24    Q.  And you told them about that?
25    A.  Yes.

16

1     Q.  That case also resolved after you had become a
2  sheriff's deputy with Elbert County?
3     A.  Yes.
4     Q.  For roughly $175,000; do you recall that?
5     A.  I don't recall the amount, but yes.
6     Q.  Did anyone from Elbert County ever ask you
7  follow-up questions about that once that case was
8  resolved?
9     A.  No.
10    Q.  Do you know whether or not Elbert County ever
11 retrieved the files from the use-of-force allegations in
12 the cases we've been talking about?
13    A.  I know that whoever was doing my background
14 check went to Commerce City to obtain my personnel file,
15 yes.
16    Q.  Okay.  Did he -- once they obtained those
17 personnel files, did they ask you any questions about
18 them?
19    A.  I was not asked any further questions about
20 anything, no.
21    Q.  So those would have been obtained after your
22 oral interview or oral boards?
23    A.  Yes.
24    Q.  Okay.  Tell me about how and under what
25 circumstances you left El Paso County Sheriff's Office.

17

1     A.  I retired as a master deputy, which is kind of a
2  senior -- it's not -- it's not a line-level deputy, and
3  it's not a sergeant.  It's kind of a corporal position, if
4  you will.
5     Q.  Is it, sort of, in between sergeant and
6  line-level deputy?
7     A.  Yes.
8     Q.  Okay.  And you retired.  Why did you retire?
9     A.  I retired honorably.  It was a personal decision
10 I made.  There was a new -- there was a transition in
11 sheriffs coming in, and I had already purchased my
12 business and had that going for approximately six months
13 prior to my retirement and knew that I had to make a
14 decision between the two.
15    Q.  If you had stayed, would you have had to
16 reinterview or anything with the new sheriff?  Was the new
17 sheriff getting rid of some people, keeping some people?
18 Did you have any information about that?
19        MR. RATNER:  Object to foundation and form.
20        Go ahead.
21    A.  I can't recall hearing anybody that I talked to
22 afterward say that they had to reinterview for their jobs.
23 And so --
24    Q.  (By Mr. Fisher)  Were some people fired when the
25 new sheriff came in, to your knowledge?

18

1     A.  No.  I don't know about -- I don't know anything
2  about that.
3     Q.  Okay.  Did you ever meet the new sheriff?
4     A.  I believe I met him once.
5     Q.  Would that be Tim Norton?
6     A.  Yes.
7     Q.  And in, like, a work capacity, or just met him
8  somewhere?
9     A.  No.  Just -- well, he was -- he was
10 petitioning -- or he was -- what's the word? --
11 campaigning for sheriff while I was still there, and so he
12 met several deputies.  I was one of them at the time.
13    Q.  Okay.
14    A.  So I did meet him personally but did not have
15 any sort of conversation with him.
16    Q.  Okay.  So I'm going to ask you some questions
17 about this case.  And when I say "this case," I mean the
18 case involving Christopher Poer.  Do you know which case
19 I'm talking about?
20    A.  Yes.
21    Q.  You see what's on that screen there?
22    A.  Yes.  Looks like a call for service detail
23 record.
24    Q.  Yep.  This is also called a CAD report.
25        MR. FISHER:  We'll mark this as

Deposition of:  William Dickey - June 29, 2021
Sherry Poer v. Sheriff Tim Norton in his official capacity, et al.

19

1    Deposition Exhibit 1.
2         (Exhibit Number 1 was marked.)
3         Q.  (By Mr. Fisher)  And this document was already
4    previously marked as, I think --
5         MR. RATNER:  Exhibit 3.
6         Q.  (By Mr. Fisher) -- Exhibit 3 to one of the
7    motions that your attorneys filed for you, a summary
8    judgment and motion.
9         So I'm going talk to you, as I said, about the
10   "incident," quote, unquote, that happened on
11   April 12, 2008, involving Christopher Matthew Poer;
12   correct?
13        A.  Yes.
14        Q.  On that day of the incident, you were with
15   Sergeant Turner.  You were serving a sex offender with
16   some kind of document?
17        A.  With a protection order, a restraining order,
18   yes.
19        Q.  And during that call for service that -- well,
20   during the serving of that restraining order, you received
21   a radio run about the incident in this case; right?
22        A.  A what?
23        Q.  A radio run.
24        MR. RATNER:  Object to form.
25        Q.  (By Mr. Fisher)  A radio transmission, call for

20

1    service.
2         A.  Can you clarify your question?  I'm sorry.
3         Q.  Sure.
4         While you were serving the sex offender, you
5    received a call over the radio letting you know about
6    something that was going on over at Christopher Poer's --
7    where he was staying at the time?
8         A.  Yes.
9         Q.  Okay.  And the initial radio run was a call for
10   service for someone who was experiencing mental health
11   issues and needed help?
12        A.  Yes.
13        Q.  And that somebody turned out to be
14   Christopher Poer?
15        A.  Yes.
16        Q.  You had never met Mr. Poer before the incident;
17   correct?
18        A.  No.
19        Q.  You had never heard anything about Mr. Poer in
20   your entire life before the incident; correct?
21        A.  No.
22        Q.  Later that evening, you met Mr. Poer in person?
23        A.  I came in contact with him later, yes.
24        Q.  But before you came into contact with him, the
25   only thing you knew about him was things you heard over

21

1    the radio in regards to the call for service; right?
2         MR. RATNER:  Form and foundation.
3         A.  Yes.
4         Q.  (By Mr. Fisher)  Before you came in contact with
5    him that night, you didn't know anything about his
6    criminal record or lack thereof; correct?
7         A.  I was not aware of anything like that, no.
8         Q.  And before this incident, you didn't know
9    anything about his physical health history?
10        A.  No.
11        Q.  And before the incident, you didn't know
12   anything about Poer's prior medical treatment?
13        A.  No.
14        Q.  Before the incident, you didn't know anything
15   about Mr. Poer having served in the Green Berets in Iraq
16   and Afghanistan?
17        A.  No.
18        Q.  You didn't know anything about his PTSD that
19   followed his military service?
20        MR. RATNER:  Form and foundation.
21        A.  I was not aware of anything like that, no.
22        Q.  (By Mr. Fisher)  So let's talk about some of the
23   radio traffic that you received about the incident.
24        A.  Okay.
25        Q.  In general -- before we get into specifics, in

22

1    general, when you receive radio transmissions, you also
2    receive notes of those radio runs on your patrol car's
3    computer screen; fair to say?
4         A.  Yes.
5         Q.  In general, what's your practice regarding
6    looking at those notes on the screen versus just listening
7    to the radio transmissions?
8         MR. RATNER:  Object to form.
9         A.  I'm not quite sure what you're asking.
10        Q.  (By Mr. Fisher)  So you'll hear a radio
11   transmission come over your radio; right?
12        A.  Yes.
13        Q.  And something will also populate on your
14   computer screen showing, like, a running log of those
15   radio transmissions?
16        A.  Yes.
17        Q.  Or, sort of, a transcript of those
18   transmissions?
19        A.  Yes.
20        Q.  So I'm just saying, what is your practice when,
21   say, you're in the car and you receive a radio
22   transmission?  Will you look at the computer screen in
23   addition to listening to what's coming over the radio?
24        A.  If I'm able to, yes.
25        Q.  If you're not driving, I guess?

Deposition of:  William Dickey - June 29, 2021
Sherry Poer v. Sheriff Tim Norton in his official capacity, et al.

23

1    A.  Correct.
2         Q.  And you'll do that just because you can't always
3    hear something that's on the radio, and it's easier if
4    you're listening and watching, right, so you don't miss
5    anything?
6         Tell me, why would you look at the computer
7    screen in those cases?
8         A.  As a review of what -- of the information that
9    I've received over the radio, I will review through the
10   notes to see if there is anything that I missed.
11        Q.  Okay.  So let's go through this exhibit in some
12   detail.  Okay?
13        So I'm going to scroll down a little bit.  For
14   whatever reason, it's, sort of, backwards here, so that
15   the earlier times are lower down on the document.  So I'm
16   going scroll down some until we get to the 5:50 hour --
17   5:50 p.m.
18        MR. RATNER:  David, this exhibit is highlighted.
19   Was it highlighted by you?
20        MR. FISHER:  It was highlighted by me, yeah.
21        MR. RATNER:  Okay.
22        Q.  (By Mr. Fisher)  So we see the five -- you see
23   the one there -- my mouse is hovering over it -- at
24   5:55:08 p.m.?  You see that?
25        A.  Yes.

24

1         Q.  And then police call, it says "Status: Cold,
2    Priority 3"?
3         A.  Yes.
4         Q.  It also says "Call Type: CIT assist."  See that?
5         A.  Yes.
6         Q.  What is "Cold, Priority 3?
7         A.  Priority 3 is the lowest level priority, meaning
8    it's not an emergency call.  Cold means it has already
9    occurred.  It is not -- it is not in progress.  It was
10   something that has already occurred or has just finished
11   occurring.
12        Q.  And the other priorities -- possible priorities
13   would be 1 and 2?
14        A.  Correct.
15        Q.  And 1 is the most urgent, and 2 is somewhere in
16   between?
17        A.  Yes.
18        Q.  So this was a Priority 3 when you received it?
19        MR. RATNER:  Object to form and foundation.
20        A.  I'm not sure -- yeah.  I'm not sure that this --
21   I think we're mixing up two different calls here.
22        Q.  (By Mr. Fisher)  Do you see "CIT assist"?
23        A.  I do.
24        Q.  What does that mean?
25        A.  It as Crisis Intervention Training assist.

25

1         Q.  Tell us, what is Crisis Intervention Training?
2         A.  Crisis Intervention Training is a program, a
3    training program, to deal with individuals in all sorts of
4    crisis situations, be it mental health or -- I mean,
5    generally, it's mental health situations, and where the
6    person is in need of services.
7         Q.  That's training that you participated in as a
8    police officer?
9         A.  Yes.
10        Q.  Like a 40-hour course?
11        A.  That's the basic course, yes.
12        Q.  Did you do more than that?
13        A.  Yes.
14        Q.  How many hours would you say you've trained as a
15   CIT?
16        A.  It's hard to put a number on it.  I went through
17   additional -- because they offer the basic course.  They
18   offer auxiliary courses in addition to that basic course.
19   And then I also became a CIT instructor.
20        Q.  Okay.  So you got enough training that you would
21   actually train others on how to deal with CIT situations?
22        A.  That's correct.
23        Q.  You could see here -- right above, do you see
24   "Name:  Christopher" -- it's not highlighted, but do you
25   see where my mouse is pointed?

26

1         A.  Yes.
2         Q.  And then -- is there a little glare on there?
3         A.  Yeah.  There's a glare on.  See if I change this
4    here.  That's better.
5         Q.  Is that better?
6         A.  Yep.
7         Q.  Okay.  We could do the other one behind you.
8         A.  No.  That's fine.
9         Q.  Okay.  And can you see it gives a contact phone
10   number as well on the 5:55:23 line?
11        A.  Yes.
12        Q.  Who's Madison Steck?  Is that the person taking
13   down the --
14        A.  She would be one of the dispatchers.
15        Q.  Okay.  And again, it gives this person's contact
16   number; right?  Why do they provide you that contact
17   number?
18        A.  To be able to contact the individual.
19        Q.  Okay.  So you were told about this CIT call --
20   CIT assist call, I should say.  You were told the person's
21   name was Christopher, and you were given that person's
22   phone number?
23        A.  Correct.
24        MR. RATNER:  Object to form and foundation.
25        A.  Can you break that down one more time for me

Deposition of:   William Dickey - June 29, 2021
Sherry Poer v. Sheriff Tim Norton in his official capacity, et al.

27

1 please?
2 Q. (By Mr. Fisher) Sure.
3     So you were told it was a CIT assist call?
4 A. Yes.
5 Q. You were given that person's name as
6 Christopher?
7 A. Yes.
8 Q. And you were given Christopher's contact phone
9 number; correct?
10 A. Yes.
11 Q. So you could see at this entry, 5:44:49, this is
12 all in caps. It's written "Someone broke in and installed
13 cameras and Bluetooth in RPS home."
14     What does "RPS" mean? Do you know what that
15 means?
16 A. It's RPs, without the apostrophe -- reporting
17 party's.
18 Q. So there, the dispatcher is telling you that the
19 reporting party is reporting that they believe someone
20 broke in and installed cameras in their home?
21 A. Correct.
22 Q. And in their phone, I should say, or in the
23 Bluetooth and in the phone; right?
24 A. Yes.
25 MR. RATNER: Object to form.

28

1 Q. (By Mr. Fisher) You could see also at 5:56:20,
2 the reporting party was talking very fast and not making
3 sense; right?
4 A. Yes.
5 Q. Okay. So let's talk about this entry, the CIT
6 entry -- CIT assist.
7     So that means -- when you're given that by the
8 dispatchers, you know you're going to be dealing with
9 somebody with a mental health -- who's having mental
10 health issues; right?
11 A. Potentially.
12 Q. And let's talk about your CIT training in
13 responding to people dealing with mental health issues.
14     It's a special training that law enforcement
15 does that revolves around how to deal with people who are
16 going through mental health crises; correct?
17 MR. RATNER: Object to form and foundation.
18 Q. (By Mr. Fisher) Among other things?
19 MR. RATNER: Same objection.
20 A. Yes, it is. Yes.
21 Q. (By Mr. Fisher) And in that training, you're
22 taught how to handle -- withdrawn.
23     Part of that training, you're taught to dos and
24 don'ts of dealing with people in mental health crisis;
25 fair to say?

29

1 MR. RATNER: Form and foundation.
2 A. I'm not sure what you're asking.
3 Q. (By Mr. Fisher) You're taught what things to do
4 when dealing with someone with mental health problems;
5 right?
6 MR. RATNER: Same objection.
7 A. Not necessarily.
8 Q. (By Mr. Fisher) Why? What's your problem with
9 that question? Explain.
10 A. We -- the training is to give you tools and
11 resources in how to deal with people in crisis. It's not
12 a list of dos and don'ts.
13 Q. But there are no dos and don'ts in the training?
14 MR. RATNER: Object to form and foundation.
15 A. There are -- I guess I would need it rephrased
16 in a different way. I'm not sure how to answer that.
17 Q. (By Mr. Fisher) Well, you were taught in your
18 CIT training that when you're dealing with someone who's
19 going through a mental health crisis, you could talk to
20 that person; right?
21 A. That's one of the elements.
22 Q. That's one of the things that you should do if
23 you can; right?
24 MR. RATNER: Objection. Foundation.
25 A. If you can, yeah.

30

1 Q. (By Mr. Fisher) And when you talk to that
2 person, you should do so in a calm and reassuring way; is
3 that correct?
4 MR. RATNER: Object to form.
5 A. If the situation is allows for that, yes.
6 Q. (By Mr. Fisher) And you should tell that person
7 if -- I'll preface this for all of my next questions, "If
8 the situation allows it." Okay?
9     You should tell that person over and over again
10 that you -- you should identify yourself as law
11 enforcement; correct?
12 A. Yes.
13 Q. And you should tell that person that you're
14 there to help them?
15 A. That's one tactic, yes.
16 Q. And you should calmly tell them over and over
17 again that you're not going to hurt them?
18 MR. RATNER: Object to form and foundation.
19 A. I don't recall a specific instruction on that,
20 but, generally, that you're there to calm them, yes.
21 Q. (By Mr. Fisher) And you learned in that
22 training that, as much as possible, you should try to
23 deescalate the situation with somebody undergoing a mental
24 health crisis; correct?
25 MR. RATNER: Same objection.

**Deposition of: William Dickey - June 29, 2021**
**Sherry Poer v. Sheriff Tim Norton in his official capacity, et al.**

---

31

1    A.  Yes.
2    Q.  (By Mr. Fisher)  What does that mean, to
3    deescalate a situation?
4        A.  Whenever possible, to bring the situation back
5    to a -- to a lower level to, back down to a normal level,
6    I guess I should say, to try and calm the person down.
7    Q.  Try to calm the whole situation down; right?
8        A.  Yes.
9    Q.  And in this case, when you went to this call for
10   service.  You knew that you were dealing with somebody, or
11   at least suspected that you were dealing with somebody in
12   the throws of a mental health crisis?
13       A.  I knew that it was a possibility, yes.
14   Q.  In fact, you believed it was -- you were on the
15   way for a call for someone who might be needing, like, an
16   M-1 hold; is that fair to say?
17       MR. RATNER:  Object to form and foundation.
18       A.  Which call for service are we referring to?
19   Q.  (By Mr. Fisher)  The one that you eventually
20   went to that night.
21       A.  Okay, because we're talking about two different
22   ones.
23   Q.  I'm talking about the one that you eventually
24   went to that night.
25       A.  The one that we haven't covered yet?

---

32

1    Q.  In this exhibit, correct.
2        A.  Correct.
3    Q.  Yeah.
4        A.  So --
5    Q.  Eventually, you went to that residence in
6    Elbert County on Private Road -- 4570 Private Road 188;
7    right?
8        A.  Yes.
9    Q.  And when you went to that call for service, you
10   knew were going to someone who might need an M-1 hold;
11   right?
12       MR. RATNER:  Object form and foundation.
13       A.  I knew that there was an individual who was
14   possibly having a mental health crisis condition.  But
15   there were other circumstances that were beyond that
16   which, apparently, we haven't covered yet.
17   Q.  (By Mr. Fisher)  What does that mean, an M-1
18   hold?
19       A.  A mental health hold is where we evaluate the
20   person, determine if they need to be seen by a mental
21   health physician at a hospital and to get them the
22   resources and help that they need.
23   Q.  Okay.  Do you see 6:03 on this, highlighted
24   where my mouse is?  "ES-1 arrived"?
25       A.  Yes.

---

33

1    Q.  Who's ES-1?
2        A.  Echo Sam 1 is the call sign for Sergeant Turner.
3    Q.  You were with him that night serving the sex
4    offender; correct?
5        A.  Yes.
6    Q.  And when it says he arrived, where did he arrive
7    at that time, 6:03:01?
8        A.  Arrival can just mean -- so we can take certain
9    calls by phone.  And if they say, you know, they'll be on
10   scene by phone, the dispatcher will change it to an
11   arrived status.
12           We may not be actually arrived at the physical
13   location, but we have -- we're in a position where we're
14   making a phone call or talking to the person.
15   Q.  What do you suspect it means when it says "ES-1
16   arrived" in this context?
17       MR. RATNER:  Object to form and foundation.
18       A.  At that time, he was with me, and we were in a
19   different part of the county.  And he was -- he arrived;
20   he was on scene by phone.
21   Q.  Meaning with the person who had called?
22       A.  Meaning he was attempting to contact the person
23   by phone.
24   Q.  Gotcha.
25           And we see it at 6:33 right here where my mouse

---

34

1    is, "Call placed on Unit ES-1 Stack."  Do you see that?
2        A.  Yes.
3    Q.  What does that mean?
4        A.  I'm not sure.  I mean, I can take a guess as to
5    what that means.
6        MR. RATNER:  Don't guess.
7    Q.  (By Mr. Fisher)  Give me your best estimate of
8    what you think that means.  It's saying for the record
9    that that is -- you don't know for sure, but this is what
10   you think it means.
11       MR. RATNER:  Object to foundation.
12       A.  I don't know what that means.
13   Q.  (By Mr. Fisher)  Do you think, perhaps, it means
14   this is something that was, kind of -- this is going to
15   be, sort of, assigned to ES-1?
16       MR. RATNER:  Object to foundation and form.
17   Q.  (By Mr. Fisher)  -- based on the stack?
18       A.  If it was assigned to him, it would be he was
19   going to handle it.
20   Q.  Okay.  Then you see right above that "ES-1
21   routed to call 574"?
22       A.  Yes.
23   Q.  And then above that "ES-1 leave pending.  Will
24   call RP again when clear."  Does that mean Sergeant Turner
25   was saying, We're leaving our other call, and they're

---

Deposition of: William Dickey - June 29, 2021
Sherry Poer v. Sheriff Tim Norton in his official capacity, et al.

35

1  going to call Christopher back again when he's cleared the
2  other scene?
3      A.  No.  It means leave the call that he's assigned,
4  which was the mental health call, in pending -- so we have
5  a pending screen of calls.  Leave it in pending.  He will
6  call the RP again.
7      Q.  So meaning he had already called the RP at this
8  point?
9      A.  I believe so.
10     Q.  Okay.
11         MR. RATNER:  Object to foundation.
12     Q.  (By Mr. Fisher)  And then we see above that 738,
13 "Elaine is on the phone, property owner."  She says her
14 gun -- "She said he has her gun and his hand right now."
15 Do You see that?
16     A.  Yes.
17     Q.  "Gun is a .380.  It's loaded."  See that?
18     A.  Yes.
19     Q.  And then you see narrative changed from "normal"
20 to "critical."  What does that mean?
21     A.  It means they upgraded the priority of the call.
22 And it also looks like it's a different dispatcher.
23     Q.  Okay.  And would that be Priority 2 -- it went
24 from three to two or three to one?  You don't know?
25     A.  It's hard to say.

36

1      Q.  Okay.  Do you see, also, here at 7:39:09,
2  "Elaine does not believe that there is anyone else there
3  except her and Chris"?
4      A.  Yes, I see that.
5      Q.  So as we're going through these notes here, this
6  is all stuff that you're receiving real-time on your radio
7  when you're out in the field; right?
8      A.  Correct.
9      Q.  And if you want to, you could look at it on your
10 computer screen if you were able; correct?
11     A.  Yes.
12     Q.  Do you recall whether or not you were looking at
13 this stuff on your computer screen that night?
14         MR. RATNER:  Object to form.
15     A.  I don't recall.
16     Q.  (By Mr. Fisher)  But either way, you'd be
17 receiving this information real-time on your radio?
18     A.  Yes.
19     Q.  Then you see 7:39, "She is in her room and
20 staying there until deputies arrive."  That would be
21 referring to Elaine Holt, I presume; is that fair to say?
22     A.  I am not sure on that.
23     Q.  Okay.  And then you see here "EC-21 en route."
24 Is that you?
25     A.  Yes.  That was my call sign, echo Charlie 21.

37

1      Q.  You also see "echo Charlie 32 en rought."  Who's
2  that?
3      A.  I'm not sure who -- which deputy that was,
4  but --
5      Q.  Bjork or Whitlock, maybe?
6      A.  Yes.  That would be one of the graveyard units.
7      Q.  And you see 7:40:31, "Thinks that Chris may be
8  in the RV right now 100 feet from house."  Do you see
9  that?
10     A.  Yes.
11     Q.  That would have been information you're also
12 receiving real-time, right, as you're on the way to the
13 scene?
14     A.  That's correct.
15     Q.  "Chris just asked Elaine if she had a gun on
16 her."  Do you see that?
17     A.  Yes.
18     Q.  And this is all stuff the dispatcher is relaying
19 to you guys on your radios; right?
20     A.  Yes.
21     Q.  "Chris keeps going on about what he's seeing and
22 hearing"; right?
23     A.  Yes.
24     Q.  You see 7:43, "Chris did have the gun pointed at
25 her when" she asked if -- "when he asked her if she had a

38

1  gun."  Do you see that?
2      A.  Yes.
3      Q.  And then again here at 7:43, "Advised Elaine to
4  stay in her room and to not look out the window."  Do you
5  see that?
6      A.  Yes.
7      Q.  And then above that, 7:44:45, "Chris is not
8  currently in the house.  Possibly in driveway walking back
9  and forth"; right?
10     A.  I see that.
11     Q.  Now, you eventually got to the scene; right?
12     A.  Yes.
13     Q.  And is it fair to say it's a pretty rural and
14 remote area?
15     A.  Yes.
16     Q.  The houses are something like 35-acre lots over
17 there?
18         MR. RATNER:  Object to form and foundation.
19     A.  I don't know what the sizing is up there.
20     Q.  (By Mr. Fisher)  The houses are pretty far apart
21 from each other?
22     A.  Yes.
23     Q.  Does 35 acres sound about right, or do you think
24 it's smaller or larger?
25     A.  I don't know.

Deposition of:  William Dickey - June 29, 2021
Sherry Poer v. Sheriff Tim Norton in his official capacity, et al.

39

1   Q.  Okay.  The houses are not on top of each other;
2   right?  It's not like in Centennial or something?
3   A.  No.
4       MR. RATNER:  Object to form and foundation.
5   Q.  (By Mr. Fisher)  There's a lot of distance
6   between people's homes and people's driveways and other
7   people's homes and all that; right?
8   A.  From what I could see, yes.
9   Q.  Had you ever been to this area before, this
10  neighborhood?
11  A.  No.  I had not been to this particular location,
12  no.
13  Q.  Okay.  And you see here at 7:45:38 where my
14  mouse is, "Elaine thinks that Chris does not know that law
15  enforcement has been called and he was waiting for them
16  because he thinks that they are being robbed."  Do you see
17  this?
18  A.  I do.
19  Q.  So that was Elaine conveying to dispatch that
20  Chris doesn't know that law enforcement is on the way;
21  right?
22      MR. RATNER:  Object to form and foundation.
23  A.  I'm sorry.  You're going to have to ask that one
24  more time.
25  Q.  (By Mr. Fisher)  This is the dispatcher relaying

40

1   to you all that Elaine had relayed to her -- to the
2   dispatcher that Chris does not know that law enforcement
3   has been called --
4   A.  Yes.
5   Q.  -- right?  But he is waiting for law enforcement
6   because he thinks that they are being robbed --
7   A.  Yes.
8   Q.  -- right?  And you're given this information in
9   real-time when you're getting there arriving at the scene;
10  right?
11  A.  Correct.
12  Q.  And you were also given this information right
13  above, "He is now walking eastbound on Private Road 188
14  off the property.  He still has the gun"; right?
15  A.  I see that, yes.
16  Q.  You can see here at 7:48:49, "Chris in green and
17  black flannel and jeans."  Do you see that?
18  A.  Yes.
19  Q.  He's a white male, 47 years old, approximately
20  5'10", 230?
21  A.  I see that.
22  Q.  So you're being given a description by dispatch
23  here of Christopher; right?
24  A.  Yes.
25  Q.  So that you could identify him when you arrive

41

1   on scene?  That's the purpose of that?
2   A.  Yes.
3   Q.  Then you see at 7:49:13, "ES-1" -- who is
4   Sergeant Turner?
5   A.  Yes.
6   Q.  -- "advises he has a shield and he doesn't want
7   any of the other deputies to turn onto Road 188 until he
8   is on scene."  You see that?
9   A.  Yes.
10  Q.  He's talking about a ballistic shield; right?
11  A.  I believe so, yes.
12  Q.  Tell us what that is.
13  A.  It's a shield carried by SWAT team members, or
14  certain SWAT team members, a thick heavy shield with a
15  curved face and a handle on the back side, and it's used
16  for protection.
17  Q.  You can -- for instance, it would -- you'd be
18  able to approach a gunman with a shield like that and it
19  would provide cover for you?
20  A.  It would, yes.
21  Q.  That's, sort of, the purpose of that shield;
22  right?
23  A.  Yes.
24  Q.  One of the purposes of it.
25      And so Sergeant Turner was airing over the radio

42

1   to everybody, Don't go onto the scene until I get there
2   with my shield?
3   A.  Correct.
4   Q.  And then we have -- a little above that, "Elaine
5   can still see him across 188 to the north in a field";
6   right?
7   A.  Yes.  I see that.
8   Q.  And then right above that, "Elaine cannot see
9   him anymore.  Thinks he's still in the field"; right?
10  A.  Yes.
11  Q.  So that would have been in the field adjacent to
12  her home over there by Private Road 188; right?
13  A.  Yes.
14  Q.  And then we see at 7:52:06, you arrive?
15  A.  Yes.
16  Q.  Shortly after you arrived -- in fact, just
17  seconds after, right above here, "Just heard two
18  gunshots."  That was reported by you; right?
19  A.  Yes.
20  Q.  And then right above that entry, another
21  ten seconds later, "Just heard another one"; right?
22  A.  Yes.
23  Q.  So shortly after you arrived to the scene, you
24  heard three gunshots in pretty rapid succession?
25  A.  Yes.

Deposition of:  William Dickey - June 29, 2021
Sherry Poer v. Sheriff Tim Norton in his official capacity, et al.

43

1   Q.  Sergeant Turner asked if you knew the directions
2  of the shots; right?
3   A.  Yes.
4   Q.  And you said you think the sound came from the
5  northwest; right?
6   A.  Yes.
7   Q.  And then heard two more shots right above that
8  at 7:53:19?
9   A.  That was not an additional --
10   Q.  That's the duplicate of what we just had below
11  it?
12   A.  Yes.
13   Q.  Okay.  So it seems like, so far, through the
14  dispatch we've gone through, you heard two shots quickly,
15  and then another ten seconds later, another shot?
16   A.  Correct.
17   Q.  And then this is you here where my mouse is,
18  EC-231, or is that somebody else?
19   A.  Yes.  I think that was just a typo, 231.
20   Q.  So that should be --
21   A.  Echo Charlie 21.
22   Q.  You're saying you're at a bend where it turns to
23  go north at the gate.  Shots coming from the northwest of
24  you by a horse and rider on a metal statue.
25   A.  That's not -- how you read it is not what

44

1  occurred.
2   Q.  Tell me what occurred.
3   A.  I was advising that I heard the shots coming
4  from the northwest.  I was standing by -- I was trying to
5  give them my location.  I was standing by a metal statue
6  of a horse and rider.
7   Q.  And the metal statue is just a little bit west
8  of the property where Elaine Holt lived?
9   A.  I believe to the north of -- to the north and
10  west.
11   Q.  North and west.  Okay.
12       And then you see -- at 7:54:06, you see the
13  entry "Can see the deputy.  Thinks that he is at the wrong
14  place for where Chris is."  You see that?
15   A.  Yes.
16   Q.  That would have been dispatch telling you what
17  Elaine was telling them?
18   A.  I believe so, yes.
19   Q.  The next entry above, "Needs to go to the house
20  at 4369.  Thinks that's where she thinks the shots were
21  fired."  You see that?
22   A.  Yes.
23   Q.  So then you have, right above that, "Subject 100
24  yards from echo Charlie 21 in field."  Do you see that?
25   A.  Yes.

45

1   Q.  And then it says, "Meet at echo Charlie 21's
2  truck."
3   A.  Yes.
4   Q.  Does that mean you should meet the other
5  officers at your truck?
6   A.  I was advising -- I had seen the subject
7  approximately a hundred yards from a way from me in a
8  field and for responding units to meet me at my truck.
9   Q.  Okay.  So now we're at 7:55, approximately?
10   A.  Yes.
11   Q.  Right.  And just to go back, we had heard the
12  gunshots?
13   A.  You passed it.
14   Q.  This is a duplicate entry, so -- at 7:52; right?
15   A.  Yes.
16   Q.  So gunshots at 7:52 p.m.  And right now we're at
17  7:55.  So it's been approximately three minutes since you
18  heard the gunshots?
19   A.  Yes.
20   Q.  And now you're meeting your fellow -- or you've
21  just spotted this man a hundred yards from you; right?
22   A.  Yes.
23   Q.  Now, you see here at 7:55, your sergeant arrived
24  on scene; right?
25   A.  Yes.

46

1   Q.  And now the dispatcher airing over the radio at
2  7:56, "The male now heading back towards the residence";
3  right?
4   A.  Yes.
5   Q.  You could see here your entry, echo Charlie 21,
6  "No one use lights or sirens"?
7   A.  Correct.
8   Q.  What did you mean by that?
9   A.  Meaning incoming units -- whenever we have a
10  priority situation, be it a person with a gun, perhaps a
11  domestic disturbance, any sort of significant priority,
12  it's our -- it's our practice to shut down lights and
13  sirens coming into the area so that individuals or people
14  involved are not -- that we don't become a target to
15  anybody as we come into the area.
16   Q.  Here, at 7:57, you say you can hear the male
17  yelling at the top of his lungs, sounds -- and then it
18  says, "DK, can no longer see him."
19       What does that mean "DK"?
20   A.  Drunk.
21   Q.  Oh.  So you heard him yelling at the top of his
22  lungs.  You couldn't hear what he was saying; right?
23   A.  I could.
24   Q.  But for whatever reason, whatever he was saying
25  led you to believe that he was drunk?

Deposition of:  William Dickey - June 29, 2021
Sherry Poer v. Sheriff Tim Norton in his official capacity, et al.

47

1    A.  That he sounded intoxicated, yes.
2    Q.  Okay.  So you aired that over the radio, and
3  then 30 seconds later, it was aired over the radio back to
4  you from dispatch, "Per Elaine, Chris has not been
5  drinking and not on drugs."  Do you see that?
6    A.  Yes.
7    Q.  And that was information relayed to you on the
8  scene in real-time after you said that you thought he
9  might be drunk; right?
10    A.  Yes.
11    Q.  And whether or not somebody's drunk when you're
12  approaching them is important to know; right?
13    A.  Yes.
14    Q.  Because it may affect your ability to talk with
15  that person and for them to understand you?
16    A.  Correct.
17    Q.  But you were told, at least per Elaine, Chris
18  had not been drinking and not taken drugs.  Do you see
19  that?
20    A.  Yes.
21    Q.  And that is, in fact, what you were told at
22  approximately 7:58 that evening?
23    A.  Again, yes.
24    Q.  Before you had encountered Mr. Poer, before you
25  actually physically encountered him; correct?

48

1    A.  Yes.
2    Q.  At 8:00 p.m., it was put over the radio that
3  Sergeant Turner and yourself will be entering the field in
4  Sergeant Turner's vehicle; is that right?
5    A.  Yes.
6    Q.  Now, before that decision was made, you and
7  Sergeant Turner had a conversation; correct?
8    A.  Yes.
9    Q.  And he told you that he didn't actually have his
10  shield; he left it in his other truck?
11    A.  Yes.
12    Q.  And you said, We can use the truck for cover;
13  right?
14    A.  Yes.
15    Q.  And that we should approach using the truck to
16  go into the field?
17    A.  Yes.
18    Q.  He said to you, I don't want to really approach
19  this guy if he could start shooting at us if we don't have
20  to.  Do you recall that?
21    A.  I do recall that.
22    Q.  But you said, No, I think we should do it?
23    A.  I can't recall if I said that specifically.
24    Q.  Well, in any event, he was expressing concerns
25  for approaching someone if you didn't necessarily have to;

49

1  correct?
2    MR. RATNER:  Object to form and foundation.
3    A.  That's not accurate, no.
4    Q.  (By Mr. Fisher)  What's inaccurate about it?
5    A.  The rest of the conversation.
6    Q.  But what's inaccurate about what I just said?
7    A.  His -- because there is a context to what he was
8  saying.
9    Q.  Okay.
10    A.  You took a specific sentence out of a
11  conversation.  So the conversation was, I don't have my
12  shield.  How about we use the truck?  Let's use the truck.
13  I don't want to have to go into the field where's
14  somebody's hooting at us if we don't have to.
15       It was the whole conversation leading up to
16  that, not just, "We don't need go into this field."
17    Q.  So when he said, I don't want to approach
18  somebody with a gun who could shoot us unless we have
19  to --
20    A.  He did say that, yes.
21    Q.  But you're interpreting that to mean we should
22  go into a field, just with a truck?
23    A.  Yeah.
24    MR. RATNER:  Object to form and foundation.
25    A.  Yes.

50

1    Q.  (By Mr. Fisher)  Okay.  But that's -- I guess,
2  that's your interpretation.  That's not precisely what he
3  said; fair to say?
4    MR. RATNER:  Object to form.
5    A.  It would be on the video.
6    Q.  (By Mr. Fisher)  Okay.  We can listen to that in
7  a second.
8       Who was the boss on the scene there out of the
9  officers who were there?
10    MR. RATNER:  Object to form.
11    A.  When an officer arrives on scene, it's their
12  scene.
13    Q.  (By Mr. Fisher)  In other words, even though
14  Sergeant Turner was your superior, that was your scene?
15    A.  Yes.
16    Q.  So if Sergeant Turner told you to do something
17  that you didn't agree with, you wouldn't listen to that
18  command?
19    MR. RATNER:  Object to form.
20    A.  If a supervisor arrives on scene and takes
21  control of the scene, then we relinquish control of that
22  scene to them.  Until that time, the responding officer --
23  it doesn't matter if it's a deputy responding and a
24  sheriff shows up, the officer is in control of that scene.
25    Q.  (By Mr. Fisher)  Is that per Elbert County;

Deposition of:  William Dickey - June 29, 2021
Sherry Poer v. Sheriff Tim Norton in his official capacity, et al.

51

1  policy?
2      A.  That's pretty much for any department that I'm
3  aware of.
4      Q.  But was that the Elbert County policy as well?
5      A.  I don't know that it's a written policy.
6      Q.  So this is more of an unwritten rule?
7      MR. RATNER:  Object to form.
8      A.  It would be -- it would be best practice.
9      Q.  (By Mr. Fisher)  Who would have informed you of
10  that best practice at Elbert County?
11      A.  I don't know.
12      Q.  Okay.  I'm just trying to figure out, is this
13  something that you were trained on at Elbert County?  Was
14  it in your training materials?  Was it in their
15  use-of-force policy, or it something you just, kind of,
16  know without being told?
17      MR. RATNER:  Object to form.
18      A.  There's a lot there.  It's just -- it's how
19  we -- it's how we did things.
20      Q.  (By Mr. Fisher)  At Elbert County?
21      A.  No.  It was that way at Commerce City as well.
22      Q.  So at both of those agencies, that was always
23  your experience of how it happened?
24      A.  Yes.
25      Q.  Was that something that you were trained on at

52

1  either one of those agencies, that that should be the way
2  it is?
3      A.  At some point during field training and so on,
4  yes.
5      Q.  Okay.  So when Sergeant Turner arrived on the
6  scene he was, in fact, your superior?
7      A.  He was my superior in rank, yes.
8      Q.  Why did you qualify it that way?  Was he not
9  your superior?  Was he only a superior in rank and not in
10  general or something?
11      MR. RATNER:  Object to form.
12      A.  Well, as I said, the scene was mine, as I
13  arrived first.  I had more information than he did on the
14  entire situation.  And for a ranking officer or supervisor
15  to come in and take over a scene but not know what's going
16  on, it doesn't make sense.
17      Q.  (By Mr. Fisher)  What didn't Sergeant Turner
18  know that you knew at that point?
19      MR. RATNER:  Form and foundation.
20      A.  Many things.
21      Q.  (By Mr. Fisher)  Like what?
22      MR. RATNER:  Same objection.
23      A.  He did not know where the suspect was located.
24      Q.  (By Mr. Fisher)  Didn't you tell him?
25      A.  I gave a general hundred yards out, but that

53

1  doesn't mean anything.  I mean, that could be a hundred
2  yards in any direction.
3      Q.  When he came and met up with you at the scene
4  and you guys were discussing the shield and the truck and
5  going into the field, didn't you tell him where you had
6  just seen Mr. Poer?
7      A.  Yes.
8      Q.  Did you show him?  Did you point?
9      A.  Yes.
10      Q.  Okay.  So now he knows where Mr. Poer is or
11  where you had last seem him; correct?
12      A.  Correct.
13      MR. RATNER:  Form and foundation.
14      Q.  (By Mr. Fisher)  What else didn't he know at
15  that point?
16      A.  That would be about it.
17      Q.  Okay.  So now you had given him that
18  information?
19      A.  Yes.
20      Q.  And he's your superior in rank; right?
21      A.  Yes.
22      Q.  And he's on scene; right?
23      A.  Yes.
24      Q.  What would it take for him to take over at that
25  point?  Simply say it, or just start taking control?  What

54

1  would it take for him to then, quote, unquote, sort of,
2  take over the scene?
3      MR. RATNER:  Form and foundation.
4      A.  I would say for him to take control of the -- I
5  mean, to be lead in that situation would be for him to,
6  well, like you stated, take control of the situation or
7  verbally advise "I'm in the control of the situation."
8      Q.  (By Mr. Fisher)  But I guess that didn't happen
9  in this case?
10      A.  No.
11      Q.  You, kind of, stayed in control of the scene at
12  this point?
13      A.  Yes.
14      Q.  And there was never a conversation about him
15  take over or anything like that?
16      A.  No.
17      MR. FISHER:  Okay.  I'd say let's take a break,
18  because we're supposed to call in three minutes.
19      MR. RATNER:  Okay.
20      (Recess from 10:56  until 11:30.)
21      Q.  (By Mr. Fisher)  Sergeant Turner -- do you know
22  if he was also CIT certified?
23      A.  I do not know.
24      Q.  So at this point when you are deciding to
25  approach him in the field using the truck for cover --

Deposition of:   William Dickey - June 29, 2021
Sherry Poer v. Sheriff Tim Norton in his official capacity, et al.

55

1    A.  Yes.
2    Q.  -- you suspect he's having a mental health
3  crisis; right?
4    A.  Yes.
5    MR. RATNER:  Object to form.
6    Q.  (By Mr. Fisher)  You've been told by dispatch
7  that Elaine says he has not been drinking or taking drugs?
8    A.  Yes.
9    Q.  At this point, you knew that Chris thought he
10  had been robbed; correct?  That's what he conveyed to law
11  enforcement?
12    MR. RATNER:  I'm going to object to form and
13  foundation.
14    A.  He had conveyed something to that effect to
15  dispatch on his original call two hours earlier.
16    Q.  (By Mr. Fisher)  And that he was being
17  surveilled?
18    A.  Again, from what he stated earlier to dispatch.
19    Q.  And according to the dispatches you got, he
20  didn't know law enforcement was coming?
21    A.  According to the information I had, correct.
22    Q.  The information you had at this point, Chris had
23  not hurt anyone?
24    A.  The information I had at that point he had not
25  physically hurt anyone, no.

56

1    Q.  In fact, you never -- he never hurt anyone that
2  night physically; correct?
3    A.  I don't know.
4    Q.  That you're aware of?
5    A.  That I'm aware of, I don't know that he had
6  physically hurt anybody, no.
7    Q.  Do you have some reason to believe that maybe he
8  physically hurt somebody that night?
9    A.  I don't believe he physical -- from what I
10  understood, he did not physically hurt anybody that night.
11    Q.  And certainly at this point before you had
12  approached him, you had not received any information that
13  he had physically hurt anyone that night?
14    A.  Correct.
15    Q.  And at this point before you approached him, you
16  had also not received any information that he had even
17  attempted to hurt anyone; correct?
18    A.  Yes, he had, actually.
19    Q.  What information was that?
20    A.  That he had pointed the gun at Elaine Holt.
21    Q.  And that was attempting to hurt somebody?
22    MR. RATNER:  Object to form.  Argumentative.
23    Q.  (By Mr. Fisher)  I mean, you had received
24  information that he had pointed gun at somebody, but not
25  that he attempted to hurt somebody.

57

1    MR. RATNER:  Object to form and foundation.
2  Already asked and answered.
3    THE WITNESS:  Am I required to --
4    Q.  (By Mr. Fisher)  Yeah.  Go ahead.
5    A.  I believe -- I would believe somebody pointing a
6  gun at somebody could be an attempt to hurt somebody.
7    Q.  Okay.  I guess we'll agree to disagree.
8    When you spotted him in the field 100 to
9  125 yards away, you didn't see any other people near him,
10  did you?
11    A.  I did not.
12    Q.  In fact, that entire evening you didn't see
13  anyone else near him except for law enforcement officers,
14  yourself and Sergeant Turner and Sergeant Bjork,
15  et cetera?
16    A.  I did not see any other persons around him, no.
17    Q.  And where you spotted him, this is a large open
18  field in a rural area?
19    A.  The field -- yes.  The field is surrounded by
20  houses on two sides.
21    Q.  But the houses are not stacked up on top of each
22  other like in the suburbs.  This is a rural area where the
23  houses are far apart?
24    A.  That's correct.
25    Q.  And when you saw him in the field, you didn't

58

1  see anyone within hundreds of yards of him?
2    A.  Not that I could see.
3    Q.  And you didn't have any information that there
4  was anyone within hundreds of yards of him?
5    A.  At that time, no.
6    Q.  This wasn't a hostage situation?
7    A.  No.
8    Q.  This wasn't an active shooter situation, either,
9  as that's defined, was it?
10    MR. RATNER:  Object to form.
11    A.  I guess, what is "active shooter" definition?
12    Q.  (By Mr. Fisher)  You don't have one that you
13  would use in law enforcement?
14    MR. RATNER:  Object to form.
15    Q.  (By Mr. Fisher)  Can you see my screen?  Before
16  I even put this up -- do you see it all right?
17    A.  Yes, I see it.
18    Q.  I'll stop sharing for a second.
19    A.  That's fine.
20    Q.  Just don't look at the exhibit for a second.
21    Do you not have a definition of your own of
22  "active shooter" that you were trained in or anything like
23  that?
24    A.  Someone who is actively firing a weapon in a
25  situation would be an active-shooter situation.

Deposition of:  William Dickey - June 29, 2021
Sherry Poer v. Sheriff Tim Norton in his official capacity, et al.

59

1    Q.  So just take a look at what I have up here on
2  the screen.  It comes from the United States Department of
3  Homeland Security.
4       MR. FISHER:  We can mark this as Exhibit 2, and
5  I'll make a PDF copy to give to defense counsel.
6       (Exhibit Number 2 was marked.)
7    Q.  (By Mr. Fisher)  You see where it gives the
8  definition of "active shooter" here?  It says "The
9  agreed-upon definition of an active shooter by the U.S.
10  government, including White House, U.S. Department of
11  Justice, FBI, U.S. Department of Education, U.S.
12  Department of Homeland Security, is an individual actively
13  engaged in killing or attempting to kill people in a
14  confined and populated area.  In most cases, active
15  shooters use firearms, and there is no pattern or method
16  to their selection of victims."
17       Would you agree with that definition?
18    A.  I would agree that's the U.S. Department of
19  Homeland Security's definition, yes.
20    Q.  And U.S. Department of Justice FBI, U.S.
21  Department of Education, U.S. Department of Homeland
22  Security, and Federal Emergency Management Agency's
23  definition, apparently?
24       MR. RATNER:  Object to foundation.
25    Q.  (By Mr. Fisher)  Do you see that?

60

1    A.  I do see that.
2    Q.  But you have a different definition of that?
3    A.  It's not that I have a different definition of
4  it.  I mean, I see that that's how they have defined it,
5  and I understand what it's saying.
6    Q.  Okay.  This was not a situation like that where
7  Mr. Poer was actively shooting at people or had shot at
8  people randomly and indiscriminately before you arrived;
9  right?
10       MR. RATNER:  Object to form.
11    A.  I would not agree with that statement.
12    Q.  (By Mr. Fisher) I'm confused.  He was --
13       MR. RATNER:  Hold on a second.  Just because
14  he's confused, that's not a question.
15    Q.  (By Mr. Fisher)  It sort of was.  Maybe you
16  could clarify your answer, is what I meant to ask.
17       MR. RATNER:  Object to form.
18    Q.  (By Mr. Fisher)  What do you mean you would not
19  agree with my question?
20    A.  Based on the information that we had of him
21  having the gun and then walking outside and randomly
22  shooting at who knows what.
23    Q.  There were no people around; right?
24       MR. RATNER:  Object to form and foundation.
25    A.  I was not there -- or I could not see other

61

1  people.  That doesn't mean there weren't people around.
2  Bullets go up and down.
3    Q.  (By Mr. Fisher)  You could see Mr. Poer at some
4  point.  He was 100 to 125 yards away from you; right?
5    A.  Yes.
6    Q.  And that was at or around the time he fired the
7  shot?
8    A.  Yes.
9    Q.  And you didn't see any people within hundreds of
10  yards of him at that time?
11    A.  Not that I saw.
12    Q.  Do you think there were some mysterious people
13  hidden in bushes that you weren't aware of?
14       MR. RATNER:  Object to form.
15    Q.  (By Mr. Fisher)  Did you have some reason to
16  believe that?
17    A.  I'm not --
18       MR. RATNER:  Objection.
19       THE REPORTER:  I'm sorry.  I'm not getting the
20  objections.  There's overlapping.
21       MR. RATNER:  Same objection.  It's
22  argumentative.
23    Q.  (By Mr. Fisher)  You didn't have any information
24  that there were people close to him, including what you
25  could see or hear; right?

62

1    A.  I did not have any information at that time that
2  there were people nearby him.
3    Q.  Okay.  And you had never received any
4  information that he had shot people or killed people that
5  night or anything like that?
6    A.  I did not receive any information to that
7  effect.
8    Q.  Okay.  And again, we talked about this earlier,
9  but I'll just give you the quote.
10       When you were talking about the decision to use
11  the truck and approach him, Sergent Turner said to you,
12  and I quote, "I don't want to engage someone who's going
13  to shoot at us if we don't have to."  Do you recall that?
14    A.  I do recall that.
15    Q.  Nonetheless, you made the decision that you
16  should approach using the truck?
17       MR. RATNER:  Object to form.  Assumes facts not
18  in evidence.
19    Q.  (By Mr. Fisher)  Is that correct?
20    A.  We made a joint decision together, which is
21  evident on the video.
22    Q.  Who was in charge of the scene at that point?
23    A.  I was still in charge of the scene at that
24  point.
25    Q.  So who made the decision to use the truck to

Deposition of:  William Dickey - June 29, 2021
Sherry Poer v. Sheriff Tim Norton in his official capacity, et al.

63

1    approach him in the field?
2         A.  We both agreed that approaching with the truck
3    was a tactical -- was the tactical advantage, given that
4    we did not have a shield, and there was a lot of distance
5    to cover.
6         Q.  So it was your decision to use the truck?
7         A.  Yes.
8         Q.  Your sergeant didn't overrule you?
9         A.  Correct.
10        Q.  And so he listened to your suggestion, and
11   that's what you-all did?
12        A.  Yes.
13        Q.  You thought it was prudent at that point to
14   approach Chris in the open field; is that fair to say?
15        A.  Yes.
16        Q.  And in fact, you insisted that it should be done
17   in stealth.  Is that also fair to say?
18        A.  Yes.
19        Q.  You said no lights or sirens?
20        A.  For the approaching, yes.
21        Q.  And also for your own vehicle that you were
22   approaching with, you didn't want the lights on; right?
23        A.  That's correct.
24        Q.  You wanted to, sort of, ambush Chris in the
25   field?

64

1         MR. RATNER:  Object to form.
2         Q.  (By Mr. Fisher)  You can answer.
3         A.  I would not use that word.
4         Q.  What's wrong with that word?  You wanted to
5    sneak up on him?  Do you prefer that?
6         MR. RATNER:  Object to form.
7         Q.  (By Mr. Fisher)  I was just asking how you would
8    characterize it.
9         A.  We wanted to approach him without being seen.
10        Q.  Which is another way of saying sneak up on a
11   person; right?
12        MR. RATNER:  Object to form.  Argumentative.
13        Q.  (By Mr. Fisher)  You didn't want him to know you
14   were coming?
15        A.  That is correct.
16        Q.  So you purposely turned the vehicle lights off
17   until you got very close?
18        A.  That is correct.
19        Q.  This is a man who you knew was waiting for the
20   police to arrive so he could report a crime to them?
21        MR. RATNER:  Object to foundation.
22        A.  Yes.
23        Q.  (By Mr. Fisher)  This is a man that you
24   suspected was in the throws of a mental health crisis?
25        MR. RATNER:  Object to foundation.

65

1         A.  Potentially, yes.
2         Q.  (By Mr. Fisher)  And despite your training as a
3    CIT officer, you decided to sneak up on this person in a
4    stealth manner instead of trying to communicate with him
5    first?
6         MR. RATNER:  Object to form.
7         A.  I need you to reask that.
8         Q.  (By Mr. Fisher)  I said, despite your training
9    as a CIT officer, you decided to sneak up on this man
10   instead of trying to communicate with him first?
11        MR. RATNER:  Object to form.
12        A.  On a person with a gun, yes.  Absolutely.
13        Q.  (By Mr. Fisher)  And this particular person;
14   correct?
15        A.  Yes.
16        Q.  As we said earlier, when you're dealing with a
17   CIT situation, you were trained you should attempt to talk
18   to that person if you can; right?
19        A.  As a CIT and in CIT training, we are trained to
20   make the situation safe before trying to talk to someone.
21        Q.  You're also taught that you should talk to
22   somebody in a calm, reassuring manner when you do it?
23        MR. RATNER:  Object to form.
24        A.  Yes.
25        Q.  (By Mr. Fisher)  You should identify yourself as

66

1    a police officer?
2         A.  Yes.
3         Q.  Tell them that you're there to help?
4         A.  If at all possible, yes.
5         Q.  And you should try to deescalate the situation;
6    right?
7         MR. RATNER:  Object to form.  Asked and
8    answered.
9         Q.  (By Mr. Fisher)  You can answer.
10        A.  If at all possible, yes.
11        Q.  You had Mr. Poer's cell phone number; correct?
12        A.  I did not.  Sergeant Turner, I believe, did.
13        Q.  It was also in the dispatch -- in the CAD;
14   right?
15        A.  Yes.
16        Q.  You didn't call him?
17        A.  No.
18        Q.  You could have called him; correct?
19        A.  I believe it was attempted, and it went to voice
20   mail.
21        Q.  At that time?  I'm talking about at the time
22   that you-all were deciding to approach using truck as
23   cover.
24        A.  No.
25        Q.  Nobody called him at that time --

Deposition of:  William Dickey - June 29, 2021
Sherry Poer v. Sheriff Tim Norton in his official capacity, et al.

67

1    A.  No.
2    Q.  -- to try to talk to him; right?
3    A.  No.
4    Q.  You had a PA system in that truck?
5    A.  Yes.
6    Q.  You could have gotten on the PA and said,
7  "Mr. Poer, this is the police. We're here to help you.
8  Please put down your gun and start walking towards our
9  voice." You could have done that; right?
10   A.  That could be one way of doing things, sure.
11   Q.  And stayed behind the truck for cover while you
12 did that; right?
13   A.  Possibly.
14   Q.  You never even entertained that possibility,
15 though, that evening?
16   A.  No.
17   Q.  And this was somebody who you already knew was
18 experiencing signs of paranoia; right?
19      MR. RATNER:  Object to form and foundation.
20 Asked and answered.
21   A.  I did not deal with him directly.
22   Q.  (By Mr. Fisher)  From what you were --
23   A.  If we're going based off of the CAD notes, then,
24 yes, it appeared he was having some sort of mental illness
25 issue.

68

1    Q.  And some sort of paranoia, as well, thinking
2  that people had put recording devices in his house and on
3  his phone; right?
4       MR. RATNER:  Same objections.
5    A.  I don't know.  Maybe they did.
6    Q.  (By Mr. Fisher)  You think those -- why did you
7  think this was a CIT assist or a mental health call if you
8  thought those fears were legitimate about being recorded?
9    A.  We don't classify those calls as what they are;
10 the dispatchers do.
11   Q.  Okay.  So you believed that this was a man who
12 was really being surveilled, and people were robbing his
13 house and surveilling his phones and his Bluetooth and all
14 that?
15   A.  I didn't say that.
16   Q.  You believed that this was somebody experiencing
17 paranoia, and those things really probably weren't
18 happening; right?
19      MR. RATNER:  Form and foundation.
20   Q.  (By Mr. Fisher)  You can answer.
21   A.  I believe that the likelihood of what we were --
22 the information we were given, that it was a mental health
23 situation.
24   Q.  So you began moving forward in the field at --
25 let's see --

69

1       MR. RATNER:  Natasha's in the waiting room.
2       (Investigator Natasha Powers joined the
3  videoconference.)
4       MR. RATNER:  So the record reflects she's on the
5  Zoom; correct?
6       MR. FISHER:  Yeah.  So Natasha Powers, my
7  investigator, is on the Zoom just listening.
8    Q.  (By Mr. Fisher)  So the time you're
9  approaching -- you decide to get in the truck and start
10 approaching, that would have been -- do you see this
11 8 hours, zero minutes, 21 seconds?
12   A.  8:00 p.m. yes.
13   Q.  And going back, you had not -- the time you
14 heard the gunshots was approximately 7:52 and 21 seconds.
15 Do you recall that?
16   A.  Yes.
17   Q.  So that would have been eight minutes prior?
18   A.  That's correct.
19   Q.  So again, just going back to this concept --
20 well, forget the term "active shooter."  This was a person
21 who had fired three shots eight minutes in the past?
22   A.  Yes.
23   Q.  Wasn't currently firing shots at anybody?
24      MR. RATNER:  Object to form.
25   A.  That is correct.

70

1    Q.  (By Mr. Fisher)  And again mat this point when
2  you're approaching him, you're not aware of anybody being
3  in his general vicinity?
4    A.  Not that I was aware of.
5    Q.  You started the approach at about eight minutes,
6  and if you'll scroll up a little bit, you said, "One at
7  gunpoint," at 8:02 and 40 seconds; is that right?
8    A.  Yes.
9    Q.  So it took you approximately two minutes and
10 19 seconds after you began your approach to have Chris at
11 gunpoint?
12   A.  That's correct.
13   Q.  And you weren't the first one to spot Chris in
14 that field once you all started approaching; right?
15   A.  No.
16   Q.  It was Sergeant Turner?
17   A.  Sergeant Turner called out that he had spotted
18 him, yes.
19   Q.  In fact, he said, "Oh, shit.  There he is"?
20   A.  Yes.
21   Q.  You were told about one firearm in the dispatch;
22 right?
23   A.  Yes.
24   Q.  That he had, quote, unquote, "Elaine's gun"?
25   A.  Yes.

Deposition of:  William Dickey - June 29, 2021
Sherry Poer v. Sheriff Tim Norton in his official capacity, et al.

71

```
1    Q.  It was a .380 pistol?
2    A.  Yes.
3    Q.  You weren't told about other firearms; right?
4    A.  No.
5    Q.  Now, when you approach any citizen in any police
6  encounter, it's always that person could have weapons on
7  them; right?
8    A.  Absolutely.
9    Q.  It's always possible any person could have
10 several weapons on them; right?
11   A.  Absolutely.
12   Q.  But in this case, the only information you had
13 about weapons was one gun?
14   A.  That's correct.
15   Q.  Let's go to the body cam.
16   MR. FISHER:  And I think we're going to have
17 to -- Natasha if, you can hear me, while we're watching
18 the body cam, we're going to have to mute your -- we're
19 going to have to mute the Zoom; otherwise it will echo in
20 here.
21   MS. POWERS:  Yep.  No problem.
22   Q.  (By Mr. Fisher)  Before we get into playing the
23 video, when Sergeant Turner said, "Oh, shit.  There he
24 is," and he spotted him, Chris was laying on the ground in
25 the field?
```

72

```
1    A.  Yes.
2    Q.  You all started approaching him at that point?
3    A.  No.
4    Q.  I mean, you had already been approaching him,
5  but once you spotted him, you started going towards where
6  is he was laying?
7    A.  No.
8    Q.  What do you mean?
9    A.  We immediately stopped and held our position and
10 gave orders.
11   Q.  Okay.  And Turner used some sort of -- he lit
12 him up.  In other words, he used some sort of flashlight;
13 right?
14   A.  Correct.
15   Q.  Was it like a handheld?  Was part of his gun?
16   A.  I believe he had a light on his weapon.
17   Q.  Was that like an AR-15 rifle?  Describe to us
18 what is.
19   A.  An AR-15 rifle is a semiautomatic carbene rifle
20 that is -- it's semiautomatic, single shot -- or single
21 trigger pull, single shot rifle chambered in -- usually in
22 223 ammunition and is a common rifle used by most law
23 enforcement agencies across the U.S.
24   Q.  And it's one that Officer -- Sergeant Turner had
25 on him that day.  He had it deployed --
```

73

```
1    A.  Correct.
2    Q.  -- pointed in the direction of Mr. Poer once he
3  had spotted him; correct?
4    A.  That's correct.
5    Q.  And the flashlight was also pointed in the
6  direction of Mr. Poer at that point?
7    A.  That's correct.
8    Q.  You also had an AR-15 in your hand?
9    A.  Yes, sir.
10   Q.  Also pointed at Mr. Poer?
11   A.  Yes.
12   Q.  And at that point, Turner started yelling loud
13 verbal commands; right?
14   A.  Yes.
15   Q.  "Hands up, motherfucker"?
16   A.  Yes.
17   Q.  "Hands up or I will shoot you"?
18   A.  Yes.
19   Q.  "Hands up or I will fucking shoot you"?
20   A.  Yes.
21   Q.  You also eventually started yelling loud verbal
22 commands?
23   A.  Initially it didn't, but, yes, I did at one
24 point.
25   Q.  You were saying, "Don't do it.  You're going to
```

74

```
1  get shot"?
2    A.  Yes.
3    MR. RATNER:  I'm going to object to form.
4  You're skipping ahead in time.
5    Q.  (By Mr. Fisher)  Okay.  Was your rifle loaded?
6    A.  Yes.
7    Q.  Was there a bullet ready to be fired in the
8  chamber?
9    A.  Yes.
10   Q.  Is there a safety on that gun?
11   A.  Yes, there is.
12   Q.  Was the safety on or off?
13   A.  At the time I deployed it, the safety was on.
14   Q.  And at the time you're holding it at him and
15 saying, "Don't do it.  You're going to get shot," is the
16 safety on or off?
17   A.  Safety was on.
18   Q.  So you never turned the safety off that night?
19   A.  No, I did turn it off.
20   Q.  At which point?
21   A.  At the point I thought that he was going to be
22 shot.
23   Q.  So as you're approaching him giving the
24 commands?
25   A.  You'll have to be more specific.
```

Deposition of: William Dickey - June 29, 2021
Sherry Poer v. Sheriff Tim Norton in his official capacity, et al.

75

1   Q.   You be more specific.  Go ahead.  Tell me when
2   you turned it off.
3       A.   At the point that he was reaching for the gun on
4   the ground and I thought I might have to shoot him is when
5   I clicked my safety off.
6       Q.   And that's while you were approaching him?
7       A.   No.  He started reaching for the gun while we
8   were still at the truck.
9       Q.   And how far away were you from him at that
10  point?
11      A.   Approximately 20, 25 feet, somewhere in that
12  area.
13      Q.   And you say he was reaching for a gun.  He was
14  lying on his belly, right, or on his side?
15      A.   He was laying on his belly -- or, no, he was
16  laying on his back initially.  When we first contacted
17  him, he was on his back.
18      Q.   Did you see a gun at that point?
19      A.   No.
20      Q.   And then at some point, did he roll to his side?
21      A.   Yes.
22      Q.   Facing you?
23      A.   Yes.
24      Q.   With his hands out in front of him?
25      A.   With his hands outstretched in front of him, yes

76

1   (demonstrating).
2       Q.   And for the record, you just put your hands out
3   in front of you, in front of your chest?
4       A.   Yes.  I'm sorry.
5       Q.   That's fine.  I just wanted to describe that.
6           And you didn't see a weapon in his hands?
7       A.   No.
8       Q.   And you could see his hands?
9       A.   Yes.
10      Q.   You say he started reaching for something;
11  right?
12      A.   Yes.
13      Q.   Could you see what he was reaching for?
14      A.   Not at that time.
15      Q.   So there was a flashlight on him?
16      A.   Yes.
17      Q.   It was getting dark?
18      A.   Yes.
19      Q.   But the flashlight was illuminating him?
20      A.   Yes.
21      Q.   I was illuminating his hands as he was reaching
22  his hands forward; correct?
23      A.   Yes.
24      Q.   In the flashlight beam as that area was being
25  illuminated, you didn't see a gun near his hands.

77

1       A.   Not while his hands were in the air, no.
2       Q.   In the air or out in front of him is what you
3   mean; right?
4       A.   No.  They're two different things.
5       Q.   When did his hands get "in the air," quote,
6   unquote?
7       A.   When he first rolled over, his hands --
8   specifically, his left hand was approximately chest level
9   out in the air.  And as he rolled towards us, his hand
10  went down to the ground, and he started feeling his way
11  through the grass with his hand.
12      Q.   And you saw him doing that?
13      A.   Yes.
14      Q.   Can you see that on the body-cam video?  Have
15  you reviewed that -- let me start with that question.
16  Have you reviewed the body-cam video?
17      A.   I have reviewed the body-cam video.
18      Q.   Can you see him reaching with his hand onto the
19  ground searching for something?
20      A.   No.  The video's too dark.
21      Q.   Okay.  And as you were approaching him and the
22  flashlight was on him, you can see his hands as he's
23  reaching for something; right?
24      A.   Yes.
25      Q.   You cannot see a gun there; right?

78

1       A.   Correct.
2       Q.   You eventually found a gun that evening?
3       A.   Yes.
4       Q.   But that gun was by his feet; correct?
5       A.   It was down by his knees.
6       Q.   I'm going to share something different with you
7   here.
8           Do you recall that when you gave a statement to
9   Elbert County that night, you drew a -- you drew a little
10  diagram?
11      MR. RATNER:  Object to form.
12      Q.   (By Mr. Fisher)  Do you recall that?
13      MR. RATNER:  Object to form.
14      A.   I never gave a statement to Elbert County that
15  night.
16      Q.   (By Mr. Fisher)  I'm sorry.  Parker Police?
17      A.   The next day, yes.
18      Q.   You drew a little diagram; right?
19      A.   I believe so.
20      Q.   I'm going to show that to you.
21          Can you see it?
22      A.   I can only see half of it.
23      Q.   Yeah, but can you see that drawing?
24      A.   Yes.
25      Q.   It says "Man with gun incident"?

Deposition of:  William Dickey - June 29, 2021
Sherry Poer v. Sheriff Tim Norton in his official capacity, et al.

79

1    A.  Yes.
2    Q.  Did you write that?
3    A.  Yes.
4    Q.  And then you drew this thing below it; right?
5  Did you draw this?
6    A.  Yes.
7    Q.  It's a rough picture; right?
8    A.  I'm not an artist.
9    Q.  Right.  And you see a person's head, and it says
10 "facedown" above that?
11   A.  Yes.
12      MR. FISHER:  We'll mark this as
13 Deposition Exhibit 3.
14      (Exhibit Number 3 was marked.)
15   Q.  (By Mr. Fisher)  Do you see the gun that you
16 drew in this picture?
17   A.  Yes.
18   Q.  The gun that you drew in this picture is well
19 below the man's feet; correct?
20   A.  I would agree it's down by his feet, yes.
21   Q.  Okay.  And it looks like in this picture you
22 have Josh being represented as being on his right side or
23 by his right arm; correct?
24   A.  Yes.
25   Q.  And that would be Josh Bjork --

80

1    A.  Yes.
2    Q.  -- another deputy?
3    A.  Yes.
4    Q.  You have Travis by his left arm; correct?
5    A.  Yes.
6    Q.  That would be Travis Turner, your sergeant;
7  right?
8    A.  Yes.
9    Q.  And you have Dickey over there -- that's
10 yourself, obviously -- by his left hip area; correct?
11   A.  Yes.
12   Q.  What did you write there?  DS?  Oh, drive stun;
13 right?
14   A.  Yes.
15   Q.  That's where you drive stun, or that's where you
16 put the taser into his body; correct?
17   A.  Physical taser made contact with his body --
18   Q.  Makes contact with the outside of his body?
19   A.  Yes.
20   Q.  Through his clothing, I guess?
21   A.  Yes.
22   Q.  And then you have taser probes in, looks like,
23 kind of the small of his back area in the left center?
24   A.  Yes.
25   Q.  And again, the gun is well below his body, kind

81

1  of below his feet and off to the right in the photo -- in
2  this drawing that you made?
3    A.  In this drawing, yes.
4    Q.  Okay.  You intended this drawing to be a rough
5  representation of where the guy was and where you all were
6  and where the gun was; right?
7    A.  Yes.
8    Q.  And you made it the day after the incident when
9  you were interviewed by Parker PD?
10   A.  Correct.
11   Q.  So again, when you all are approaching and you
12 have the guns, the AR-15s, pointed at him and a flashlight
13 pointed at him, you see his hands moving; correct?
14   A.  Yes.
15   Q.  You don't actually see a gun at that point;
16 right?
17   A.  Correct.
18   Q.  Later when you got closer, you did see a gun?
19   A.  Yes.
20   Q.  And that gun was over by his feet, like
21 represented in this diagram here or this picture that you
22 made?
23   A.  That's correct.
24   Q.  Eventually when you got over to Chris, you
25 kicked him; correct?

82

1    A.  Yes.
2    Q.  Where did you kick him?
3    A.  Square in the hip.  As he was rolling -- as he
4  was rolling towards us, I basically kicked so that he
5  would go flat down on the ground.
6       MR. FISHER:  Oh, you know what?  Can we unmute?
7       THE REPORTER:  You're welcome to do that if
8  you'd like.
9       MR. RATNER:  Is she on your phone too?
10      MR. FISHER:  No.
11      MR. RATNER:  So why is there an echo?
12      MR. FISHER:  That was any computer.
13      MR. RATNER:  Are you on Zoom?
14      MR. FISHER:  Yeah.  I'm on Zoom so I can share
15 this stuff with you.  But if I have my volume on and my
16 mic's on, that's what that was.  So I just turned my
17 volume down.
18   Q.  (By Mr. Fisher)  So you kicked him in the which
19 area?
20   A.  It would be in the left hip.
21   Q.  He's laying on his right hip, and you kicked him
22 in the left hip?
23   A.  That's correct.
24   Q.  To get him onto his back?
25   A.  No, to get him onto his stomach.

Deposition of:  William Dickey - June 29, 2021
Sherry Poer v. Sheriff Tim Norton in his official capacity, et al.

83

1  Q.  Did you achieve that result?  Did kicking him
2  get him onto his stomach?
3  A.  Yes.
4  Q.  And at that point, he's laying on his stomach
5  with his hands out in front of him?
6  MR. RATNER:  Object to form.
7  Q.  (By Mr. Fisher)  Where are his hands?
8  A.  His hands are underneath him.
9  Q.  Can you see that in the video?
10  A.  Possibly.  With the light and the movement and
11  everything like that, it's hard to tell.
12  Q.  Okay.  So before you kicked him in the hip,
13  where were his hands?
14  A.  One -- his right hand or his right arm would be
15  somewhat underneath him, because he was rolling over on
16  it.  And his left hand was outstretched in front of him,
17  as I said, feeling all around in front of him in the
18  grass.
19  Q.  Was he saying anything at that point?
20  A.  No.
21  Q.  Were you communicating with him?
22  A.  Yes.
23  Q.  What were you saying?
24  A.  "Don't do it.  Quit reaching.  Don't do it."
25  Q.  And what was Travis saying?

84

1  A.  More of the same of what you had already
2  reiterated or outlined.
3  Q.  "Show me your fucking hands or I'm going to
4  fucking shoot you"; is that right?
5  MR. RATNER:  Object to form.
6  A.  Right.
7  Q.  (By Mr. Fisher)  So now you've kicked him over
8  onto his stomach?
9  A.  Yes.
10  Q.  With which foot?
11  A.  I can't recall.  Probably my right.
12  Q.  You still have a gun pointed at him?
13  A.  Yes.
14  Q.  The machine gun?
15  MR. RATNER:  Object to form.
16  Q.  (By Mr. Fisher)  Assault rifle?
17  MR. RATNER:  Object to form.
18  A.  It's not an assault rifle.
19  Q.  (By Mr. Fisher)  What is it?
20  A.  Assault rifle is a misnomer.  It is a
21  semiautomatic rifle.
22  Q.  What is the difference between an assault rifle
23  and a semiautomatic rifle?
24  A.  "Assault rifle" is a made-up term by the
25  government in the 1990s so that they could put it into a

85

1  law.  There's no such thing as assault rifles.
2  Q.  So you were holding a semiautomatic rifle?
3  A.  A semiautomatic AR-15 rifle.
4  Q.  And as is Sergeant Turner?
5  A.  Yes.  He's holding his rifle.  I had my rifle.
6  Q.  Both pointed at Mr. Poer?
7  A.  Yes.
8  Q.  Now that you've kicked him onto his stomach, you
9  say his hands were underneath him?
10  A.  Yes.
11  Q.  Both of them?
12  A.  He pulled his left arm underneath him.
13  Q.  What about his right arm?
14  A.  It was already -- it was underneath him from
15  rolling over onto it.
16  Q.  You and Sergeant Turner are asking him to give
17  his hands at that point?
18  A.  Yes.
19  Q.  Where is Deputy Bjork at this point?
20  A.  He had gone around Mr. Poer's head, to the other
21  side -- well, as you can see on the diagram, to the -- to
22  his --
23  Q.  Right side?
24  A.  -- right side as he's laying facedown and was
25  attempting to pull his right arm out to get a handcuff on

86

1  him.
2  Q.  So we got Josh on his right side pulling at his
3  right arm?
4  A.  Yes.
5  Q.  And we have Travis on his left side?
6  A.  Yes.
7  Q.  Is he also pulling at his left arm?
8  A.  He's attempting to, yes.
9  Q.  But he's pulling -- you're saying he's not able
10  to pull it out.  Is that why you said "attempting to"?
11  A.  Correct.
12  Q.  He's not attempting to pull; he's actually
13  pulling his arm; right?
14  A.  He's -- he is attempting to pull his arm out
15  from underneath him.
16  Q.  But he's actually in contact with his arm
17  physically pulling it?
18  A.  Yes.
19  Q.  And so you've got one deputy on one side pulling
20  his right arm, and other deputy on the other side pulling
21  his left arm?
22  A.  Correct.
23  Q.  And at this point, you see the gun in the grass?
24  A.  Yes.
25  Q.  Behind him by his feet?

Deposition of:   William Dickey - June 29, 2021
Sherry Poer v. Sheriff Tim Norton in his official capacity, et al.

---

87

1      A.   Yes.
2      Q.   And in fact, Deputy Bjork then secures the gun?
3      A.   No.
4      Q.   Sergeant says, "Oh, there's the gun.  Grab it."
5  You say, "Gun, gun.  Grab it."  And at that point, Bjork
6  takes the gun and secures it in his waistband?
7      A.   Possibly.  I don't -- I was focused on what I
8  was doing.  I don't recall -- and so much was happening, I
9  don't recall his hands going over and getting the gun and
10  coming back.  All I remember was him working on trying to
11  get that right arm out.
12      Q.   Okay.  Do you recall saying, "There's the gun.
13  Grab it"?
14      A.   If I said it, it's on the video.  I don't
15  recall.
16      Q.   Okay.  Let's play that part of the video.
17          You just have to mute that again, please.
18  Hopefully this doesn't make a Jimi Hendrix noise.
19          So I'm going to fast forward.
20          MR. FISHER:  I guess we'll make this
21  Deposition Exhibit 4.
22          (Exhibit Number 4 was marked.)
23      Q.   (By Mr. Fisher)  Let me just get to the
24  appropriate point here.  I'll just start playing it from
25  11:19 to start with.

---

88

1          (The video was played.)
2      Q.   So I'm going to stop the video at this point,
3  11:46.
4          You were saying, "Don't do it.  Don't do it";
5  right?
6      A.   Correct.
7      Q.   Sergeant Turner's saying, "Hands up or I'm going
8  to fucking shoot you"; right?
9      A.   Correct.
10      Q.   And we could see Mr. Poer there.  He's lying on
11  his left side?
12      A.   On his right side.
13      Q.   Correct.  Lying on his right side.  You can see
14  his chest and hands.
15          I'll back it up just a little bit so we can see
16  it a little better.  It's kind of hard to see.
17          (The video was played.)
18      Q.   (By Mr. Fisher)  Can you see there?
19      A.   Yes.
20      Q.   What does that look like to you?  You see his
21  face?
22      A.   I see his face.
23      Q.   And he's on his right side?
24      A.   Appears to be.
25      Q.   And he's got his left arm, kind of, out in front

---

89

1  of him?
2      A.   Yes.
3      Q.   You see that where my mouse is?
4      A.   Looks like it, yeah.
5      Q.   And the gun would be somewhere -- you didn't
6  know this at that time.  It turns out the gun was
7  somewhere by his feet?
8      A.   Correct.
9      Q.   And you didn't see a gun at this point --
10      A.   No.
11      Q.   -- right?
12          So let's continue.  Because the last thing I was
13  asking you about when the gun was secured -- so let's get
14  to that point.
15          (The video was played.)
16      Q.   And so that's where you're kicking him, right,
17  at 11:50?
18      A.   I kicked him one time.
19      Q.   In the hip?
20      A.   Yes.
21      Q.   And we could see his face there; right?
22      A.   The side of his face.
23      Q.   It's blurry but --
24      A.   Yes.
25      Q.   And you can see both of his hands out in front

---

90

1  of him; right?  There's one on the bottom of the screen
2  here where my mouse is and one to the left of his face.
3  See that?
4      A.   Yep.
5          (The video was played.)
6      Q.   (By Mr. Fisher)  Sergeant Turner's saying,
7  "Behind your back now, both of them," meaning his hands;
8  right?
9      A.   Yes.
10      Q.   I paused at 1:15.  Could you see there before we
11  went to that point, his hands were actually in front of
12  his head like this (indicating)?  Could you see that?  Or
13  I can go back.
14      A.   No.  I need you to go back.
15      Q.   And when I say "like this," for the record, I'm
16  putting my hands in front of my face, kind of like I was
17  laying on my stomach on top of my elbows with my hands out
18  in front of me.
19          So I'll go back a little bit.  Sometimes doesn't
20  let me rewind in very short increments, but I'll try.
21      A.   Can you make the whole thing a little bigger?
22          (The video was played.)
23      Q.   (By Mr. Fisher)  Let's try to keep moving here.
24  I went a little bit ahead there.
25          (The video was played.)

---

Deposition of:  William Dickey - June 29, 2021
Sherry Poer v. Sheriff Tim Norton in his official capacity, et al.

91

1    Q.  You can't really see his hands in this still
2  frame at 11:53; right?
3    A.  No.
4    Q.  You can just see his head, but the camera
5  doesn't know show the hands; right?
6    A.  Right.  It's off screen.
7       (The video was played.)
8    Q.  Did you see them there for just one second
9  between 11:53 and 54?
10   A.  Yeah.  At chest level.
11   Q.  Kind of, like, out in front of him by his face?
12   A.  I saw his hands going -- I saw his hands, yeah,
13  down on the ground.  There we go.  What mark is that?
14   Q.  That's 11:50.  I'm just going to play it and
15  stop it again.
16      (The video was played.)
17   Q.  Did you see him?
18   A.  Yes.  Yes.
19   Q.  He's laying on his stomach but kind of on his
20  elbows as well?
21   A.  Yes.
22   Q.  And his hands are, kind of, in front of his face
23  as he's laying on his stomach; right?
24   A.  Yes.
25   Q.  The hands are not under his body, but his elbows

92

1  are under his body supporting him; correct?
2       MR. RATNER:  We're at what?  I can't see it.
3       MR. FISHER:  11:54.
4    Q.  (By Mr. Fisher)  So I'm just going go forward to
5  where you guys secure the gun.
6       (The video was played.)
7    Q.  Did you hear Sergeant Turner at 11:56, "There's
8  the gun.  Grab it"; right?
9    A.  Yes.
10   Q.  And you say, "Gun"; right?
11   A.  Yes.
12   Q.  Do you recall now that you were telling
13  Deputy Bjork to grab the gun, and he put it in his
14  waistband?
15      MR. RATNER:  Object to form and foundation.
16   Q.  (By Mr. Fisher)  If you recall.  If you don't,
17  that's fine.
18   A.  I honestly don't recall.
19   Q.  Okay.  Do you recall the one accident occurred
20  at some point?
21   A.  Yes.
22   Q.  Do you recall when it was?
23   A.  I don't recall when it was.  I know that after
24  he was in custody, I asked where the gun was, and
25  Deputy Bjork said he had it.

93

1    Q.  If I represent to you that Deputy Bjork in this
2  interview said he secured it at this point in the video,
3  do you have any reason to disagree with that?
4    A.  No.
5    Q.  So now the gun is secured.  You have Mr. Poer
6  laying on his belly.  You have one officer on his right
7  arm, one officer on his left arm, and you're there
8  covering him with the AR-15; right?
9    A.  Yes.
10      (The video was played.)
11   Q.  (By Mr. Fisher)  You hear, a little after the
12  12-minute mark, Sergeant Turner saying, "Put your hands
13  behind your fucking back or I'm going to fucking shoot
14  you."
15   A.  Yep.
16   Q.  Right?
17      (The video was played.)
18   Q.  You repeat, also, "Put your hands behind your
19  back"?
20   A.  Yes.
21   Q.  What was that -- do you hear that metal clanging
22  noise?
23   A.  Yes.
24   Q.  What was that?
25   A.  That could have been -- that could have been any

94

1  number of -- I mean, a rifle against a magazine on a belt.
2  It could have been anything.  It could have been a
3  flashlight.
4    Q.  Immediately thereafter, you start saying, "It's
5  okay.  It's okay."  What were you talking about?  I'll
6  play it for you again.
7    A.  You'll have to play it.  I don't remember.
8    Q.  Just going to scroll it back a little bit,
9  starting at 12.
10      (The video was played.)
11   Q.  As he's saying, "I'm going to shoot you if you
12  don't do it," somebody's pressing a rifle into his back.
13  Who is that?  Is that you?
14      (The video was played.)
15   Q.  I'll just scroll back a little bit.  I
16  apologize.  Start again from about 11:52.
17      (The video was played.)
18   Q.  Can you see -- is that your rifle in the picture
19  there?
20   A.  Well, that would be my body cam outlining my
21  rifle, yes.
22      (The recording was played.)
23   Q.  Do you see your rifle there?
24   A.  Yeah.
25   Q.  It is, like, pressed into his body or just away

Deposition of:  William Dickey - June 29, 2021
Sherry Poer v. Sheriff Tim Norton in his official capacity, et al.

95

1    from his body?  Can you tell?
2        A.  It's pointing at him, but I've got -- it's a
3    16-inch, you know, or 20-inch total length weapon, and I'm
4    bending over.  But I've got my hand -- my right hand is on
5    the hand guard or on the grip, and so it's pointing down
6    where it's going to be pointing at him, yes.
7        Q.  Do you know if you're actually touching him with
8    the rifle muzzle?
9        A.  I don't recall.
10       Q.  So let's keep watching.
11           (The video was played.)
12       Q.  See right there?  Did it look like you were
13   making contact with him with the rifle barrel?
14       A.  I don't recall doing that.
15       Q.  Okay.
16           (The video was played.)
17       Q.  And there's that noise followed by you saying,
18   "It's okay," twice.
19           Well, let me just -- sorry.  I interrupted.  I'm
20   just going to play it from 12:10 to, like, 12:15 so we can
21   see watch it from here.
22           (The video was played.)
23       Q.  All right.  So you say, "I'm going to fucking
24   shoot you."  We hear the metal clang.  You say, "It's
25   okay.  It's okay.  We got him."

96

1        A.  Yes.
2        Q.  Who were you talking to, and who were you
3    referring to?
4        A.  Everybody on the scene, so Josh and to
5    Sergeant Turner.
6        Q.  In other words, you're telling them, We got him.
7    We can all relax.  We got him.
8        A.  Trying to calm the situation -- deescalate, if
9    you will.
10       Q.  Okay.
11           (The video was played.)
12       Q.  So now you say at approximately 12:15 in the
13   video, "I've got a taser.  Move your knee."  Who are you
14   talking to?
15       A.  The "move the knee" part was Travis -- was
16   Sergeant Turner.
17       Q.  So Turner had his knee on the suspect?
18       A.  No.  He was kneeling -- or he had his knee in
19   the way of where I was going to deploy the taser.
20       Q.  You were going to deploy the taser into his
21   body?
22       A.  Yes.
23       Q.  And the knee was in the way of that taser
24   deployment?
25       A.  Yes.

97

1        Q.  Deputy Bjork was on his right arm at this point?
2        A.  Yes.
3        Q.  Turner on his left arm?
4        A.  Yes.
5        Q.  But Turner's knee was in the way of where you
6    wanted to deploy the taser into his body?
7        A.  Yes.  Turner's very tall and has long legs.
8        Q.  How much do you think -- how tall is Turner?
9        A.  I think he's 6'4", 6'5".
10       Q.  And a fairly big guy, like, muscular?
11       A.  I would say so.
12       Q.  And how much do you think he weighed at the
13   time, approximately?
14       A.  I don't even know.
15       Q.  Somewhere in 6'4", like, 240 range?
16       A.  No, no.  He's leaner than that.  He's maybe
17   220 pounds.
18       Q.  Okay.  At the time at least, works out, goes to
19   the gym, that kind of thing?
20       A.  I don't know his personal habits at that time.
21       Q.  Okay.  You could you tell, kind of, that he is
22   someone who lifts weights by looking at him?
23       A.  I can tell he's someone who takes care of
24   himself.
25       Q.  Physically?

98

1        A.  Physically, yeah, as we all try to do.
2        Q.  Some better than others.
3        A.  Agreed.
4        Q.  COVID, things change.
5            All right.  So I'm going to keep playing it here
6    where you're about to tase him, and you're telling
7    Sergeant Turner to move his knee.
8        A.  Yes.
9        Q.  Did Turner ever have his knee on Poer's back at
10   this point?
11       A.  I don't recall seeing that.
12       Q.  Did Josh ever do that?
13       A.  I don't recall ever seeing that.
14       Q.  If Turner said that in his interview, would you
15   have some reason to dispute that?  Did you see something
16   different?
17       A.  No.  I mean, if he said something like that in
18   his interview, that would be his recollection.  I don't --
19   I don't remember seeing anybody with knees in the back.
20       Q.  Okay.  So I started it at 12:17 and stopped it.
21   We can hear the taser mechanism going off; right?
22       A.  Yes.
23       Q.  You can hear that electric whirring sound?
24       A.  Yes.
25       Q.  We could also hear a groan from Mr. Poer when it

Deposition of:  William Dickey - June 29, 2021
Sherry Poer v. Sheriff Tim Norton in his official capacity, et al.

99

1  starts?
2      A.  Yes.
3      Q.  Kind of like a groan of pain?
4      MR. RATNER:  Object to foundation.
5      A.  It's a groan.
6      Q.  (By Mr. Fisher)  You've been tased before;
7  right?
8      A.  Yes, I have.
9      Q.  It is painful?
10     A.  It hurts, yes.
11     Q.  Did you groan in pain when you were tased?
12     A.  I'm pretty sure I did.
13     Q.  Similar to what we're hearing right now in the
14  video?
15     A.  Yes.
16     Q.  Okay.  I'm going keep playing it at 12:18.
17     (The video was played.)
18     Q.  And we can continuously hear the taser whirring.
19  I stopped it at 12:19; right?
20     A.  Sure.
21     Q.  And we also heard a handcuff ratcheting at
22  12:19.  Did you hear that?
23     A.  Yes.
24     Q.  That would be Deputy Bjork handcuffing Poer's
25  right hand; correct?

100

1      A.  Deputy Bjork was the one handcuffing.  And if
2  there was a cuff being applied at that time, it would have
3  been him, yes.
4      Q.  On Poer's right hand?
5      A.  I believe so, yes.
6      Q.  Because he was on Poer's right side?
7      A.  Correct.
8      Q.  I'm going to start playing again at 12:19.
9      (The video was played.)
10     Q.  We can still hear the whirring of the taser.  Do
11  you hear that?
12     A.  Yes.
13     Q.  We're 12:21 in the video.
14     (The video was played.)
15     Q.  And I kept playing it up until 12:25 until I
16  stopped it.  We could still hear the taser whirring;
17  right?
18     A.  That was the second cycle, yes.
19     Q.  Okay.  How long would you say there was a pause
20  between the two cycles, if at all?
21     A.  Two to two and a half seconds.
22     Q.  Let's listen again, and tell me if you can hear
23  a pause at all in the whirring of the electricity.  Okay?
24  I'll start it back at 12:10, with the understanding the
25  taser should start about 12:17.

101

1      (The video was played.)
2      Q.  I hear it continuously.  Tell me if you --
3  without -- try not to talk over it so you can listen, but
4  tell me if you hear it stop at all.  Okay?
5      MR. RATNER:  I'm going to object to form as
6  being argumentative, and it assumes facts that are not in
7  evidence.
8      Q.  (By Mr. Fisher)  Okay.  I'll start it at 12
9  again.
10     (The video was played.)
11     Q.  Now, at 12:30, I heard the noise stop.  Did you
12  hear it stop at around this time when I stopped?
13     A.  During -- when I gave verbal commands is when
14  the cycle stopped.  That's what we're trained to do, is
15  you tase one cycle.  You stop and you give verbal
16  commands.  If you don't receive compliance, you do it
17  again.
18     Q.  So that's what you did in this case in your
19  recollection aided by the video: Tased for
20  five seconds, gave verbal commands for one or two seconds,
21  and then tased another five seconds later?
22     A.  Aided by the video and by the taser report that
23  shows that there was a two-and-a-half-second gap.
24     Q.  So that's your recollection aided by those two
25  things of what happened in this case?

102

1      A.  Yes.
2      Q.  Okay.  I'll keep playing from here to 12:30.
3      (The video was played.)
4      Q.  You can hear Sergeant Turner saying, "Give me
5  your fucking hand now."  Sounds like he's speaking pretty
6  loudly; right?
7      A.  Yes.
8      Q.  In an agitated manner?
9      MR. RATNER:  Object to form.
10     A.  He's loud, yes.
11     Q.  (By Mr. Fisher)  And he's saying, "Give me your
12  fucking hand now"; right?  Not in a quiet little mousy
13  way?
14     A.  No.
15     Q.  Like sort of in a loud, aggressive "fucking
16  listen to me right now" kind of way?
17     A.  Yes.
18     MR. RATNER:  Object to form.
19     Q.  (By Mr. Fisher)  Is this when he started
20  punching Mr. Poer in the face five times?
21     A.  I don't recall.  I was focused on tasing him.
22     Q.  Did you see him punch Mr. Poer?
23     A.  I think I recall seeing him, maybe, one or two
24  strikes.  But I was not focused on watching him up here
25  (indicating).  I was focused on what I was doing right

Deposition of:  William Dickey - June 29, 2021
Sherry Poer v. Sheriff Tim Norton in his official capacity, et al.

103

1    here (indicating).
2    Q.  You told Parker police in the interview the
3 following day that you saw him strike Mr. Poer.  That's
4 true; right?
5    A.  Yes.
6    Q.  You're just not sure how many times?
7    A.  Correct.
8    Q.  So are you aware that Sergeant Turner in his
9 interview said five times?
10    A.  From reading the reports, yes, I am -- or from
11 listening to the --
12    Q.  Do you believe that's incorrect, or you just
13 didn't see all five strikes?
14    A.  I don't believe it's incorrect.  I did not
15 see -- I did not see it all five times.
16    Q.  Is this the point in the interaction, when we
17 stopped the video here at 12:34, that he started punching
18 him in the face several times?
19    MR. RATNER:  Object to foundation.
20    A.  I believe so.
21    Q.  (By Mr. Fisher)  Okay.  We'll go back to 12:30.
22 Listen and watch.  I'll start it again at 12:12.
23    (The video was played.)
24    Q.  It was kind of quiet there.  Was that the point
25 where he's punching him in the head?

104

1    MR. RATNER:  Object to foundation and form.
2    A.  I don't believe so.
3    Q.  (By Mr. Fisher)  Do you think it was earlier in
4 the encounter?
5    A.  I believe it was when he was yelling at him.
6 Because at that point when it goes quiet is when I
7 remember looking at Josh.  He was having trouble getting
8 the handcuff open so he could get it onto a wrist.
9    Q.  He said something like, "Goddamn handcuff"?
10    A.  Yes.  Something like that.
11    Q.  That was Josh saying, like, he was having
12 trouble opening it so that he could apply it to the wrist?
13    A.  Correct.
14    Q.  So let's go back to where Sergeant Turner is
15 yelling.  You think that's the point he punched him
16 several times in the head.
17    (The video was played.)
18    Q.  (By Mr. Fisher)  So that metal clang we heard at
19 that point, that was not punching?
20    A.  No.
21    Q.  You're not sure what that metal clang was?
22    A.  It was not punching; I can tell you that.
23    Q.  Hitting with a metal object, perhaps?
24    A.  Nope.
25    Q.  You can't identify what that metal clang was, I

105

1 guess, can you?
2    A.  No.  We were all -- I mean, with all of us going
3 in, you know, rifles bang against, you know, stuff all the
4 time.  It could have been my rifle hitting Josh's handgun.
5 It could have been my rifle slapping against -- you know,
6 I've got all kinds of metal crap on my belt.  I don't know
7 exactly what it was.
8    Q.  Those are all just, sort of, educated guesses
9 about what the clanging noise could be?
10    A.  Yes.
11    Q.  You don't know what it actually was?
12    A.  No.
13    Q.  Okay.
14    (The video was played.)
15    Q.  So when he's saying, "You're going to get shot
16 in the fucking head if you don't stop," and you say,
17 "Here, I got a taser," had he punched him at that point,
18 perhaps, when he was yelling at him?
19    A.  I don't believe so.
20    Q.  Okay.  So I'll keep playing it at 12:13.
21    (The video was played.)
22    Q.  And now at 12:32 when he's saying, "Give me his
23 fucking hand," in kind of a loud, aggressive manner, is
24 that when you think he was punching him?
25    A.  Most likely.

106

1    Q.  Okay.  You did see it, but you're just -- you
2 don't know exactly at what point in the encounter he did
3 punch him in the head?
4    A.  Correct.
5    Q.  But you're surmising based on your review of the
6 radio now and listening to it that it's probably at this
7 time stamp?
8    A.  Yes.
9    (The recording was played.)
10    Q.  And again he says, "Now give me them."  So four
11 or five -- three or four seconds have elapsed from when we
12 identified maybe this would be the beginning of the
13 punching until the end?
14    A.  Yes.
15    Q.  Okay.
16    (The video was played.)
17    Q.  And then it kind of goes quiet.
18    A.  Yes.
19    Q.  Do you think, maybe, at this point, this is
20 where Mr. Poer was knocked unconscious?
21    A.  Possibly.
22    MR. RATNER:  I'm going to object to form.
23 Mischaracterizes testimony and evidence.
24    Q.  (By Mr. Fisher)  Okay.  Keep going.
25    (The video was played.)

Deposition of:  William Dickey - June 29, 2021
Sherry Poer v. Sheriff Tim Norton in his official capacity, et al.

107

1   Q.  Again, we hear nothing but your breathing, and
2   you hear Bjork say, "Gosh darn handcuff," or something
3   like that?  And you say, "It's okay."
4       (The video was played.)
5   A.  And the clicking of the handcuff.
6   Q.  (By Mr. Fisher)  And you hear "echo Sam one, one
7   detained"?
8   A.  Yes.
9   Q.  So that's Sergeant Turner getting on the radio
10  and saying, Okay, we've got one now detained.  In other
11  words, we got him cuffed?
12  A.  Correct.
13  Q.  Okay.
14      You are aware -- or let me ask you.  Are you
15  aware that Sergeant Turner likely knocked him unconscious
16  by punching him in the head?
17      MR. RATNER:  Object to form foundation.
18  Mischaracterizes the evidence.
19  Q.  (By Mr. Fisher)  You can answer.
20  A.  I'm aware that that's a possibility.
21  Q.  That's something that -- a possibility that
22  Sergeant Turner echoes while on the scene.  I mean, he
23  said that out loud while on the scene; right?
24  A.  Yes.
25  Q.  He said to you, "I think I might have knocked

108

1   him out punching him"?
2   A.  Yes.
3   Q.  And he said that to the EMS workers when they
4   arrived as well?
5   A.  I believe so.
6   Q.  "I think I may have knocked him out when I
7   punched him"; right?
8   A.  Yes.
9   Q.  And Sergeant Turner punched him in the head
10  several times after you had deployed the taser twice;
11  right?
12  A.  Correct.
13  Q.  And after you all had already secured the gun;
14  correct?
15  A.  Again, I don't know when the gun was secured.
16  If it was -- I don't know at what point the gun was
17  secured.
18  Q.  Okay.
19      MR. RATNER:  We could turn the mute back off
20  over there.  I'll turn the volume off on this first.
21      Let's take a little break, come back in, like,
22  five or ten.
23      (Recess from 1:38 p.m. until 1:44 p.m.)
24  Q.  (By Mr. Fisher)  What is your training regarding
25  delivering blows to the head?

109

1   A.  I have no training specific to that.
2   Q.  Were you ever trained about whether or not that
3   is an acceptable use of force as a police officer?
4   A.  Yes.
5   Q.  What is the training?
6   A.  It was more of a discussion.  I mean, it's not
7   like you can practice that sort of thing.
8   Q.  Okay.  So maybe "training" is the wrong word.
9   What was the discussion around that?
10  A.  That it would be an applicable use of force in a
11  deadly force situation.
12  Q.  Because if you hit somebody in the head, it's
13  possible you could kill them?
14  A.  It is possible, yes.
15  Q.  So you should only use it in a situation where
16  deadly force is warranted?
17  A.  Yes.
18  Q.  That's not true with a taser; right?
19      MR. RATNER:  Object to form.
20  Q.  (By Mr. Fisher)  One can use a taser in
21  situations other than only where deadly force is
22  warranted; correct?
23  A.  Yes.
24  Q.  The taser is considered okay to use if somebody
25  is actively resisting or using active aggression; correct?

110

1   A.  That's one of the -- one of the applications,
2   yes.
3   Q.  And of course, you could use a taser if deadly
4   force is warranted --
5   A.  You could.
6   Q.  -- right?  But you could also use a handgun in
7   that situation?
8   A.  Yes.
9   Q.  Or an assault rifle?  Sorry.  Wrong word.  An
10  AR-15 rifle, for instance?
11  A.  Yes.  Thank you.
12  Q.  When you were tasing Mr. Poer, that was as his
13  right hand was being handcuffed?
14  A.  I believe his right hand had been extracted or
15  was in the process of -- his right hand was in the process
16  of being extracted from underneath his body.
17      And I tased him, and it allowed Deputy Bjork to
18  fully pull his hand out and apply the handcuff.  Because
19  during the video where you said you could hear the
20  electricity, you can also hear the ratchets of the
21  handcuff.
22  Q.  At the same time; right?
23  A.  Yes.
24  Q.  And when you tased him.  You understood that
25  you're delivering roughly 50,000 volts of electricity into

Deposition of:  William Dickey - June 29, 2021
Sherry Poer v. Sheriff Tim Norton in his official capacity, et al.

111

1   his body?
2       A.   That's correct.
3       Q.   And you did that for two intervals of
4   five seconds each?
5       A.   That's correct.
6       Q.   Was your training in law enforcement that you
7   should wait approximately two and a half seconds or so
8   between applications of the taser?
9       A.   There's no specific timeline given.  But they do
10  say -- it is trained that you need to -- once you deliver
11  one round of shock for the five seconds, that you do need
12  to see if compliance is obtained.  So that means, you
13  know, being able to let off, give commands, see if you can
14  gain compliance before tasing again.
15      Q.   Because is it fair to say that while somebody
16  has 50,000 volts of electricity coursing through their
17  system, they can't really operate their body properly?
18      A.   That's exactly correct.
19      Q.   And so while somebody's being tased, they
20  couldn't necessarily give you their hands, because they
21  don't have the ability or motor functions?
22      A.   They cannot voluntarily give you their hands,
23  but that's not to say that their limbs could not be moved.
24      Q.   Right.
25           You were not injured during this encounter;

112

1   correct?
2       A.   No.
3       Q.   Sergeant Turner was not injured during this
4   encounter?
5       A.   I don't believe so.
6       Q.   Deputy Bjork was not injured during this
7   encounter?
8       A.   I don't believe so.
9       Q.   Deputy Whitlock was to not injured during this
10  encounter?
11      A.   No.
12      Q.   The only one who was injured was Mr. Poer?
13      A.   Yes.
14      Q.   He died at the scene; correct?
15      A.   He was pronounced dead at the hospital.
16           MR. RATNER:  I'm going to object to form.
17           Can you read back, not that last question but
18  the question before that?
19           (The reporter read back the last two questions.)
20           MR. RATNER:  I'm going to object to form.
21  Mischaracterizes the evidence.
22      Q.   (By Mr. Fisher)  He died at some point that
23  evening; correct?
24      A.   Yes.
25      Q.   Do you know when he died?

113

1       A.   The time, no.
2       Q.   After he was in handcuffs and you guys started
3   performing CPR, he was nonresponsive at that point; right?
4       A.   That is correct.
5       Q.   You were trying to talk to him; he wasn't
6   answering?
7       A.   That is correct.
8       Q.   His eyes looked as if they were dilated and,
9   kind of, wide open; correct?
10      A.   His eyes were half -- his eyes were actually
11  closed.
12      Q.   I see.
13      A.   He was not responsive to any commands or
14  questions or anything at that point, no.
15      Q.   You were trying to feel a pulse and couldn't
16  feel one; right?
17      A.   Correct.
18      Q.   So after he was handcuffed, after he'd already
19  been tased and hit in the head several times, he did not
20  have a pulse at that point?  You could not detect his
21  pulse?
22      A.   Correct.
23      Q.   Could you tell if he was breathing at that
24  point?
25      A.   I could not.

114

1       Q.   Couldn't tell either way?
2       A.   No.
3       Q.   Okay.  I guess you didn't -- were you listening
4   for breath or trying to determine if he was breathing?
5       A.   I was trying to determine vital signs, yes.
6       Q.   And you couldn't detect any?
7       A.   Correct.
8       Q.   So it's fair to say he was either dead or dying
9   at that point?
10           MR. RATNER:  Object to form and foundation.
11      Q.   (By Mr. Fisher)  I know you're not a doctor, but
12  as much as you're aware?
13           MR. RATNER:  Same objection.
14      Q.   (By Mr. Fisher)  You can answer.
15      A.   It's fair to say that he was nonresponsive at
16  that point and did not have vital signs.
17      Q.   Okay.  Is it fair to say that Mr. Poer is the
18  only person during this entire incident who was injured,
19  to your knowledge?
20           MR. RATNER:  Object to form.  Assumes facts not
21  in evidence.  And foundation.
22      A.   To my knowledge, I don't know of anyone else
23  that was injured in that -- in the incident.
24      Q.   (By Mr. Fisher)  It turned out -- you later
25  found out that Chris had some preexisting health injuries;

Deposition of:  William Dickey - June 29, 2021
Sherry Poer v. Sheriff Tim Norton in his official capacity, et al.

---

115

1 correct -- or health complications?
2    A.  He had a lot of preexisting health
3 complications.
4    Q.  That's something you found out after the fact;
5 right?
6    A.  Yes.
7    Q.  You didn't know anything about that before you
8 made contact with him; right?
9    A.  No.
10    Q.  You didn't know anything about that before you
11 decided to tase him; right?
12    A.  No.
13    Q.  You didn't know anything about that at the time
14 Sergeant Turner was punching him in the head; correct?
15    MR. RATNER:  Object to form.
16    Q.  (By Mr. Fisher)  It's something you found out
17 way after the fact by talking to other people; right?
18    A.  Yes.
19    Q.  And again, earlier, you had his cell phone
20 number.  But that's not something you tried to call and
21 find out about; correct?
22    A.  No.
23    Q.  And nobody, to your knowledge or -- I'm sorry.
24 Let me take that back.
25    You yourself or Sergeant Turner didn't call

---

116

1 Elaine and ask her about any health concerns, either;
2 correct?
3    A.  No.
4    Q.  Was anybody -- I know -- I think I asked you
5 this before.  I just want to double-check.  At any point
6 during this encounter, was anybody, like, on top of
7 Chris's back as he was laying on his stomach?
8    A.  No.
9    Q.  People were holding his arms down from both
10 sides?
11    A.  Yes.
12    Q.  That would be Turner and --
13    A.  Bjork.
14    Q.  -- Bjork putting pressure on his arms or just
15 trying to pull them out?  Or what were they doing?
16    A.  Trying to pull them out to get them behind his
17 back.
18    Q.  So then he would have been laying prone on his
19 belly at that point?
20    A.  Yes.
21    Q.  Without the support of his arms because the
22 officers are pulling them; right?
23    A.  Yes.
24    Q.  And for how long was that going on?
25    A.  How long was what going on?

---

117

1    Q.  Mr. Poer, kind of, proned out on his belly with
2 the officers pulling on his arms?
3    A.  We could go by the video.  I'm not sure.
4 Approximately 45 seconds.  I mean, I would have to time
5 stamp the video.
6    Q.  Obviously, this is a lawsuit against you and
7 Elbert County.  And there's the other one that I know
8 about where Mr. Leadholm sued you, because I was the
9 attorney in that case.
10    There's another one where I know about where
11 Mr. Brandt sued you for an incident with a taser in a
12 parking lot.
13    Are you aware of any other lawsuits against you
14 in your life?
15    A.  Yes.
16    Q.  Tell me about those.
17    A.  There was one other one that was just resolved
18 with a convicted murderer in the Elbert County Jail who
19 assaulted one of our deputies and was taken into custody
20 with the police K-9, and he sustained injury and sued the
21 department.
22    Q.  And you personally?
23    A.  In my professional capacity because I was -- I
24 was there.
25    Q.  You were a named defendant in that lawsuit?

---

118

1    A.  Yes.
2    Q.  And what was the result of that lawsuit?  What
3 happened to it?
4    A.  He is in prison for life, and I believe they
5 gave him something like $20,000.
6    Q.  So they settled the case with him --
7    A.  They settled the case.
8    Q.  -- for some monetary amount?
9    A.  Yes.
10    Q.  Were you deposed in that case?
11    A.  No.
12    Q.  Were you deposed in the Brandt matter?
13    A.  No.
14    Q.  I know you were deposed in the Leadholm matter.
15    A.  Yep.
16    Q.  So I think I asked you this before, but this and
17 the prior deposition I did with you are the only times
18 you've ever been deposed?
19    A.  Correct.
20    Q.  In this case, you thought that Mr. Poer might
21 have been intoxicated by alcohol; correct?
22    A.  Intoxicated.  I didn't say by alcohol
23 necessarily.
24    Q.  I think you said maybe you thought he was drunk
25 or had been drinking?  Didn't you say that?

Deposition of:  William Dickey - June 29, 2021
Sherry Poer v. Sheriff Tim Norton in his official capacity, et al.

119

1    A    Possibly drunk or -- intoxication can come in
2 the form of medication as well.
3    Q.   In this case involving Mr. Leadholm, you also
4 thought he was intoxicated in that case; correct?
5    A.   Yes.
6    Q.   It turned out he was not.  It turned out he was
7 having a diabetic shock episode; correct?
8    A.   It turns out he had low blood sugar, yes.
9    Q.   Related to his diabetic condition; right?
10   A.   Yes.
11   Q.   In that case, Mr. Leadholm suffered a broken
12 bone as a result of the force used against him; correct?
13   A.   Yes.
14   Q.   And he was tased five times in that case;
15 correct?
16   A.   I believe so.
17   Q.   By you?
18   A.   Yes.
19   Q.   He was also hit with a baton by a different
20 officer; right?
21   A.   He was hit with a baton, yes.
22   Q.   That lawsuit was pending before you were hired
23 by Elbert County, but it wasn't resolved yet?
24   A.   That's correct.
25   Q.   Certainly, anyone who does a Google search can

120

1 see that lawsuit on the Internet; right?
2       MR. RATNER:  Object to foundation.
3    A.   Yes.
4    Q.   (By Mr. Fisher)  That night after Mr. Poer took
5 the ambulance away [sic], you guys eventually made your
6 way to the Rattlesnake fire station or something?
7    A.   Yes.
8    Q.   What is that?
9    A.   Rattlesnake Fire District is the volunteer fire
10 department for northern -- northwestern area of
11 Elbert County.
12   Q.   How did you get there?
13   A.   Drove my truck.
14   Q.   By yourself?
15   A.   I believe initially, yes, I drove there myself.
16   Q.   And why do you say "initially?"  Did eventually
17 somebody else get in with you?
18   A.   Yes.
19   Q.   Who was that?
20   A.   Detective Brukbacher from Parker PD.
21   Q.   And why did she get into your truck?
22   A.   She went with me from the fire station back to
23 the office in Kiowa to do my body cam download.
24   Q.   That was after your interview?
25   A.   No.  I didn't interview until the next day with

121

1 her.
2    Q.   Okay.  So eventually you got back in your truck
3 with Detective Brukbacher and went to download the body
4 cam?
5    A.   Yes.
6    Q.   But first you drove to the fire station by
7 yourself?
8    A.   Yes.  It was approximately a quarter or half
9 mile away it.
10   Q.   It was close?
11   A.   Yeah.
12   Q.   Okay.  And when you arrive at the fire station,
13 who else is there?
14   A.   I don't remember names, but I know the four of
15 us that were involved, Sergeant Turner, Deputy Bjork,
16 Deputy Whitlock, and I were there, as well as members of
17 the Critical Response Team.
18   Q.   So people from different agencies?
19   A.   Yes.
20   Q.   Like Cherry Hills, Arapahoe --
21   A.   Yes.  Whoever comprised that agency --
22   Q.   -- Parker Police?
23   A.   -- or that group.
24   Q.   They were there when you showed up?
25   A.   I think there were a couple people there, and

122

1 there were more arriving as I got there.
2    Q.   What about Elbert County command staff?  Were
3 they there?
4    A.   The sheriff was there.  Sheriff Shayne Heap was
5 there, and Lieutenant Pat Sills was there.
6    Q.   Did they speak with you at the fire station,
7 those two gentleman?
8    A.   No.
9    Q.   Was that on purpose?  Were they not supposed to?
10   A.   No.  They just -- we had been -- by the time he
11 arrived, they were already dividing us up into separate
12 rooms for interviews.
13   Q.   When you say "they," who do you mean?
14   A.   The CRT team.
15   Q.   Okay.  The Critical Response Team; right?
16   A.   Yes.
17   Q.   And that would be members of different police
18 organizations, not from Elbert County, who come in to
19 investigate any time there's an in-custody death?
20   A.   Any time there's a critical incident, yes.
21   Q.   Including in-custody deaths?
22   A.   That's correct.
23   Q.   Before you were separated, you were there with
24 the other three officers.  Did you guys talk about the
25 incident at all?

Deposition of: William Dickey - June 29, 2021
Sherry Poer v. Sheriff Tim Norton in his official capacity, et al.

123

1    A. No.
2    Q. Was there some reason why you didn't talk about
3  the incident?
4    A. We were separated. There's a big U-shaped
5  conference table in this room, and we were all separated
6  on different sides of the table.
7    Q. Were you, like, instructed not to talk to each
8  other?
9    A. I don't recall being told specifically. We
10  just -- we just kept to ourselves after that.
11    Q. How long were you in that room before you were
12  actually separated into different rooms?
13    A. Just a couple of minutes.
14    Q. Just the four of you in there?
15    A. In where?
16    Q. That conference room with the U-shaped table.
17    A. No. There was -- like I said, there was members
18  of the CRT team that were there. There was a few members
19  there, and there were more arriving as we waited.
20    Q. Did you ever talk to Shayne Heap that night?
21    A. Yes.
22    Q. When was that?
23    A. At the scene.
24    Q. But before going to the fire station?
25    A. Correct.

124

1    Q. And what did you talk to him about?
2    A. I gave him a very brief rundown of what had
3  occurred. And he asked if I was okay and told me that
4  they -- or he told me to just go hang out in my truck and,
5  you know --
6    Q. Decompress?
7    A. -- decompress. Thank you. That's a good word.
8      And when I went back a little while later,
9  somebody had gone to get us some food because but were
10  hungry. And he said that the CRT team was being called
11  out to come investigate.
12    Q. Did Mr. Heap ask you any questions -- after you
13  had told him what happened, did he, like, ask you
14  follow-up questions during, or he just listened?
15    A. I don't recall him asking me anything. He just
16  listened.
17    Q. Did he give you any comments or whether or not
18  he thought the behavior of yourself and the other officers
19  was appropriate that night or not?
20    A. He did not make any comments to that effect, no.
21    Q. Not one way or the other?
22    A. No. He was more concerned with asking if we
23  were okay.
24    Q. If you were okay.
25      What happened to Mr. Poer's body that night?

125

1    MR. RATNER: Object to form.
2    A. From which point on?
3    Q. (By Mr. Fisher) After he left the scene in the
4  ambulance.
5    THE WITNESS: Object to foundation.
6    A. That, I don't know. He went to the hospital,
7  but I don't know -- he went to Parker Adventist. But I
8  don't know what happened from there.
9    Q. (By Mr. Fisher) You never saw his body again
10  after that?
11    A. No.
12    Q. Are you aware or have you become aware that he
13  didn't see the pathologist for several days
14  afterwards?
15    A. I was not aware of that.
16    Q. So this is the first time you're hearing that
17  coming from me?
18    A. Yes.
19    Q. So you don't know why or for what reason he may
20  have been left unrefrigerated for a couple days before he
21  saw a pathologist?
22    MR. RATNER: Object to foundation.
23    Q. (By Mr. Fisher) You don't know anything about
24  that?
25    A. I don't know anything about that.

126

1    Q. Okay. When did you first see the body cam
2  video?
3    A. As I downloaded it.
4    Q. That would have been that night with
5  Detective Brukbacher?
6    A. Yes.
7    Q. The two of you watched it together?
8    A. Yes.
9    Q. Where was that?
10    A. At the sheriff's office in Kiowa.
11    Q. And so you take the physical body cam off your
12  person and plug it into something? Or how does that work?
13    A. There's a USB.
14    Q. So connect to it?
15    A. Yes.
16    Q. And you connect that to a computer?
17    A. Yes.
18    Q. And you can, kind of, drag it from the body cam
19  to the computer?
20    A. Yes. There's extraction software that we use.
21    Q. And then the two of you watched it together?
22    A. Yes.
23    Q. Did you, like, stop and pause --
24    A. No.
25    Q. -- or just watch it once live together?

Deposition of:  William Dickey - June 29, 2021
Sherry Poer v. Sheriff Tim Norton in his official capacity, et al.

127

1    A.  We just watched it together and then made her --
2  I think she had a USB or a DVD.
3    Q.  And she got a copy of it?
4    A.  Yes.
5    Q.  Whose idea was it for the two of you to watch it
6  together?
7    A.  Hers.
8    Q.  Okay.  And was there anyone else present when
9  the two of you watched it?
10    A.  No.  Because everybody who was working that
11  night was involved in the incident.  It's a pretty small
12  department.
13    Q.  And she didn't ask you any questions about the
14  incident until after you had viewed the body cam together?
15    A.  Correct.
16    Q.  Because later the following day, she brought you
17  in for a recorded interview, and that's when she first
18  asked you questions about the incident?
19    A.  Yes.  That night, it was already -- by the time
20  we got back to the sheriff's office to do the download, it
21  was already, like, 12:30 or something like that.  It was
22  really late.  And I was exhausted.
23    And I said -- you know, I asked her if I could
24  do my interview the next day, and she said that was fine.
25  And so we set up a time to meet at Parker PD the next

128

1  afternoon.
2    Q.  Did she request -- did she first request, Can we
3  do the interview tonight, and you said, Can we do it
4  tomorrow?
5    A.  I can't recall her asking me specifically.  I
6  just told her I was not ready to do my interview yet.
7    Q.  Okay.  In that interim night, did you talk to
8  anybody about the incident or what happened?
9    A.  I don't recall -- because of the time of night,
10  I don't recall speaking to anybody about that.
11    Q.  What about the following day before you were
12  interviewed?
13    A.  I don't recall speaking to anybody.
14    Q.  You were told at that time that you could get a
15  lawyer if you wanted one; correct?
16    A.  Yes.
17    Q.  And that's something you declined?
18    A.  Yes.
19    Q.  You didn't consult with a lawyer?
20    A.  No.
21    Q.  All right.  Did you -- I believe Travis and Josh
22  were interviewed that evening.  Are you aware of that?
23    A.  Yes.
24    Q.  But you waited until the next day?
25    A.  Yes.  They were -- they had enough team members

129

1  at the office to do the interviews for them.  And I think
2  even for -- I don't know if Trystan (phonetic) was
3  interviewed or not.  But they had enough people there to
4  do that.
5    And Detective Brukbacher wanted to get the body
6  camera downloaded and everything first, so I just sat in
7  the room and didn't do anything.
8    Q.  So while they were being interviewed, you were
9  kind of sitting around?
10    A.  Yes.
11    Q.  Did Elbert County, to your knowledge, ever do
12  any kind of investigation of this incident?
13    A.  Yes.
14    Q.  What kind of investigation?
15    A.  There's an internal investigation with all uses
16  of force.
17    Q.  So it was, like, a use-of-force investigation?
18    A.  Yes.
19    Q.  Separate and apart from the CRT investigation?
20    A.  Yes.
21    Q.  What was the result of that use-of-force
22  investigation?
23    A.  We were -- we were cleared.
24    Q.  Were you interviewed for that?
25    A.  No.  I believe they used the interviews from the

130

1  CRT as their -- as their interview.
2    Q.  What other steps did they take to do that
3  investigation?
4    A.  That, I don't know.
5    Q.  How were you informed that you were cleared?
6    A.  When we received our letters from the district
7  attorney clearing us of any wrongdoing, we were also
8  advised that we were cleared by the agency.
9    Q.  Who advised you that?
10    A.  The sheriff.
11    Q.  Personally?
12    A.  Yes.
13    Q.  Came to you or called you or what?
14    A.  Came to me.  We sat down in a room, and he gave
15  me my letter from the district attorney that cleared us
16  and said that everything was done; everything was clear.
17    Q.  So just so I'm clear, the CRT team did one
18  investigation; right?
19    A.  Yes.
20    Q.  And at the same time, Elbert County did a
21  parallel investigation of the use-of-force incident?
22    A.  Yes.  They did their own report, their own
23  use-of-force report.
24    Q.  So it was like a summary report?  In other
25  words, they summarized their findings in it?

Deposition of:  William Dickey - June 29, 2021
Sherry Poer v. Sheriff Tim Norton in his official capacity, et al.

131

1    When you say "report" --
2    A.  I'm not sure what you mean by that.
3    Q.  What did you mean by "report" -- they did their
4    own report?
5    A.  There's a -- so whenever a use of force occurs,
6    there's an actual form.  There's a use-of-force report
7    form that gets typed up that says, These are the involved
8    deputies.  This was the force used.  This was the taser.
9    This was the firearm.  This is, you know, whatever it is
10   that was being used.
11        And that goes into their file.  I don't know the
12   inner workings of internal affairs.
13   Q.  Have you seen that report?
14   A.  I have not.
15   Q.  Were you asked to fill anything out in that
16   report?
17   A.  No.
18   Q.  As far as you're aware, did the Elbert County
19   investigation do anything other than look at the
20   interviews that CRT had conducted and then give their
21   findings?
22   A.  I don't recall if they -- if they did, it was
23   not made known to me.
24   Q.  I see.  So Elbert County -- fair to say
25   Elbert County found no wrongdoing by you or any of the

132

1    other deputies that evening?
2    A.  That is correct.
3    Q.  So obviously, you were not disciplined for
4    this --
5    A.  No.
6    Q.  -- encounter?
7    A.  No.
8    Q.  Did your resignation have anything to do with
9    this encounter?
10   A.  No.
11        MR. FISHER:  Let us take another five minutes.
12   And I don't have that much left, so hopefully we can get
13   you out of here soon.
14        MR. RATNER:  Unless you need it, I'm ready to
15   go.
16        MR. FISHER:  I don't have too much more.
17        (Recess from 2:10 p.m. until 2:22 p.m.)
18   Q.  (By Mr. Fisher)  Do you remember when I was
19   asking you about at what point the gun was actually
20   secured?
21   A.  Yes.
22   Q.  And you said you don't really remember?
23   A.  Yes.
24   Q.  I'm going to play for you Deputy Whitlock's
25   interview from that night starting at 19 minutes, and

133

1    we're going to listen to what he has to say.  Okay?
2    A.  Okay.
3    Q.  I'm going to start it at 18:54, actually.
4        (The video was played.)
5    A.  That's Deputy Bjork.
6    Q.  That's what I meant:  Deputy Bjork.
7        (The video was played.)
8    Q.  So you could see -- I started a little bit
9    early.  He's talking about what happened after the fact
10   and the cuffing.
11   A.  When we sat him up?
12   Q.  Correct.
13        So now I'm playing it back again at 19:15.
14   Shortly, he's going to talk about the gun.
15   A.  Okay.
16        (The video was played.)
17   Q.  So here, we're at 19:22.
18        (The video was played.)
19   Q.  I don't think this is quite the right part.  I'm
20   just going to keep playing it until we get to that point.
21        (The video was played.)
22   Q.  Okay.  So that's coming to the more relevant
23   part.  I'm just going to rewind it a little bit.  I just
24   stopped it at 21:07.  I'm going to go back 20 and
25   30 seconds, and we'll play it from there.

134

1        (The video was played.)
2    Q.  So at 20:52, you hear him say, "I forgot to
3    mention," and that's where I'm going to press play again.
4    A.  Okay.
5        (The video was played.)
6    Q.  So you can hear there Deputy Bjork says that
7    when the gun was pointed out to him by yourself and
8    Sergeant Turner, that he picked it up and put it in his
9    waistband.
10   A.  Okay.
11   Q.  Correct?  Is that what you heard on the tape?
12   A.  That's what I heard.
13   Q.  Do you have any reason to think it's untrue what
14   Deputy Bjork said?
15   A.  No.
16   Q.  Okay.  And that was -- the point he's describing
17   in this audio interview, he's describing before you had
18   tased Christopher Poer; correct?
19   A.  That would be before that, yes.
20   Q.  And that would be before Officer Turner punched
21   him in the face several times; correct?
22   A.  Sergeant Turner.
23   Q.  Sergeant Turner.
24        So according to Bjork, at least -- and you have
25   no reason to quibble with what he's saying here -- the gun

Deposition of:   William Dickey - June 29, 2021
Sherry Poer v. Sheriff Tim Norton in his official capacity, et al.

135

1    had already been secured in his waistband before those
2    uses of force were applied to Christopher Poer?
3        A.  Correct.
4        Q.  You also heard him say that at the point that
5    Deputy Dickey and Sergeant Turner got on top of him,
6    meaning Mr. Poer.  Did you hear him say that?
7        A.  Yes, I did.
8        Q.  What does he mean by that, to the best of your
9    knowledge?
10       A   Before we got up on top -- before we got up over
11   the top of him.
12       Q.  He said got "on top" of him.  You're saying you
13   were never, quote, unquote, "on top" of him; right?
14       A.  Correct.
15       Q.  That -- to me, when he says got "on top" of him,
16   I feel like the two of you are pressed up against him on
17   top of him.  Is that not true?
18       A.  No.  There's no way we could do that with rifles
19   and everything.
20       Q.  Understood.  Because you're pointing the rifles
21   at him while he's prone on his stomach?
22       A.  Correct.
23       Q.  And, I guess, how did Sergeant Turner grab his
24   arm if he's also holding a rifle?
25       A.  He was kneeling down.  I remember him -- his

136

1    right knee -- he was squatting down.  I believe his right
2    knee -- or, I'm sorry -- his left knee was down, and his
3    right knee was splayed outward towards me.
4           That's when I told him to move his knee, because
5    he's got really long legs.  So his -- you know, if he's
6    hovering over Mr. Poer and he's kneeling down, his knee is
7    going to be in the way of me where I was trying to tase
8    him.
9        Q.  So when you told him to move his knee, what did
10   he do?
11       A.  He moved it inward, like, back inward towards
12   his other knee, I guess you could say.
13       Q.  Closer to Mr. Poer?
14       A.  Well, he was -- I mean, I guess you could say
15   that.  It's -- he was moving it away from me.
16       Q.  Gotcha.
17       MR. RATNER:  Oh.  You could unmute that, if you
18   can.  Is it asking for somebody to be in right now?
19       MR. RATNER:  No.  There's nobody -- oh, yeah.
20   She is in the waiting -- Natasha.
21       MR. FISHER:  Just hit "admit" and then unmute.
22       MR. RATNER:  Are you muted?
23       MR. FISHER:  Yeah.  I'm good.
24       Q.  (By Mr. Fisher)  So let me just back up a
25   second.

137

1           When you're tasing him -- when you're tasing
2    Mr. Poer, does Deputy Dickey -- I'm sorry -- does
3    Sergeant Turner still have his hands on Mr. Poer at that
4    point?
5        A.  Yes.
6        Q.  Does that not cause a shock to happen to Turner?
7        A.  No.
8        Q.  Why not?
9        A.  The way a taser works is that it has two barbed
10   prongs that are attached to copper wire that are attached
11   to the cartridge, which is attached to the taser.  The
12   electricity flows from the taser through the cartridge
13   through the wires through the barbs into the person.
14          Unless another person -- unless another person
15   comes in contact with those wires, like, it actually
16   touches them or they put their hand or leg or foot or
17   something in between the spacing of the two probes,
18   they're not going to have any sort of electrical
19   conductivity.
20       Q.  Gotcha.  And so that's how you delivered the
21   first five-second taser to Mr. Poer was through the
22   probes; right?
23       A.  Actually, both were -- so we're trained to do --
24   the most effective use of the taser is to spread out
25   the -- spread out the pattern of electricity in the body.

138

1    Okay?
2           So the -- if you have -- an ideal tasing would
3    be if you had one barb that struck high and one that
4    struck low on a large muscle mass, like the back or the
5    leg or something like that, where it's giving the most
6    electricity or the most electrical shock over the course
7    of the body.
8           With me, being that I tased him from
9    approximately, you know, six, eight inches away, those
10   darts are only an inch apart or so into his back.  And
11   then that's when we're trained, if we do something like
12   that, we follow it up with a drive stun.
13          Because then that makes a connection further
14   down the body, which your low back -- or actually, all of
15   your back and your glutes and your leg muscles are the
16   most muscular of your -- areas of you body.
17          And so if you tase in the back and you're able
18   to follow up with a drive stun, that makes the pattern
19   more effective in the entire body.
20       Q.  And "more effective" meaning it's going to
21   incapacitate the person further?
22       A.  Yes.
23       Q.  And when you say you follow it up with a drive
24   stun, each one of the taser deployments you administered
25   were both a drive stun touching his leg and the prongs in

Deposition of:  William Dickey - June 29, 2021
Sherry Poer v. Sheriff Tim Norton in his official capacity, et al.

139

1  the lower back all at the same time?
2      A.  Yes.  So the prongs -- the prongs stay in place.
3  They don't get removed, even on subsequent tasings.  The
4  prongs stay in place, and the drive stun is applied.
5  That's for the first cycle.
6          And then the second cycle was just merely
7  pulling the trigger and repeating another cycle.
8      Q.  Okay.  So each one of the deployments involve
9  that spread of electricity between the lower back and the
10  thigh or leg area?
11     A.  Yes.  It does not double or triple or anything
12  the amount of electricity.  It just spreads it out.
13     Q.  I was under the mistaken impression, I guess,
14  that the first taser deployment was the only probes.  But
15  actually both were probes and drive stun together; fair to
16  say?
17     A.  Correct.  That's correct.
18     Q.  Okay.  And you did that because, in your
19  experience and your training, that type of spread is more
20  effective than just two prongs together into a person's
21  body?
22     A.  Yes.
23     Q.  And while you were doing that tasing, the other
24  two officers each had one of his arms?
25     A.  They were both -- so, yeah.  They were both

140

1  trying to get in underneath his bicep and armpit and
2  trying to pull an arm out from underneath him.
3      Q.  Okay.  And this was all going on after the gun
4  had already been secured?
5      A.  Yes.
6      Q.  Okay.  You never found a second weapon that
7  night; correct?
8      A.  No.
9      Q.  And you were never given any information at any
10  point that night that there was a second weapon?
11     A.  No.
12         MR. FISHER:  That is all the questions I have
13  for you.  I appreciate your time.
14         THE WITNESS:  Thank you.
15         MR. RATNER:  We're done.
16         THE REPORTER:  Ten days is my standard
17  turnaround.  Is that okay?
18         MR. FISHER:  That works for me.
19         THE REPORTER:  Both of you would like copies of
20  the transcript?
21         MR. RATNER:  Sure do.
22              * * * * * * *
23         WHEREUPON, the foregoing deposition was
24  concluded at 2:33 p.m.  Total time on the record was
25  3 hours and 41 minutes.

1      I, CHRISTOPHER DICKEY, the deponent in the above
2  deposition, do hereby acknowledge that I have read the
3  foregoing transcript of my testimony, and state under oath
4  that it, together with any attached Amendment to
5  Deposition pages, constitutes my sworn testimony.
6
7  _____ I have made changes to my deposition
8  _____ I have NOT made any changes to my deposition
9
10  _____
     CHRISTOPHER DICKEY
11
12
13  Subscribed and sworn to before me this _____ day of
14  _____, 20____.
15  My commission expires: _____.
16
17  _____
     NOTARY PUBLIC
18
19
20
21
22
23
24
25

1          REPORTER'S CERTIFICATE
2  STATE OF COLORADO          )
3  CITY AND COUNTY OF DENVER   )
4      I, Sara A. Stueve, a Registered Professional Reporter
5  and Notary Public within and for the State of Colorado,
6  commissioned to administer oaths, do hereby certify that
7  previous to the commencement of the examination, the
8  witness was duly sworn by me to testify the truth in
9  relation to matters in controversy between the said
10  parties; that the said deposition was taken in stenotype
11  by me at the time and place aforesaid and was thereafter
12  reduced to typewritten form by me; and that the foregoing
13  is a true and correct transcript of my stenotype notes
14  thereof; that I am not an attorney nor counsel nor in any
15  way connected with any attorney or counsel for any of the
16  parties to said action nor otherwise interested in the
17  outcome of this action.
18      My commission expires October 26, 2024.
19
20
21  _____
     SARA A. STUEVE
     Registered Professional Reporter
22   Notary Public, State of Colorado
23
24
25

Deposition of:   William Dickey - June 29, 2021
Sherry Poer v. Sheriff Tim Norton in his official capacity, et al.

Page 1

**A**

**a.m**
2:6
**ability**
5:6 47:14
   111:21
**able**
22:24 26:18
   36:10 41:18
   86:9 111:13
   138:17
**Absolutely**
65:12 71:8,11
**acceptable**
109:3
**accepted**
15:10
**accident**
92:19
**accurate**
49:3
**achieve**
83:1
**acknowledge**
141:2
**acres**
38:23
**action**
1:2 142:16,17
**active**
2:16 58:8,11,22
   59:8,9,14
   69:20 109:25
**active-shooter**
58:25
**actively**
58:24 59:12
   60:7 109:25
**actual**
131:6
**addition**
7:22 22:23
   25:18
**additional**

25:17 43:9
**adjacent**
42:11
**administer**
142:6
**administered**
138:24
**administrator**
7:1
**Administratrix**
1:3
**admit**
136:21
**advantage**
63:3
**Adventist**
125:7
**advise**
54:7
**advised**
38:3 130:8,9
**advises**
41:6
**advising**
44:3 45:6
**affairs**
131:12
**affect**
47:14
**Afghanistan**
21:16
**aforesaid**
142:11
**afternoon**
128:1
**afterward**
17:22
**age**
9:12
**agencies**
51:22 52:1
   72:23 121:18
**agency**
12:20 121:21
   130:8

**Agency's**
59:22
**aggression**
109:25
**aggressive**
102:15 105:23
**agitated**
102:8
**ago**
7:20
**agree**
50:17 57:7
   59:17,18 60:11
   60:19 79:20
**agreed**
63:2 98:3
**agreed-upon**
59:9
**ahead**
7:5 8:6,9 17:20
   57:4 74:4 75:1
   90:24
**aided**
101:19,22,24
**air**
77:1,2,5,9
**aired**
47:2,3
**airing**
41:25 46:1
**alcohol**
118:21,22
**allegations**
10:5 11:13 12:6
   13:13,23 14:2
   14:10,12 16:11
**allowed**
110:17
**allows**
30:5,8
**ambulance**
120:5 125:4
**ambush**
63:24
**Amendment**

141:4
**ammunition**
72:22
**amount**
15:12 16:5
   118:8 139:12
**answer**
3:19,23 4:9,10
   4:12 6:18 7:5
   8:10 29:16
   60:16 64:2
   66:9 68:20
   107:19 114:14
**answered**
57:2 66:8 67:20
**answering**
113:6
**answers**
4:24 5:5
**anybody**
17:21 46:15
   56:6,10 69:23
   70:2 98:19
   116:4,6 128:8
   128:10,13
**anymore**
42:9
**apart**
38:20 57:23
   129:19 138:10
**apartment**
11:2
**apologize**
5:23 94:16
**apostrophe**
27:16
**apparently**
32:16 59:23
**APPEARAN...**
1:13
**appeared**
67:24
**Appears**
88:24
**applicable**

109:10
**application**
12:17 13:7
**applications**
110:1 111:8
**applied**
100:2 135:2
   139:4
**apply**
12:15 104:12
   110:18
**appreciate**
140:13
**approach**
41:18 48:15,18
   49:17 54:25
   62:11,16 63:1
   63:14 64:9
   66:22 70:5,10
   71:5
**approached**
56:12,15
**approaching**
47:12 48:25
   63:2,20,22
   69:9,10 70:2
   70:14 72:2,4
   74:23 75:6
   77:21 81:11
**appropriate**
2:1 87:24
   124:19
**approximately**
6:3 7:20 17:12
   40:19 45:7,9
   45:17 47:22
   69:14 70:9
   75:11 77:8
   96:12 97:13
   111:7 117:4
   121:8 138:9
**April**
19:11
**AR-15**
72:17,19 73:8

Deposition of:  William Dickey - June 29, 2021
Sherry Poer v. Sheriff Tim Norton in his official capacity, et al.

Page 2

85:3 93:8
110:10
**AR-15s**
81:12
**Arapahoe**
121:20
**area**
38:14 39:9
46:13,15 57:18
57:22 59:14
75:12 76:24
80:10,23 82:19
120:10 139:10
**areas**
138:16
**argumentative**
56:22 61:22
64:12 101:6
**arm**
79:23 80:4
83:14 85:12,13
85:25 86:3,7
86:13,14,16,20
86:21 87:11
88:25 93:7,7
97:1,3 135:24
140:2
**armpit**
140:1
**arms**
116:9,14,21
117:2 139:24
**Arrival**
33:8
**arrive**
33:6 36:20
40:25 42:14
64:20 121:12
**arrived**
32:24 33:6,11
33:12,16,19
42:16,23 45:23
52:5,13 60:8
108:4 122:11
**arrives**

50:11,20
**arriving**
40:9 122:1
123:19
**artist**
79:8
**asked**
13:15,19,20
16:19 37:15,25
37:25 43:1
57:2 66:7
67:20 92:24
116:4 118:16
124:3 127:18
127:23 131:15
**asking**
12:20 13:8,16
14:18 22:9
29:2 64:7
85:16 89:13
124:15,22
128:5 132:19
136:18
**assault**
84:16,18,20,22
84:24 85:1
110:9
**assaulted**
117:19
**assigned**
34:15,18 35:3
**assist**
24:4,22,25
26:20 27:3
28:6 68:7
**associate's**
9:16
**assumes**
62:17 101:6
114:20
**attached**
137:10,10,11
141:4
**attempt**
57:6 65:17

**attempted**
56:17,25 66:19
**attempting**
33:22 56:21
59:13 85:25
86:8,10,12,14
**attorney**
117:9 130:7,15
142:14,15
**attorneys**
19:7
**attorneys'**
15:16
**audio**
134:17
**auxiliary**
25:18
**aware**
10:22,24 21:7
21:21 51:3
56:4,5 61:13
70:2,4 103:8
107:14,15,20
114:12 117:13
125:12,12,15
128:22 131:18

──────── **B** ────────
**bachelor's**
9:17
**back**
11:7,10 31:4,5
35:1 38:8
41:15 45:11
46:2 47:3
69:13,19 75:16
75:17 80:23
82:24 87:10
88:15 90:7,13
90:14,19 93:13
93:19 94:8,12
94:15 98:9,19
100:24 103:21
104:14 108:19
108:21 112:17

112:19 115:24
116:7,17
120:22 121:2
124:8 127:20
133:13,24
136:11,24
138:4,10,14,15
138:17 139:1,9
**background**
5:8 9:15 12:21
12:22 13:11
16:13
**backwards**
23:14
**ballistic**
41:10
**bang**
105:3
**barb**
138:3
**barbed**
137:9
**barbs**
137:13
**barrel**
95:13
**based**
8:1 34:17 60:20
67:23 106:5
**basic**
25:11,17,18
**basically**
82:4
**baton**
119:19,21
**battery**
11:7
**beam**
76:24
**began**
68:24 70:10
**beginning**
106:12
**BEHALF**
1:14,18

**behavior**
124:18
**believe**
3:10 4:16,22
8:11 11:15,23
18:4 27:19
35:9 36:2
41:11 44:9,18
46:25 56:7,9
57:5,5 61:16
66:12,19 68:21
72:16 78:19
100:5 103:12
103:14,20
104:2,5 105:19
108:5 110:14
112:5,8 118:4
119:16 120:15
128:21 129:25
136:1
**believed**
31:14 68:11,16
**belly**
75:14,15 93:6
116:19 117:1
**belt**
94:1 105:6
**bend**
43:22
**bending**
95:4
**Berets**
21:15
**best**
5:6 34:7 51:8,10
135:8
**better**
6:23 26:4,5
88:16 98:2
**beyond**
32:15
**bicep**
140:1
**big**
97:10 123:4

Deposition of:   William Dickey - June 29, 2021
Sherry Poer v. Sheriff Tim Norton in his official capacity, et al.

Page 3

**bigger**
90:21
**bit**
5:8 23:13 44:7
70:6 88:15
90:19,24 94:8
94:15 133:8,23
**Bjork**
37:5 57:14
79:25 85:19
87:2,5 92:13
92:25 93:1
97:1 99:24
100:1 107:2
110:17 112:6
116:13,14
121:15 133:5,6
134:6,14,24
**black**
40:17
**blocked**
7:19
**blood**
119:8
**blows**
108:25
**Bluetooth**
27:13,23 68:13
**blurry**
89:23
**board**
12:19 13:15,19
14:3,5 15:4
**boards**
14:21 16:22
**body**
2:18 71:15,18
80:16,17,18,25
91:25 92:1
94:20,25 95:1
96:21 97:6
110:16 111:1
111:17 120:23
121:3 124:25
125:9 126:1,11

126:18 127:14
129:5 137:25
138:7,14,16,19
139:21
**body-cam**
11:4 77:14,16
77:17
**bone**
119:12
**boss**
50:8
**bottom**
90:1
**Brandt**
8:3 15:22
117:11 118:12
**Brandt's**
7:23
**break**
26:25 54:17
108:21
**breath**
114:4
**breathing**
107:1 113:23
114:4
**brief**
124:2
**briefly**
3:16
**bring**
31:4
**broke**
27:12,20
**broken**
119:11
**brought**
127:16
**Brukbacher**
120:20 121:3
126:5 129:5
**bullet**
74:7
**Bullets**
61:2

**bushes**
61:13
**business**
7:6 9:17 17:12
**Byrialsen**
1:15 2:4

——————
**C**
**C**
3:1
**Cabinets**
9:6
**CAD**
18:24 66:13
67:23
**call**
2:15 18:22
19:19,25 20:5
20:9 21:1 24:1
24:4,8 26:19
26:20 27:3
31:9,15,18
32:9 33:2,14
34:1,21,24,25
35:1,3,4,6,21
36:25 54:18
55:15 66:16
68:7 115:20,25
**called**
2:3 6:16 18:24
33:21 35:7
39:15 40:3
66:18,25 70:17
124:10 130:13
**calling**
7:7,7
**calls**
24:21 33:9 35:5
68:9
**calm**
30:2,20 31:6,7
65:22 96:8
**calmly**
30:16
**cam**

71:15,18 94:20
120:23 121:4
126:1,11,18
127:14
**camera**
2:18 91:4 129:6
**cameras**
27:13,20
**campaigning**
18:11
**capacities**
1:8
**capacity**
1:7,8,9 18:7
117:23
**caps**
27:12
**car**
22:21
**car's**
22:2
**carbene**
72:19
**care**
7:11,12 97:23
**Carl**
4:18 10:8
**carried**
41:13
**cartridge**
137:11,12
**case**
3:12,14 4:18 7:8
7:8 10:8,10,21
14:25 15:1,6
15:10 16:1,7
18:17,17,18,18
19:21 31:9
54:9 71:12
101:18,25
117:9 118:6,7
118:10,20
119:3,4,11,14
**cases**
14:23 16:12

23:7 59:14
**cause**
137:6
**cell**
66:11 115:19
**Centennial**
39:2
**center**
80:23
**certain**
33:8 41:14
**certainly**
56:11 119:25
**CERTIFICA...**
142:1
**certified**
54:22
**certify**
142:6
**cetera**
14:8 57:15
**CFS**
2:15
**chamber**
74:8
**chambered**
72:21
**change**
26:3 33:10 98:4
**changed**
35:19
**changes**
141:7,8
**channel**
7:23
**characterize**
64:8
**charge**
62:22,23
**Charlie**
36:25 37:1
43:21 44:24
45:1 46:5
**chasing**
11:2

Deposition of:   William Dickey - June 29, 2021
Sherry Poer v. Sheriff Tim Norton in his official capacity, et al.

Page 4

| | | | | |
|---|---|---|---|---|
| **check** | 11:14,18,20 | 142:22 | **companies** | **connection** |
| 12:21 16:14 | 13:20 15:9 | **come** | 12:25 | 4:17 138:13 |
| **Cherry** | 16:14 51:21 | 22:11 46:15 | **company** | **considered** |
| 121:20 | 142:3 | 52:15 108:21 | 6:13 8:22 | 109:24 |
| **chest** | **civil** | 119:1 122:18 | **complete** | **constitutes** |
| 76:3 77:8 88:14 | 1:2 2:2 | 124:11 | 5:5 12:22 | 141:5 |
| 91:10 | **clang** | **comes** | **complex** | **consult** |
| **chose** | 95:24 104:18,21 | 59:2 137:15 | 11:2 | 128:19 |
| 12:4 | 104:25 | **coming** | **compliance** | **contact** |
| **Chris** | **clanging** | 17:11 22:23 | 101:16 111:12 | 20:23,24 21:4 |
| 1:7 36:3 37:7,15 | 93:21 105:9 | 43:23 44:3 | 111:14 | 26:9,15,16,18 |
| 37:21,24 38:7 | **clarify** | 46:13 55:20 | **complications** | 27:8 33:22 |
| 39:14,20 40:2 | 20:2 60:16 | 64:14 87:10 | 115:1,3 | 80:17,18 86:16 |
| 40:16 44:14 | **classify** | 125:17 133:22 | **comprised** | 95:13 115:8 |
| 47:4,17 55:9 | 68:9 | **command** | 121:21 | 137:15 |
| 55:22 63:14,24 | **clear** | 14:7,8 50:18 | **computer** | **contacted** |
| 70:10,13 71:24 | 4:3 34:24 | 122:2 | 22:3,14,22 23:6 | 75:16 |
| 81:24 114:25 | 130:16,17 | **commands** | 36:10,13 82:12 | **context** |
| **Chris's** | **cleared** | 73:13,22 74:24 | 126:16,19 | 33:16 49:7 |
| 116:7 | 35:1 129:23 | 101:13,16,20 | **concept** | **continue** |
| **Christopher** | 130:5,8,15 | 111:13 113:13 | 69:19 | 89:12 |
| 1:4,11 2:2 3:2 | **clearing** | **commencement** | **concerned** | **continuously** |
| 18:18 19:11 | 130:7 | 142:7 | 124:22 | 99:18 101:2 |
| 20:6,14 25:24 | **clicked** | **commencing** | **concerns** | **control** |
| 26:21 27:6 | 75:5 | 2:5 | 48:24 116:1 | 50:21,21,24 |
| 35:1 40:23 | **clicking** | **commenting** | **concluded** | 53:25 54:4,6,7 |
| 134:18 135:2 | 107:5 | 7:11 | 140:24 | 54:11 |
| 141:1,10 | **client** | **comments** | **Condiotti-Wade** | **controversy** |
| **Christopher's** | 6:22,24 | 7:9,18 124:17 | 8:16 | 142:9 |
| 27:8 | **close** | 124:20 | **condition** | **conversation** |
| **circumstances** | 61:24 64:17 | **Commerce** | 32:14 119:9 | 18:15 48:7 49:5 |
| 13:21 16:25 | 121:10 | 5:9 9:8 10:4,25 | **conducted** | 49:11,11,15 |
| 32:15 | **closed** | 11:14,18,20 | 131:20 | 54:14 |
| **CIT** | 113:11 | 13:20 15:9 | **conductivity** | **conveyed** |
| 24:4,22 25:15 | **closer** | 16:14 51:21 | 137:19 | 55:10,14 |
| 25:19,21 26:19 | 81:18 136:13 | **commission** | **conference** | **conveying** |
| 26:20 27:3 | **clothing** | 141:15 142:18 | 123:5,16 | 39:19 |
| 28:5,6,12 | 80:20 | **commissioned** | **confined** | **convicted** |
| 29:18 54:22 | **Cold** | 142:6 | 59:14 | 117:18 |
| 65:3,9,17,19 | 24:1,6,8 | **common** | **confused** | **coordinates** |
| 65:19 68:7 | **college** | 72:22 | 60:12,14 | 13:1 |
| **citizen** | 9:16 | **communicate** | **connect** | **copies** |
| 71:5 | **Colorado** | 65:4,10 | 126:14,16 | 140:19 |
| **City** | 1:1,16,20 2:5,8 | **communicating** | **connected** | **copper** |
| 5:9 9:8 10:4,25 | 7:24 142:2,5 | 83:21 | 142:15 | 137:10 |

Deposition of:   William Dickey - June 29, 2021
Sherry Poer v. Sheriff Tim Norton in his official capacity, et al.

Page 5

| | | | | |
|---|---|---|---|---|
| **copy** | 118:21 119:4,7 | 31:25 32:16 | 101:15 139:5,6 | **deaths** |
| 59:5 127:3 | 119:12,15,24 | **covering** | 139:7 | 122:21 |
| **corporal** | 122:22 123:25 | 93:8 | **cycles** | **deceased** |
| 17:3 | 127:15 128:15 | **COVID** | 10:11 100:20 | 1:4 6:24,25 |
| **correct** | 132:2 133:12 | 98:4 | _____ | **December** |
| 3:9 6:1 10:6,8 | 134:11,18,21 | **CPR** | **D** | 4:15 5:14 |
| 10:11 11:14,18 | 135:3,14,22 | 113:3 | **D** | **decide** |
| 12:4,8 19:12 | 139:17,17 | **crap** | 2:10 3:1 | 69:9 |
| 20:17,20 21:6 | 140:7 142:13 | 105:6 | **dark** | **decided** |
| 23:1 24:14 | **costs** | **crime** | 76:17 77:20 | 65:3,9 115:11 |
| 25:22 26:23 | 15:16 | 64:20 | **darn** | **deciding** |
| 27:9,21 28:16 | **counsel** | **criminal** | 107:2 | 54:24 66:22 |
| 30:3,11,24 | 4:6 59:5 142:14 | 9:17 21:6 | **darts** | **decision** |
| 32:1,2 33:4 | 142:15 | **crises** | 138:10 | 17:9,14 48:6 |
| 36:8,10 37:14 | **county** | 28:16 | **date** | 62:10,15,20,25 |
| 40:11 42:3 | 5:15,20,22 6:6 | **crisis** | 5:12 | 63:6 |
| 43:16 46:7 | 8:18 12:10,14 | 24:25 25:1,2,4 | **David** | **declined** |
| 47:16,25 48:7 | 14:5 15:18 | 28:24 29:11,19 | 1:15 23:18 | 128:17 |
| 49:1 53:11,12 | 16:2,6,10,25 | 30:24 31:12 | **david@fblaw....** | **decompress** |
| 55:10,21 56:2 | 32:6 33:19 | 32:14 55:3 | 1:17 | 124:6,7 |
| 56:14,17 57:24 | 50:25 51:4,10 | 64:24 | **day** | **deescalate** |
| 62:19 63:9,23 | 51:13,20 78:9 | **critical** | 19:14 72:25 | 30:23 31:3 66:5 |
| 64:15,18 65:14 | 78:14 117:7,18 | 35:20 121:17 | 78:17 81:8 | 96:8 |
| 66:11,18 69:5 | 119:23 120:11 | 122:15,20 | 103:3 120:25 | **defendant** |
| 69:18,25 70:12 | 122:2,18 | **CRT** | 127:16,24 | 117:25 |
| 71:14 72:14 | 129:11 130:20 | 122:14 123:18 | 128:11,24 | **Defendants** |
| 73:1,3,4,7 | 131:18,24,25 | 124:10 129:19 | 141:13 | 1:10,18 |
| 76:22 78:1,4 | 142:3 | 130:1,17 | **days** | **defense** |
| 79:19,23 80:4 | **couple** | 131:20 | 125:13,20 | 59:5 |
| 80:10,16 81:10 | 121:25 123:13 | **cuff** | 140:16 | **defined** |
| 81:13,17,23,25 | 125:20 | 100:2 | **dead** | 58:9 60:4 |
| 82:23 86:11,22 | **course** | **cuffed** | 7:25 112:15 | **definition** |
| 88:6,9,13 89:8 | 25:10,11,17,18 | 107:11 | 114:8 | 2:16 58:11,21 |
| 92:1 99:25 | 110:3 138:6 | **cuffing** | **deadly** | 59:8,9,17,19 |
| 100:7 103:7 | **courses** | 133:10 | 109:11,16,21 | 59:23 60:2,3 |
| 104:13 106:4 | 25:18 | **currently** | 110:3 | **degree** |
| 107:12 108:12 | **coursing** | 8:17 38:8 69:23 | **deal** | 9:16,17 |
| 108:14 109:22 | 111:16 | **curved** | 25:3,21 28:15 | **degrees** |
| 109:25 111:2,5 | **court** | 41:15 | 29:11 67:21 | 9:16,19 |
| 111:18 112:1 | 1:1 3:20,24 4:21 | **custody** | **dealing** | **deliver** |
| 112:14,23 | **cover** | 92:24 117:19 | 28:8,13,24 29:4 | 111:10 |
| 113:4,7,9,17 | 41:19 48:12 | **custom** | 29:18 31:10,11 | **delivered** |
| 113:22 114:7 | 54:25 63:5 | 6:10 9:3 | 65:16 | 137:20 |
| 115:1,14,21 | 66:23 67:11 | **cycle** | **death** | **delivering** |
| 116:2 118:19 | **covered** | 100:18 101:14 | 6:21 7:4 122:19 | 108:25 110:25 |

Deposition of:  William Dickey - June 29, 2021
Sherry Poer v. Sheriff Tim Norton in his official capacity, et al.

Page 6

| | | | | |
|---|---|---|---|---|
| **demonstrating** 76:1 | 50:23 80:2 85:19 86:19,20 87:2 92:13,25 93:1 97:1 99:24 100:1 110:17 112:6,9 121:15,16 132:24 133:5,6 134:6,14 135:5 137:2 | **died** 112:14,22,25 **difference** 84:22 **different** 10:2,14,19 24:21 29:16 31:21 33:19 35:22 60:2,3 77:4 78:6 98:16 119:19 121:18 122:17 123:6,12 | 46:1 **dispatchers** 26:14 28:8 68:10 **dispatches** 55:19 **dispute** 98:15 **distance** 39:5 63:4 **district** 1:1,1 120:9 130:6,15 | 126:3 129:6 **drag** 126:18 **draw** 79:5 **drawing** 78:23 81:2,3,4 **drew** 78:9,9,18 79:4 79:16,18 **drinking** 47:5,18 55:7 118:25 |
| **Denver** 1:16,20 2:5 142:3 **department** 2:16 5:10 11:1 11:14,18 12:16 13:1 51:2 59:2 59:10,11,12,18 59:20,21,21 117:21 120:10 127:12 | **describe** 72:17 76:5 **describing** 134:16,17 **description** 40:22 **despite** 65:2,8 **detail** 2:15 18:22 23:12 | **dilated** 113:8 **DIRECT** 3:5 **direction** 53:2 73:2,6 **directions** 43:1 **directly** 13:11 67:21 **disagree** 57:7 93:3 | **disturbance** 46:11 **dividing** 122:11 **DK** 46:18,19 **doctor** 114:11 **document** 19:3,16 23:15 **doing** 3:24 6:9,11 | **drive** 80:12,15 138:12 138:18,23,25 139:4,15 **driveway** 38:8 **driveways** 39:6 **driving** 22:25 **drove** 120:13,15 121:6 |
| **deploy** 96:19,20 97:6 **deployed** 72:25 74:13 108:10 **deployment** 96:24 139:14 **deployments** 138:24 139:8 **deponent** 141:1 **deposed** 3:11,14 4:14 5:2 118:10,12,14 118:18 | **detained** 107:7,10 **detect** 113:20 114:6 **Detective** 120:20 121:3 126:5 129:5 **detectives** 14:8 **determine** 32:20 114:4,5 **devices** 68:2 **diabetic** | **disciplined** 132:3 **disclose** 14:22 **discuss** 14:20 **discussing** 53:4 **discussion** 15:18 109:6,9 **dispatch** 39:19 40:22 | 16:13 67:10 77:12 87:8 95:14 102:25 116:15 139:23 **dollar** 15:12 **domestic** 46:11 **don'ts** 28:24 29:12,13 **dos** 28:23 29:12,13 **double** 139:11 | **drugs** 47:5,18 55:7 **drunk** 46:20,25 47:9 47:11 118:24 119:1 **DS** 80:12 **duly** 3:3 142:8 **duplicate** 43:10 45:14 **DVD** 127:2 |
| **deposition** 1:11 2:2 3:17 4:6,20,23 8:6 19:1 79:13 87:21 118:17 140:23 141:2,5 141:7,8 142:10 **deputies** 14:8 18:12 36:20 41:7 117:19 131:8 132:1 **deputy** 1:7 2:17,18 12:18 15:5,8 16:2 17:1,2,6 37:3 44:13 | 10:22 119:7,9 **diagram** 2:17 78:10,18 81:21 85:21 **Dickey** 1:7,11 2:2 3:2,7 80:9 135:5 137:2 141:1,10 **Dickey's** 2:17,18 | 43:14 44:16 47:4 55:6,15 55:18 66:13 70:21 **dispatcher** 27:18 33:10 35:22 37:18 39:25 40:2 | **double-check** 116:5 **download** 120:23 121:3 127:20 **downloaded** | **dying** 114:8 |
| | | | | **E** |
| | | | | **E** 2:10 3:1,1 |

Deposition of:   William Dickey - June 29, 2021
Sherry Poer v. Sheriff Tim Norton in his official capacity, et al.

Page 7

**earlier**
23:15 55:15,18
62:8 65:16
104:3 115:19
**early**
133:9
**easier**
23:3
**eastbound**
40:13
**EC-21**
36:23
**EC-231**
43:18
**echo**
33:2 36:25 37:1
43:21 44:24
45:1 46:5
71:19 82:11
107:6
**echoes**
107:22
**educated**
105:8
**Education**
59:11,21
**educational**
9:14
**effect**
55:14 62:7
124:20
**effective**
137:24 138:19
138:20 139:20
**eight**
69:17,21 70:5
138:9
**either**
36:16 52:1 58:8
114:1,8 116:1
**El**
5:15,20 16:25
**Elaine**
35:13 36:2,21
37:15 38:3

**earlier** (continued)
39:14,19 40:1
42:4,8 44:8,17
47:4,17 55:7
56:20 116:1
**Elaine's**
70:24
**elapsed**
106:11
**Elbert**
5:22 6:6 8:18
12:10,14 14:5
15:18 16:2,6
16:10 32:6
50:25 51:4,10
51:13,20 78:9
78:14 117:7,18
119:23 120:11
122:2,18
129:11 130:20
131:18,24,25
**elbows**
90:17 91:20,25
**electric**
98:23
**electrical**
137:18 138:6
**electricity**
100:23 110:20
110:25 111:16
137:12,25
138:6 139:9,12
**elements**
29:21
**Email**
1:17,21
**emergency**
24:8 59:22
**employed**
5:20
**employment**
12:17
**EMS**
108:3
**en**
36:23 37:1

**encounter**
71:6 104:4
106:2 111:25
112:4,7,10
116:6 132:6,9
**encountered**
47:24,25
**ended**
11:6
**enforcement**
6:19 9:7,8,13,13
28:14 30:11
39:15,20 40:2
40:5 55:11,20
57:13 58:13
72:23 111:6
**engage**
62:12
**engaged**
59:13
**entering**
48:3
**entertained**
67:14
**entire**
13:6 20:20
52:14 57:12
114:18 138:19
**entry**
27:11 28:5,6
42:20 44:13,19
45:14 46:5
**episode**
119:7
**Eric**
7:23 8:3
**ES-1**
32:24 33:1,15
34:1,15,20,23
41:3
**ESQ**
1:15,19
**established**
12:11
**estate**

**encounter** (continued)
1:4 7:2
**estimate**
34:7
**et**
14:8 57:15
**evaluate**
32:19
**evaluation**
12:25
**Evans**
1:19
**evening**
20:22 47:22
57:12 67:15
78:2 112:23
128:22 132:1
**event**
8:17 48:24
**eventually**
11:20 31:19,23
32:5 38:11
73:21 78:2
81:24 120:5,16
121:2
**everybody**
42:1 96:4
127:10
**evidence**
62:18 101:7
106:23 107:18
112:21 114:21
**evident**
62:21
**exactly**
13:18 105:7
106:2 111:18
**examination**
2:3,11 3:5 142:7
**exhausted**
127:22
**exhibit**
19:1,2,5,6 23:11
23:18 32:1
58:20 59:4,6
79:13,14 87:21

87:22
**EXHIBITS**
2:14
**experience**
9:8,8 51:23
139:19
**experiencing**
20:10 67:18
68:16
**expires**
141:15 142:18
**explain**
13:20 14:18
29:9
**explanation**
8:7
**explorer**
9:10
**expressing**
48:24
**extensive**
12:21
**extracted**
110:14,16
**extraction**
126:20
**eyes**
113:8,10,10

---

**F**

**face**
41:15 88:21,22
89:21,22 90:2
90:16 91:11,22
102:20 103:18
134:21
**Facebook**
7:6,18
**facedown**
79:10 85:24
**Facing**
75:22
**fact**
31:14 42:16
47:21 52:6

Deposition of:   William Dickey - June 29, 2021
Sherry Poer v. Sheriff Tim Norton in his official capacity, et al.

Page 8

| | | | | |
|---|---|---|---|---|
| 56:1 57:12 | **field** | 58:24 69:23 | 82:10,12,14,18 | 138:12,18,23 |
| 63:16 70:19 | 36:7 42:5,9,11 | **firms** | 83:7 84:7,16 | **follow-up** |
| 87:2 115:4,17 | 44:24 45:8 | 8:13 | 84:19 87:20,23 | 14:1,16,17 16:7 |
| 133:9 | 48:3,16 49:13 | **first** | 88:18 90:6,23 | 124:14 |
| **facts** | 49:16,22 52:3 | 3:3 52:13 65:5 | 92:3,4,16 | **followed** |
| 62:17 101:6 | 53:5 54:25 | 65:10 70:13 | 93:11 99:6 | 21:19 95:17 |
| 114:20 | 57:8,18,19,19 | 75:16 77:7 | 101:8 102:11 | **followers** |
| **fair** | 57:25 63:1,14 | 108:20 121:6 | 102:19 103:21 | 7:24 |
| 12:2 22:3 28:25 | 63:25 68:24 | 125:16 126:1 | 104:3,18 | **following** |
| 31:16 36:21 | 70:14 71:25 | 127:17 128:2 | 106:24 107:6 | 103:3 127:16 |
| 38:13 50:3 | **figure** | 129:6 137:21 | 107:19 108:24 | 128:11 |
| 63:14,17 | 51:12 | 139:5,14 | 109:20 112:22 | **follows** |
| 111:15 114:8 | **file** | **Fisher** | 114:11,14,24 | 3:4 |
| 114:15,17 | 16:14 131:11 | 1:15,15 2:4,12 | 115:16 120:4 | **food** |
| 131:24 139:15 | **filed** | 3:6 4:11 6:24 | 125:3,9,23 | 124:9 |
| **fairly** | 19:7 | 7:1,4,14 8:9 | 132:11,16,18 | **foot** |
| 97:10 | **files** | 9:24 17:24 | 136:21,23,24 | 84:10 137:16 |
| **familiar** | 16:11,17 | 18:25 19:3,6 | 140:12,18 | **force** |
| 7:23 8:3 | **fill** | 19:25 21:4,22 | **five** | 8:12 13:8,11,13 |
| **far** | 131:15 | 22:10 23:20,22 | 10:10,17 23:22 | 109:3,10,11,16 |
| 3:24 38:20 | **finally** | 24:22 27:2 | 101:20,21 | 109:21 110:4 |
| 43:13 57:23 | 13:1 | 28:1,18,21 | 102:20 103:9 | 119:12 129:16 |
| 75:9 131:18 | **find** | 29:3,8,17 30:1 | 103:13,15 | 131:5,8 135:2 |
| **fast** | 9:22 115:21 | 30:6,21 31:2 | 106:11 108:22 | **foregoing** |
| 28:2 87:19 | **findings** | 31:19 32:17 | 111:4,11 | 140:23 141:3 |
| **FBI** | 12:8 13:12 | 34:7,13,17 | 119:14 132:11 | 142:12 |
| 59:11,20 | 130:25 131:21 | 35:12 36:16 | **five-second** | **forget** |
| **fears** | **fine** | 38:20 39:5,25 | 137:21 | 69:20 |
| 68:8 | 26:8 58:19 76:5 | 49:4 50:1,6,13 | **flannel** | **forgot** |
| **Federal** | 92:17 127:24 | 50:25 51:9,20 | 40:17 | 134:2 |
| 59:22 | **finished** | 52:17,21,24 | **flashlight** | **form** |
| **feel** | 15:3,4,6 24:10 | 53:14 54:8,17 | 72:12 73:5 | 17:19 19:24 |
| 113:15,16 | **fire** | 54:21 55:6,16 | 76:15,19,24 | 21:2,20 22:8 |
| 135:16 | 120:6,9,9,22 | 56:23 57:4 | 77:22 81:12 | 24:19 26:24 |
| **feeling** | 121:6,12 122:6 | 58:12,15 59:4 | 94:3 | 27:25 28:17 |
| 77:10 83:17 | 123:24 | 59:7,25 60:12 | **flat** | 29:1,14 30:4 |
| **fees** | **firearm** | 60:15,18 61:3 | 82:5 | 30:18 31:17 |
| 15:16 | 70:21 131:9 | 61:15,23 62:19 | **Floor** | 32:12 33:17 |
| **feet** | **firearms** | 64:2,7,13,23 | 1:16 2:5 | 34:16 36:14 |
| 37:8 75:11 78:4 | 59:15 71:3 | 65:2,8,13,25 | **flows** | 38:18 39:4,22 |
| 79:19,20 81:1 | **fired** | 66:9 67:22 | 137:12 | 49:2,24 50:4 |
| 81:20 86:25 | 17:24 44:21 | 68:6,20 69:6,8 | **focused** | 50:10,19 51:7 |
| 89:7 | 61:6 69:21 | 70:1 71:16,22 | 87:7 102:21,24 | 51:17 52:11,19 |
| **fellow** | 74:7 | 74:5 78:12,16 | 102:25 | 53:13 54:3 |
| 45:20 | **firing** | 79:12,15 82:6 | **follow** | 55:5,12 56:22 |

Deposition of:   William Dickey - June 29, 2021
Sherry Poer v. Sheriff Tim Norton in his official capacity, et al.

Page 9

| | | | | |
|---|---|---|---|---|
| 57:1 58:10,14 | 114:10,21 | **getting** | 97:18 104:6 | **Gotcha** |
| 60:10,17,24 | 120:2 125:5,22 | 8:24 17:17 40:9 | 106:17 131:11 | 33:24 136:16 |
| 61:14 62:17 | **four** | 61:19 76:17 | **going** | 137:20 |
| 64:1,6,12 65:6 | 106:10,11 | 87:9 104:7 | 3:16,25 4:7 6:18 | **gotten** |
| 65:11,23 66:7 | 121:14 123:14 | 107:9 | 8:7 11:21,24 | 67:6 |
| 67:19 68:19 | **frame** | **give** | 11:25 13:23 | **government** |
| 69:24 74:3 | 91:2 | 5:12 29:10 34:7 | 14:13 17:12 | 59:10 84:25 |
| 78:11,13 83:6 | **front** | 44:5 59:5 62:9 | 18:16 19:9 | **grab** |
| 84:5,15,17 | 75:24,25 76:3,3 | 85:16 101:15 | 20:6 23:13,16 | 87:4,5,13 92:8 |
| 92:15 101:5 | 77:2 83:5,16 | 102:4,11 | 28:8,16 29:19 | 92:13 135:23 |
| 102:9,18 104:1 | 83:17 88:25 | 105:22 106:10 | 30:17 32:10 | **grass** |
| 106:22 107:17 | 89:25 90:11,16 | 111:13,20,22 | 34:14,19 35:1 | 77:11 83:18 |
| 109:19 112:16 | 90:18 91:11,22 | 124:17 131:20 | 36:5 37:21 | 86:23 |
| 112:20 114:10 | **fucking** | **given** | 39:23 52:15 | **graveyard** |
| 114:20 115:15 | 73:19 84:3,4 | 12:1 26:21 27:5 | 53:5 55:12 | 37:6 |
| 119:2 125:1 | 88:8 93:13,13 | 27:8 28:7 40:8 | 62:12 67:23 | **green** |
| 131:6,7 142:12 | 95:23 102:5,12 | 40:12,22 53:17 | 69:13,19 71:16 | 21:15 40:16 |
| **forth** | 102:15 105:16 | 63:3 68:22 | 71:18,19 72:5 | **grip** |
| 38:9 | 105:23 | 111:9 140:9 | 73:25 74:3,15 | 95:5 |
| **forward** | **full** | **gives** | 74:21 78:6,20 | **groan** |
| 68:24 76:22 | 5:5 | 26:9,15 59:7 | 84:3 87:9,19 | 98:25 99:3,5,11 |
| 87:19 92:4 | **fully** | **giving** | 88:2,7 91:12 | **ground** |
| **foul** | 110:18 | 5:5 74:23 138:5 | 91:14 92:4 | 71:24 75:4 |
| 7:7 | **functions** | **glare** | 93:13 94:8,11 | 77:10,19 82:5 |
| **found** | 111:21 | 26:2,3 | 95:6,20,23 | 91:13 |
| 78:2 114:25 | **further** | **glutes** | 96:19,20 98:5 | **group** |
| 115:4,16 | 16:19 138:13,21 | 138:15 | 98:21 99:16 | 121:23 |
| 131:2,25 140:6 | ———— G ———— | **go** | 100:8 101:5 | **guard** |
| **foundation** | | 3:16 7:5 8:6,9 | 105:2,15 | 95:5 |
| 17:19 21:2,20 | **G** | 12:19,21 13:2 | 106:22,24 | **guess** |
| 24:19 26:24 | 3:1 | 17:20 23:11 | 112:16,20 | 8:22 22:25 |
| 28:17 29:1,14 | **gain** | 42:1 43:23 | 116:24,25 | 29:15 31:6 |
| 29:24 30:18 | 111:14 | 44:19 45:11 | 123:24 132:24 | 34:4,6 50:1 |
| 31:17 32:12 | **gap** | 48:16 49:13,16 | 133:1,3,14,20 | 54:8 57:7 |
| 33:17 34:11,16 | 101:23 | 49:22 57:4 | 133:23,24 | 58:11 80:20 |
| 35:11 38:18 | **gate** | 61:2 71:15 | 134:3 136:7 | 87:20 105:1 |
| 39:4,22 49:2 | 43:23 | 75:1 82:5 | 137:18 138:20 | 114:3 135:23 |
| 49:24 52:19 | **general** | 90:13,14,19 | 140:3 | 136:12,14 |
| 53:13 54:3 | 21:25 22:1,5 | 91:13 92:4 | **good** | 139:13 |
| 55:13 57:1 | 52:10,25 70:3 | 103:21 104:14 | 3:7,24 124:7 | **guesses** |
| 59:24 60:24 | **generally** | 117:3 124:4 | 136:23 | 105:8 |
| 64:21,25 67:19 | 14:20 25:5 | 132:15 133:24 | **Google** | **gun** |
| 68:19 92:15 | 30:20 | **Goddamn** | 119:25 | 11:7,7 35:14,14 |
| 99:4 103:19 | **gentleman** | 104:9 | **Gosh** | 35:17 37:15,24 |
| 104:1 107:17 | 122:7 | **goes** | 107:2 | 38:1 40:14 |

Deposition of:  William Dickey - June 29, 2021
Sherry Poer v. Sheriff Tim Norton in his official capacity, et al.

Page 10

46:10 49:18
56:20,24 57:6
60:21 65:12
67:8 70:24
71:13 72:15
74:10 75:3,7
75:13,18 76:25
77:25 78:2,4
78:25 79:15,18
80:25 81:6,15
81:18,20 84:12
84:14 86:23
87:2,4,5,5,6,9
87:12 89:5,6,9
89:13 92:5,8
92:10,13,24
93:5 108:13,15
108:16 132:19
133:14 134:7
134:25 140:3
**gunman**
41:18
**gunpoint**
70:7,11
**guns**
81:12
**gunshots**
42:18,24 45:12
45:16,18 69:14
**guy**
48:19 81:5
97:10
**guys**
37:19 53:4 92:5
113:2 120:5
122:24
**gym**
97:19

———————————
**H**
**habits**
97:20
**half**
78:22 100:21
111:7 113:10

121:8
**Hall**
1:19
**hand**
35:14 73:8 77:8
77:9,11,18
83:14,16 95:4
95:4,5 99:25
100:4 102:5,12
105:23 110:13
110:14,15,18
137:16
**handcuff**
85:25 99:21
104:8,9 107:2
107:5 110:18
110:21
**handcuffed**
110:13 113:18
**handcuffing**
99:24 100:1
**handcuffs**
113:2
**handgun**
105:4 110:6
**handheld**
72:15
**handle**
28:22 34:19
41:15
**hands**
73:15,17,19
75:24,25 76:2
76:6,8,21,22
76:25 77:1,5,7
77:22 81:13
83:5,7,8,13
84:3 85:9,17
87:9 88:7,14
89:25 90:7,11
90:16,17 91:1
91:5,12,12,23
91:25 93:12,18
111:20,22
137:3

**hang**
124:4
**happen**
11:25 54:8
137:6
**happened**
19:10 51:23
101:25 118:3
124:13,25
125:8 128:8
133:9
**happening**
68:18 87:8
**hard**
25:16 35:25
83:11 88:16
**head**
3:25 79:9 85:20
90:12 91:4
103:25 104:16
105:16 106:3
107:16 108:9
108:25 109:12
113:19 115:14
**heading**
46:2
**health**
20:10 21:9 25:4
25:5 28:9,10
28:13,16,24
29:4,19 30:24
31:12 32:14,19
32:21 35:4
55:2 64:24
68:7,22 114:25
115:1,2 116:1
**Heap**
13:4 122:4
123:20 124:12
**hear**
22:10 23:3
46:16,22 61:25
71:17 92:7
93:11,21 95:24
98:21,23,25

99:18,22
100:10,11,16
100:22 101:2,4
101:12 102:4
107:1,2,6
110:19,20
134:2,6 135:6
**heard**
20:19,25 42:17
42:21,24 43:7
43:14 44:3
45:11,18 46:21
69:14 99:21
101:11 104:18
134:11,12
135:4
**hearing**
17:21 37:22
99:13 125:16
**heavy**
41:14
**held**
72:9
**help**
20:11 30:14
32:22 66:3
67:7
**Hendrix**
87:18
**hidden**
61:13
**high**
138:3
**highlighted**
23:18,19,20
25:24 32:23
**Hills**
121:20
**hip**
80:10 82:3,20
82:21,22 83:12
89:19
**hired**
5:13 8:24 15:14
119:22

**hiring**
12:13
**history**
21:9
**hit**
109:12 113:19
119:19,21
136:21
**hitting**
104:23 105:4
**hold**
6:17 9:20 31:16
32:10,18,19
60:13
**holding**
74:14 85:2,5
116:9 135:24
**Holt**
36:21 44:8
56:20
**home**
27:13,20 42:12
**Homeland**
2:16 59:3,12,19
59:21
**homes**
9:4 39:6,7
**honestly**
92:18
**honorably**
17:9
**hook**
9:22
**hooting**
49:14
**hopefully**
87:18 132:12
**horse**
43:24 44:6
**hospital**
32:21 112:15
125:6
**hostage**
58:6
**hour**

Deposition of:  William Dickey - June 29, 2021
Sherry Poer v. Sheriff Tim Norton in his official capacity, et al.

Page 11

23:16
hours
25:14 55:15
69:11 140:25
house
37:8 38:8 44:19
59:10 68:2,13
houses
38:16,20 39:1
57:20,21,23
hovering
23:23 136:6
hundred
45:7,21 52:25
53:1
hundreds
58:1,4 61:9
hungry
124:10
hurt
30:17 55:23,25
56:1,6,8,10,13
56:17,21,25
57:6
hurts
99:10

_____ I _____
idea
127:5
ideal
138:2
identified
106:12
identify
30:10 40:25
65:25 104:25
identifying
6:22
illness
67:24
illuminated
76:25
illuminating
76:19,21

immediately
72:9 94:4
important
47:12
impression
139:13
in-custody
122:19,21
in-state
9:25
inaccurate
49:4,6
incapacitate
138:21
inch
138:10
inches
138:9
incidences
14:18
incident
2:17 11:1 15:21
19:10,14,21
20:16,20 21:8
21:11,14,23
78:25 81:8
114:18,23
117:11 122:20
122:25 123:3
127:11,14,18
128:8 129:12
130:21
incidents
11:16,21
including
59:10 61:24
122:21
incoming
46:9
incorrect
103:12,14
increments
90:20
indicating
90:12 102:25

103:1
indiscriminate...
60:8
individual
1:8,8 26:18
32:13 59:12
individually
1:3
individuals
25:3 46:13
information
6:22 9:21 17:18
23:8 36:17
37:11 40:8,12
47:7 52:13
53:18 55:21,22
55:24 56:12,16
56:19,24 58:3
60:20 61:23
62:1,4,6 68:22
71:12 140:9
informed
51:9 130:5
initial
20:9
initially
73:23 75:16
120:15,16
injured
111:25 112:3,6
112:9,12
114:18,23
injuries
114:25
injury
117:20
inner
131:12
inserting
7:9
insisted
63:16
installed
27:12,20
instance

41:17 110:10
instruct
6:18
instructed
123:7
instruction
30:19
instructor
25:19
intended
81:4
interaction
103:16
interest
6:20
interested
9:13 142:16
interim
5:18 128:7
internal
129:15 131:12
Internet
120:1
interpretation
50:2
interpreting
49:21
interrupted
95:19
intervals
111:3
Intervention
24:25 25:1,2
interview
13:3 16:22 93:2
98:14,18 103:2
103:9 120:24
120:25 127:17
127:24 128:3,6
130:1 132:25
134:17
interviewed
81:9 128:12,22
129:3,8,24
interviews

122:12 129:1,25
131:20
intoxicated
47:1 118:21,22
119:4
intoxication
119:1
investigate
122:19 124:11
investigated
11:17 12:23
13:9
investigation
129:12,14,15,17
129:19,22
130:3,18,21
131:19
investigator
69:2,7
involve
139:8
involved
14:23 46:14
121:15 127:11
131:7
involving
18:18 19:11
119:3
inward
136:11,11
Iraq
21:15
issue
67:25
issues
20:11 28:10,13

_____ J _____
Jail
117:18
January
5:13
jeans
40:17
Jimi

Deposition of:  William Dickey - June 29, 2021
Sherry Poer v. Sheriff Tim Norton in his official capacity, et al.

Page 12

87:18
**job**
3:24 5:15,25
6:19 12:15
13:9
**jobs**
8:24 17:22
**joined**
69:2
**joint**
62:20
**Josh**
79:22,25 86:2
96:4 98:12
104:7,11
128:21
**Josh's**
105:4
**judgment**
15:9 19:8
**June**
1:12 2:6
**justice**
9:17 59:11,20

——————————
            **K**
——————————
**K-9**
117:20
**keep**
90:23 95:10
98:5 99:16
102:2 105:20
106:24 133:20
**keeping**
17:17
**keeps**
37:21
**kept**
100:15 123:10
**kick**
82:2
**kicked**
81:25 82:4,18
82:21 83:12
84:7 85:8

89:18
**kicking**
83:1 89:16
**kill**
59:13 109:13
**killed**
62:4
**killing**
59:13
**kind**
7:4,17 17:1,3
19:16 34:14
51:15 54:11
80:23,25 88:16
88:25 90:16
91:11,19,22
97:19,21 99:3
102:16 103:24
105:23 106:17
113:9 117:1
126:18 129:9
129:12,14
**kinds**
7:7 9:2 105:6
**Kiowa**
120:23 126:10
**knee**
96:13,15,17,18
96:23 97:5
98:7,9 136:1,2
136:2,3,4,6,9
136:12
**kneeling**
96:18 135:25
136:6
**knees**
78:5 98:19
**knew**
17:13 20:25
31:10,13 32:10
32:13 43:1
52:18 55:9
64:19 67:17
**knocked**
106:20 107:15

107:25 108:6
**know**
5:9 7:14 8:14
14:19 15:13
16:10,13 18:1
18:1,18 20:5
21:5,8,11,14
21:18 27:14
28:8 33:9 34:9
34:12 35:24
38:19,25 39:14
39:20 40:2
47:12 51:5,11
51:16 52:15,18
52:23 53:14
54:21,23 55:20
56:3,5 64:13
68:5 82:6 89:6
91:5 92:23
95:3,7 97:14
97:20 105:3,3
105:5,6,11
106:2 108:15
108:16 111:13
112:25 114:11
114:22 115:7
115:10,13
116:4 117:7,10
118:14 121:14
124:5 125:6,7
125:8,19,23,25
127:23 129:2
130:4 131:9,11
136:5 138:9
**knowledge**
17:25 114:19,22
115:23 129:11
135:9
**known**
131:23
**knows**
53:10 60:22

——————————
            **L**
——————————
**lack**

21:6
**large**
57:17 138:4
**larger**
38:24
**late**
127:22
**law**
6:19 8:13 9:7,8
9:12,13 28:14
30:10 39:14,20
40:2,5 55:10
55:20 57:13
58:13 72:22
85:1 111:6
**lawsuit**
15:19 117:6,25
118:2 119:22
120:1
**lawsuits**
14:23 117:13
**lawyer**
128:15,19
**laying**
71:24 72:6
75:15,16 82:21
83:4 85:24
90:17 91:19,23
93:6 116:7,18
**lead**
54:5
**Leadholm**
3:12 4:18 7:8
10:8,10,21
14:25 15:1
117:8 118:14
119:3,11
**leading**
49:15
**leaner**
97:16
**learned**
30:21
**leave**
8:18 34:23 35:3

35:5
**leaving**
6:6 34:25
**led**
46:25
**left**
5:13 11:10
13:20 16:25
48:10 77:8
80:4,10,23
82:20,22 83:16
85:12 86:5,7
86:21 88:11,25
90:2 93:7 97:3
125:3,20
132:12 136:2
**leg**
137:16 138:5,15
138:25 139:10
**legitimate**
68:8
**legs**
97:7 136:5
**length**
95:3
**let's**
5:8 12:13 21:22
23:11 28:5,12
49:12 54:17
68:25 71:15
87:16 89:12,13
90:23 95:10
100:22 104:14
108:21
**letter**
130:15
**letters**
130:6
**letting**
20:5
**level**
24:7 31:5,5 77:8
91:10
**lieu**
12:2

Deposition of:  William Dickey - June 29, 2021
Sherry Poer v. Sheriff Tim Norton in his official capacity, et al.

Page 13

**Lieutenant**
122:5
**life**
20:20 117:14
   118:4
**lifts**
97:22
**light**
72:16 83:10
**lights**
46:6,12 63:19
   63:22 64:16
**likelihood**
68:21
**limbs**
111:23
**line**
26:10
**line-level**
17:2,6
**linking**
7:8,8
**list**
29:12
**listen**
50:6,17 100:22
   101:3 102:16
   103:22 133:1
**listened**
63:10 124:14,16
**listening**
22:6,23 23:4
   69:7 103:11
   106:6 114:3
**lit**
72:11
**little**
5:8 23:13 26:2
   42:4 44:7 70:6
   78:9,18 88:15
   88:16 90:19,21
   90:24 93:11
   94:8,15 102:12
   108:21 124:8
   133:8,23

**live**
126:25
**lived**
44:8
**LLC**
1:19 6:13
**loaded**
35:17 74:5
**located**
52:23
**location**
33:13 39:11
   44:5
**log**
22:14
**long**
97:7 100:19
   116:24,25
   123:11 136:5
**longer**
46:18
**look**
22:22 23:6 36:9
   38:4 58:20
   59:1 88:20
   95:12 131:19
**looked**
12:23 113:8
**looking**
22:6 36:12
   97:22 104:7
**looks**
18:22 35:22
   79:21 80:22
   89:4
**lot**
39:5 51:18 63:4
   115:2 117:12
**lots**
38:16
**loud**
73:12,21 102:10
   102:15 105:23
   107:23
**loudly**

102:6
**low**
119:8 138:4,14
**lower**
23:15 31:5
   139:1,9
**lowest**
24:7
**lungs**
46:17,22
**lying**
75:14 88:10,13

## M
**M-1**
31:16 32:10,17
**machine**
84:14
**made-up**
84:24
**Madison**
26:12
**magazine**
94:1
**mail**
66:20
**making**
28:2 33:14
   95:13
**male**
40:19 46:2,16
**man**
45:21 64:19,23
   65:9 68:11
   78:25
**man's**
79:19
**management**
9:18 59:22
**manner**
65:4,22 102:8
   105:23
**mark**
1:19 11:10
   18:25 59:4

79:12 91:13
93:12
**marked**
19:2,4 59:6
   79:14 87:22
**mass**
138:4
**master**
17:1
**mat**
70:1
**materials**
51:14
**matter**
50:23 118:12,14
**matters**
142:9
**Matthew**
19:11
**mean**
7:1 8:4 9:24
   13:14 18:17
   24:24 25:4
   27:14 31:2
   32:17 33:8
   34:3,4,24
   35:20 45:4
   46:8,19 49:21
   53:1,1 54:5
   56:23 60:4,18
   61:1 72:4,8
   77:3 94:1
   98:17 105:2
   107:22 109:6
   117:4 122:13
   131:2,3 135:8
   136:14
**meaning**
24:7 33:21,22
   35:7 46:9 90:7
   135:6 138:20
**means**
24:8 27:15 28:7
   33:15 34:5,8
   34:10,12,13

35:3,21 111:12
**meant**
12:6 60:16
   133:6
**mechanism**
98:21
**medical**
21:12
**medication**
119:2
**meet**
18:3,14 45:1,4,8
   127:25
**meeting**
45:20
**members**
12:20 13:18
   41:13,14
   121:16 122:17
   123:17,18
   128:25
**mental**
20:10 25:4,5
   28:9,9,13,16
   28:24 29:4,19
   30:23 31:12
   32:14,19,20
   35:4 55:2
   64:24 67:24
   68:7,22
**mention**
134:3
**merely**
139:6
**met**
3:9 18:4,7,12
   20:16,22 53:3
**metal**
43:24 44:5,7
   93:21 95:24
   104:18,21,23
   104:25 105:6
**method**
59:15
**mic's**

Deposition of:  William Dickey - June 29, 2021
Sherry Poer v. Sheriff Tim Norton in his official capacity, et al.

Page 14

|  |  |  |  |  |
|---|---|---|---|---|
| 82:16 | 111:21 | 7:8 121:14 | 123:20 124:19 | 26:17,22 27:9 |
| **middle** | **mouse** | **narrative** | 124:25 126:4 | 59:6 66:11 |
| 10:22 | 23:23 25:25 | 35:19 | 127:11,19 | 79:14 87:22 |
| **mile** | 32:24 33:25 | **Natasha** | 128:7,9 132:25 | 94:1 115:20 |
| 121:9 | 39:14 43:17 | 1:23 69:2,6 | 140:7,10 | |
| **military** | 89:3 90:2 | 71:17 136:20 | **Ninth** | **O** |
| 21:19 | **mousy** | **Natasha's** | 1:16 | **O** |
| **mine** | 102:12 | 69:1 | **nods** | 3:1 |
| 12:17 52:12 | **move** | **near** | 3:25 | **oath** |
| **minutes** | 96:13,15 98:7 | 57:9,13 76:25 | **noise** | 141:3 |
| 45:17 54:18 | 136:4,9 | **nearby** | 87:18 93:22 | **oaths** |
| 69:11,17,21 | **moved** | 62:2 | 95:17 101:11 | 142:6 |
| 70:5,9 123:13 | 111:23 136:11 | **necessarily** | 105:9 | **object** |
| 132:11,25 | **movement** | 29:7 48:25 | **nonresponsive** | 4:6 17:19 19:24 |
| 140:25 | 83:10 | 111:20 118:23 | 113:3 114:15 | 22:8 24:19 |
| **Mischaracteri...** | **moving** | **need** | **Nope** | 26:24 27:25 |
| 106:23 107:18 | 68:24 81:13 | 7:11 9:3 25:6 | 104:24 | 28:17 29:14 |
| 112:21 | 90:23 136:15 | 29:15 32:10,20 | **normal** | 30:4,18 31:17 |
| **misnomer** | **murderer** | 32:22 49:16 | 31:5 35:19 | 32:12 33:17 |
| 84:20 | 7:7 117:18 | 65:7 90:14 | **north** | 34:11,16 35:11 |
| **missed** | **muscle** | 111:10,11 | 42:5 43:23 44:9 | 36:14 38:18 |
| 23:10 | 138:4 | 132:14 | 44:9,11 | 39:4,22 49:2 |
| **mistaken** | **muscles** | **needed** | **northern** | 49:24 50:4,10 |
| 139:13 | 138:15 | 20:11 | 120:10 | 50:19 51:7,17 |
| **mixed** | **muscular** | **needing** | **northwest** | 52:11 55:5,12 |
| 8:13 | 97:10 138:16 | 31:15 | 43:5,23 44:4 | 56:22 57:1 |
| **mixing** | **mute** | **Needs** | **northwestern** | 58:10,14 59:24 |
| 24:21 | 71:18,19 87:17 | 44:19 | 120:10 | 60:10,17,24 |
| **mixture** | 108:19 | **neighborhood** | **Norton** | 61:14 62:17 |
| 14:7 | **muted** | 39:10 | 1:7 18:5 | 64:1,6,12,21 |
| **monetary** | 136:22 | **never** | **Notary** | 64:25 65:6,11 |
| 118:8 | **muzzle** | 20:16,19 54:14 | 2:7 141:17 | 65:23 66:7 |
| **month** | 95:8 | 56:1,1 62:3 | 142:5,22 | 67:19 69:24 |
| 6:3 | **mysterious** | 67:14 74:18 | **notes** | 74:3 78:11,13 |
| **months** | 61:12 | 78:14 125:9 | 14:19 22:2,6 | 83:6 84:5,15 |
| 17:12 | | 135:13 140:6,9 | 23:10 36:5 | 84:17 92:15 |
| **morning** | **N** | **new** | 67:23 142:13 | 99:4 101:5 |
| 3:7 | **N** | 17:10,16,16,25 | **NOTICE** | 102:9,18 |
| **motherfucker** | 1:15 2:10 3:1 | 18:3 | 2:1 | 103:19 104:1 |
| 73:15 | **name** | **night** | **November** | 104:23 106:22 |
| **motion** | 25:24 26:21 | 21:5 31:20,24 | 8:20 | 107:17 109:19 |
| 19:8 | 27:5 | 33:3 36:13 | **number** | 112:16,20 |
| **motions** | **named** | 56:2,8,10,13 | 1:2 6:20,20 | 114:10,20 |
| 19:7 | 117:25 | 62:5 74:18 | 10:14 19:2 | 115:15 120:2 |
| **motor** | **names** | 78:9,15 120:4 | 25:16 26:10,16 | 125:1,5,22 |

Deposition of:   William Dickey - June 29, 2021
Sherry Poer v. Sheriff Tim Norton in his official capacity, et al.

Page 15

| | | | | |
|---|---|---|---|---|
| **objection** | 124:18 139:24 | 108:18 109:8 | 142:17 | 67:18 68:1,17 |
| 4:8 28:19 29:6 | **offices** | 109:24 114:3 | **outlined** | **Parker** |
| 29:24 30:25 | 2:4 | 114:17 121:2 | 84:2 | 78:16 81:9 |
| 52:22 61:18,21 | **official** | 121:12 122:15 | **outlining** | 103:2 120:20 |
| 114:13 | 1:7,8 | 124:3,23,24 | 94:20 | 121:22 125:7 |
| **objections** | **oh** | 126:1 127:8 | **outside** | 127:25 |
| 61:20 68:4 | 7:1 46:21 70:19 | 128:7 133:1,2 | 60:21 80:18 | **parking** |
| **obtain** | 71:23 80:12 | 133:15,22 | **outstretched** | 117:12 |
| 16:14 | 82:6 87:4 | 134:4,10,16 | 75:25 83:16 | **part** |
| **obtained** | 136:17,19 | 138:1 139:8,18 | **outward** | 28:23 33:19 |
| 16:16,21 111:12 | **okay** | 140:3,6,17 | 136:3 | 72:15 87:16 |
| **obviously** | 3:18,21 4:1,5 | **old** | **overlapping** | 96:15 133:19 |
| 3:19 80:10 | 7:21 8:17 9:2,5 | 40:19 | 61:20 | 133:23 |
| 117:6 132:3 | 9:7 10:2,4,21 | **once** | **overrule** | **participated** |
| **occurred** | 13:16 15:15 | 3:11 16:7,16 | 63:8 | 25:7 |
| 24:9,10 44:1,2 | 16:16,24 17:8 | 18:4 70:14 | **owner** | **particular** |
| 92:19 124:3 | 18:3,13,16,21 | 72:5 73:2 | 35:13 | 39:11 65:13 |
| **occurring** | 20:9 21:24 | 111:10 126:25 | | **parties** |
| 24:11 | 23:11,12,21 | **ones** | **———— P ————** | 142:10,16 |
| **occurs** | 25:20 26:7,9 | 31:22 | **P** | **party** |
| 131:5 | 26:15,19 28:5 | **open** | 3:1 | 27:19 28:2 |
| **October** | 30:8 31:21 | 57:17 63:14 | **p.m** | **party's** |
| 142:18 | 32:23 34:20 | 104:8 113:9 | 23:17,24 45:16 | 27:17 |
| **offender** | 35:10,23 36:1 | **opening** | 48:2 69:12 | **Paso** |
| 19:15 20:4 33:4 | 36:23 39:1,13 | 104:12 | 108:23,23 | 5:15,20 16:25 |
| **offer** | 43:13 44:11 | **operate** | 132:17,17 | **passed** |
| 15:9 25:17,18 | 45:9 47:2 49:9 | 111:17 | 140:24 | 45:13 |
| **office** | 50:1,6 51:12 | **opinions** | **PA** | **passing** |
| 5:16,21,22 6:7 | 52:5 53:10,17 | 14:20 | 67:4,6 | 13:2 |
| 7:23 8:4,19 | 54:17,19 57:7 | **option** | **packet** | **Pat** |
| 12:14 14:6 | 60:6 62:3,8 | 12:1,4 | 12:22 | 122:5 |
| 16:25 120:23 | 68:11 72:11 | **oral** | **page** | **pathologist** |
| 126:10 127:20 | 74:5 77:21 | 12:19 13:15,19 | 2:11,14 7:6,7,9 | 125:13,21 |
| 129:1 | 79:21 81:4 | 14:3,5,21 15:4 | 7:10,18 | **patrol** |
| **officer** | 83:12 87:12,16 | 16:22,22 | **pages** | 12:18 14:8 22:2 |
| 25:8 50:11,22 | 92:19 94:5,5 | **order** | 141:5 | **pattern** |
| 50:24 52:14 | 95:15,18,25,25 | 19:17,17,20 | **pain** | 59:15 137:25 |
| 65:3,9 66:1 | 96:10 97:18,21 | **orders** | 99:3,11 | 138:18 |
| 72:24 93:6,7 | 98:20 99:16 | 72:10 | **painful** | **pause** |
| 109:3 119:20 | 100:19,23 | **organizations** | 99:9 | 100:19,23 |
| 134:20 | 101:4,8 102:2 | 122:18 | **panel** | 126:23 |
| **officers** | 103:21 105:13 | **original** | 13:18 | **paused** |
| 1:7 45:5 50:9 | 105:20 106:1 | 55:15 | **parallel** | 90:10 |
| 57:13 116:22 | 106:15,24 | **outcome** | 130:21 | **PD** |
| 117:2 122:24 | 107:3,10,13 | 14:22 15:18 | **paranoia** | 81:9 120:20 |

Deposition of:   William Dickey - June 29, 2021
Sherry Poer v. Sheriff Tim Norton in his official capacity, et al.

Page 16

127:25
**PDF**
59:5
**pending**
34:23 35:4,5,5
119:22
**people**
7:10,14 8:11,24
9:3,13,22 14:4
14:5 17:17,17
17:24 28:13,15
28:24 29:11
46:13 57:9
59:13 60:7,8
60:23 61:1,1,9
61:12,24 62:2
62:4,4 68:2,12
115:17 116:9
121:18,25
129:3
**people's**
39:6,6,7
**performing**
113:3
**permanent**
12:7
**person**
8:14 13:19
20:22 25:6
26:12 29:20
30:2,6,9,13
31:6 32:20
33:14,21,22
46:10 47:15
64:11 65:3,12
65:13,18 69:20
71:6,9 114:18
126:12 137:13
137:14,14
138:21
**person's**
26:15,20,21
27:5 79:9
139:20
**personal**

7:10 17:9 97:20
**personally**
18:14 117:22
130:11
**personnel**
16:14,17
**persons**
57:16
**petitioning**
18:10
**phone**
26:9,22 27:8,22
27:23 33:9,10
33:14,20,23
35:13 66:11
68:3 82:9
115:19
**phones**
68:13
**phonetic**
129:2
**photo**
81:1
**physical**
21:9 33:12 56:9
80:17 126:11
**physically**
47:25 55:25
56:2,6,8,10,13
86:17 97:25
98:1
**physician**
32:21
**picked**
134:8
**picture**
79:7,16,18,21
81:21 94:18
**pistol**
71:1
**place**
44:14 139:2,4
142:11
**placed**
34:1

**Plaintiff**
1:5,14 2:3
**play**
87:16 91:14
94:6,7 95:20
132:24 133:25
134:3
**played**
88:1,17 89:15
90:5,22,25
91:7,16 92:6
93:10,17 94:10
94:14,17,22
95:11,16,22
96:11 99:17
100:9,14 101:1
101:10 102:3
103:23 104:17
105:14,21
106:9,16,25
107:4 133:4,7
133:16,18,21
134:1,5
**playing**
71:22 87:24
98:5 99:16
100:8,15 102:2
105:20 133:13
133:20
**please**
27:1 67:8 87:17
**PLLC**
1:15 2:4
**plug**
126:12
**plus**
15:16
**Poer**
1:3,4 6:25 18:18
19:11 20:14,16
20:19,22 21:15
47:24 53:6,10
60:7 61:3 67:7
73:2,6,10 85:6
88:10 93:5

98:25 102:20
102:22 103:3
106:20 110:12
112:12 114:17
117:1 118:20
120:4 134:18
135:2,6 136:6
136:13 137:2,3
137:21
**Poer's**
20:6 21:12
66:11 85:20
98:9 99:24
100:4,6 124:25
**point**
5:10 15:9 35:8
52:3,18 53:8
53:15,25 54:12
54:24 55:9,22
55:24 56:11,15
61:4 62:22,24
63:13 70:1
72:2 73:6,12
73:24 74:20,21
75:3,10,18,20
81:15 83:4,19
85:17,19 86:23
87:5,24 88:2
89:9,14 90:11
92:20 93:2
97:1 98:10
103:16,24
104:6,15,19
105:17 106:2
106:19 108:16
112:22 113:3
113:14,20,24
114:9,16 116:5
116:19 125:2
132:19 133:20
134:16 135:4
137:4 140:10
**pointed**
25:25 37:24
56:20,24 73:2

73:5,10 81:12
81:13 84:12
85:6 134:7
**pointing**
57:5 95:2,5,6
135:20
**police**
5:9 9:10 11:1,14
11:18 24:1
25:8 64:20
66:1 67:7 71:5
78:16 103:2
109:3 117:20
121:22 122:17
**policy**
51:1,4,5,15
**polygraph**
12:24
**populate**
22:13
**populated**
59:14
**position**
12:18 17:3
33:13 72:9
**possibility**
31:13 67:14
107:20,21
**possible**
24:12 30:22
31:4 66:4,10
71:9 109:13,14
**possibly**
32:14 38:8
67:13 83:10
87:7 106:21
119:1
**posts**
7:6,9 8:1
**Potentially**
28:11 65:1
**pounds**
97:17
**Powers**
1:23 69:2,6

Deposition of:   William Dickey - June 29, 2021
Sherry Poer v. Sheriff Tim Norton in his official capacity, et al.

Page 17

71:21
**practice**
22:5,20 46:12
51:8,10 109:7
**precisely**
50:2
**preexisting**
114:25 115:2
**preface**
30:7
**prefer**
9:23 64:5
**present**
1:23 127:8
**press**
134:3
**pressed**
94:25 135:16
**pressing**
94:12
**pressure**
116:14
**presume**
36:21
**pretty**
38:13,20 42:24
51:2 99:12
102:5 127:11
**previous**
142:7
**previously**
19:4
**prior**
13:9 17:13
21:12 69:17
118:17
**priorities**
24:12,12
**priority**
24:2,6,7,7,18
35:21,23 46:10
46:11
**prison**
118:4
**privacy**

6:19
**private**
8:22 32:6,6
40:13 42:12
**probably**
68:17 84:11
106:6
**probes**
80:22 137:17,22
139:14,15
**problem**
29:8 71:21
**problems**
29:4
**procedure**
2:2
**proceed**
4:8
**process**
12:13,14,19
13:6,7 110:15
110:15
**professional**
2:7 117:23
142:4,21
**program**
9:12 25:2,3
**progress**
24:9
**promulgated**
6:21
**prone**
116:18 135:21
**proned**
117:1
**prongs**
137:10 138:25
139:2,2,4,20
**pronounced**
112:15
**properly**
111:17
**property**
35:13 40:14
44:8

**protection**
19:17 41:16
**provide**
8:7 26:16 41:19
**providing**
4:24
**prudent**
63:13
**psychological**
12:25
**PTSD**
21:18
**Public**
2:7 141:17
142:5,22
**pull**
72:21 85:25
86:10,12,14
110:18 116:15
116:16 140:2
**pulled**
85:12
**pulling**
86:2,7,9,13,17
86:19,20
116:22 117:2
139:7
**pulse**
113:15,20,21
**punch**
102:22 106:3
**punched**
104:15 105:17
108:7,9 134:20
**punching**
102:20 103:17
103:25 104:19
104:22 105:24
106:13 107:16
108:1 115:14
**purchased**
17:11
**purpose**
41:1,21 122:9
**purposely**

64:16
**purposes**
41:24
**PURSUANT**
2:1
**put**
12:7 25:16 48:2
58:16 67:8
68:2 76:2
80:16 84:25
92:13 93:12,18
134:8 137:16
**putting**
11:6,6 90:16
116:14

_____

**Q**

**qualify**
52:8
**quarter**
121:8
**question**
4:3,9 8:10 20:2
29:9 60:14,19
77:15 112:17
112:18
**questions**
12:20 13:7,10
13:14,17 14:1
14:16,17 16:7
16:17,19 18:16
30:7 112:19
113:14 124:12
124:14 127:13
127:18 140:12
**quibble**
134:25
**quickly**
43:14
**quiet**
102:12 103:24
104:6 106:17
**Quit**
83:24
**quite**

22:9 133:19
**quote**
19:10 54:1 62:9
62:12 70:24
77:5 135:13

_____

**R**

**R**
3:1
**radio**
19:21,23,25
20:5,9 21:1,23
22:1,2,7,10,11
22:15,21,23
23:3,9 36:6,17
41:25 46:1
47:2,3 48:2
106:6 107:9
**radios**
37:19
**randomly**
60:8,21
**range**
5:12 97:15
**rank**
52:7,9 53:20
**ranking**
52:14
**rapid**
42:24
**ratcheting**
99:21
**ratchets**
110:20
**RATNER**
1:19 4:10 6:17
6:25 7:3,5 8:6
9:20 17:19
19:5,24 21:2
21:20 22:8
23:18,21 24:19
26:24 27:25
28:17,19 29:1
29:6,14,24
30:4,18,25

Deposition of:  William Dickey - June 29, 2021
Sherry Poer v. Sheriff Tim Norton in his official capacity, et al.

Page 18

31:17 32:12
33:17 34:6,11
34:16 35:11
36:14 38:18
39:4,22 49:2
49:24 50:4,10
50:19 51:7,17
52:11,19,22
53:13 54:3,19
55:5,12 56:22
57:1 58:10,14
59:24 60:10,13
60:17,24 61:14
61:18,21 62:17
64:1,6,12,21
64:25 65:6,11
65:23 66:7
67:19 68:4,19
69:1,4,24 74:3
78:11,13 82:9
82:11,13 83:6
84:5,15,17
92:2,15 99:4
101:5 102:9,18
103:19 104:1
106:22 107:17
108:19 109:19
112:16,20
114:10,13,20
115:15 120:2
125:1,22
132:14 136:17
136:19,22
140:15,21
**ratnerm@hall...**
1:21
**Rattlesnake**
120:6,9
**reaching**
75:3,7,13 76:10
76:13,21 77:18
77:23 83:24
**read**
43:25 112:17,19
141:2

**reading**
103:10
**ready**
74:7 128:6
132:14
**real-time**
36:6,17 37:12
40:9 47:8
**really**
9:22 48:18
68:12,17 91:1
111:17 127:22
132:22 136:5
**reask**
65:7
**reason**
23:14 46:24
56:7 61:15
93:3 98:15
123:2 125:19
134:13,25
**reassuring**
30:2 65:22
**recall**
4:21 10:12,15
11:4,11,22
13:10,18 14:17
15:12 16:4,5
17:21 30:19
36:12,15 48:20
48:21,23 62:13
62:14 69:15
78:8,12 84:11
87:8,9,12,15
92:12,16,18,19
92:22,23 95:9
95:14 98:11,13
102:21,23
123:9 124:15
128:5,9,10,13
131:22
**receive**
9:19 22:1,2,21
62:6 101:16
**received**

6:21 7:17 9:25
19:20 20:5
21:23 23:9
24:18 56:12,16
56:23 62:3
130:6
**receiving**
36:6,17 37:12
**Recess**
54:20 108:23
132:17
**recollection**
98:18 101:19,24
**record**
3:20 4:8 6:23
9:23 12:7
18:23 21:6
34:8 69:4 76:2
90:15 140:24
**recorded**
68:8 127:17
**recording**
68:2 94:22
106:9
**reduced**
142:12
**referring**
31:18 36:21
96:3
**reflects**
69:4
**regarding**
22:5 108:24
**regards**
8:12 21:1
**Registered**
2:7 142:4,21
**reinterview**
17:16,22
**reiterated**
84:2
**related**
13:11 119:9
**relation**
142:9

**relax**
96:7
**relayed**
40:1 47:7
**relaying**
37:18 39:25
**relevant**
133:22
**relinquish**
50:21
**remember**
3:12 11:8 87:10
94:7 98:19
104:7 121:14
132:18,22
135:25
**remind**
9:11,14
**remote**
38:14
**removed**
139:3
**repeat**
93:18
**repeating**
139:7
**rephrase**
4:4
**rephrased**
29:15
**report**
2:15 18:24
64:20 101:22
130:22,23,24
131:1,3,4,6,13
131:16
**reported**
42:18
**reporter**
2:7 3:20,24 4:21
61:19 82:7
112:19 140:16
140:19 142:4
142:21
**REPORTER'S**

142:1
**reporting**
27:16,19,19
28:2
**reports**
103:10
**represent**
10:17 15:15
93:1
**representation**
81:5
**represented**
8:12,14 79:22
81:21
**request**
128:2,2
**required**
57:3
**residence**
32:5 46:2
**resign**
12:1 14:13
**resignation**
132:8
**resigned**
12:8 13:24
**resisting**
109:25
**resolved**
15:13,17 16:1,8
117:17 119:23
**resources**
29:11 32:22
**responding**
28:13 45:8
50:22,23
**Response**
121:17 122:15
**responsive**
113:13
**rest**
49:5
**restraining**
19:17,20
**result**

Deposition of:  William Dickey - June 29, 2021
Sherry Poer v. Sheriff Tim Norton in his official capacity, et al.

Page 19

| | | | | |
|---|---|---|---|---|
| 83:1 118:2 | 35:14 36:7 | 109:18 110:6 | 34:21 | 49:8 60:5 |
| 119:12 129:21 | 37:8,12,19,22 | 110:13,14,15 | **RP** | 64:10 73:25 |
| **retire** | 38:9,11,23 | 110:22 111:24 | 34:24 35:6,7 | 74:15 83:19,23 |
| 17:8 | 39:2,7,21 40:5 | 113:3,16 115:5 | **RPs** | 83:25 86:9 |
| **retired** | 40:8,10,12,14 | 115:8,11,17 | 27:13,14,16 | 87:12 88:4,7 |
| 17:1,8,9 | 40:23 41:10,22 | 116:22 119:9 | **rule** | 90:6 93:12 |
| **retirement** | 42:6,8,9,12,17 | 119:20 120:1 | 51:6 | 94:4,11 95:17 |
| 17:13 | 42:18,20,21 | 122:15 128:21 | **rules** | 102:4,11 |
| **retrieved** | 43:2,5,7 44:23 | 130:18 133:19 | 2:1 3:16 | 104:11 105:15 |
| 16:11 | 45:11,14,16,21 | 135:13 136:1,1 | **run** | 105:22 107:10 |
| **review** | 45:24 46:3,22 | 136:3,18 | 19:21,23 20:9 | 134:25 135:12 |
| 23:8,9 106:5 | 47:9,12 48:4 | 137:22 | **rundown** | **says** |
| **reviewed** | 48:13 53:20,22 | **Road** | 124:2 | 24:1,4 33:6,15 |
| 77:15,16,17 | 55:3 58:16 | 32:6,6 40:13 | **running** | 35:13 45:1 |
| **revolves** | 60:9,23 61:4 | 41:7 42:12 | 22:14 | 46:18 55:7 |
| 28:15 | 61:25 63:22 | **robbed** | **runs** | 59:8 78:25 |
| **rewind** | 64:11 65:18 | 39:16 40:6 | 22:2 | 79:9 87:4 |
| 90:20 133:23 | 66:6,14 67:2,9 | 55:10 | **rural** | 106:10 131:7 |
| **rid** | 67:12,18 68:3 | **robbing** | 38:13 57:18,22 | 134:6 135:15 |
| 17:17 | 68:18 70:7,14 | 68:12 | **RV** | **scene** |
| **rider** | 70:22 71:3,7 | **roll** | 37:8 | 2:17 33:10,20 |
| 43:24 44:6 | 71:10 72:13 | 75:20 | | 35:2 37:13 |
| **rifle** | 73:13 75:14 | **rolled** | ――――――― | 38:11 40:9 |
| 72:17,19,19,21 | 76:11 77:3,23 | 77:7,9 | **S** | 41:1,8 42:1,23 |
| 72:22 74:5 | 77:25 78:18 | **rolling** | | 45:24 47:8 |
| 84:16,18,20,21 | 79:4,7,9,22,23 | 82:3,4 83:15 | **s** | 50:8,11,12,14 |
| 84:22,23,24 | 80:7,13 81:1,6 | 85:15 | 1:19 2:4 3:1 | 50:20,21,22,24 |
| 85:2,3,5,5 94:1 | 81:16 82:21 | **room** | 6:25 | 52:6,12,15 |
| 94:12,18,21,23 | 83:14,14 84:4 | 36:19 38:4 69:1 | **safe** | 53:3,22 54:2 |
| 95:8,13 105:4 | 84:6,11 85:13 | 123:5,11,16 | 65:20 | 54:11 62:22,23 |
| 105:5 110:9,10 | 85:23,24,25 | 129:7 130:14 | **safety** | 96:4 107:22,23 |
| 135:24 | 86:2,3,13,20 | **rooms** | 74:10,12,13,16 | 112:14 123:23 |
| **rifles** | 87:11 88:5,8 | 122:12 123:12 | 74:17,18 75:5 | 125:3 |
| 85:1 105:3 | 88:12,13,23 | **rough** | **Sam** | **screen** |
| 135:18,20 | 89:11,16,21 | 79:7 81:4 | 33:2 107:6 | 18:21 22:3,6,14 |
| **right** | 90:1,8 91:2,5,6 | **roughly** | **Sara** | 22:22 23:7 |
| 4:15,25 10:13 | 91:23 92:8,10 | 15:10 16:4 | 2:6 142:4,21 | 35:5 36:10,13 |
| 12:11 15:11 | 93:6,8,16 95:4 | 110:25 | **sat** | 58:15 59:2 |
| 19:21 21:1 | 95:12,23 97:1 | **rought** | 129:6 130:14 | 90:1 91:6 |
| 22:11 23:4 | 98:5,21 99:7 | 37:1 | 133:11 | **scroll** |
| 25:23 26:16 | 99:13,19,25 | **round** | **saw** | 23:13,16 70:6 |
| 27:23 28:3,10 | 100:4,6,17 | 111:11 | 57:25 61:11 | 94:8,15 |
| 29:5,20,23 | 102:6,12,16,25 | **route** | 77:12 91:12,12 | **search** |
| 31:7 32:7,11 | 103:4 107:23 | 36:23 | 103:3 125:9,21 | 119:25 |
| 33:25 34:20 | 108:7,11 | **routed** | **saying** | **searching** |
| | | | 22:20 34:8,25 | |
| | | | 43:22 46:22,24 | |

Deposition of:   William Dickey - June 29, 2021
Sherry Poer v. Sheriff Tim Norton in his official capacity, et al.

Page 20

| | | | | |
|---|---|---|---|---|
| 77:19 | 45:23 46:5,18 | 28:3 52:16 | 19:15,20 20:4 | 49:18 62:13 |
| **second** | 47:5,18 57:9 | **sentence** | 33:3 | 73:17,19 75:4 |
| 9:20 50:7 58:18 | 57:12,16 58:1 | 49:10 | **set** | 84:4 88:8 |
| 58:20 60:13 | 58:2,15,16,17 | **separate** | 127:25 | 93:13 94:11 |
| 91:8 100:18 | 59:7,25 60:1,4 | 10:11 14:19 | **settled** | 95:24 |
| 136:25 139:6 | 60:25 61:3,9 | 122:11 129:19 | 118:6,7 | **shooter** |
| 140:6,10 | 61:25 68:25 | **separated** | **Seventeenth** | 2:16 58:8,11,22 |
| **seconds** | 69:10 75:18 | 122:23 123:4,5 | 1:20 | 59:8,9 69:20 |
| 42:17,21 43:15 | 76:6,8,13,25 | 123:12 | **sex** | **shooters** |
| 47:3 69:11,14 | 77:14,18,22,25 | **September** | 19:15 20:4 33:3 | 59:15 |
| 70:7,10 100:21 | 78:21,22,23 | 5:2 | **share** | **shooting** |
| 101:20,20,21 | 79:9,15 81:13 | **sergeant** | 78:6 82:14 | 48:19 60:7,22 |
| 106:11 111:4,7 | 81:15,18 83:9 | 1:8 17:3,5 19:15 | **sharing** | **short** |
| 111:11 117:4 | 85:21 86:23 | 33:2 34:24 | 58:18 | 90:20 |
| 133:25 | 88:10,13,15,16 | 41:4,25 43:1 | **Shayne** | **shortly** |
| **secure** | 88:18,20,22 | 45:23 48:3,4,7 | 122:4 123:20 | 42:16,23 133:14 |
| 92:5 | 89:3,9,21,25 | 50:14,16 52:5 | **shelves** | **shot** |
| **secured** | 90:3,10,12 | 52:17 54:21 | 9:6 | 43:15 60:7 61:7 |
| 89:13 93:2,5 | 91:1,4,8,17 | 57:14,14 63:8 | **sheriff** | 62:4 72:20,21 |
| 108:13,15,17 | 92:2 94:18,23 | 66:12 70:16,17 | 1:7 13:3,4 17:16 | 74:1,15,22 |
| 132:20 135:1 | 95:12,21 98:15 | 71:23 72:24 | 17:17,25 18:3 | 105:15 |
| 140:4 | 102:22 103:13 | 80:6 85:4,16 | 18:11 50:24 | **shots** |
| **secures** | 103:15,15 | 87:4 88:7 90:6 | 122:4,4 130:10 | 43:2,7,14,23 |
| 87:2,6 | 106:1 111:12 | 92:7 93:12 | **sheriff's** | 44:3,20 69:21 |
| **Security** | 111:13 113:12 | 96:5,16 98:7 | 5:16,21,22 6:7 | 69:23 |
| 2:16 59:3,12,22 | 120:1 125:13 | 102:4 103:8 | 8:19 12:14 | **show** |
| **Security's** | 126:1 131:24 | 104:14 107:9 | 14:6 15:5,8 | 53:8 78:20 84:3 |
| 59:19 | 133:8 | 107:15,22 | 16:2,25 126:10 | 91:5 |
| **see** | **seeing** | 108:9 112:3 | 127:20 | **showed** |
| 7:25 18:21 | 37:21 98:11,13 | 115:14,25 | **sheriffs** | 121:24 |
| 23:10,22,22,24 | 98:19 102:23 | 121:15 134:8 | 17:11 | **showing** |
| 24:4,22 25:23 | **seen** | 134:22,23 | **Sherry** | 22:14 |
| 25:23,25 26:3 | 11:3 32:20 45:6 | 135:5,23 137:3 | 1:3 6:25 | **shows** |
| 26:9 27:11 | 53:6 64:9 | **Sergent** | **shield** | 50:24 101:23 |
| 28:1 32:23 | 131:13 | 62:11 | 41:6,10,13,14 | **shut** |
| 33:25 34:1,20 | **selection** | **served** | 41:18,21 42:2 | 46:12 |
| 35:12,15,17,19 | 59:16 | 21:15 | 48:10 49:12 | **sic** |
| 36:1,4,19,23 | **Self-employed** | **service** | 53:4 63:4 | 120:5 |
| 37:1,7,8,16,24 | 6:8 | 2:15 18:22 | **shit** | **side** |
| 38:1,5,10 39:8 | **semiautomatic** | 19:19 20:1,10 | 70:19 71:23 | 41:15 75:14,20 |
| 39:13,16 40:15 | 72:19,20 84:21 | 21:1,19 31:10 | **shock** | 79:22 85:21,23 |
| 40:16,17,21 | 84:23 85:2,3 | 31:18 32:9 | 10:22 111:11 | 85:24 86:2,5 |
| 41:3,8 42:5,7,8 | **senior** | **services** | 119:7 137:6 | 86:19,20 88:11 |
| 42:14 44:12,12 | 17:2 | 25:6 | 138:6 | 88:12,13,23 |
| 44:13,14,21,24 | **sense** | **serving** | **shoot** | 89:22 100:6 |

Deposition of:  William Dickey - June 29, 2021
Sherry Poer v. Sheriff Tim Norton in his official capacity, et al.

Page 21

| | | | | |
|---|---|---|---|---|
| sides | smaller | 43:4 98:23 | 57:21 | 24:1 33:11 |
| 57:20 116:10 | 38:24 | sounded | staff | stay |
| 123:6 | sneak | 47:1 | 14:7,8 122:2 | 38:4 139:2,4 |
| sign | 64:5,10 65:3,9 | sounds | stamp | stayed |
| 33:2 36:25 | software | 46:17 102:5 | 106:7 117:5 | 17:15 54:11 |
| significant | 126:20 | South | standard | 67:11 |
| 46:11 | somebody | 1:16 | 140:16 | staying |
| signs | 20:13 28:9 | spacing | standing | 20:7 36:20 |
| 67:18 114:5,16 | 30:23 31:10,11 | 137:17 | 44:4,5 | stealth |
| Sills | 43:18 49:18 | speak | start | 63:17 65:4 |
| 122:5 | 56:8,21,24,25 | 122:6 | 48:19 53:25 | Steck |
| Similar | 57:5,6,6 65:22 | speaking | 67:8 69:9 | 26:12 |
| 99:13 | 67:17 68:16 | 102:5 128:10,13 | 77:15 87:24,25 | stenotype |
| Simply | 109:12,24 | special | 94:4,16 100:8 | 142:10,13 |
| 53:25 | 111:15 120:17 | 28:14 | 100:24,25 | steps |
| single | 124:9 136:18 | specific | 101:8 103:22 | 130:2 |
| 72:20,20,21 | somebody's | 13:10 30:19 | 133:3 | stomach |
| sir | 47:11 49:14 | 49:10 74:25 | started | 82:25 83:2,4 |
| 73:9 | 94:12 111:19 | 75:1 109:1 | 70:5,14 72:2,5 | 84:8 85:8 |
| sirens | somewhat | 111:9 | 73:12,21 75:7 | 90:17 91:19,23 |
| 46:6,13 63:19 | 83:15 | specifically | 76:10 77:10 | 116:7 135:21 |
| sitting | soon | 48:23 77:8 | 98:20 102:19 | stop |
| 129:9 | 132:13 | 123:9 128:5 | 103:17 113:2 | 58:18 88:2 |
| situation | sorry | specifics | 133:8 | 91:15 101:4,11 |
| 30:5,8,23 31:3,4 | 5:22 8:5 20:2 | 10:15 21:25 | starting | 101:12,15 |
| 31:7 46:10 | 39:23 61:19 | splayed | 94:9 132:25 | 105:16 126:23 |
| 52:14 54:5,6,7 | 76:4 78:16 | 136:3 | starts | stopped |
| 58:6,8,25,25 | 95:19 110:9 | spot | 99:1 | 72:9 98:20 |
| 60:6 65:17,20 | 115:23 136:2 | 70:13 | state | 99:19 100:16 |
| 66:5 68:23 | 137:2 | spotted | 2:8 3:3 10:1 | 101:12,14 |
| 96:8 109:11,15 | sort | 45:21 57:8,17 | 141:3 142:2,5 | 103:17 133:24 |
| 110:7 | 7:13 9:3,6 17:5 | 70:17 71:24 | 142:22 | Street |
| situations | 18:15 22:17 | 72:5 73:3 | stated | 1:16,20 2:5 |
| 25:4,5,21 | 23:14 34:15 | spread | 54:6 55:18 | strike |
| 109:21 | 41:21 46:11 | 137:24,25 139:9 | statement | 103:3 |
| six | 54:1 60:15 | 139:19 | 60:11 78:8,14 | strikes |
| 17:12 138:9 | 63:24 67:24 | spreads | States | 102:24 103:13 |
| sizing | 68:1 72:11,12 | 139:12 | 1:1 59:2 | struck |
| 38:19 | 102:15 105:8 | Square | station | 138:3,4 |
| skipping | 109:7 137:18 | 82:3 | 120:6,22 121:6 | Stueve |
| 74:4 | sorts | squatting | 121:12 122:6 | 2:6 142:4,21 |
| slapping | 25:3 | 136:1 | 123:24 | stuff |
| 105:5 | sound | stack | statue | 36:6,13 37:18 |
| small | 4:15 10:13 | 34:1,17 | 43:24 44:5,7 | 82:15 105:3 |
| 80:23 127:11 | 15:11 38:23 | stacked | status | stun |

Deposition of:  William Dickey - June 29, 2021
Sherry Poer v. Sheriff Tim Norton in his official capacity, et al.

Page 22

| | | | | |
|---|---|---|---|---|
| 80:12,15 | 3:23 20:3 22:9 | take | tased | 30:16 41:12 |
| 138:12,18,24 | 24:20,20 27:2 | 3:25 7:12 33:8 | 10:10 99:6,11 | 44:2 52:24 |
| 138:25 139:4 | 29:2,16 34:4,9 | 34:4 52:15 | 101:19,21 | 53:5 66:3 75:1 |
| 139:15 | 36:22 37:3 | 53:24,24 54:1 | 110:17,24 | 83:11 95:1 |
| **subject** | 67:10 99:12,20 | 54:2,4,6,15,17 | 111:19 113:19 | 97:21,23 |
| 44:23 45:6 | 103:6 104:21 | 59:1 108:21 | 119:14 134:18 | 100:22 101:2,4 |
| **subjected** | 117:3 131:2 | 115:24 126:11 | 138:8 | 104:22 113:23 |
| 12:24 | 140:21 | 130:2 132:11 | **taser** | 114:1 117:16 |
| **submitted** | **surmising** | **taken** | 10:11 11:6 | **telling** |
| 12:17 | 106:5 | 2:3 7:11 47:18 | 15:22 80:16,17 | 5:3 27:18 44:16 |
| **Subscribed** | **surrounded** | 117:19 142:10 | 80:22 96:13,19 | 44:17 92:12 |
| 141:13 | 57:19 | **takes** | 96:20,23 97:6 | 96:6 98:6 |
| **subsequent** | **surrounding** | 50:20 87:6 | 98:21 99:18 | **tells** |
| 139:3 | 13:21 | 97:23 | 100:10,16,25 | 4:11 |
| **suburbs** | **surveilled** | **talk** | 101:22 105:17 | **ten** |
| 57:22 | 55:17 68:12 | 3:21 5:8 12:13 | 108:10 109:18 | 42:21 43:15 |
| **succession** | **surveilling** | 19:9 21:22 | 109:20,24 | 108:22 140:16 |
| 42:24 | 68:13 | 28:5,12 29:19 | 110:3 111:8 | **term** |
| **sued** | **suspect** | 30:1 47:14 | 117:11 131:8 | 69:20 84:24 |
| 1:8 15:22 117:8 | 33:15 52:23 | 65:17,20,21 | 137:9,11,12,21 | **terminated** |
| 117:11,20 | 55:2 96:17 | 67:2 101:3 | 137:24 138:24 | 12:1 |
| **suffered** | **suspected** | 113:5 122:24 | 139:14 | **termination** |
| 119:11 | 31:11 64:24 | 123:2,7,20 | **tasing** | 12:2 |
| **sugar** | **sustained** | 124:1 128:7 | 102:21 110:12 | **terms** |
| 119:8 | 11:21,23,25 | 133:14 | 111:14 137:1,1 | 6:19 |
| **suggestion** | 12:7 13:9,12 | **talked** | 138:2 139:23 | **testified** |
| 63:10 | 13:23 14:13 | 17:21 62:8 | **tasings** | 3:4 |
| **Suite** | 117:20 | **talking** | 139:3 | **testify** |
| 1:20 | **SWAT** | 11:17 16:12 | **taught** | 142:8 |
| **summarized** | 41:13,14 | 18:19 28:2 | 28:22,23 29:3 | **testimony** |
| 130:25 | **sworn** | 31:21,23 33:14 | 29:17 65:21 | 106:23 141:3,5 |
| **summary** | 3:3 4:25 141:5 | 41:10 62:10 | **team** | **Thank** |
| 19:7 130:24 | 141:13 142:8 | 66:21 94:5 | 41:13,14 121:17 | 110:11 124:7 |
| **superior** | **Syracuse** | 96:2,14 115:17 | 122:14,15 | 140:14 |
| 50:14 52:6,7,9,9 | 1:16 2:4 | 133:9 | 123:18 124:10 | **thereof** |
| 53:20 | **system** | **tall** | 128:25 130:17 | 21:6 142:14 |
| **supervisor** | 67:4 111:17 | 97:7,8 | **teenager** | **thick** |
| 50:20 52:14 | ——————— | **tape** | 11:2 | 41:14 |
| **support** | **T** | 134:11 | **Telephone** | **thigh** |
| 116:21 | **table** | **target** | 1:17,21 | 139:10 |
| **supporting** | 123:5,6,16 | 46:14 | **tell** | **thing** |
| 92:1 | **tactic** | **tase** | 4:10,25 7:12 | 3:25 7:13 9:6 |
| **supposed** | 30:15 | 11:3 98:6 | 13:16,22 14:12 | 20:25 79:4 |
| 54:18 122:9 | **tactical** | 101:15 115:11 | 16:24 23:6 | 85:1 89:12 |
| **sure** | 63:3,3 | 136:7 138:17 | 25:1 30:6,9,13 | 90:21 97:19 |

Deposition of:   William Dickey - June 29, 2021
Sherry Poer v. Sheriff Tim Norton in his official capacity, et al.

Page 23

**things**
8:24 9:2 13:2
14:21 20:25
28:18 29:3,22
51:19 52:20
67:10 68:17
77:4 98:4
101:25
**think**
8:5 9:21 10:13
10:18,18 19:4
24:21 34:8,10
34:13 38:23
43:4,19 48:22
61:12 68:6,7
71:16 97:8,9
97:12 102:23
104:3,15
105:24 106:19
107:25 108:6
116:4 118:16
118:24 121:25
127:2 129:1
133:19 134:13
**thinking**
68:1
**thinks**
37:7 39:14,16
40:6 42:9
44:13,20,20
**thought**
47:8 55:9 63:13
68:8 74:21
75:4 118:20,24
119:4 124:18
**threats**
6:21 7:4,22
**three**
35:24,24 42:24
45:17 54:18
69:21 106:11
122:24
**throws**
31:12 64:24
**Tim**

1:7 18:5
**time**
4:14 6:2,4 7:17
10:22 13:4
15:4 18:12
20:7 26:25
33:7,18 39:24
50:22 58:5
61:6,10 62:1
66:21,21,25
69:8,13 74:4
74:13,14 76:14
89:6,18 97:13
97:18,20 100:2
101:12 105:4
106:7 110:22
113:1 115:13
117:4 122:10
122:19,20
125:16 127:19
127:25 128:9
128:14 130:20
139:1 140:13
140:24 142:11
**timeline**
111:9
**times**
23:15 102:20
103:6,9,15,18
104:16 108:10
113:19 118:17
119:14 134:21
**told**
11:20,24 14:9
15:24 26:19,20
27:3 47:17,21
48:9 50:16
51:16 55:6
70:21 71:3
103:2 123:9
124:3,4,13
128:6,14 136:4
136:9
**tomorrow**
128:4

**tonight**
128:3
**tools**
29:10
**top**
39:1 46:17,21
57:21 90:17
116:6 135:5,10
135:11,12,13
135:15,17
**total**
95:3 140:24
**touches**
137:16
**touching**
95:7 138:25
**traffic**
21:23
**train**
25:21
**trained**
25:14 51:13,25
58:22 65:17,19
101:14 109:2
111:10 137:23
138:11
**training**
24:25 25:1,2,3,7
25:20 28:12,14
28:21,23 29:10
29:13,18 30:22
51:14 52:3
65:2,8,19
108:24 109:1,5
109:8 111:6
139:19
**transcribed**
4:20
**transcript**
22:17 140:20
141:3 142:13
**transition**
17:10
**transmission**
19:25 22:11,22

**transmissions**
22:1,7,15,18
**Travis**
1:8 80:4,6 83:25
86:5 96:15
128:21
**treatment**
21:12
**tried**
115:20
**trigger**
72:21 139:7
**triple**
139:11
**trouble**
104:7,12
**truck**
45:2,5,8 48:10
48:12,15 49:12
49:12,22 53:4
54:25 62:11,16
62:25 63:2,6
66:22 67:4,11
69:9 75:8
120:13,21
121:2 124:4
**true**
103:4 109:18
135:17 142:13
**truth**
3:3 4:25 5:3
142:8
**truthful**
4:24
**try**
4:4 30:22 31:6,7
66:5 67:2
90:20,23 98:1
101:3
**trying**
44:4 51:12 65:4
65:10,20 87:10
96:8 113:5,15
114:4,5 116:15
116:16 136:7

140:1,2
**Trystan**
129:2
**turn**
41:7 74:19
108:19,20
**turnaround**
140:17
**turned**
20:13 64:16
74:18 75:2
82:16 114:24
119:6,6
**Turner**
19:15 33:2
34:24 41:4,25
43:1 48:3,7
50:14,16 52:5
52:17 54:21
57:14 62:11
66:12 70:16,17
71:23 72:11,24
73:12 80:6
85:4,16 92:7
93:12 96:5,16
96:17 97:3,8
98:7,9,14
102:4 103:8
104:14 107:9
107:15,22
108:9 112:3
115:14,25
116:12 121:15
134:8,20,22,23
135:5,23 137:3
137:6
**Turner's**
48:4 88:7 90:6
97:5,7
**turns**
43:22 89:6
119:8
**twice**
95:18 108:10
**two**

Deposition of:   William Dickey - June 29, 2021
Sherry Poer v. Sheriff Tim Norton in his official capacity, et al.

Page 24

5:19 6:2,20
9:16 11:23
17:14 24:21
31:21 35:24
42:17 43:7,14
55:15 57:20
70:9 77:4
100:20,21,21
101:20,24
102:23 111:3,7
112:19 122:7
126:7,21 127:5
127:9 135:16
137:9,17
139:20,24
**two-and-a-hal...**
101:23
**type**
24:4 139:19
**typed**
131:7
**typewritten**
142:12
**typo**
43:19

_____ **U** _____
**U-shaped**
123:4,16
**U.S**
2:16 59:9,10,11
59:11,18,20,20
59:21 72:23
**unconscious**
106:20 107:15
**undergoing**
30:23
**underneath**
83:8,15 85:9,12
85:14 86:15
110:16 140:1,2
**understand**
4:24 47:15 60:5
**understanding**
100:24

**understood**
4:13 56:10
110:24 135:20
**Unit**
34:1
**United**
1:1 59:2
**units**
37:6 45:8 46:9
**universities**
10:2
**unmute**
82:6 136:17,21
**unquote**
19:10 54:1
70:24 77:6
135:13
**unrefrigerated**
125:20
**untrue**
134:13
**unwritten**
51:6
**upgraded**
35:21
**urgent**
24:15
**USB**
126:13 127:2
**use**
8:12 13:11,13
46:6 48:12
49:12,12 58:13
59:15 62:10,25
63:6 64:3
109:3,10,15,20
109:24 110:3,6
126:20 131:5
137:24
**use-of-force**
10:5 11:13,16
13:22 14:2,10
16:11 51:15
129:17,21
130:21,23

131:6
**uses**
13:8 129:15
135:2
**usually**
72:21

_____ **V** _____
**vehicle**
48:4 63:21
64:16
**verbal**
73:13,21 101:13
101:15,20
**verbally**
3:23 54:7
**versus**
22:6
**vicinity**
70:3
**victims**
59:16
**video**
2:18 11:3,4 50:5
62:21 71:23
77:14,16,17
83:9 87:14,16
88:1,2,17
89:15 90:5,22
90:25 91:7,16
92:6 93:2,10
93:17 94:10,14
94:17 95:11,16
95:22 96:11,13
99:14,17 100:9
100:13,14
101:1,10,19,22
102:3 103:17
103:23 104:17
105:14,21
106:16,25
107:4 110:19
117:3,5 126:2
133:4,7,16,18
133:21 134:1,5

**video's**
77:20
**videoconference**
69:3
**viewed**
127:14
**vital**
114:5,16
**voice**
66:19 67:9
**volts**
110:25 111:16
**volume**
82:15,17 108:20
**voluntarily**
111:22
**volunteer**
120:9
**vs**
1:6

_____ **W** _____
**waistband**
87:6 92:14
134:9 135:1
**wait**
3:19 111:7
**waited**
123:19 128:24
**waiting**
39:15 40:5
64:19 69:1
136:20
**walking**
38:8 40:13
60:21 67:8
**want**
8:7 36:9 41:6
48:18 49:13,17
62:12 63:22
64:13 116:5
**wanted**
63:24 64:4,9
76:5 97:6
128:15 129:5

**warranted**
109:16,22 110:4
**wasn't**
58:6,8 69:23
113:5 119:23
**watch**
95:21 103:22
126:25 127:5
**watched**
126:7,21 127:1
127:9
**watching**
23:4 71:17
95:10 102:24
**way**
9:21 29:16 30:2
31:15 36:16
37:12 39:20
45:7 51:21
52:1,8 64:10
67:10 77:10
96:19,23 97:5
102:13,16
114:1 115:17
120:6 124:21
135:18 136:7
137:9 142:15
**we'll**
7:12 18:25 57:7
79:12 87:20
103:21 133:25
**we're**
24:21 31:21
33:13,13 34:25
36:5 45:9,16
54:18 67:7,23
71:16,17,18,18
92:2 99:13
100:13 101:14
133:1,17
137:23 138:11
140:15
**we've**
12:10 16:12
43:14 107:10

Deposition of:   William Dickey - June 29, 2021
Sherry Poer v. Sheriff Tim Norton in his official capacity, et al.

Page 25

58:24 72:16
76:6 95:3
140:6,10
**weapons**
71:6,10,13
**weighed**
97:12
**weights**
97:22
**welcome**
82:7
**went**
12:10 16:14
25:16 31:9,20
31:24 32:5,9
35:23 66:19
77:10 90:11,24
120:22 121:3
124:8 125:6,7
**weren't**
61:1,13 68:17
70:13 71:3
**west**
44:7,10,11
**whirring**
98:23 99:18
100:10,16,23
**white**
40:19 59:10
**Whitlock**
37:5 112:9
121:16
**Whitlock's**
132:24
**wide**
113:9
**window**
38:4
**wire**
137:10
**wires**
137:13,15
**withdrawn**
28:22
**witness**

57:3 125:5
140:14 142:8
**woodworking**
6:10 8:22 9:3
**word**
18:10 64:3,4
109:8 110:9
124:7
**words**
50:13 72:12
96:6 107:11
130:25
**work**
5:18 6:4 14:5
18:7 126:12
**workers**
108:3
**working**
87:10 127:10
**workings**
131:12
**works**
97:18 137:9
140:18
**wouldn't**
50:17
**wrist**
104:8,12
**write**
79:2 80:12
**written**
2:1 12:17,22
27:12 51:5
**wrong**
10:18 44:13
64:4 109:8
110:9
**wrongdoing**
130:7 131:25

_____
**X**
_____
**X**
2:10

_____
**Y**

**yards**
44:24 45:7,21
52:25 53:2
57:9 58:1,4
61:4,10
**yeah**
7:3 23:20 24:20
26:3 29:25
32:3 49:23
57:4 69:6
78:23 82:14
89:4 91:10,12
94:24 98:1
121:11 136:19
136:23 139:25
**year**
7:20
**years**
40:19
**yelling**
46:17,21 73:12
73:21 104:5,15
105:18
**Yep**
18:24 26:6
71:21 90:4
93:15 118:15
**you-all**
63:11 66:22
**YouTube**
7:22

_____
**Z**
_____
**zero**
69:11
**Zoom**
69:5,7 71:19
82:13,14

_____
**0**
_____

_____
**1**
_____
**1**
2:15 19:1,2
24:13,15 33:2

**1:15**
90:10
**1:38**
108:23
**1:44**
108:23
**10:00**
2:6
**10:56**
54:20
**100**
37:8 44:23 57:8
61:4
**1001**
1:20
**11:19**
87:25
**11:30**
54:20
**11:46**
88:3
**11:50**
89:17 91:14
**11:52**
94:16
**11:53**
91:2,9
**11:54**
92:3
**11:56**
92:7
**12**
19:11 94:9
101:8
**12-minute**
93:12
**12:10**
95:20 100:24
**12:12**
103:22
**12:13**
105:20
**12:15**
95:20 96:12
**12:17**

98:20 100:25
**12:18**
99:16
**12:19**
99:19,22 100:8
**12:21**
100:13
**12:25**
100:15
**12:30**
101:11 102:2
103:21 127:21
**12:32**
105:22
**12:34**
103:17
**125**
57:9 61:4
**16-inch**
95:3
**175,000**
16:4
**18:54**
133:3
**188**
32:6 40:13 41:7
42:5,12
**19**
2:15 70:10
132:25
**19:15**
133:13
**19:22**
133:17
**1990s**
84:25
**19cv1088(LTB)**
1:2

_____
**2**
_____
**2**
2:16 24:13,15
35:23 59:4,6
**2:10**
132:17

Deposition of:  William Dickey - June 29, 2021
Sherry Poer v. Sheriff Tim Norton in his official capacity, et al.

Page 26

| | | | | |
|---|---|---|---|---|
| **2:22** | **231** | **4369** | 33:25 | **8:02** |
| 132:17 | 43:19 | 44:20 | | 70:7 |
| **2:33** | **240** | **45** | ___ 7 ___ | **80202** |
| 140:24 | 97:15 | 117:4 | **7:39** | 1:20 |
| **20** | **25** | **4570** | 36:19 | **80237** |
| 75:11 133:24 | 75:11 | 32:6 | **7:39:09** | 1:16 2:5 |
| 141:14 | **26** | **4600** | 36:1 | **87** |
| **20-inch** | 142:18 | 1:16 2:4 | **7:40:31** | 2:18 |
| 95:3 | **29** | **47** | 37:7 | |
| **20,000** | 1:12 2:6 | 40:19 | **7:43** | ___ 9 ___ |
| 118:5 | | | 37:24 38:3 | **9th** |
| **20:52** | ___ 3 ___ | ___ 5 ___ | **7:44:45** | 2:5 |
| 134:2 | **3** | **5'10** | 38:7 | |
| **2005** | 2:12,17 19:5,6 | 40:20 | **7:45:38** | |
| 5:13 | 24:2,6,7,18 | **5:44:49** | 39:13 | |
| **2007** | 79:13,14 | 27:11 | **7:48:49** | |
| 5:2 | 140:25 | **5:50** | 40:16 | |
| **2008** | **30** | 23:16,17 | **7:49:13** | |
| 19:11 | 47:3 133:25 | **5:55:08** | 41:3 | |
| **2014** | **300** | 23:24 | **7:52** | |
| 10:16 | 1:20 | **5:55:23** | 45:14,16 69:14 | |
| **2016** | **303)256-6345** | 26:10 | **7:52:06** | |
| 5:14 | 1:17 | **5:56:20** | 42:14 | |
| **2017** | **303)628-3337** | 28:1 | **7:53:19** | |
| 4:15 | 1:21 | **50,000** | 43:8 | |
| **2018** | **32** | 110:25 111:16 | **7:54:06** | |
| 8:20 | 37:1 | **54** | 44:12 | |
| **2021** | **35** | 91:9 | **7:55** | |
| 1:12 2:6 | 38:23 | **555** | 45:9,17,23 | |
| **2024** | **35-acre** | 2:15 | **7:56** | |
| 142:18 | 38:16 | **574** | 46:2 | |
| **21** | **350,000** | 34:21 | **7:57** | |
| 9:12 36:25 | 15:10,16 | **59** | 46:16 | |
| 43:21 44:24 | **380** | 2:16 | **7:58** | |
| 46:5 69:11,14 | 35:17 71:1 | | 47:22 | |
| **21's** | | ___ 6 ___ | **738** | |
| 45:1 | ___ 4 ___ | **6'4** | 35:12 | |
| **21:07** | **4** | 97:9,15 | **79** | |
| 133:24 | 2:18 87:21,22 | **6'5** | 2:17 | |
| **220** | **40** | 97:9 | | |
| 97:17 | 70:7 | **6:03** | ___ 8 ___ | |
| **223** | **40-hour** | 32:23 | **8** | |
| 72:22 | 25:10 | **6:03:01** | 69:11 | |
| **230** | **41** | 33:7 | **8:00** | |
| 40:20 | 140:25 | **6:33** | 48:2 69:12 | |