Transcript of the Deposition Testimony of:

# Travis Turner
### June 30, 2021

**Sherry Poer**

**v.**

**Sheriff Tim Norton in his official capacity, et al.**

**Civil No. 19cv1088 (LTB)**



## Mile High
### Court Reporting & Video, Inc.

14143 Denver West Parkway, Suite 100 • Golden, Colorado 80401
(303) 202-0210 • contact@milehighreporting.com
www.milehighreporting.com

Deposition of:  Travis Turner - June 30, 2021
Sherry Poer v. Sheriff Tim Norton in his official capacity, et al.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action Number 19cv1088(LTB)

SHERRY POER, individually and as Administratrix of the
Estate of CHRISTOPHER POER, Deceased,
        Plaintiff,
vs.
SHERIFF TIM NORTON in his official capacity,
OFFICERS: DEPUTY CHRIS DICKEY, and
SERGEANT TRAVIS, both of whom are sued in their individual
capacities, in his individual capacity and official
capacity,
        Defendants.
--------------------------------------------------------
                DEPOSITION OF TRAVIS TURNER
                     June 30, 2021
--------------------------------------------------------

APPEARANCES:

ON BEHALF OF THE PLAINTIFF:
        DAVID N. FISHER, ESQ.
        Fisher & Byrialsen, PLLC
        4600 South Syracuse Street, Ninth Floor
        Denver, Colorado 80237
        Telephone: (303)256-6345
        Email: david@fblaw.org

ON BEHALF OF THE DEFENDANTS:
        MARK S. RATNER, ESQ.
        Hall & Evans, LLC
        1001 Seventeenth Street, Suite 300
        Denver, Colorado 80202
        Telephone: (303)628-3337
        Email: ratnerm@hallevans.com

Also Present:  Natasha Powers

Deposition of:  Travis Turner - June 30, 2021
Sherry Poer v. Sheriff Tim Norton in his official capacity, et al.

2

1        PURSUANT TO WRITTEN NOTICE and the appropriate rules

2    of civil procedure, the deposition of TRAVIS TURNER,

3    called for examination by the Plaintiff, was taken at the

4    offices of Fisher & Byrialsen PLLC, 4600 S. Syracuse

5    Street, 9th Floor, Denver, Colorado 80237, commencing at

6    10:00 a.m. on June 30, 2021, before Sara A. Stueve,

7    Registered Professional Reporter and Notary Public in and

8    for the State of Colorado.

9

10                          I N D E X

11

     EXAMINATION:                                   PAGE
12
     By Mr. Fisher                                   3
13

14   EXHIBITS:                                       PAGE

15   6  Bio of SFC Christopher M. Poer from          41
        the website www.48sfa.org
16

17   PREVIOUSLY MARKED EXHIBITS:

18   3  Deputy Dickey's diagram of incident scene    58

19

20

21

22

23

24

25

Deposition of:  Travis Turner - June 30, 2021
Sherry Poer v. Sheriff Tim Norton in his official capacity, et al.

3

1         P R O C E E D I N G S
2         *  *  *  *  *
3         TRAVIS TURNER,
4    having been first duly sworn to state the whole truth,
5    testified as follows:
6         DIRECT EXAMINATION
7    MR. FISHER:
8         Q.  Good morning, Sergeant Turner.  You and I have
9    never met before; correct?
10        A.  Correct.
11        Q.  Have you ever been deposed before?
12        A.  One time.
13        Q.  When was that?
14        A.  '98, '99.
15        Q.  What did that have to do with?
16        A.  An arrest.
17        Q.  An arrest that you had made?
18        A.  That I was involved in.  I didn't make the
19   arrest, but I was on scene.
20        Q.  You were a participating law enforcement officer
21   in that arrest?
22        A.  Correct.
23        Q.  Who were you working for at the time?
24        A.  Lone Peak.
25        Q.  Where is that?

4

1         A.  It's in Utah between Salt Lake and Provo.
2         Q.  Was there a civil suit filed in that case?
3         A.  There was.
4         Q.  What was the result of that civil suit?
5         A.  It was dismissed from -- before it ended.
6         Q.  So I'll just go over briefly with you the rules
7    of the deposition since it's been a while.
8         Whenever I ask you a question, just wait for me
9    to finish before answering.  And then when you answer,
10   just make sure you answer out loud, because the court
11   reporter won't take down nods of the ahead and shakes of
12   the head or anything like that.  Okay?
13        A.  Okay.
14        Q.  So as I was saying, you just have to answer out
15   loud when I'm done asking you a question.  Okay?
16        A.  Okay.
17        Q.  And there might be objections -- there will be
18   objections from your attorney here.  So when he objects,
19   just pause a second so that the reporter can hear his
20   objection, and then, unless he tells you not to answer,
21   you can just go ahead and answer the question after he's
22   placed his objection on the record.
23        A.  Okay.
24        Q.  Fair enough?
25        A.  Yeah.

5

1         Q.  If I ask you a question that you don't
2    understand, just let me know that.  Okay?
3         A.  Okay.
4         Q.  That's about it.  Pretty simple otherwise.
5         You took an oath to testify truthfully, the same
6    like you would in court.  Do you understand that?
7         A.  Yes.
8         Q.  Have you ever testified in court before?
9         A.  Yes.
10        Q.  What kinds of cases?
11        A.  Everything from a traffic ticket to a murder.
12        Q.  Okay.  Is that in Douglas County?
13        A.  Utah, Alaska, Colorado.  Testified in
14   Douglas County.  Testified in Elbert County.
15        Q.  Tell me about your career trajectory.
16        A.  I started the academy in '96.
17        Q.  Where was that?
18        A.  Utah.
19        Q.  Is that where you're from?
20        A.  Yes.
21        And then after the academy, I was hired by
22   Utah County Sheriff's Office.  Halfway through the
23   academy, got a job offer by Alpine Island, which is
24   currently Lone Peak Public Safety District.
25        Shortly after that -- worked for them for

6

1    ten years until 2008.  In 2010, I went to Alaska.
2         Q.  Let me interrupt you one second.  While you were
3    with that department, what was your rank?
4         A.  I was patrol sergeant.
5         Q.  Okay.  So you started out as patrol sergeant?
6         A.  No.  I started out as --
7         Q.  Patrol?
8         A.  Yeah.  A patrol guy.
9         Q.  And then eventually patrol sergeant?
10        A.  Correct.
11        Q.  And then why did you leave that job?
12        A.  I was terminated.
13        Q.  What for?
14        A.  There was an issue with my wife, and it ended up
15   costing me my job.
16        Q.  Some kind of domestic issue between you and your
17   wife?
18        A.  She made a bunch of ridiculous claims, and they
19   entertained them initially, and I lost my job over it.
20        Q.  Were you ever charged criminally with anything?
21        A.  I was.
22        Q.  And what happened with those criminal charges?
23        A.  It was dismissed.  It was a lie.
24        Q.  Did you have to get arrested and all that?
25        A.  No.  They gave me a summons to appear, and I

Deposition of:  Travis Turner - June 30, 2021
Sherry Poer v. Sheriff Tim Norton in his official capacity, et al.

7

1 appeared, and they had to dismiss it because she admitted
2 she lied.
3      Q.  But based on those allegations, you ended up
4 getting terminated from your job?
5      A.  Correct.
6      Q.  Was there ever, like, an internal affairs
7 investigation associated with that or some kind of
8 investigation by the department?
9      A.  Yes.
10      Q.  What was the outcome of that investigation?
11      A.  They terminated me.
12      Q.  Okay.  What was your next job after that?
13      A.  I worked in Alaska, Bethel.
14      Q.  And what did you do there?
15      A.  I was a police officer.
16      Q.  For how long?
17      A.  Close to three years, two and a half years.
18      Q.  How'd you end up way out in Alaska?
19      A.  I had a buddy that I worked with at Lone Peak
20 who was working up there, and he called me and said, I
21 think you'd really like it up here.  Apply.  So I did.
22      Q.  And during your time at that law enforcement
23 agency in Alaska, did you maintain the same rank that
24 entire time?
25      A.  Law enforcement doesn't work like the corporate

8

1 world. I was hired as a regular patrol deputy and --
2      Q.  You stayed that way throughout?
3      A.  Yeah.
4      Q.  What kinds of cases did you work on in that
5 agency?
6      A.  Everything from a traffic ticket to murders.
7      Q.  Okay.  And why did you leave that job and when?
8      A.  Because my wife was done with Alaska.  Where we
9 were was extremely rural.  And that was, basically, just
10 to get my foot back in the door, is why I took that job.
11 And the plan was always to come back to the lower 48.
12      Q.  Was that the same wife who had made the
13 allegations?
14      A.  No.
15      Q.  A second wife?
16      A.  Correct.
17      Q.  Okay.  And so you came back to the lower 48.
18 And where'd you work then?
19      A.  Kiowa Police Department in Elbert County, town
20 of Kiowa.
21      Q.  And how long were you there for?
22      A.  Ten or 11 months.
23      Q.  And deputy there?
24      A.  No, officer.
25      Q.  Okay.  They call them officer?  And why'd you

9

1 leave Kiowa?
2      A.  To go to Elbert County.
3      Q.  So you were with Kiowa ten or 11 months and then
4 got a new job at Elbert County?
5      A.  Correct.
6      Q.  And when did you start at Elbert County?
7      A.  December 24th --
8      Q.  Christmas Eve?
9      A.  -- 2013.  Yeah, Christmas Eve.
10      Q.  So you've been working there seven years or so?
11      A.  Yeah.
12      Q.  You started out as a deputy?
13      A.  Yeah.  Patrol deputy.
14      Q.  What's your current rank?
15      A.  Sergeant.
16      Q.  Same as you were in the incident in this case in
17 2018, sergeant?
18      A.  Correct.
19      Q.  How'd you become a sergeant?  Did you have to
20 take a test?
21      A.  Yeah.  I mean, I was promoted to corporal a
22 little while after I got hired, and then I got promoted to
23 sergeant, probably, a year later.
24      Q.  So is that what the stripes on the uniform are?
25      A.  Right.

10

1      Q.  Sergeant?
2      A.  Yes.
3      Q.  Corporal is in between deputy and sergeant?
4      A.  Yes.
5      Q.  And how long were you a corporal for?
6      A.  Probably about a year.
7      Q.  In the seven years that you've been with El Paso
8 County Sheriff's Office, what kinds of cases have you
9 handled?
10      A.  Again, everything.  I mean -- yeah.  All kinds
11 of stuff.
12      Q.  Violent cases?  Robberies?
13      A.  Yes.
14      Q.  Burglaries?
15      A.  Yes.
16      Q.  Drug cases?
17      A.  Yes.
18      Q.  Murders?
19      A.  Yep.
20      Q.  Also just traffic stuff?
21      A.  Yes.
22      Q.  How about domestic stuff?
23      A.  Yes.  Lots of domestic stuff.
24      Q.  Have you ever had any allegations of excessive
25 force while you were with Elbert County?

Deposition of:  Travis Turner - June 30, 2021
Sherry Poer v. Sheriff Tim Norton in his official capacity, et al.

11

1    A.  No.
2    Q.  Not a single one?
3    A.  No.
4    Q.  Okay.  So let me try to parse that out a little
5  bit.
6        Like in this case, there was no -- there wasn't,
7  like, a complaint of excessive force, but, obviously,
8  there was force used.  When I say "this case," I'm
9  referring to Mr. Poer's case.  Or when I say, "this
10  incident," that's what I'll be talking about.
11        So in this case, I don't think there was a
12  complaint made for excessive force.  Obviously, there's a
13  lawsuit now, but -- so when I asked you before, I guess I
14  meant had anyone ever complained of excessive force?
15    A.  I've never had a complaint of excessive force.
16    Q.  What's the Elbert County policy in terms of, if
17  you use force, does it have to be --
18    A.  Reasonable and prudent?
19    Q.  No.  Does it have to be reviewed in some way?
20    A.  Yes.
21    Q.  What's the criteria for that?  Like any force?
22  Handcuffing?  Anything?
23    A.  Well, it has to be -- no.  It has to be
24  considered use of force.  Use of force is -- I mean,
25  normal handcuffing is not considered use of force.

12

1    Q.  So what are we talking about?  Like taser
2  deployment?
3    A.  Right.  You hit someone with an asp or punch
4  them or shoot them or whatever.
5    Q.  Then it's going to get reviewed?
6    A.  Yeah.
7        MR. RATNER:  Hold on a second.
8        You guys are engaging in a conversation, which
9  is fine.  But you've got to make sure he asks his
10  question, and you've got to make sure he finishes his
11  answer.  Because it's starting to overlap and, obviously,
12  we all want a clear record.
13    Q.  (By Mr. Fisher)  Okay.  So where I was going is
14  you've probably had uses of force reviewed by
15  Elbert County even if there weren't complaints because
16  that's just policy?
17    A.  Correct.
18    Q.  Like in this case, for instance, there wasn't a
19  complaint, but it was an in-custody death, so it was
20  reviewed?
21    A.  Yes.
22        MR. RATNER:  Object to form.
23    Q.  (By Mr. Fisher)  How many times in your career
24  at Elbert County have you used force that was reviewed
25  just because that's the policy?

13

1        MR. RATNER:  Form and foundation.
2    Q.  (By Mr. Fisher)  You can answer.
3    A.  Four times.
4    Q.  Like, less than a dozen or something?
5    A.  Probably less than five or six my whole time
6  here.
7    Q.  So there just haven't been that many instances
8  over your career where you've actually had to use that
9  type of force which would lead to any kind of review?
10    A.  Correct.
11    Q.  Usually it's just talking to people, maybe
12  handcuffing, whatever?
13    A.  Correct.
14    Q.  And there's only been a handful of times where
15  you actually had to use force that would require some kind
16  of review by Elbert County?
17    A.  Yes.
18    Q.  Can you tell me about some of those cases?
19    A.  Trying to think of the last one.
20    Q.  I mean, obviously, we know about this case, and
21  we'll get into that separately.
22    A.  Yeah.  I had a case where a mentally disturbed
23  individual -- he was diagnosed as schizophrenic.  We'd
24  been out there a few times, so I was pretty comfortable
25  with him.

14

1        He was a big, big guy, probably my height and
2  maybe 50 pounds heavier.
3    Q.  What is your approximate height and weight?
4    A.  6'5," 240.
5    Q.  What was your approximate weight at the time of
6  the incident in this case?
7    A.  It was probably 230.
8    Q.  Similar?
9    A.  Yeah, close.  I've been pretty close to the same
10  size for a long time.
11    Q.  Okay.  So go ahead.  I'm sorry.  You had this
12  incident with somebody with schizophrenia.  You'd known
13  him a little bit.  And what happened?
14    A.  The previous times I had dealt with him, we'd
15  been able talk him down.  And this time, his dad came to
16  the door.  He had elderly parents that were having a hard
17  time dealing with him, as he was an adult.
18        Dad came to the door and said, He's going out
19  the garage.  So I went around the side with another
20  deputy, and he came out swinging.
21    Q.  Just, like, punching?
22    A.  Yeah.  He opened the door and punched me right
23  in the side of my head, broke my hearing aide.  And myself
24  the other deputy took him down to the ground.
25        And I actually reached around -- so I was behind

Deposition of:  Travis Turner - June 30, 2021
Sherry Poer v. Sheriff Tim Norton in his official capacity, et al.

---

15

1  the deputy.  We were both on top of him.  And I actually
2  reached around and used my taser on him.
3      Q.  Are you a certified taser user?  Is that the
4  right word?
5      A.  User, yes.
6      Q.  Are you a taser instructor as well?
7      A.  I'm not a taser instructor.
8      Q.  Okay.  You had to take training and courses and
9  things like that to be able to be certificated to use the
10  taser; correct?
11     A.  Yes.
12     Q.  So you were just talking about you were usually
13  able to talk him down; right?
14     A.  Yes.
15     Q.  That -- you would agree with me that's a pretty
16  important part of being a police officer, being able to
17  talk people down?
18         MR. RATNER:  Form and foundation.
19     Q.  (By Mr. Fisher)  You can answer.
20     A.  Yeah.
21     Q.  In fact, whenever possible, you would rather --
22  correct me if I'm wrong, you'd rather not use force if you
23  can avoid it?
24     A.  That is correct.
25     Q.  And one of the most important tools in being a

---

16

1  police officer is using words and deescalating situations;
2  is that fair to say?
3         MR. RATNER:  Object to form and foundation.
4      A.  Yes.
5      Q.  (By Mr. Fisher)  And you try to do that whenever
6  possible?
7      A.  I do.
8      Q.  And only resort to use of force if you feel it's
9  necessary in that situation and reasonable in that
10  situation?
11     A.  Yes.
12     Q.  So you had to take him down and use a taser in
13  that case, so that was eventually reviewed by
14  Elbert County?
15     A.  Correct.
16     Q.  Did they find that your behavior was appropriate
17  and reasonable and there were no problems with it?
18     A.  They did.
19     Q.  What are some of the other instances where you
20  had uses or force at Elbert County?
21     A.  They're few and far between.
22         I had a -- we had an incident where we had an
23  armed individual that was threatening to kill himself.  It
24  was me and, I think, two other guys that responded to that
25  call.

---

17

1      As we were responding -- he was on a large piece
2  of wooded property.  And a similar deal: adult child
3  living in home with parents, having some issues.
4      He had apparently pointed a gun at himself and
5  then gone into the -- or gone off onto the property
6  somewhere.
7      So we responded.  As we rolled up, we were
8  initially going to get out and use a shield and walk him
9  on foot from a distance --
10     Q.  A ballistic shield?
11     A.  Yes.
12     Q.  Go ahead.
13     A.  -- and see if we could locate him.
14     Right as we rolled up they said, He just went
15  into the garage.  And it was a huge piece of property, and
16  like I said, it was wooded.
17     So we rolled up, and his parents were outside
18  saying he was inside -- he's in the garage.  He's in the
19  garage.
20     We went in, and I was the first one through the
21  door, and he charged me.  And I had a rifle in my hands,
22  so I reached up with my left foot and kicked him back.
23  And he fell to the ground, and we handcuffed him.
24     Q.  So that kick was then reviewed by Elbert County,
25  and they found that it was justified?

---

18

1      A.  They did.
2      Q.  Tell me about your training and experience --
3  well, tell me about your training and your understanding
4  of the policies of Elbert County about when and in what
5  circumstances blows to the head are appropriate uses of
6  force?
7         MR. RATNER:  Object to form.
8      Q.  (By Mr. Fisher)  You can answer.
9      A.  If someone's resisting and they have -- trying
10  to think how to answer this.
11     If someone's resisting and they have -- you
12  know, if they're violently resisting, if they've -- if I'm
13  arresting somebody for a serious felony, you know,
14  something crazy, and they resist, I'm going to resort to
15  that.
16     Q.  Is your understanding that blows to the head are
17  considered deadly force, or do you have some different
18  understanding?
19     A.  Well, I think we need to rephrase "blows to the
20  head."  Because I didn't hit this guy in the head.  I hit
21  him in the face.
22     Q.  Okay.  So you make a distinction -- forget about
23  this case for a second.  I'm talking more generally.  But
24  you're making a distinction between blows to the face
25  versus blows to the head.

---

Deposition of:  Travis Turner - June 30, 2021
Sherry Poer v. Sheriff Tim Norton in his official capacity, et al.

19

1    A.  Yes.
2    Q.  Tell me about that distinction.
3    A.  You're using the term "head."  I didn't hit him
4    in the head.  I hit him in the face, in this area
5    (indicating).
6    Q.  Okay.  So for the record, you're framing your
7    face with your hands on both sides --
8    A.  From the eyes down --
9    Q.  From the eyes down to the jaw?
10   A.  -- and in the front, yeah.
11   Q.  So is that -- is that your own, kind of,
12   internal definition?  Or is that something you were taught
13   or trained in at Elbert County about a distinction between
14   blows to the face and head?
15   A.  No.  That's just my own internal definition.
16   Q.  Were you ever taught about blows to the head or
17   blows to the face or both at Elbert County?
18   A.  No, not specifically.  It's overall use of
19   force.
20   Q.  Did you -- you received, I assume, training at
21   Elbert County and elsewhere about hands-on techniques as a
22   police officer?
23   A.  Yes.
24   Q.  How to do takedowns; right?
25   A.  Correct.

20

1    Q.  Physically taking somebody to the ground?
2    A.  Yes.
3    Q.  Maybe arm bars?
4    A.  Yes.
5    Q.  Pressure point techniques?
6    A.  Yeah, different things like that.
7    Q.  Were you ever taught about administering blows
8    to someone's face or head with your fists?
9    A.  I have been trained yearly on administering
10   blows to people.  That's something that we cover every
11   year in our training.  Specifically to punch someone in
12   the face, they didn't say "punch someone in the face."
13   Q.  So you were never trained at Elbert County on
14   how to punch someone in the face or head?
15   A.  No.
16   Q.  Is that a technique that you were taught is not
17   supposed to be utilized, or it's only supposed to utilized
18   in certain scenarios?
19   A.  I believe that's a technique that is okay to use
20   in certain scenarios.
21   Q.  And so that's your belief, but I'm asking what
22   you were taught at Elbert County.
23   A.  Yeah.  I mean, I don't know how you want me to
24   answer this.
25   Q.  Did you receive any training or teaching

21

1    about --
2    A.  I did not go to a class about punching anyone in
3    the face.
4    Q.  Okay.  And you've been to several use-of-force
5    trainings over your career at Elbert County; right?
6    A.  Correct.
7    Q.  Where they show you how to do certain techniques
8    and how to administer certain strikes, blows, takedowns,
9    et cetera?
10   A.  Yes.
11   Q.  And in none of those classes or trainings did
12   they ever teach you about how to punch somebody in the
13   face or head?
14   A.  Not specifically.
15   Q.  And they never talked about whether or not that
16   should or should not be done and under what circumstances?
17   A.  Yeah.  I mean, it's talked about.  We administer
18   strikes on multiple different levels: knee strikes, elbow
19   strikes, punches.
20   Q.  Were you ever -- for instance, like when you're
21   taught how to use an asp, are you ever shown, like, a
22   diagram where the head is red, "Don't hit in the head.
23   You should hit in these other parts of the body instead"?
24   A.  Yes.
25   Q.  And the purpose of that is because blows to the

22

1    head can be lethal; right?
2    A.  They can be.
3    Q.  It's your understanding that you should avoid
4    blows to the head unless it's a situation where deadly
5    force is necessary?
6    MR. RATNER:  Object to form and foundation.
7    Q.  (By Mr. Fisher)  You can answer.
8    A.  I would say blows to the head are -- it doesn't
9    have to be a deadly force situation.
10   If, you know, something's going south real bad,
11   someone's trying to hurt me, you know, we have to effect
12   an arrest, there's other circumstances involved, then
13   blows to the face or head are appropriate when reasonable.
14   Q.  Aside from this case, how many times in your
15   career have you had to use blows to the head or the face
16   on a suspect or somebody you were trying to arrest?
17   A.  A couple of times.
18   Q.  Was that at Elbert County?
19   A.  I think the last guy that I hit in the face -- I
20   think the last one was in Alaska where I had to punch
21   someone like that.
22   Q.  And did that person have a weapon?
23   A.  No.
24   Q.  And why did you punch that person in the face?
25   A.  Because he was violently fighting.

Deposition of:  Travis Turner - June 30, 2021
Sherry Poer v. Sheriff Tim Norton in his official capacity, et al.

23

1     Q.  "Fighting" meaning, like, resisting being
2  handcuffed or physically fighting?
3     A.  Actively resisting, physically fighting and
4  resisting arrest.
5     Q.  So let's break that down a little bit.
6     What do you consider to be actively fighting?
7     A.  Trying to hurt me.
8     Q.  So, like, trying to punch or kick or wrestle
9  you?
10    A.  Correct.
11    Q.  And that's different than just resisting arrest;
12  right?
13    A.  Yes.
14    Q.  Resisting arrest is, perhaps, not giving your
15  hands, flailing arms, something like that?
16    MR. RATNER:  Object to form.
17    A.  Yes.
18    Q.  (By Mr. Fisher)  And, like, not allowing an
19  officer to handcuff you, that's resisting arrest; right?
20    A.  Yes.
21    Q.  And then there's also passive resistance; right?
22    A.  Yes.
23    Q.  Do you know what I mean by that?
24    A.  Like, protesting.
25    Q.  Yeah.  Where a suspect is just, maybe, laying on

24

1  their hands or something and not moving.
2     A.  Correct.
3     Q.  Refusing to give their hands like that, but
4  they're not physically fighting with you or, you know,
5  actively -- more actively resisting, whether kicking or
6  flailing at you or things like that.  Does that make
7  sense?
8     MR. RATNER:  Object to form.
9     A.  That makes sense, sure.
10    Q.  (By Mr. Fisher)  And depending on the level of
11  resistance or active aggression or if somebody's fighting
12  with you, that can ratchet up the amount of force that you
13  are then entitled to use in response; is that fair to say?
14    A.  Yes.
15    Q.  And of course, if somebody has a gun, and you
16  think they may try to shoot you or somebody
17  else, that would entitle you to use deadly force; correct?
18    A.  Yes.
19    Q.  If somebody had a gun but no longer has one,
20  that changes the calculation; correct?
21    MR. RATNER:  Object to form.
22    A.  Sure.
23    Q.  (By Mr. Fisher)  Because at that point, the
24  person no longer has a gun, and they don't have access to
25  that gun, and it's not a deadly force situation anymore --

25

1     MR. RATNER:  Object to form and foundation.
2     Q.  (By Mr. Fisher)  -- fair to say?
3     A.  It would depend on the scenario, if that's the
4  only gun they have.
5     Q.  Right.  In general, when you go to arrest
6  somebody or you're in the middle of an arrest, anybody
7  could have a weapon in any scenario, quite frankly; right?
8     A.  Yes.
9     Q.  Especially if they have a big coat on or
10  something like that, you don't know what they have under
11  there?
12    A.  Correct.
13    Q.  That being said, you just -- you don't assume
14  that all people have weapons on them when you encounter
15  them; correct?  You consider that it's a possibility, but
16  you don't just make an assumption "This person definitely
17  has a weapon on them"?
18    A.  I don't even approach a traffic stop without the
19  assumption that someone could have a weapon.
20    Q.  Could have a weapon?
21    A.  Could have a weapon.
22    Q.  And sometimes you'll actually get some kind of
23  reason to believe that a specific person does have a
24  weapon or know that they do have a weapon; correct?
25    A.  Correct.

26

1     Q.  And you can certainly act on that and treat that
2  appropriately; right?
3     A.  Yes.
4     Q.  Let me -- I'm going to ask you some questions
5  specifically about this case for a little bit.  Okay?
6     A.  Okay.
7     Q.  You got the call on April 12, 2018, that there
8  was a man on Private Road -- is it 188?
9     A.  Yes.
10    Q.  -- who was calling in because he believed that
11  his home was being bugged or recorded; right?
12    A.  I did, yes.
13    Q.  And at that time, you were serving a restraining
14  order on a sex offender?
15    A.  It wasn't a sex -- I don't remember if he was a
16  sex offender or not.  He may have been.  That was a
17  domestic type of restraining order.
18    Q.  In any event, you were at another call, and then
19  you got this call that this was going on at
20  Private Road 188; right?
21    A.  Yes.
22    Q.  And you were with Deputy Dickey at the time?
23    A.  I was.
24    Q.  Was he, sort of, your partner at the time?  Did
25  you guys work together often?

Deposition of:  Travis Turner - June 30, 2021
Sherry Poer v. Sheriff Tim Norton in his official capacity, et al.

27

1  A. We worked together often. I wouldn't say
2  partner.
3  Q. You guys didn't really have, like, a partner --
4  was there a partner situation at Elbert County?
5  A. No. We drive single-man cars.
6  Q. Okay.
7  A. Not enough people for that.
8  Q. But it's not a big agency, so you and
9  Deputy Dickey would work together on cases?
10  A. Right.
11  Q. So that day, you were working together. You get
12  this call. And in response to it, you call the reporting
13  party back on the phone; right?
14  A. That's correct.
15  Q. And if I remember right, you left him a message
16  the first time?
17  A. I did.
18  Q. And what was your understanding of the nature of
19  that first call?
20  A. It was someone calling in about cameras being
21  placed in his house, his phone being bugged.
22  Q. And did you -- what was your assessment of that
23  phone call? Did you believe that this was somebody who
24  was probably really being bugged by somebody, or somebody
25  who was maybe suffering some mental illness or paranoia or

28

1  something?
2  A. My assessment was probably some kind of paranoia
3  situation, which is why I gave him the phone call instead
4  of a physical response.
5  Q. So the idea was let me call this guy, see what's
6  going on, see if I can calm him down a little bit, see if
7  this is a real situation or we can just talk about it on
8  the phone or something?
9  A. Yes.
10  Q. You weren't able to make contact on that first
11  call?
12  A. No. I left a message.
13  Q. Have you ever been trained as a CIT officer? Do
14  you know what that is?
15  A. Yes.
16  Q. Have you ever been trained in that?
17  A. I've never been through CIT training.
18  Q. Do you know what it, roughly, is?
19  A. Yeah. I mean, for the most part, it's the
20  ability to engage and correctly respond to people who are
21  having a mental crisis.
22  Q. Okay. And from the call that you got from
23  Mr. Poer on that day, the first call, did you feel like
24  that was a situation where it might be, sort of, a CIT
25  situation, somebody suffering from mental illness who

29

1  needs that kind of response?
2  MR. RATNER: Object to form.
3  A. No. I would have responded.
4  Q. (By Mr. Fisher) I see.
5  A. I didn't know. That's why I called first.
6  Q. To try to get more information?
7  A. Yes.
8  Q. Okay. And you weren't able to because nobody
9  picked up?
10  A. That is correct.
11  Q. It was labeled as a "CIT assist" in the CAD
12  notes. We can look at it if you'd like, or do you
13  remember that?
14  A. I don't remember that, but I don't not believe
15  you.
16  Q. Does that make sense to you?
17  A. Yes.
18  Q. That it would be labeled such?
19  A. Yes.
20  Q. And why would it be labeled like that?
21  MR. RATNER: Object to foundation.
22  Q. (By Mr. Fisher) Dispatch has certain labels
23  they place on things. I can't speak as to
24  Douglas County's policies on how they label calls.
25  Q. Is that something that you'd be aware of, that

30

1  this was called CIT assist?
2  A. Yeah. I mean, yeah. Yes.
3  Q. And what would that mean to you?
4  A. That there's some kind of weird behavior
5  happening.
6  Q. Can you see where my mouse is here?
7  A. Yes.
8  Q. So this is Exhibit 1 from yesterday, from
9  Dickey's deposition. So I'm pointing at the one that's
10  highlighted at 5:58 [sic]. Do you see police call, type
11  change from new call to CIT assist, status: cold,
12  priority --
13  A. That means citizen assist.
14  Q. What does that mean?
15  A. It's the gamut of all kinds of phone calls.
16  It's everything from a loose horse to a, you know, just
17  your normal calls.
18  Q. I need help with something?
19  A. Someone wants a phone call, you know. I don't
20  know.
21  Q. It could be anything?
22  A. Yes.
23  Q. Just, kind of, a general label?
24  A. Yes.
25  Q. And then above, you see at 5:55 the contact's

Deposition of:  Travis Turner - June 30, 2021
Sherry Poer v. Sheriff Tim Norton in his official capacity, et al.

31

1   name, Christopher, and his phone number are given; right?
2      A.  Yes.
3      Q.  So now you know the name of the person who
4   called and their phone number; right?
5      A.  Yes.
6      Q.  And then, in fact, caller phone changed from
7   this 202 number to a 303 number.  Do you see that?
8      A.  I do.
9      Q.  And then you see some of the text of what the
10  reporting party was talking about:  Someone broke in and
11  installed cameras and Bluetooth in reporting party's
12  phone; right?
13     A.  I can see that, yes.
14     Q.  There's also a little piece of narrative here:
15  Reporting party was talking very fast, not making sense.
16  Do you see that?
17     A.  Yes.
18     Q.  Is that something you would have been aware of
19  at the time?
20     A.  I believe so.  I don't remember specifically.
21     Q.  It's something that -- if it's on this CAD
22  report, it probably went over the radio; right?
23        MR. RATNER:  Object to form foundation.
24     A.  Not everything on the CAD report goes over the
25  radio.

32

1      Q.  (By Mr. Fisher)  Okay.
2      A.  So this is the final CAD report after the
3   dispatcher's added all their notes.  There's actually a
4   different screen that I would have been using at the time
5   before we went to our new computer system.
6      Q.  And that would be in your car?
7      A.  That was -- I'm trying to think of how they set
8   them up.
9         Yeah.  It was in my car.  I had a tablet set up.
10  As to whether or not things were working that day and I
11  had it set up or whether I had to use my phone or whether
12  I didn't have access to it, I can't speak to that.  I
13  don't remember.
14     Q.  Was this something you recall hearing on that
15  day or being advised of:  Reporting party was talking very
16  fast, not making sense?
17     A.  I recall that it was some kind of -- something
18  that sounded weird.
19     Q.  And then when it says, 6:03:  Unit ES1 arrived.
20  What does that mean to you?  See that where my mouse is?
21     A.  Yep.  Echo Sam 1.  That's my call number.  That
22  means I arrived.
23     Q.  What does "arrived" mean?
24     A.  "Arrived" means you're on scene.
25     Q.  At 6:03 p.m., you believe you were already on

33

1   scene at Private Road 188?  Or could that mean that that's
2   when you were --
3      A.  That means I was on scene by phone.
4      Q.  Okay.  You called him at that time?
5      A.  Yes.  I don't see the distinction between scene
6   and phone there.
7      Q.  And what is this -- see this entry at 6:33:
8   Call placed on ES1's stack?  What does that mean?
9      A.  That means I was advised of the call, I'm
10  assuming, right at 6:33.  Or they readvised -- no.  So
11  6:03 -- if it says "arrived," that's probably the time
12  that I made the phone call.
13     Q.  Would be this one at 6:03?
14     A.  Yes.
15     Q.  And then --
16     A.  And then --
17     Q.  -- placed on stack 30 minutes later?
18     A.  Correct.  That means I was still on the call
19  that I was dealing with, and they readvised, and it was
20  placed on the stack of calls.
21     Q.  And what does this one mean just above it, 6:33:
22  ES1 rerouted to call 576?  Does that mean you were
23  rerouted to a different call having nothing to do with
24  this case?
25     A.  I believe so.  I don't know what number 576 is.

34

1   But that would be on the incident for that day -- or for
2   that call on that day.
3      Q.  And then at 6:57, you see an entry that you
4   leave.  It says:  ES1 leave pending.  Will call reporting
5   party again when clear.
6      A.  Yes.
7      Q.  What does that one mean to you?
8      A.  It means I'll call in again when I'm done.
9      Q.  Doing whatever you're doing?
10     A.  Yeah.  I already tried to call him once.  I'll
11  call him when I'm done doing what I'm doing.
12     Q.  And then an hour -- well, not quite an hour
13  later, 7:37 p.m., Christopher called back saying that they
14  are out there right now.
15     A.  Yes.
16     Q.  See that?
17     A.  I do.
18     Q.  Is that something you would have been advised of
19  at the time?
20     A.  I'm not sure.
21     Q.  Okay.  So you're saying if it's in this CAD
22  report, you may or may not have been told about this over
23  the radio or been able to see it on your screen?
24     A.  Yes.  They add their notes.  They can come back
25  and add notes.  They don't necessarily tell us every

Deposition of:  Travis Turner - June 30, 2021
Sherry Poer v. Sheriff Tim Norton in his official capacity, et al.

35

1  single thing that comes across this.  I'm sure they do
2  their best to relay the information.
3      Q.  Do you recall, you know, approximately at 7:30
4  that night, that you were told these things:  That
5  Christopher is calling back saying that they're out there
6  right now.  Elaine's on the phone.  She's the property
7  owner.  She says he has a gun in his right hand now?
8      A.  I do.
9      Q.  You remember that stuff?
10     A.  Oh, yeah.
11     Q.  Because you're hearing, okay, somebody's got a
12 loaded gun now?
13     A.  Yes.
14     Q.  And you're figuring, I should go to the scene?
15     A.  Yes.
16     Q.  And that's what you did?
17     A.  That's what we did, yes.
18     Q.  Yeah.  So you left where you were and went
19 lights and sirens to Private Road 188?
20     A.  Yes.
21     Q.  And you were in a separate car from Dickey;
22 right?
23     A.  Correct.
24     Q.  On the way there, you aired over the radio that
25 no one should approach until you get there with your

36

1  ballistic shield; is that fair?
2      A.  Yes.  I knew Chris was in front of me.  And
3  there's different ways to take routes.
4          Anyway, I was worried that they may pull up and
5  put themselves in a situation where they could get shot
6  before they have any kind of protection.
7      Q.  And when you say "they," you mean your fellow
8  officers?
9      A.  Yes.
10     Q.  And that would be Dickey, Whitlock, Bjork?
11     A.  Yes.
12     Q.  Anyone else?
13     A.  No.  I think that's all that was responding to
14 the call initially.
15     Q.  I might be making this up, but I feel like there
16 was a female officer involved at some paint.  Am I making
17 that up?
18     A.  No.
19     Q.  Were there any female officers working there?
20     A.  I think in the jail.
21     Q.  Okay.
22         So you said, you know, Don't go in there until I
23 get there with my ballistic shield, because a ballistic
24 shield is good protection in a situation like this?
25     A.  I did.

37

1      Q.  And you normally kept your ballistic shield in
2  your work truck; right?
3      A.  Yes.
4      Q.  Your work truck?
5      A.  Yes.
6      Q.  But your truck that -- you had taken it in for
7  service recently, and you forgot to put the shield --
8  ballistic shield back in the truck after the service?
9      A.  That's correct.
10     Q.  So when you arrived on scene, you actually
11 realized you didn't have your shield with you?
12     A.  Yes.
13         MR. FISHER:  Let's just take five minutes.  I'm
14 going to use the restroom real quick, and then I'm ready
15 to go back.  Okay?
16         THE WITNESS:  Okay.
17         (Recess from 10:33 a.m. until 10:37 a.m.)
18     Q.  (By Mr. Fisher)  Just getting back to your
19 training briefly, while you were in Utah at the academy,
20 did you receive training on use of force?
21     A.  Training in --
22     Q.  Use of force, using force?
23     A.  I did, yes.
24     Q.  Anything different or additional than what we
25 talk about in the Colorado training?

38

1          MR. RATNER:  I'm going to object to form.
2      Q.  (By Mr. Fisher)  You can answer.
3      A.  Not really.
4      Q.  Okay.  Anything additional about strikes to the
5  head?
6      A.  No.
7      Q.  Or face?
8      A.  No.
9      Q.  Okay.  Have you had any additional training
10 outside law enforcement in things like Krav Maga or MMA or
11 boxing or anything like that?
12     A.  When you say "outside of law enforcement" --
13     Q.  Or inside of law enforcement?
14     A.  Yeah.  I've had mixed martial arts training.
15     Q.  As part of law enforcement training?
16     A.  At part of law enforcement training.
17     Q.  When you were with which agency?
18     A.  Alaska.
19     Q.  Okay.
20     A.  That was actually something they taught in the
21 academy up there.  Yeah.
22     Q.  So getting back to the day of the incident, when
23 you're on the way there, you know that the man who had
24 called earlier, Christopher, now had what you believed to
25 be a loaded gun; right?

Deposition of:  Travis Turner - June 30, 2021
Sherry Poer v. Sheriff Tim Norton in his official capacity, et al.

39

1   A.  Yes.
2   Q.  Because that's what you'd been told over
3   dispatch?
4   A.  Yes.
5   Q.  You also had his phone number and his name?
6   A.  Yes.
7   Q.  And you had called him earlier?
8   A.  Yes.
9   Q.  Can you explain for us -- that area,
10  Private Road 188, is a pretty rural area; is that fair to
11  say?
12  A.  Yeah.  It's rural.
13  Q.  Like 35-acre plots?
14  A.  I think between 35 and 80 acres.
15  Q.  The houses are not close together?
16  A.  No.  They're far apart.
17  Q.  And you understood that at the time you were
18  arriving, Mr. Poer is outside of the house somewhere;
19  right?
20  A.  Yes.
21  Q.  He's got a gun; right?
22  A.  Yes.
23  Q.  Elaine's gun?
24  A.  Yes.
25  Q.  Elaine was the property owner; right?

40

1   A.  Yes.
2   Q.  Did you know Elaine at all prior to this?
3   A.  No.
4   Q.  Have you ever come across her again since?
5   A.  No.
6   Q.  So this was, like, the one and only time you'd
7   ever met her?
8   A.  Yes.
9   Q.  And same with Mr. Poer:  This was the one and
10  only time you'd met him?
11  A.  Yes.
12  Q.  And, in fact, in arriving there and going to the
13  scene, you didn't know anything about him other than what
14  was in the CAD or what had been reported to you over the
15  radio?
16  A.  Correct.
17  Q.  You didn't know anything about prior criminal
18  history; right?
19  A.  No.
20  Q.  You didn't know anything about mental illness or
21  not; right?
22  A.  I knew what they relayed initially.
23  Q.  About someone bugging the house?
24  A.  All I knew is what they relayed.
25  Q.  Right.  And nothing about, like, whether or not

41

1   he has PTSD or anything like that?
2   A.  They may have actually said that.  I remember --
3   I remember they -- they where are on the phone with her
4   the whole time, and she was giving bits and pieces about
5   his background.
6   Q.  Does it refresh your memory if I tell you that
7   that information was relayed after he'd already been in
8   custody and detained and was receiving medical care?
9   A.  Yeah.  It doesn't refresh my memory.  I just
10  can't remember.  It's been a long time.
11  Q.  Okay.  Did you know anything about him when you
12  were arriving at the scene?  Did you know anything about
13  him being a former Green Beret?
14  A.  No.  I didn't hear that until later.
15  Q.  That's something you heard later?
16  A.  Yes.
17  Q.  What do you know about his military service now?
18  A.  Now, like you said, he's a former Green Beret,
19  Special Forces, and CIA.
20  Q.  I'm going to mark this as -- I guess this will
21  be Deposition Exhibit 1.
22  MR. RATNER:  Why don't you continue on from
23  yesterday.
24  MR. FISHER:  Sure.  That's fine.  This will be
25  six, then.

42

1   (Exhibit Number 6 was marked.)
2   Q.  (By Mr. Fisher)  So I'll just read some of this
3   to you.  I'm going to ask you if you know anything about
4   this.
5   MR. RATNER:  What is this, for the record?
6   MR. FISHER:  What's that?
7   MR. RATNER:  What is this, for the record?
8   MR. FISHER:  This is just --
9   MR. RATNER:  It's a bio of Mr. Poer.
10  MR. FISHER:  Yeah.  It's a bio of Mr. Poer.  It
11  comes from a website called www.48sfa.org.  And I'll get
12  you a copy of it as soon as I'm done with the deposition.
13  Q.  (By Mr. Fisher)  You see it says "SFC
14  Christopher M. Poer"?
15  A.  Yes.
16  Q.  And there's a picture of Mr. Poer when he was
17  younger?
18  A.  Yes.
19  Q.  And it talks about Sergeant First Class
20  Christopher Matthew Poer was born on 4 September 1971 in
21  New Castle, Indiana.  Talks about his high school and
22  college.
23  He began his Special Forces career in 1999
24  serving as an 18C Engineer Sergeant at 5th Special
25  Forces Group, Fort Campbell, Kentucky.

Deposition of:  Travis Turner - June 30, 2021
Sherry Poer v. Sheriff Tim Norton in his official capacity, et al.

43

1  Following the attacks of 911, he deployed to
2  Afghanistan in support of Operation Enduring Freedom.
3  Notably, he played a key role in the mission to kill or
4  capture Mullah Omar in January of 2002.  For his actions
5  in this mission, he was awarded the Bronze Star with V
6  devices for gallantry --
7      MR. RATNER:  David, what does this have to do
8  with anything?
9      MR. FISHER:  I'm just asking if he knows this.
10     A.  I've never seen this before.  The only thing I
11 know is what is in the reports from the Critical Incident
12 Team.
13     Q.  (By Mr. Fisher)  Gotcha.  And this is not
14 something they had in their reports, I guess?
15     A.  Yeah.  So in the documents that I read that I
16 was provided with -- in fact, I just read last night -- he
17 was Special Forces and CIA.
18     Q.  Yeah.
19     A.  But I've never seen this before.  I've never
20 heard any of this information.
21     Q.  Okay.  Had you ever heard this information where
22 my mouse is right now:  He worked with the United States
23 Military Academy, Department of Military Instruction, and
24 guest lectured on Ethics in War classes given to cadets.
25 He also served as a cadet mentor and earned a master's

44

1  degree from Framingham State University?
2      A.  No.
3      Q.  Regardless, I guess, at the time of the
4  incident, you didn't know anything about his prior
5  military service or metals that he'd received because of
6  his actions in war zones and things like that?
7      A.  No.
8      Q.  You would learn some of that subsequent?
9      A.  Correct.
10     Q.  When you arrived at the scene, you didn't know
11 anything about possible alcohol or drug intoxication;
12 correct?
13     A.  Correct.  They talked about that.  I don't
14 remember.
15     Q.  Who's "they?"
16     A.  Dispatch.
17     Q.  Okay.  There was a point in dispatch where
18 Dickey said, "It sounds like he might be intoxicated."  Do
19 you recall that?
20     MR. RATNER:  Object to form.
21     A.  Specifically, no -- that statement.
22     I do -- in reviewing the videotape, I do
23 remember Elaine said something that he was not under the
24 influence of alcohol right about the time that we were
25 dealing with him.  But I'm not 100 percent certain exactly

45

1  when that came in.
2      Q.  (By Mr. Fisher)  Yeah.  You can see where my
3  mouse is on Exhibit 1.  7:57:  Echo Charlie 21 -- that'd
4  be Dickey; right?
5      A.  Yes.
6      Q.  -- can hear male yelling at the top of his
7  lungs.  Sounds DK, which I asked him yesterday.  He meant
8  drunk.  Can no longer see him; right?
9      A.  Yes.
10     Q.  And then in response to that, just less than a
11 minute later, 30 seconds later at 7:58:  Per Elaine, Chris
12 had not been drinking and no drugs.
13     Do you see that?
14     A.  I do.
15     Q.  So that would have been information that was
16 relayed to you before you actually contacted Mr. Poer that
17 day; correct?
18     MR. RATNER:  Object to form and foundation.
19     A.  According to the time stamps, yes.
20     Q.  (By Mr. Fisher)  You don't have any reason to
21 think these time stamps are wrong, I assume?
22     A.  No.
23     Q.  Okay.  Because you'll see just above, at
24 eight minutes, you, ES1, echo Charlie 21, will be entering
25 the field in ES1's vehicle.  See that?

46

1      A.  I do.
2      Q.  So that would have been approximately
3  two minutes after you had gotten the information, per
4  Elaine, Chris has not been drinking and no drugs?
5      A.  Yes.
6      Q.  So arriving at the scene, you don't have your
7  ballistic shield.  You had a conversation with Dickey
8  about, What should we do next?  Right?  Not those exact
9  words, but --
10     A.  Yes.
11     Q.  And Dickey said, We can use -- we can go and use
12 the truck for cover and enter the field that way.  That
13 was suggested by Dickey; correct?
14     A.  I believe so.
15     Q.  Have you seen the body cam footage?
16     A.  I have seen the body cam footage.  I watched it
17 again --
18     Q.  Recently?
19     A.  -- a couple nights ago.  It's not something --
20 yeah.
21     Q.  Do you recall in response to Sergeant Dickey --
22 or, sorry -- in response to Deputy Dickey suggesting that,
23 you said, I don't want to really engage with someone who
24 could shoot us right now if we don't have to?  Do you
25 remember saying that?

Deposition of: Travis Turner - June 30, 2021
Sherry Poer v. Sheriff Tim Norton in his official capacity, et al.

47

1    A.  I do.
2    Q.  And I take that to mean that you were saying, We
3  have other options than engaging with this person right
4  now.
5    A.  No.  When I use the terminology "engage,"
6  there's really not an option to engage with this guy.
7  It's just when and how based on everything that had been
8  given to us.
9       So when I used the term "engage," we were simply
10  figuring out how we were going to approach this person.
11  Due to the fact that my shield wasn't in my truck, that
12  had changed circumstances.
13    Q.  I mean, you had different options at that point
14  about what you could do; right?  When you're standing
15  there and you don't have the shield and you're deciding
16  what to do next, you have some different options; right?
17    A.  Yes.
18    Q.  One of them was to do what you did, which was to
19  go towards him using the truck as cover; right?
20    A.  Yes.
21    Q.  Another option could have been to stay in cover
22  and call him on the phone and talk to him; right?
23    A.  That could have been an option, yes.
24    Q.  You also could have used the truck for cover and
25  used the PA system in the truck to speak with him as well;

48

1  correct?
2    A.  Sure.
3    Q.  And either on the phone or the PA system, you
4  could have identified yourself as law enforcement, that
5  you're there to help and you want to speak with him?  You
6  could have done that?
7    A.  Sure.
8    Q.  You could have told him to come out where
9  you-all can see him, put the gun on the ground, put his
10  hands up, and start walking to the sound of your voice?
11    A.  Yeah.
12    Q.  And you could have done the same thing on the
13  phone; right?
14    A.  Yeah.  I mean, there's a myriad of different
15  ways to handle every circumstance.
16    Q.  This wasn't, like, a hostage situation; correct?
17    A.  No.
18    Q.  I mean, Mr. Poer was in a rural area in a field;
19  right?
20    A.  Yes.
21    Q.  You had no indication that there were other
22  people nearby him; correct?
23    A.  Well, he was walking towards someone's house
24  firing rounds.
25    Q.  At the time you approached him, he hadn't fired

49

1  rounds in over eight minutes; is that fair to say?
2    A.  I would have to see the time stamp.
3    Q.  Sure.
4    A.  But yeah, it had been relayed to me that he had
5  fired rounds before I arrived on scene.  And then it was
6  told to me again by Dickey -- and when I say "relayed,"
7  that came from Elaine to dispatch.
8       And then again, Deputy Dickey advised on the
9  radio that he had fired rounds that he actually heard.
10    Q.  Yeah.  Deputy Dickey heard it in real-time on
11  scene; right?  You saw that on the body cam?
12    A.  Yes.
13    Q.  So that would -- if you look up at the screen,
14  that would have been at 7:52:  Just heard two gunshots.
15  Just heard one more.  You see that?
16    A.  Yes.
17    Q.  So that's at 7:52.  And the time you-all will be
18  entering the field, that's 8:00 --
19    A.  Okay.
20    Q.  -- right?  So that's approximately eight minutes
21  after the shots were fired; right?
22    A.  Yes.
23    Q.  So he's in a -- Mr. Poer is in a rural area
24  where the houses are very far apart from each other;
25  correct?

50

1    A.  Correct.
2    Q.  There's no indication that there's any people
3  actually near him other than him; right?
4    A.  Correct.
5    Q.  He doesn't have a gun to somebody's head; right?
6    A.  Right.
7    Q.  He's not actively shooting at that point;
8  correct?
9    A.  Correct.
10    Q.  In fact, you later learned -- and you didn't
11  know this at the time, but when he was actually
12  apprehended and the gun was found, the magazine was empty;
13  correct?
14    A.  I don't know if there was bullets it in or not.
15  I can't remember.
16    Q.  Okay.  That's not something you ever learned, I
17  guess?
18    A.  No.
19    Q.  Okay.  I'll represent to you that's what Parker
20  Police has in their reports and what Deputy Bjork said
21  about the state of the gun, because he was the one who
22  confiscated it.  Do you have any reason to believe that's
23  inaccurate?
24    A.  No.
25    Q.  Okay.  Of course, you didn't know that -- at the

Deposition of:  Travis Turner - June 30, 2021
Sherry Poer v. Sheriff Tim Norton in his official capacity, et al.

51

1  time you're making the decision of what to do, you didn't
2  know if the gun was still loaded or not?
3      A.  Correct.
4      Q.  In theory, you could have talked to him either
5  through the PA or the phone and tried to glean that
6  information; correct?
7      A.  Correct.
8      Q.  Have you ever been taught about the police --
9  "tactic" is kind of the wrong word, but of time, talk, and
10 distance?  Do you know what that is?
11     A.  It sounds vaguely familiar.
12     Q.  It's sort of a theory that, whenever possible,
13 an officer should use those tactics in order deescalate a
14 situation: time, talk, and distance.  Does that make sense
15 to you?
16     A.  Yeah, it makes sense.  I've never
17 specifically -- I can't recall any specific class or
18 anything like that where we went over that.
19     Q.  In this situation, you-all decided instead of
20 trying to talk to him over the PA or phone or do a myriad
21 of different other options, you decided to go into the
22 field using the truck as cover and try to get close to him
23 that way?
24     A.  Yes.
25         MR. RATNER:  Object to form.

52

1      Q.  (By Mr. Fisher)  And in fact, Deputy Dickey said
2  no lights and sirens.  Turn the lights off on the truck so
3  he won't see us coming; right?
4      A.  Yes.
5      Q.  So the idea was to -- and if you don't like this
6  verbiage, you can use different verbiage.  But the idea
7  was to sneak up on him and not let him know you're coming?
8      A.  Yes.
9      Q.  So rather than announce your presence, ask him
10 to come out and stay in cover, you decided we're going
11 approach him in stealth so that he doesn't know we're
12 coming?
13     A.  Yeah.  I mean, we were trying not to be seen.
14 We didn't want to get shot at while we were trying to get
15 close to him.
16     Q.  Understood.  And you're now approaching him.
17 You are in the back of the pickup truck?
18     A.  I was driving the truck.
19     Q.  You're driving truck?
20     A.  Yes.
21     Q.  Who's in the back?  Is it Bjork?
22     A.  Bjork was in the back.
23     Q.  And Dickey is walking next to the passenger
24 door?
25     A.  Yeah.  He was on the right side of the vehicle.

53

1      Q.  And Dickey has his AR-15 rifle in his hand?
2      A.  Yes.
3      Q.  Where is your AR-15 rifle at this point?
4      A.  Probably in my lap, maybe sitting on the front
5  seat.
6      Q.  Does it have the safety on at that point?
7      A.  It always has the safety on.
8      Q.  Unless you take it off?
9      A.  Yes.
10     Q.  Did you ever take the safety off of it that
11 night?
12     A.  As I was approaching, I'm sure I took the safety
13 off.
14     Q.  After you had seen him, spotted him, and started
15 approaching, you think you took the safety off at that
16 point?
17     A.  Yes.  That would be --
18     Q.  So it's ready to fire, if necessary?
19     A.  Yes.
20     Q.  Did you have a flashlight attached to that
21 weapon?
22     A.  I do.
23     Q.  You do and did at the time?
24     A.  I did and do, yes.
25     Q.  Okay.  And the purpose of that is so wherever

54

1  you're aiming the rifle, you can light that area up if the
2  flashlight's on?
3      A.  Yes.
4      Q.  And so you're approaching in the truck.
5  Eventually, you were the first one to spot Mr. Poer,
6  correct, during the approach?
7      A.  Right.
8      Q.  And you said something to the effect of, "Oh,
9  shit.  There he is"?
10     A.  Yes.
11     Q.  What was he doing when you first spotted him?
12     A.  Laying on the ground.
13     Q.  On his stomach?  On his side?  On his back?
14     A.  He was on his stomach.  He was perpendicular to
15 me, and his left side was facing me.
16     Q.  Facing you?
17     A.  Yes.
18     Q.  You could see his face?
19     A.  I could see his head, I guess.  I guess I could
20 tell the difference between his head and his feet.
21     Q.  And you had your flashlight trained him at that
22 point; correct?
23     A.  Yes.
24     Q.  And your gun trained on him?
25     A.  Yes.

Deposition of:  Travis Turner - June 30, 2021
Sherry Poer v. Sheriff Tim Norton in his official capacity, et al.

---

55

1  Q.  And that's when you got out of your truck?
2  A.  Well --
3  Q.  You had already gotten --
4  A.  I had already -- I couldn't train my gun on him
5  if I'm still driving my truck.
6  Q.  So you spot him.  You get out of the truck.  Now
7  you've got your gun pointed at him; correct?
8  A.  Yes.
9  Q.  And you start giving him loud verbal commands?
10  A.  Yes.
11  Q.  Saying "Show me your fucking hands or I will
12  fucking shoot you," something to that effect?
13  A.  Yes.  I believe I also identified us verbally as
14  the sheriff's office.
15  Q.  What do you think you said?  "Sheriff's office.
16  Don't move.  Show us your fucking hands or I'll shoot
17  you," something like that?
18  A.  Yes.
19  Q.  Fair to say you were yelling pretty loudly?
20  A.  I was.
21  Q.  And repeatedly?
22  A.  Yes.
23  Q.  And are you approaching as you're doing this or
24  are you staying stationary?
25  A.  No.  We were approaching.

---

56

1  Q.  So getting closer --
2  A.  Yes.
3  Q.  -- as you're talking to him?
4  Fair to say he was just -- at first, just, kind
5  of, laying there doing nothing?
6  A.  Yeah.  He was on his belly in the field.
7  Q.  Yeah.  And you said he was on his side earlier.
8  Was I wrong about that?
9  A.  No.  He was laying down.
10  Q.  Belly down?
11  A.  Belly down, yeah.  That's how I remember it.
12  Q.  Where were his hands?
13  A.  I only ever saw his left hand, so I can't speak
14  to what he was doing with his right hand.
15  Q.  Okay.  And as you're getting closer to him,
16  you're still giving these loud commands.  You're cursing
17  some?
18  A.  Yes.
19  Q.  It sounds like on the videotape -- correct me if
20  I'm wrong -- that you were in, kind of, a heightened state
21  at that point?
22  A.  Yes.
23  MR. RATNER:  Object to form.
24  Q.  (By Mr. Fisher)  I mean, of course.  It could be
25  a dangerous situation?

---

57

1  A.  Yes.
2  Q.  You were yelling loudly?
3  A.  Yes.
4  Q.  You have the flashlight trained on him and his
5  hands.  Could you see his hands?  You said you could see
6  one hand at that point.
7  A.  I saw his left hand.
8  Q.  You didn't see a gun in that hand; correct?
9  A.  Correct.
10  Q.  And as you're approaching, you didn't -- until
11  you got very close, you didn't see a gun at all; correct?
12  A.  Correct.
13  Q.  So there was a point where you saw a gun in his
14  hand that evening?
15  A.  I never saw a gun in his hand.
16  Q.  You never even saw a gun -- well, "close" is a
17  relative term.  You never saw a gun within a couple feet
18  of his hand?
19  A.  Yeah.  It was within a couple feet of his hand.
20  His right hand was under his body.
21  Q.  The gun -- as you approached him, his hands were
22  by his face and torso; correct?
23  A.  His left-hand was above his head.
24  Q.  Okay.
25  A.  Because he was reaching for something.

---

58

1  Q.  But the gun turned out to be by his feet;
2  correct?
3  MR. RATNER:  Object to form.
4  A.  That's not correct.
5  Q.  (By Mr. Fisher)  Okay.  Where do you believe the
6  gun was?
7  A.  Behind his back.
8  Q.  Okay.  I'm going to show you what was marked
9  yesterday as Deposition Exhibit -- I think it was three or
10  four.  It's an illustration, a drawing, that
11  Detective [sic] Dickey made.
12  A.  Okay.
13  Q.  Have you seen this before?
14  A.  No.
15  Q.  So this is -- we went over this yesterday in
16  Deputy Dickey's deposition.  You see, he made a drawing
17  when he spoke to Parker Police the following day.
18  Do you see how it says "facedown" here at the
19  top?
20  A.  Yes.
21  Q.  And there's the person's head; right?
22  A.  Yes.
23  Q.  And then right here in the middle, it says
24  "taser probes" in his, kind of, left lower back.  Do you
25  see that?

---

Deposition of:  Travis Turner - June 30, 2021
Sherry Poer v. Sheriff Tim Norton in his official capacity, et al.

59

1     A.  Yes.
2     Q.  Do you think that's -- is that accurate?  Is
3  that about where the taser probes went?
4     A.  I can't speak to where the taser probes went in.
5     Q.  You weren't able to see that?
6     A.  I didn't see that.
7     Q.  You see here on this drawing, Detective -- I'm
8  sorry -- Deputy Dickey did, it's got Travis on the guy's
9  left arm.  Would you say that's accurate?  You were over
10 there by his left arm during the encounter?
11    A.  Yes.
12    Q.  And he's got Josh on Mr. Poer's right arm.  Is
13 that accurate?
14    A.  Yes.  Except the way he's got the arms -- my
15 perception of it's different.
16    Q.  Tell me.
17    A.  So his arm was -- I specifically -- when I
18 stepped in, I put my foot, like, under his left arm, like,
19 so he couldn't crank it down.  Because I could see his
20 left hand.  I couldn't see his right hand.  He had his
21 right hand under.
22       So for him to show that the right hand was out
23 like that, that wasn't the case.  His right arm was under
24 his body.  It wasn't visible.
25    Q.  During the entire encounter, his right arm

60

1  stayed under his body?
2     A.  Until we were able to place him in handcuffs,
3  yes.  That's what he was doing, was holding his right arm
4  under his body.
5     Q.  While he was prone on his belly?
6     A.  Yes.
7     Q.  So his arms were underneath him while he was
8  lying on the ground?
9     A.  His right arm was underneath him.
10    Q.  Not his left arm?
11    A.  His left arm was visible to me the whole time.
12    Q.  Gotcha.  And there you see Dickey puts himself,
13 kind of, in the rear left side behind Mr. Poer; correct?
14    A.  Yes.
15    Q.  Do you believe that's accurate?
16    A.  That is accurate.
17    Q.  You see where he marks -- Dickey marks "drive
18 stun" here in the left lower leg?  Do you believe that's
19 accurate?
20    A.  It's the left upper leg, it would appear.
21    Q.  Do you believe that's accurate?
22    A.  I couldn't speak to where he tased him.
23    Q.  And then you see where Dickey places the gun
24 below his feet on the right side of him.  Do you believe
25 that's accurate?

61

1     A.  No.
2     Q.  Where do you believe the gun was?
3     A.  The gun was about waistband height.
4     Q.  On the right or left side?
5     A.  On the right side.
6     Q.  So where my mouse is here (indicating)?
7     A.  Yes.  And it was within, I would say, less than
8  a foot of his body.
9     Q.  Okay.  And you didn't see that until you got
10 close up --
11    A.  Yes.
12    Q.  -- right?
13       So as you're approaching, you have the
14 flashlight trained on his hands; right?  Or one of his
15 hands?
16    A.  I had lit the whole --
17    Q.  The whole area?
18    A.  -- the whole area, yeah.
19    Q.  It's a big flashlight?
20    A.  Yeah.  It's a big light.
21    Q.  So you can see -- as you're approaching and
22 you're giving commands, you can see Mr. Poer laying there.
23 You can see one of his hands, but you can't see a gun as
24 you're approaching?
25    A.  Correct.

62

1     Q.  But when got closer, eventually you did, in
2  fact, see a gun?
3     A.  Yes.
4     Q.  And I think you said, "There's the gun"; right?
5     A.  Yes.  I think I told someone to grab it.
6     Q.  You said, Josh, or somebody, grab the gun;
7  right?
8     A.  Yes.
9     Q.  And then Josh grabbed the gun?
10    A.  Yes.
11    Q.  And he secured it in his waistband?
12    A.  Yes.
13    Q.  So now at that point -- and this is before you
14 even physically contacted Mr. Poer -- the gun is now
15 secured?
16    A.  It all happened so fast.  You say "before."  It
17 was during.  It was during our contact.
18    Q.  It was before you struck him in the face?
19    A.  Yes.  It was before that happened.
20    Q.  And before he was tased?
21    A.  Yes.
22    Q.  So before he was tased and before he was struck
23 in the face, Bjork had secured the gun and put it in his
24 waistband?
25    A.  Yes.

Deposition of:  Travis Turner - June 30, 2021
Sherry Poer v. Sheriff Tim Norton in his official capacity, et al.

---

63

1      Q.  And you had no information that there was more
2   than one gun on the scene; correct?
3      A.  That's correct.
4      Q.  And you had no information that there was a
5   knife or some other weapon; correct?
6      A.  That's correct.
7      Q.  What was your first physical contact with
8   Mr. Poer that night?
9      A.  I believe I stepped on his back.
10     Q.  Can you show us how you did that?
11     A.  I can't remember.  As I was approaching him, I
12  stomped on his back.
13     Q.  What part of his back?
14     A.  His lower back.
15     Q.  With one of your feet?
16     A.  With one of my feet.  I can't tell you which
17  one.
18     Q.  What was the purpose of that stomp?
19     A.  He was starting to roll.
20     Q.  In which direction?
21     A.  Towards us.  Like, here I am (indicating).  He
22  was starting to do this (indicating).
23     Q.  Starting to lift up his body and roll towards
24  you?
25     A.  Yes.

---

64

1      Q.  Was he on his belly at that point and started to
2   roll toward you --
3      A.  Yes.
4      Q.  -- to one of his sides?
5      A.  To one of his sides, yes.
6      Q.  And so in response to that, you stomped on his
7   back with one of your feet?
8      A.  Yes.
9      Q.  To get him back down on his belly?
10     A.  Yes.
11     Q.  And you think it was in his lower back?
12     A.  I believe so.
13     Q.  Did you do that softly or --
14     A.  No.
15     Q.  You did it with some purpose?
16     A.  Yeah.  I did it with some force, yes.
17     Q.  To try to get him down to the ground?
18     A.  Yes.
19     Q.  Did you do it as hard as you could?
20     A.  No.
21     Q.  But plenty hard enough?
22     A.  Yeah.  I mean, it's not like I jumped up in the
23  air and landed on the guy.
24     Q.  Sure.
25     A.  I used my foot to try and control him.

---

65

1      Q.  And was that before or after Dickey had used his
2   foot on Mr. Poer?  Do you recall that happening?
3      A.  No.
4      Q.  That Dickey used his foot to kick him into a
5   certain position right in the beginning?
6      A.  No.
7      Q.  You don't recall that?
8      A.  No.
9      Q.  Do you believe that's untrue, or you just don't
10  have a memory either way of that?
11     A.  No.  I believe whatever he says is true.  I just
12  know what I did.  And I was awfully focused.
13     Q.  Okay.  When you stomped him in the back, is that
14  before or after the gun had been recovered?
15     A.  Probably close to the same time.  I couldn't
16  tell you exactly.
17     Q.  So it would have been before the tasing or the
18  strikes to the face?
19     A.  Yes.
20     Q.  Okay.
21     A.  I believe so.
22     Q.  And then what was your next contact with
23  Mr. Poer?
24     A.  Like I said, I put my left foot up under his
25  armpit to try and control his left hand, and I pointed my

---

66

1   rifle at his head.
2      Q.  You, in fact, pressed the rifle into the back of
3   his head?
4      A.  Yes.  Well, I mean, I've got a suppressor on the
5   end of it.  It's not like it's a small muzzle.  It's this
6   big (indicating) --
7      Q.  Okay.
8      A.  -- to let him know -- because they were trying
9   to crank his right arm out.  And I told him, you know,
10  "I'll kill you.  Give us your hands."
11     Q.  And you're saying that now in, kind of, a calm
12  fashion as we're sitting here in the deposition, because
13  it'd be weird if you were screaming.  But in the actual
14  incident, you were screaming those things at him?
15     A.  Yeah.  I was yelling at him.
16     Q.  Okay.  And cursing?
17     A.  Yes.  I cursed.
18     Q.  Very much trying to get your point across?
19     A.  I was doing everything I could on a verbal level
20  to try and get compliance, yes.
21     Q.  And so you're touching the suppressor to the
22  back of his head while we're saying these commands?
23     A.  Yes.
24     Q.  And the safety is off at that point?
25     A.  Yes.

---

Deposition of:  Travis Turner - June 30, 2021
Sherry Poer v. Sheriff Tim Norton in his official capacity, et al.

67

1    Q.  And so you're -- the suppressor is touching his
2  head.  What part of your body is physically touching him
3  at that point?
4    A.  Both of my feet.
5    Q.  Where are both your feet touching him?
6    A.  Like I said, my left foot was controlling this
7  arm from coming down.
8    Q.  And that's his left arm?
9    A.  Yeah.
10   Q.  And your right?
11   A.  I don't know.  Maybe on the right side up by his
12  head somewhere.
13   Q.  Are you putting any weight onto him with your
14  knees, legs, feet?
15   A.  I may have been.  I don't -- I don't remember if
16  I was still on my legs or if I had kneeled down.
17   Q.  So you may or may not have been kneeling down on
18  top of him?
19   A.  Yeah.  And I believe -- now that I think about
20  it, I believe I was kneeling, just because I wouldn't be,
21  you know, outstretching my body to get close to him.
22   Q.  Are you using your hands to try to pull his left
23  arm, or you can't because you have the gun?
24   A.  No.  I can't because I've got a rifle in my
25  hands.

68

1    Q.  There did come a point that you were trying to
2  pull his left arm; right?
3    A.  Yes.
4    Q.  When was that?
5    A.  During all this.  So I actually had to set my
6  gun down to secure his left arm.
7    Q.  Is it on a strap connected to your body?
8    A.  It wasn't slung to me at the time.
9    Q.  Okay.  So you took it, put it down far enough
10  away from him so he couldn't get it; correct?
11   A.  Yes.
12   Q.  And then used your hands to try to pull his arm
13  out from under him -- his left arm?
14   A.  Yes.
15   Q.  Is that before or after the tasing?
16   A.  That would have been after.
17   Q.  After the tasing, after the strikes to the face?
18   A.  Yes.
19   Q.  Okay.
20   A.  That was -- that was during handcuffing.
21   Q.  Okay.
22   A.  The problem wasn't -- the problem wasn't with
23  his left arm.
24   Q.  Tell me more about that.  What do you mean?
25   A.  It was with his right arm.  The right arm was

69

1  the one he wasn't giving up.
2    Q.  Oh.  So his left arm was out?
3    A.  Yes.
4    Q.  And it was not under his body?
5    A.  Yes.  That's what I told you before.  That
6  picture's not right.  His left arm was out.
7    Q.  So he's laying on his belly.  His left arm is
8  out to left of his head?
9    A.  Yes.
10   Q.  And you could see it.  There's no gun in it;
11  right?
12   A.  Yes.
13   Q.  Gun had been secured?
14   A.  Correct.
15   Q.  His right arm is still underneath his body?
16   A.  Yes.
17   Q.  And Josh is on that side of him trying to
18  control the right arm?
19   A.  Yes.
20   Q.  And Dickey's right behind him at this point, and
21  Dickey says, "I got a taser.  I'm going to tase him";
22  right?
23   A.  I believe I'm the one --
24   Q.  I think he said, "I got a taser."  And then you
25  said, "Tase him."

70

1    A.  Yes.
2    Q.  Does that sound right?
3    A.  Yes.
4    Q.  And then Dickey told you to move your leg; do
5  you recall that?
6    A.  No.
7    Q.  Does that sound right to you?  I can play that
8  part of the tape.
9    A.  That sounds right.
10   Q.  Just to get out of the way so you're not going
11  to get hit with the taser?
12   A.  Yes.
13   Q.  Because you're kneeling on him at that point?
14   A.  Yes.
15   Q.  And so did you, in fact, move, and then Dickey
16  fired the taser?
17   A.  I would have had to.
18   Q.  Could you hear the electricity when he fired it?
19   A.  I don't remember hearing any electricity.
20   Q.  Can you hear it when you listen to the tape of
21  the body cam?
22   A.  Yes.
23   Q.  You can hear the electricity whirring; right?
24   A.  Yes.
25   Q.  After he says, "Taser," you hear a groan by

Deposition of:  Travis Turner - June 30, 2021
Sherry Poer v. Sheriff Tim Norton in his official capacity, et al.

71

1  Mr. Poer --
2      A.  Yes.
3      Q.  -- and some electricity noise, whirring;
4  correct?
5      A.  That's correct.
6      Q.  And have you seen the taser downloads?
7      A.  Yes, I have.
8      Q.  Two five-second deployments; right?
9      A.  Correct.
10      Q.  And Dickey told us yesterday that in addition to
11  the taser probes, he used a drive stun simultaneously
12  while pulling the trigger.  Does that sound right to you?
13      A.  Yes.  That's standard in this type of
14  deployment.
15      Q.  And to get the electrical spread to a wider part
16  of the body, over more of the muscles so it becomes more
17  effective; correct?
18      A.  Yes.
19      Q.  And so while he was being tased, what were you
20  doing physically?
21      A.  Still wrestling with him, I guess.
22      Q.  When you say "wrestling" with him --
23      A.  Screaming and yelling at him, telling him to get
24  his hands up.
25      Q.  But he had the one arm underneath his body?

72

1      A.  Yes.
2      Q.  Would he have been able to get that right arm
3  out from underneath his body if you were kneeling on him
4  with your 230 pounds?
5      A.  Well, we had another guy that probably outweighs
6  me on his right side pulling on his right arm.
7      Q.  Who was that?
8      A.  Bjork.
9      Q.  How much does he weigh?
10      A.  I would guess he's around 350.
11      Q.  Is he sort of heavyset, or is he in good shape?
12      A.  He's a stout, heavyset dude.
13      Q.  Okay.  But also in somewhat good shape?  More
14  just heavier?
15      A.  He's heavier.
16      Q.  Okay.  You seem like you keep yourself in pretty
17  good shape.  Do you exercise, workout, something?
18      A.  Yes.
19      Q.  What do you do?
20      A.  I lift weights four or five times a week.
21      Q.  Do you, like, bench press or anything like that?
22      A.  Yes.
23      Q.  What do you bench press -- or did you at the
24  time?
25      A.  Over 300.

73

1      Q.  So pretty serious weightlifting?
2      A.  Yeah.
3      Q.  Fair to say you're a pretty strong guy and big
4  and tall?
5      A.  Yep.
6      Q.  It seems like from the video and Dickey's
7  deposition yesterday, there was a total of ten seconds of
8  tasing, with a gap of, maybe, two seconds in between the
9  two deployments.  Does that sound about right to you?
10      A.  Sure.  I can't speak to his taser.  I just know
11  the taser wasn't effective.
12      Q.  And why do you say it wasn't effective?
13      A.  Because we had to gain control of him.
14      Q.  And by "gain control," you mean he's still
15  leaving that arm under his body --
16      A.  Yeah.
17      Q.  -- his right arm?
18      A.  Yes.
19      Q.  And you said "fighting."  He wasn't punching or
20  kicking any of you; right?
21      A.  He's fighting -- no.  He's fighting our physical
22  attempts to get that arm out --
23      Q.  The right arm?
24      A.  -- as far as holding it under him.
25      Q.  The right arm?

74

1      In other words, he's resisting that arm being
2  pulled from underneath his body --
3      A.  Yes.
4      Q.  -- in your assessment of the situation at that
5  point?
6      A.  Yes.
7      Q.  Could it have been that his right arm is just
8  pinned under his body and 250 pounds of his own weight,
9  you kneeling on top of him adding another 230 pounds of
10  your weight?
11      A.  No.
12      Q.  Why not?
13      A.  Because he was tensing his muscles to hold it in
14  place.
15      Q.  Well, he was also being tased at the time;
16  right?
17      MR. RATNER:  Object to form.
18      A.  The sequence of events, he was tased during it,
19  yes.
20      Q.  (By Mr. Fisher)  Okay.  After the taser was
21  completed, the two cycles, is that when you punched
22  Mr. Poer in the face several times?
23      A.  After he was tased, I punched him in the face,
24  yes.
25      Q.  That would be approximately five times?

Deposition of:  Travis Turner - June 30, 2021
Sherry Poer v. Sheriff Tim Norton in his official capacity, et al.

75

1    A. Four or five times, yeah.
2    Q. And you hit him hard?
3    A. I did.
4    Q. Where in the face did you hit him?
5    A. Left side of his cheek.
6    Q. So you're pointing to the left side of your
7    cheek in the jaw area?
8    A. Yes.
9    Q. And you think you knocked him out at that point?
10   A. Yes.
11   Q. In fact, you said that several times in the
12   video; correct?
13   A. Yeah.
14   Q. Which one of the five strikes do you think
15   knocked him out?
16   A. The last one.
17   Q. Okay. And why do you think that was the last
18   one?
19   A. That's when we gained control of his arms.
20   Q. So the first -- did you do these all in rapid
21   succession?
22   A. Yes.
23   Q. Like one, two, three, four, five?
24   A. Yes.
25   Q. With your left or right hand?

76

1    A. Left.
2    Q. Are you a lefty?
3    A. I'm left-handed.
4    Q. You are left-handed?
5    A. Yes.
6    Q. And that was -- the angle you had, it was better
7    to use your left hand as well, I assume?
8    A. Yeah. I only hit him with one hand, and it was
9    my left hand.
10   Q. Were you intentionally trying to hit him in that
11   spot on his face?
12   A. No. I was just trying to gain compliance. As
13   far as intentional spot, I --
14   Q. You were just trying to hit him somewhere in the
15   face/head area?
16   A. No. I don't want to break my hand.
17   Q. That's why you would avoid, maybe, the forehead,
18   because it's harder?
19   A. Sure.
20   Q. But your target was face, not head? Because I
21   remember you made that distinction earlier.
22   A. My target was his face. I hit him exactly where
23   I needed to hit him.
24   Q. And where you wanted to hit him?
25   A. Yes.

77

1    Q. And you think it was the last blow that knocked
2    him out?
3    A. Yes.
4    Q. Could you sense some difference at that point?
5    Did the energy go out of his body?
6    A. Yeah. We gained control of his right arm.
7    That's when my physical force stopped, once he was --
8    Q. Unconscious?
9    A. -- under control. And I believe I even asked
10   Josh, "Do you have his hand? Do you have his hand?"
11   Q. Let's just play that part of the videotape. And
12   I'll just ask you a couple questions about it.
13       So it should be somewhere in the 11-minute
14   vicinity here.
15       (The recording was played.)
16   Q. So you could see there -- I just stopped at
17   11:51. You could see his face; right?
18   A. Yes.
19   Q. You could see his right arm, can't you? He's
20   lying on his right shoulder, and you can see his right arm
21   out in front of his face?
22   A. I believe -- yeah. It's hard to tell. It looks
23   like his hand is open, so that would have to be his right
24   arm.
25   Q. Okay. And this is 11:51. I'll just keep

78

1    playing it.
2       (The video was played.)
3    Q. Now, he's on belly; right?
4    A. Yes.
5    Q. And is this where you have the muzzle of your
6    rifle pressed up against him? Or is that Dickey's rifle?
7    A. My gun wasn't pressed up against him there.
8    Q. Okay.
9    A. His head doesn't have anything against it.
10   Q. Oh. So it's a little bit later, perhaps.
11   A. Yeah.
12       (The video was played.)
13   Q. And that's where, at 11:57, you said, "There's
14   the gun. Grab it"; right?
15   A. Yep.
16   Q. And that's when Deputy Bjork grabbed the gun and
17   secured it in his waistband?
18   A. Yes.
19       (The recording was played.)
20   Q. And you were just saying, "I'm going to shoot
21   you if you don't do it." Is that where you have the
22   muzzle or the suppressor of your gun pressed up against
23   his head?
24   A. Yes, I believe so.
25   Q. Okay. I'll keep playing it at 12:04.

Deposition of:  Travis Turner - June 30, 2021
Sherry Poer v. Sheriff Tim Norton in his official capacity, et al.

---

79

1          (The video was played.)
2     Q.  Did you hear that noise, that loud metal
3  clanging noise?
4     A.  Yeah.  I just heard a ting in my right ear.
5     Q.  Do you know what that is or was?
6     A.  No.
7     Q.  I'm just going to play it back.
8     A.  I have no idea what that was.
9     Q.  Are you able to hear this fine with your hearing
10  aid?  Is it loud enough and everything?
11     A.  It's fine.
12          (The video was played.)
13     Q.  Did you hear that?  There was a load metal ting,
14  followed by Dickey saying, "It's okay.  It's okay.  We got
15  him"; right?  Do you remember what was going on there?  Do
16  you know what that metal noise was?
17     A.  I don't.
18     Q.  Okay, you hadn't punched him at that point yet?
19     A.  No.
20     Q.  Okay.  And Dickey's saying, "It's okay.  It's
21  okay.  We got him"; right?
22     A.  Right.
23     Q.  Do you know what he meant by that?
24     A.  No.
25          (The video was played.)

---

80

1     Q.  He says, "I got a taser," and you say, "Tase
2  him."  You hear that?
3     A.  Yes.
4          (The video was played.)
5     Q.  We can hear the electricity; right?
6     A.  I can't hear that electricity.
7     Q.  I'll represent to you, it's a little bit low in
8  the audio.
9     A.  I heard the pop of the taser.  I did not hear
10  the sparking, but I have some pretty severe hearing loss.
11     Q.  Okay.
12          (The video was played.)
13     A.  I did hear that.
14     Q.  Did you hear there, you said, "Give me your
15  fucking hands," and kind of said it in, like, a loud, kind
16  of, growl?
17     A.  Yes.
18     Q.  Is that when you were punching him, you think?
19     A.  It was after the taser.
20     Q.  Sort of, immediately after the taser?
21     A.  Yes.
22     Q.  Okay.  And that was when we heard the whirring
23  stop at about 12:27.  We're at 12:32.  I'll just back up a
24  little bit so we can listen, kind of, continuously.
25          I'll play it from 12:24.  I think you can hear

---

81

1  the whirring stop around 12:27, and then you can hear you
2  giving these, kind of, verbal commands that are, sort of,
3  louder growls.
4          So let's just listen, okay, and watch, to the
5  extent we can see it.  It's pretty dark.
6          (The video was played.)
7     Q.  So the taser ended.  It sounds like you said to
8  Bjork, maybe, "Do you got that hand?"  Did you hear that?
9     A.  You'd have to replay that part.  I remember
10  saying something to him, checking to see if he had the
11  hand.
12     Q.  Were you talking about the right hand?
13     A.  Yes.
14     Q.  Okay.  And that one was already cuffed, right,
15  at this point?
16     MR. RATNER:  Object to form.
17     A.  No.
18     Q.  (By Mr. Fisher)  I'm going to go back to 12 --
19  you can actually -- before Dickey deploys the taser, right
20  before it, you can hear the ratcheting of the handcuff at
21  about 12:17.  So I'll just play it from 12:03, and we'll
22  listen for that.
23          (The video was played.)
24     Q.  Could you hear that ratcheting at about 12:19?
25     A.  Yes.

---

82

1     Q.  And that was during the tasing; right?
2     A.  Sound like it, yeah.
3          (The video was played.)
4     Q.  Were you going to say something?
5     A.  No.  I'm good.
6     Q.  Did you hear that?  "You got that hand?  You got
7  that hand?"
8     A.  That was me saying it, yes.
9     Q.  To Josh, probably?
10     A.  Asking him if he's got it, yeah.
11     Q.  Talking about the right hand?
12     A.  Yes.
13     Q.  Okay.  And then let's listen a little more.
14          (The video was played.)
15     Q.  And you can hear "Damn handcuff."  Was that
16  Deputy Bjork?
17     A.  Yes.
18     Q.  He's got, sort of, a higher voice for a big guy?
19     A.  Yes.
20     Q.  But there was some quiet, some breathing.  You
21  hear "Damn handcuff."  But right before that, we could
22  hear you saying in, sort of, that louder growl, "Give me
23  your fucking hand," or something like that.  Is that when
24  you think you were punching him?
25     A.  Yeah, I guess.

---

Deposition of: Travis Turner - June 30, 2021
Sherry Poer v. Sheriff Tim Norton in his official capacity, et al.

83

1  Q. That would have been after he had been tased?
2  A. Yes.
3  Q. After his right hand had been cuffed?
4     MR. RATNER: Object to form.
5  When you say you hear the ratchet?
6  Q. (By Mr. Fisher) Yeah.
7  A. That doesn't tell me his hand's cuffed. That
8  tells me the handcuff ratchet is unlinked.
9  Q. Okay. I guess, at that point, his hand may or
10  may not have been handcuffed. You don't have a memory of
11  that?
12  A. The way that I recall it is he was not
13  handcuffed until the very end. I remember us forcing his
14  hands to together just so he could be handcuffed at the
15  very end.
16     So he would have had to have had -- he would
17  have had to have had his right hand handcuffed first.
18  Q. Okay.
19  A. Because I remember holding his hand in place.
20  Q. Okay. After he'd been unconscious?
21  A. Yes.
22  Q. Okay. You could hear in that video, you're
23  saying to Josh, "You got that right hand"; right?
24  A. Yes.
25  Q. So I'm assuming -- if you have some memory

84

1  that's different -- he'd probably cuffed that hand already
2  at that point or not?
3  A. He wasn't under control at that point.
4  Q. Under control -- was the right hand cuffed, is
5  what I'm asking you, if you know?
6  A. I wasn't on the right side --
7  Q. So you can't say?
8  A. -- so I don't know. Correct.
9  Q. Eventually both hands were cuffed; you do know
10  that?
11  A. Yes.
12  Q. And you probably saw when the left hand was
13  cuffed; right?
14  A. Yes.
15  Q. And he was already unconscious?
16  A. Yes.
17  Q. But in terms of the right hand, you probably
18  didn't see when that went on?
19  A. No.
20  Q. Because you couldn't have from the vantage point
21  you were at?
22  A. Right.
23  Q. That was behind you or to the side of you?
24  A. Correct.
25  Q. Eventually he's now cuffed. You guys put your

85

1  rifles away; correct?
2  A. Yes.
3  Q. And then you realize he's not responsive?
4  A. Yes.
5  Q. And try to do CPR?
6  A. Yes.
7  Q. You and Dickey both?
8  A. Yeah. We switched off.
9  Q. Do you think one of you broke some ribs doing
10  that?
11  A. Yes.
12  Q. Could you hear it cracking?
13  A. Yes. I could feel it.
14  Q. You think you broke the ribs?
15  A. It's hard to say. When you're doing CPR,
16  it's -- I mean, you can break them, and they move. It
17  kind of feels like rattle bag.
18  Q. Once they're broken, you can feel that, in other
19  words?
20  A. Yeah. You can feel -- you can feel broken stuff
21  while you're doing CPR if you're doing it right.
22  Q. When you sat him up, did you notice he didn't
23  have a pulse and wasn't breathing?
24  A. So I actually physically checked for a pulse.
25  Q. After he'd been cuffed?

86

1  A. After he'd been cuffed. So I got clear up --
2  clear up in there.
3  Q. And you're pointing to, like, the --
4  A. His carotid.
5  Q. -- carotid artery.
6     And what did you feel?
7  A. No pulse.
8  Q. And what about breathing? Could you tell if he
9  was breathing?
10  A. No.
11  Q. You could not tell, or he was not breathing as
12  far as you to could tell?
13  A. No. I mean, he didn't have a pulse. I didn't
14  stick my face down to try and get a breath. I checked for
15  a pulse.
16  Q. You guys ended up transporting him in the bed of
17  the truck to where the ambulance was; right?
18  A. Yes.
19  Q. How'd you get him in there? You lifted him in
20  there?
21  A. We did.
22  Q. Yourself and Dickey and Bjork?
23  A. Yes.
24  Q. And put him in the bed of the pickup?
25  A. Yes.

Deposition of:  Travis Turner - June 30, 2021
Sherry Poer v. Sheriff Tim Norton in his official capacity, et al.

87

1    Q.  Which way was his head facing in the pickup?
2    A.  Left, I believe.  So if you're looking at the
3  back of the truck, his head would have been to the left.
4    Q.  So he's not in it the long ways; he's in it,
5  kind of, width ways?
6    A.  Right.  He's on the tailgate.
7    Q.  Oh.  The tailgate's open, and he's on top of the
8  tailgate?
9    A.  Yeah.  So I had a big box in the back of the
10  truck that took up a bunch of space, so I couldn't push
11  him all the way into the truck.  We put him on the
12  tailgate.
13    Q.  Horizontally?
14    A.  Yes.
15    Q.  With his head on the left side, driver's side,
16  and his feet on the passenger side?
17    A.  Yes.
18    Q.  And you guys are, kind of, riding in the back
19  with him holding him steady?
20    A.  Yes.
21    Q.  Do you think he bumped his head along the way at
22  some point --
23    A.  No.
24    Q.  -- as the car was driving over the field?
25    A.  Well, if his head was on the metal, it could

88

1  have bumped a little bit.
2    Q.  How fast were you-all going?
3    A.  As slow as we could go to get through the field
4  and not get over the back of the truck.
5    Q.  And then when you got to where the ambulance
6  was, I remember you told the ambulance workers, "I think I
7  knocked him out punching him"; right?
8    A.  Yes.
9    Q.  You told them that?
10    A.  Yes.
11    Q.  Because you thought it was important information
12  they should know --
13    A.  Absolutely.
14    Q.  -- in assessing the situation?
15    A.  Yes.
16    Q.  And you-all told them that he'd been tased as
17  well; right?
18    A.  I believe so, yes.
19    Q.  Did you ever see the coroner's report in this
20  case or the summary of it?
21    A.  You say the coroner's report.  The medical
22  examiner's report?
23    Q.  Yeah.
24    A.  Yes, I saw that.
25    Q.  Did you see how it made no mention of blows to

89

1  the face?
2    A.  Yes.
3    Q.  Did anyone ever asked you about that -- anybody
4  from the coroner's office?
5    A.  I never talked to anyone from the coroner's
6  office.
7    Q.  Or a pathologist or anyone like that?
8    A.  No.
9    Q.  Doctor?
10    A.  No.
11    Q.  I mean, you did tell that to whoever interviewed
12  you on the night of the incident; correct?
13    A.  I did.
14    Q.  You have no idea if that information was relayed
15  to the pathologist; correct?
16    A.  I couldn't speak to what other people did.
17    Q.  Okay.  Do you have any information about what
18  happened to Mr. Poer's body that night and where it went
19  when it got to the pathologist?
20    A.  No, none.
21    Q.  Okay.  That night, you were interviewed by some
22  law enforcement officers; correct?
23    A.  Correct.
24    Q.  Tell me what happened after the time that
25  Mr. Poer got carted off to the hospital.  What did you do

90

1  next until the time you ended up getting interviewed?
2    A.  I stripped my vest off.
3    Q.  What kind of vest?
4    A.  My ballistics vest.
5    Q.  You're wearing one right now?
6    A.  I was overheated from all the work.
7    Q.  Are you wearing one right now?
8    A.  Yes.
9    Q.  Is this approximately -- the same clothes you're
10  wearing now, is it similar clothing you were wearing
11  during the incident?
12    A.  Yes.
13    Q.  Just for the record, you're wearing your
14  uniform, your badge.  You've got a ballistics vest under
15  your uniform?
16    A.  Yes.
17    Q.  And patrol pants and boots?
18    A.  Yes.
19    Q.  And what do you have on your weapon belt -- on
20  your belt right now?
21    A.  Currently I have a gun, a mag, radio, light, and
22  handcuffs.
23    Q.  Is that typically what you wear on your belt?
24    A.  Yes.
25    Q.  Do you think that's what you were wearing on

Deposition of:  Travis Turner - June 30, 2021
Sherry Poer v. Sheriff Tim Norton in his official capacity, et al.

91

1  your belt that night?
2      A.  No.  I had a taser on my belt that night.
3      Q.  In addition to this stuff, you had a taser?
4      A.  Yes.  So I have an outer vest that has my taser
5  on it.  This is more of a Class B-type uniform.  But at
6  the time -- and that's a newer vest, so I didn't have that
7  at the time.
8      Q.  Okay.
9      A.  So I would have been wearing this -- something
10 similar.  But my taser was on my belt at the time --
11     Q.  Can you tell --
12     A.  -- my tactical.
13     Q.  Can you tell us what a ballistic's vest is?
14 Just explain it in more detail, like the one you're
15 wearing now and the one you were wearing at the time.
16     A.  Yeah.  It's a vest made of thin pieces of Kevlar
17 that are pressed together to have an effect -- a
18 ballistic-stopping effect.
19     Q.  It's kind of what's commonly referred to as a
20 bullet-proof vest?
21     A.  Yes.
22     Q.  And the idea is if you get shot square on in the
23 chest area, it's going to protect you to some extent?
24     A.  I mean, it depends on what you get shot with.
25 We hope it does.

92

1      Q.  That's the purpose of it: to try to give you
2  protection for being shot?
3      A.  Yes.
4      Q.  And you were wearing that that night?
5      A.  I was.
6      Q.  Do you know if Dickey and Bjork and Whitlock
7  were also wearing ballistic's vests?
8      A.  Yes.  If I noticed one of my guys wasn't wearing
9  a ballistic vest, they would be sent home to get it.
10     Q.  Before going into a scene where somebody had a
11 gun?
12     A.  Yeah.  Well, no.  They're required per policy --
13     Q.  Always.
14     A.  Yeah.  We have to wear the vest.  They can't
15 come to work without their vest on.
16     Q.  You were the sergeant at the scene that night;
17 correct?
18     A.  I was.
19     Q.  You were -- is it fair to say you were the
20 superior officer on scene between the four of you-all?
21     A.  When that happened, yes, I was.
22     Q.  Who was in charge of making the decisions that
23 evening?
24     A.  Initially, it was Chris's call.
25     Q.  Why is that?

93

1      A.  He was the first one there.
2      Q.  Okay.  And then when you arrive on scene, is it
3  still Chris's call?
4      A.  Yeah.
5      Q.  Why is that?
6      A.  Because there's no reason for it not to be his
7  call.
8      Q.  If you wanted to, could you say, "I'm the
9  sergeant.  We're not doing what you want to do, Chris.
10 We're going to do what I say"?
11     A.  Yes, I could.
12     Q.  That's not something you chose to do on that
13 night?
14     A.  No, I did not.
15     Q.  Okay.  But I guess, being the supervisor, that
16 is something you could have done, I guess; right?
17     A.  I could.
18     Q.  You'd be the person in authority who could make
19 the call or override your subordinate officers; fair to
20 say?
21     A.  Yes.
22     Q.  So anyway, I interrupted, I think, when we
23 started talking about the ballistics vest.
24         So you've leaving the scene, going somewhere
25 after Mr. Poer is taken to the hospital.  What happened

94

1  next?
2      A.  Lieutenant Cillo showed up.
3      Q.  Lieutenant -- I couldn't hear you?
4      A.  Lieutenant Cillo.  We gave him a rundown of what
5  had taken place.
6      Q.  When you say "we," you mean yourself and Dickey
7  gave --
8      A.  I personally talked to --
9      Q.  Okay.
10     A.  Yeah.  I personally talked to the lieutenant.
11     Q.  And you told him what transpired?
12     A.  Yes.
13     Q.  Summary fashion or in great detail or --
14     A.  I mean, we just went over the events.  It
15 wasn't -- summary fashion.  It was summary fashion.  And
16 then the sheriff showed up.
17     Q.  Shayne?
18     A.  Shayne.  And I gave him a rundown.  And he
19 called the Critical Incident Team.  And I got in my truck
20 and didn't talk to anyone at that point.
21     Q.  Why did you do that?
22     A.  Because they're calling out the Critical
23 Incident Team.  At that point, it's a scenario where I
24 know what -- the steps that happen from there.
25         It mean, it's a serious incident that's going to

Deposition of: Travis Turner - June 30, 2021
Sherry Poer v. Sheriff Tim Norton in his official capacity, et al.

95

1 be investigated and, at that point, I'm not going to talk
2 to anyone until I'm ready.
3    Q. Okay. But before that, I guess you did talk to
4 Lieutenant Cillo and Sheriff Heap?
5    A. Yes.
6    Q. Were Dickey and/or Bjork and/or any other
7 officers present while you were telling either Heap or
8 Cillo what happened?
9    A. I don't remember.
10    Q. Do you recall they separately had conversations?
11    A. I don't. They were -- so I told to them to do a
12 couple things initially?
13    Q. Who?
14    A. Josh. But -- so I couldn't say if they were
15 right there when I talked to the captain. Well, he was
16 the lieutenant at the time. He's captain now.
17    Q. Cillo?
18    A. Cillo, yes.
19    Q. Is captain above lieutenant?
20    A. Yes. He got promoted to captain since the time
21 of this incident. So if I refer to him as captain, it's
22 just because it's his current rank. But yeah. I can't
23 remember. I think it was just me and Pat. But --
24    Q. That's Cillo's first name?
25    A. Yeah. Sorry. Cillo.

96

1    Q. That's fine.
2       So then -- okay. You sat in your truck, didn't
3 talk to anybody. Then what happened?
4    A. I'm trying to think. I was advised at some
5 point -- I don't remember if Shane said, Okay. It's time
6 to go up to Rattlesnake Fire or -- anyway, we went up to
7 Rattlesnake Fire for the Critical Incident Team's
8 investigation.
9    Q. You drove in your own truck by yourself?
10    A. I don't remember. I think so. I think so.
11    Q. And what happened when you got to the
12 Rattlesnake fire station? Did you sit somewhere? Did you
13 stand somewhere? Did you to anybody?
14    A. I came in and talked to their investigators
15 initially. I remember they -- I don't remember if this
16 was before or after they took some pictures.
17    Q. Of --
18    A. Like, our uniforms and, you know, firearms and
19 stuff like that. I remember they counted -- I think they
20 counted the rounds. That happened after the interview,
21 though.
22    Q. None of you fired any rounds that night that
23 you're aware of?
24    A. No. No.
25    Q. Did you have any injuries from that incident?

97

1    A. Any specific injuries? I don't recall.
2    Q. Do you recall any officer getting injured during
3 this incident?
4    A. No.
5    Q. Mr. Poer, obviously, got injured; correct?
6    A. Yes.
7    Q. And he died eventually that night?
8    A. Yes.
9    Q. So anyway, they were taking photos, talked to
10 you a little bit, and then what happened?
11    A. One of the investigators wanted to go out to
12 scene to look.
13    Q. Do you remember if that was Brukbacher, the lead
14 investigator from Parker, a female?
15    A. Yes. No. It was a male.
16    Q. Okay.
17    A. It was a male. And I drove him up there and
18 showed him, like, where everything was.
19    Q. I'm still listening.
20       Could that have been Dixon, maybe?
21    A. I don't remember. I mean, he -- the guy that it
22 was -- it's in the report stuff because I read it.
23    Q. Yes.
24    A. I just don't remember his name.
25    Q. What documents or things did you review in

98

1 preparation for this deposition to try to refresh your
2 recollection?
3    A. I reviewed the video. I listened to my
4 audio-recording of my CIT interview. And then I read the
5 reports. That's the only documents I reviewed.
6    Q. I know this is out of left field. As you guys
7 were approaching Mr. Poer in the pickup truck, do you
8 recall that somebody came behind you with a -- lighting
9 you guys up from behind?
10    A. Yes.
11    Q. Some property owner there, it turned out to be?
12    A. It turned out to be a property owner. We didn't
13 know how who it was at the time.
14    Q. Right. And was it Dickey yelled, like, "Get out
15 of here. Turn off your light. You're lighting us up," or
16 something like that?
17    A. Yes.
18    Q. And the guy did turn it off eventually; right?
19    A. I believe he did a U-turn. He never turned his
20 lights off. He just turned around and went the other way.
21    Q. You ended up -- someone ended up talking to him
22 later that night finding out he was just living there
23 being a nosey body or something; right?
24    A. Yes. I think it was a homeowner. I never
25 talked to the guy. I'm not sure who it was.

Deposition of: Travis Turner - June 30, 2021
Sherry Poer v. Sheriff Tim Norton in his official capacity, et al.

99

1    Q.  So anyway, you drove to the scene with one of
2  the CRT guys; right?
3    A.  Yes.
4    Q.  And showed him what happened or --
5    A.  Yeah.  I walked him to it.  I mean, he wanted to
6  see everything, like the exact, Where did it happen in the
7  field?  Where did you guys go through?  And I just drove
8  him through and gave him a rundown or where everything
9  happened.
10    Q.  Did he take photos of that?
11    A.  Did he?
12    Q.  Or someone with him take photos?
13    A.  I'd have to read the report.  I don't know.
14    Q.  Not that you saw?
15    A.  I don't remember that.
16    Q.  Okay.  And then what happened after you showed
17  him around?
18    A.  We drove back to Rattlesnake Fire.
19    Q.  Okay.
20    A.  And I made the decision to give my interview
21  that night while everything was fresh in my brain.  I gave
22  an interview, and I went home.
23    Q.  That interview was recorded?
24    A.  Yes.
25    Q.  To the best of your knowledge, everything you

100

1  said in that interview was true and accurate?
2    A.  Yes.
3    Q.  And it was, you know, shortly after the
4  incident, so the events, as you just said, were still
5  fresh in your mind at that point?
6    A.  Yes.
7    MR. RATNER:  Let's take another five minutes or
8  so.  And my plan is to keep you here as shortly as
9  possible, so I won't try to keep you much longer, is what
10  I'm trying to say.
11    (Recess from 11:37 a.m. until 11:50 a.m.)
12    Q.  (By Mr. Fisher)  Who have you spoken to about
13  this incident other than what you just described to us?
14    A.  I have talked to Chris about it just amongst
15  ourselves and those involved.
16    Q.  Chris Dickey?
17    A.  Yes.
18    Q.  After the fact, obviously?
19    A.  Yeah.  I mean, we've all -- we've all talked
20  about it a little bit.
21    Q.  When you say you've all, you mean yourself,
22  Whitlock --
23    A.  Yeah, the guys involved.
24    I purposefully avoided a whole lot of anything
25  to do with it with anyone until they were done with

101

1  their -- until the district attorney was done with his
2  investigation.
3    Q.  When you say a handful of times you spoke to
4  Chris about it, would that be in person or on the phone or
5  both?
6    A.  Probably both.
7    Q.  Just about what happened or also about the
8  lawsuit?  What else?
9    MR. RATNER:  Hold on a second.
10    If you've talked to Chris about the lawsuit or
11  talked to an attorney about the lawsuit, then I'm going to
12  instruct him not to answer.  He can answer outside of
13  that.
14    Q.  (By Mr. Fisher)  Well, let me say this to you:
15  When I ask you questions about who you talked to and what
16  you said, I want to get in your mind that I'm not talking
17  about conversations you had with your lawyers.  Okay?
18    MR. RATNER:  I'm also addressing conversations
19  that codefendants have with each other, which I believe
20  are privileged.
21    MR. FISHER:  Not that I'm aware of.
22    Q.  (By Mr. Fisher)  I mean, just answer yes or no
23  to this question:  Did you and Dickey talk about the
24  lawsuit at all?  Regardless of what information you talked
25  to each other about more specifically, did you talk to

102

1  each other about the lawsuit?
2    A.  Yes.
3    Q.  Okay.  About it generally?
4    A.  Generally, yes.
5    Q.  Have you ever been sued before?
6    A.  Again, the only time I've been deposed was back
7  in the early '90s.
8    Q.  And, obviously, that was a long time ago.
9    A.  Yes.
10    Q.  The case was dismissed eventually, and then
11  there's this case?
12    A.  Yes.
13    Q.  You were Detective Dickey's -- detective.
14  Sorry.  You were Deputy Dickey's supervisor at the time of
15  this incident; right?
16    A.  That's correct.
17    Q.  His direct supervisor; is that accurate?
18    A.  I would have been his direct supervisor.
19    Q.  Did you -- what do you know about his past use
20  of force when he was at Commerce City other than what you
21  learned from counsel, if at all?
22    A.  Really, just that he was involved in a lawsuit.
23  And when the guy started protesting, that's how I found
24  out who it was.
25    Q.  Was that guy Brandt?

Deposition of: Travis Turner - June 30, 2021
Sherry Poer v. Sheriff Tim Norton in his official capacity, et al.

103

1    A. Correct.
2    Q. Do you also know about the case where Dickey
3  tased a man who was having a diabetic shock episode five
4  times? That was my former client.
5    A. Yeah. You're giving me a bunch of detail. I
6  don't know all the details. I know he was involved in an
7  incident, and he got sued for it.
8    Q. How did you know he was involved in that
9  incident?
10    A. Because he said so.
11    Q. When did he tell you that?
12    A. We just talked about it a handful of times over
13  the years.
14    Q. Okay.
15    A. Couldn't even begin to tell you when.
16    Q. Did you ever find out that Commerce City had
17  decided as an agency that they felt that he had acted
18  inappropriately in several uses of force and were going to
19  fire him because of that? Did you ever find that out?
20    A. Yes.
21    Q. And they gave him the option to quit instead of
22  being fired?
23    A. You're giving me a bunch of detail that I --
24    Q. You didn't know that fact?
25    A. Yeah. I didn't know -- I can't remember the

104

1  details --
2    Q. That stuff, though --
3    A. -- of what he talked about.
4    Q. -- you heard from Chris directly?
5    A. Yes. Yes.
6    Q. Did you ever have concerns about the prior uses
7  of force, and now he's in your department under your
8  command?
9    A. No.
10    Q. Why not?
11    A. I worked with him for the whole time he was
12  here. I never saw any inappropriate use of force.
13    Q. I'm just saying the fact that another agency had
14  concluded that they felt he had used force inappropriately
15  on several occasions, so much so that they were going to
16  fire him, that did not concern you as being his
17  supervisor?
18    A. Our agency conducted a thorough background
19  investigation before they hired him. So again, I never
20  saw any behavior that would indicate that there was any
21  kind of a problem.
22    Q. What do you know about that background
23  investigation?
24    A. Nothing.
25    Q. Okay. You just know that one would be conducted

105

1  in the normal course of business?
2    A. Correct.
3    Q. But you don't know actually what they did or
4  didn't do in conducting that?
5    A. No. I was not party to that.
6    Q. Because you're not in the command-level staff, I
7  guess?
8    A. Correct.
9    Q. Sergeants don't get involved in that kind of
10  thing?
11    A. Correct.
12    Q. It's -- what -- captains, lieutenants, sheriff?
13    A. Yes. Sheriff -- you said sheriff. I would say
14  no on the sheriff.
15    Q. You're saying no on the sheriff?
16    A. Yeah. The sheriff doesn't do that kind of work.
17  He, you know, would be the one that gives the final
18  sign-off after all the work's been done by the lieutenant
19  and captain and, you know, whoever's doing that stuff.
20  But it wasn't me.
21    Q. You went through a background check and whatnot
22  when you were hired, I assume?
23    A. I did.
24    Q. Did they look into your past?
25    A. Thoroughly.

106

1    Q. Yeah. Did they look at the incident that you
2  got fired for from that other agency?
3    A. Yes, they did.
4    Q. Did they ask you about that one?
5    A. It was thoroughly investigated.
6    Q. But did they ask you about it?
7    A. Yes. Yeah, I mean --
8    Q. They sat you down, and you had to explain it and
9  talk to them about what happened?
10    A. Everything, yes.
11    Q. Did they speak to -- do you know if they spoke
12  to your ex-wife or anything specifically?
13    A. The agency that hired me or POST?
14    Q. So, like, Elbert when they were deciding whether
15  or not to hire you, did they speak to your ex-wife who
16  made those prior allegations?
17    A. Elbert may have.
18    Q. You're not sure?
19    A. Yeah. If anyone did, it would have been Elbert.
20  Because I didn't have any contact with her for years after
21  this. And so Elbert may have. Because at that point, you
22  know, I can talk to her again now. Things are -- let's
23  put it this way: I've forgiven her and walked away.
24    Q. Okay. You guys are at least amicable?
25    A. We can talk to each other.

Deposition of:   Travis Turner - June 30, 2021
Sherry Poer v. Sheriff Tim Norton in his official capacity, et al.

107

1    Q.  Do you have children in common?
2    A.  Well --
3         MR. RATNER:  Hold on a second.  So I'm going to
4    instruct him not to answer.
5         MR. FISHER:  It's fine.  I was just being
6    conversational.  I was just curious.
7    Q.  (By Mr. Fisher)  It's fine.  You don't have to
8    answer it if you don't want to.
9         I just want to talk to you generally about --
10   you said you've been involved in homicide investigations
11   and murders in the past and whatnot.
12   A.  Yes.
13   Q.  Tell me a little bit about when you're, maybe,
14   the officer in control of that scene, what do you do in
15   terms of waiting for the coroner's investigator to show up
16   and preserving scene and the body and all that?  Can you
17   walk us through that a little bit?
18   A.  Yeah.  As far as preserve -- like, he was
19   transported, so there wasn't --
20   Q.  In this case; correct?
21   A.  In this case, he was transported.
22        If I go to a scene and there's someone there
23   dead, I'm going to secure the scene.  I'm going to contact
24   investigation.  I'm going to make a command staff
25   notification.

108

1         And then I'm typically going to contact the
2    investigation supervisor, tell them what's going on and
3    let him make the determination as to whether or not he's
4    going to come out and investigate it.
5         And once that determination has been made, the
6    coroner will be contacted.  And the coroner will respond,
7    conduct his investigation.  And then at the end of it, a
8    report will be filed.
9    Q.  When a coroner comes to conduct their
10   investigation in a case like that, will they want to talk
11   with the officers?  Tell us how you found the body, you
12   know, what do you know about this case, and gather that
13   kind of information?
14   A.  Yes.
15   Q.  And they're trying to learn as how much as they
16   can by the people that know a little bit more because they
17   were already on scene or whatever; right?
18   A.  Yes.
19   Q.  And until, like, investigation shows up or the
20   forensic team or coroner's investigator or whatever,
21   you're going to remain there or keep one of your
22   underlings there to make sure the body's preserved, the
23   scene is preserved, et cetera?
24   A.  Yes.
25   Q.  Because the body is part of the scene.  It's

109

1    part of the evidence; right?
2    A.  Correct.
3    Q.  And you don't want anything -- you don't want
4    the body not to be preserved; right?
5    A.  Right.
6    Q.  And you want to make sure -- you know, you turn
7    the body over to the coroner's investigator and the
8    coroner, and then they can put the body on ice and do what
9    they do later; right?
10   A.  Right.
11   Q.  Because if you can avoid it, certainly, you
12   don't want to be, you know, letting the body decompose
13   unnecessarily.  You want to keep that evidence intact and
14   fresh or whatever.
15        MR. RATNER:  Object to form and foundation.
16   A.  Yeah.  That doesn't even make sense.
17        I'll keep somebody on scene until the coroner
18   takes control, and that's it.
19   Q.  (By Mr. Fisher)  Gotcha.
20        And again, you don't know what happened to the
21   body in this case because you left -- I guess, the body
22   had left the scene before you did, I guess, and went to
23   the hospital, and you had no further contact about that?
24   A.  Correct.  Medical transported, and what took
25   place after the ambulance left, I have no idea.

110

1    Q.  Okay.  Do you know why Chris Dickey eventually
2    left the Elbert County Sheriff's Office?
3    A.  I do.
4    Q.  Why was it?
5    A.  Because he was sick of it.  He was sick of
6    everything involved with -- everything going on in law
7    enforcement.
8    Q.  What do you mean more specifically?
9    A.  The Ferguson effect.
10   Q.  Meaning all the riots -- protests, riots?
11   A.  Yes.  I had many conversations with him about
12   it.
13   Q.  All the Black Lives Matter stuff?
14   A.  Everything, yeah.  It's ridiculous.
15   Q.  It seems like you feel the same way.
16   A.  No.  I love my job.
17   Q.  Okay.
18   A.  But you're asking me about conversations with
19   Chris.  Yes, I specifically had many conversations with
20   him about that.
21   Q.  That's how he feels about the way law
22   enforcement's being portrayed or treated in the public,
23   that sort of thing?
24   A.  Yes.  That's what he said to me.
25   Q.  Right.  And so he was sick of all that?

Deposition of:  Travis Turner - June 30, 2021
Sherry Poer v. Sheriff Tim Norton in his official capacity, et al.

111

1    A.  Yes.
2    Q.  Because he didn't think it was justified or fair
3  that people had a really accurate perception of what
4  really goes on in law enforcement or -- I don't want to
5  put words in his mouth.
6    A.  No.  Like I said, he wanted out for a while.  He
7  was tired of the things that were going on, and he ended
8  up retiring after 16 years, I think.
9    Q.  But you said you love your job?
10    A.  Oh, yeah.
11    Q.  What do you think?  What do you make of all the
12  Ferguson stuff and the protests and all that stuff?
13    A.  I mean, I understand that people are angry over
14  things that happened and perceptions and perceptions.
15  I guess we'll call it that.  But it's not going to affect
16  the way I do my job.
17    MR. RATNER:  See David?  It's all about
18  perceptions.
19    MR. FISHER:  Okay.  I don't have any further
20  questions.  Thank you very much for your time.
21    I don't know if you have anything.
22    MR. RATNER:  No questions.
23    MR. FISHER:  So I appreciate you coming in and
24  taking the time.  Thank you very much.
25    MR. RATNER:  We'll reserve signature.

112

1            * * * * * * *
2    WHEREUPON, the foregoing deposition was
3  concluded at 12:02 p.m.  Total time on the record was
4  1 hour and 45 minutes.

113

1    I, TRAVIS TURNER, the deponent in the above
2  deposition, do hereby acknowledge that I have read the
3  foregoing transcript of my testimony, and state under oath
4  that it, together with any attached Amendment to
5  Deposition pages, constitutes my sworn testimony.
6
7    _____ I have made changes to my deposition
8    _____ I have NOT made any changes to my deposition
9
10  _____
      TRAVIS TURNER
11
12    Subscribed and sworn to before me this _____ day of
13  _____, 20____.
14    My commission expires: _____.
15
16  _____
      NOTARY PUBLIC

REPORTER'S CERTIFICATE
STATE OF COLORADO        )
CITY AND COUNTY OF DENVER   )
    I, Sara A. Stueve, a Registered Professional Reporter
and Notary Public within and for the State of Colorado,
commissioned to administer oaths, do hereby certify that
previous to the commencement of the examination, the
witness was duly sworn by me to testify the truth in
relation to matters in controversy between the said
parties; that the said deposition was taken in stenotype
by me at the time and place aforesaid and was thereafter
reduced to typewritten form by me; and that the foregoing
is a true and correct transcript of my stenotype notes
thereof; that I am not an attorney nor counsel nor in any
way connected with any attorney or counsel for any of the
parties to said action nor otherwise interested in the
outcome of this action.
    My commission expires October 26, 2024.

_____
SARA A. STUEVE
Registered Professional Reporter
Notary Public, State of Colorado

Deposition of: Travis Turner - June 30, 2021
Sherry Poer v. Sheriff Tim Norton in his official capacity, et al.

Page 1

| A | | | | |
|---|---|---|---|---|
| **a.m** | **add** | **ahead** | 12:11 13:2 | 22:13 |
| 2:6 37:17,17 | 34:24,25 | 4:11,21 14:11 | 15:19 18:8,10 | **appropriately** |
| 100:11,11 | **added** | 17:12 | 20:24 22:7 | 26:2 |
| **ability** | 32:3 | **aid** | 38:2 101:12,12 | **approximate** |
| 28:20 | **adding** | 79:10 | 101:22 107:4,8 | 14:3,5 |
| **able** | 74:9 | **aide** | **answering** | **approximately** |
| 14:15 15:9,13 | **addition** | 14:23 | 4:9 | 35:3 46:2 49:20 |
| 15:16 28:10 | 71:10 91:3 | **aiming** | **anybody** | 74:25 90:9 |
| 29:8 34:23 | **additional** | 54:1 | 25:6 89:3 96:3 | **April** |
| 59:5 60:2 72:2 | 37:24 38:4,9 | **air** | 96:13 | 26:7 |
| 79:9 | **addressing** | 64:23 | **anymore** | **AR-15** |
| **Absolutely** | 101:18 | **aired** | 24:25 | 53:1,3 |
| 88:13 | **administer** | 35:24 | **anyway** | **area** |
| **academy** | 21:8,17 114:6 | **Alaska** | 36:4 93:22 96:6 | 19:4 39:9,10 |
| 5:16,21,23 | **administering** | 5:13 6:1 7:13,18 | 97:9 99:1 | 48:18 49:23 |
| 37:19 38:21 | 20:7,9 | 7:23 8:8 22:20 | **apart** | 54:1 61:17,18 |
| 43:23 | **Administratrix** | 38:18 | 39:16 49:24 | 75:7 76:15 |
| **access** | 1:3 | **alcohol** | **apparently** | 91:23 |
| 24:24 32:12 | **admitted** | 44:11,24 | 17:4 | **arm** |
| **accurate** | 7:1 | **allegations** | **appear** | 20:3 59:9,10,12 |
| 59:2,9,13 60:15 | **adult** | 7:3 8:13 10:24 | 6:25 60:20 | 59:17,18,23,25 |
| 60:16,19,21,25 | 14:17 17:2 | 106:16 | **APPEARAN...** | 60:3,9,10,11 |
| 100:1 102:17 | **advised** | **allowing** | 1:13 | 66:9 67:7,8,23 |
| 111:3 | 32:15 33:9 | 23:18 | **appeared** | 68:2,6,12,13 |
| **acknowledge** | 34:18 49:8 | **Alpine** | 7:1 | 68:23,25,25 |
| 113:2 | 96:4 | 5:23 | **Apply** | 69:2,6,7,15,18 |
| **acres** | **affairs** | **ambulance** | 7:21 | 71:25 72:2,6 |
| 39:14 | 7:6 | 86:17 88:5,6 | **appreciate** | 73:15,17,22,23 |
| **act** | **affect** | 109:25 | 111:23 | 73:25 74:1,7 |
| 26:1 | 111:15 | **Amendment** | **apprehended** | 77:6,19,20,24 |
| **acted** | **Afghanistan** | 113:4 | 50:12 | **armed** |
| 103:17 | 43:23 | **amicable** | **approach** | 16:23 |
| **action** | **aforesaid** | 106:24 | 25:18 35:25 | **armpit** |
| 1:2 114:16,17 | 114:11 | **amount** | 47:10 52:11 | 65:25 |
| **actions** | **agency** | 24:12 | 54:6 | **arms** |
| 43:4 44:6 | 7:23 8:5 27:8 | **and/or** | **approached** | 23:15 59:14 |
| **active** | 38:17 103:17 | 95:6,6 | 48:25 57:21 | 60:7 75:19 |
| 24:11 | 104:13,18 | **angle** | **approaching** | **arrest** |
| **actively** | 106:2,13 | 76:6 | 52:16 53:12,15 | 3:16,17,19,21 |
| 23:3,6 24:5,5 | **aggression** | **angry** | 54:4 55:23,25 | 22:12,16 23:4 |
| 50:7 | 24:11 | 111:13 | 57:10 61:13,21 | 23:11,14,19 |
| **actual** | **ago** | **announce** | 61:24 63:11 | 25:5,6 |
| 66:13 | 46:19 102:8 | 52:9 | 98:7 | **arrested** |
| | **agree** | **answer** | **appropriate** | 6:24 |
| | 15:15 | 4:9,10,14,20,21 | 2:1 16:16 18:5 | **arresting** |

Deposition of: Travis Turner - June 30, 2021
Sherry Poer v. Sheriff Tim Norton in his official capacity, et al.

Page 2

18:13
**arrive**
93:2
**arrived**
32:19,22,23,24
33:11 37:10
44:10 49:5
**arriving**
39:18 40:12
41:12 46:6
**artery**
86:5
**arts**
38:14
**Aside**
22:14
**asked**
11:13 45:7 77:9
89:3
**asking**
4:15 20:21 43:9
82:10 84:5
110:18
**asks**
12:9
**asp**
12:3 21:21
**assessing**
88:14
**assessment**
27:22 28:2 74:4
**assist**
29:11 30:1,11
30:13
**associated**
7:7
**assume**
19:20 25:13
45:21 76:7
105:22
**assuming**
33:10 83:25
**assumption**
25:16,19
**attached**

53:20 113:4
**attacks**
43:1
**attempts**
73:22
**attorney**
4:18 101:1,11
114:14,15
**audio**
80:8
**audio-recording**
98:4
**authority**
93:18
**avoid**
15:23 22:3
76:17 109:11
**avoided**
100:24
**awarded**
43:5
**aware**
29:25 31:18
96:23 101:21
**awfully**
65:12

                    **B**
**B-type**
91:5
**back**
8:10,11,17
17:22 27:13
34:13,24 35:5
37:8,15,18
38:22 52:17,21
52:22 54:13
58:7,24 63:9
63:12,13,14
64:7,9,11
65:13 66:2,22
79:7 80:23
81:18 87:3,9
87:18 88:4
99:18 102:6

**background**
41:5 104:18,22
105:21
**bad**
22:10
**badge**
90:14
**bag**
85:17
**ballistic**
17:10 36:1,23
36:23 37:1,8
46:7 92:9
**ballistic's**
91:13 92:7
**ballistic-stopp...**
91:18
**ballistics**
90:4,14 93:23
**bars**
20:3
**based**
7:3 47:7
**basically**
8:9
**bed**
86:16,24
**began**
42:23
**beginning**
65:5
**BEHALF**
1:14,18
**behavior**
16:16 30:4
104:20
**belief**
20:21
**believe**
20:19 25:23
27:23 29:14
31:20 32:25
33:25 46:14
50:22 55:13
58:5 60:15,18

60:21,24 61:2
63:9 64:12
65:9,11,21
67:19,20 69:23
77:9,22 78:24
87:2 88:18
98:19 101:19
**believed**
26:10 38:24
**belly**
56:6,10,11 60:5
64:1,9 69:7
78:3
**belt**
90:19,20,23
91:1,2,10
**bench**
72:21,23
**Beret**
41:13,18
**best**
35:2 99:25
**Bethel**
7:13
**better**
76:6
**big**
14:1,1 25:9 27:8
61:19,20 66:6
73:3 82:18
87:9
**bio**
2:15 42:9,10
**bit**
11:5 14:13 23:5
26:5 28:6
78:10 80:7,24
88:1 97:10
100:20 107:13
107:17 108:16
**bits**
41:4
**Bjork**
36:10 50:20
52:21,22 62:23

72:8 78:16
81:8 82:16
86:22 92:6
95:6
**Black**
110:13
**blow**
77:1
**blows**
18:5,16,19,24
18:25 19:14,16
19:17 20:7,10
21:8,25 22:4,8
22:13,15 88:25
**Bluetooth**
31:11
**body**
21:23 46:15,16
49:11 57:20
59:24 60:1,4
61:8 63:23
67:2,21 68:7
69:4,15 70:21
71:16,25 72:3
73:15 74:2,8
77:5 89:18
98:23 107:16
108:11,25
109:4,7,8,12
109:21,21
**body's**
108:22
**boots**
90:17
**born**
42:20
**box**
87:9
**boxing**
38:11
**brain**
99:21
**Brandt**
102:25
**break**

Deposition of: Travis Turner - June 30, 2021
Sherry Poer v. Sheriff Tim Norton in his official capacity, et al.

Page 3

23:5 76:16
85:16
**breath**
86:14
**breathing**
82:20 85:23
86:8,9,11
**briefly**
4:6 37:19
**broke**
14:23 31:10
85:9,14
**broken**
85:18,20
**Bronze**
43:5
**Brukbacher**
97:13
**buddy**
7:19
**bugged**
26:11 27:21,24
**bugging**
40:23
**bullet-proof**
91:20
**bullets**
50:14
**bumped**
87:21 88:1
**bunch**
6:18 87:10
103:5,23
**Burglaries**
10:14
**business**
105:1
**Byrialsen**
1:15 2:4

**C**

**C**
3:1
**CAD**
29:11 31:21,24

32:2 34:21
40:14
**cadet**
43:25
**cadets**
43:24
**calculation**
24:20
**call**
8:25 16:25 26:7
26:18,19 27:12
27:12,19,23
28:3,5,11,22
28:23 30:10,11
30:19 32:21
33:8,9,12,18
33:22,23 34:2
34:4,8,10,11
36:14 47:22
92:24 93:3,7
93:19 111:15
**called**
2:3 7:20 29:5
30:1 31:4 33:4
34:13 38:24
39:7 42:11
94:19
**caller**
31:6
**calling**
26:10 27:20
35:5 94:22
**calls**
29:24 30:15,17
33:20
**calm**
28:6 66:11
**cam**
46:15,16 49:11
70:21
**cameras**
27:20 31:11
**Campbell**
42:25
**capacities**

1:8
**capacity**
1:7,8,9
**captain**
95:15,16,19,20
95:21 105:19
**captains**
105:12
**capture**
43:4
**car**
32:6,9 35:21
87:24
**care**
41:8
**career**
5:15 12:23 13:8
21:5 22:15
42:23
**carotid**
86:4,5
**cars**
27:5
**carted**
89:25
**case**
4:2 9:16 11:6,8
11:9,11 12:18
13:20,22 14:6
16:13 18:23
22:14 26:5
33:24 59:23
88:20 102:10
102:11 103:2
107:20,21
108:10,12
109:21
**cases**
5:10 8:4 10:8,12
10:16 13:18
27:9
**Castle**
42:21
**certain**
20:18,20 21:7,8

29:22 44:25
65:5
**certainly**
26:1 109:11
**CERTIFICA...**
114:1
**certificated**
15:9
**certified**
15:3
**certify**
114:6
**cetera**
21:9 108:23
**change**
30:11
**changed**
31:6 47:12
**changes**
24:20 113:7,8
**charge**
92:22
**charged**
6:20 17:21
**charges**
6:22
**Charlie**
45:3,24
**check**
105:21
**checked**
85:24 86:14
**checking**
81:10
**cheek**
75:5,7
**chest**
91:23
**child**
17:2
**children**
107:1
**chose**
93:12
**Chris**

1:7 36:2 45:11
46:4 93:9
100:14,16
101:4,10 104:4
110:1,19
**Chris's**
92:24 93:3
**Christmas**
9:8,9
**Christopher**
1:4 2:15 31:1
34:13 35:5
38:24 42:14,20
**CIA**
41:19 43:17
**Cillo**
94:2,4 95:4,8,17
95:18,25
**Cillo's**
95:24
**circumstance**
48:15
**circumstances**
18:5 21:16
22:12 47:12
**CIT**
28:13,17,24
29:11 30:1,11
98:4
**citizen**
30:13
**City**
102:20 103:16
114:3
**civil**
1:2 2:2 4:2,4
**claims**
6:18
**clanging**
79:3
**class**
21:2 42:19
51:17 91:5
**classes**
21:11 43:24

Deposition of:  Travis Turner - June 30, 2021
Sherry Poer v. Sheriff Tim Norton in his official capacity, et al.

Page 4

| | | | | |
|---|---|---|---|---|
| **clear**<br>12:12 34:5 86:1<br>86:2 | 105:6<br>**commands**<br>55:9 56:16 | 50:22<br>**connected**<br>68:7 114:15 | **coroner's**<br>88:19,21 89:4,5<br>107:15 108:20 | **counsel**<br>102:21 114:14<br>114:15 |
| **client**<br>103:4 | 61:22 66:22<br>81:2 | **consider**<br>23:6 25:15 | 109:7<br>**corporal** | **counted**<br>96:19,20 |
| **close**<br>7:17 14:9,9 | **commencement**<br>114:7 | **considered**<br>11:24,25 18:17 | 9:21 10:3,5<br>**corporate** | **County**<br>5:12,14,14,22 |
| 39:15 51:22<br>52:15 57:11,16 | **commencing**<br>2:5 | **constitutes**<br>113:5 | 7:25<br>**correct** | 8:19 9:2,4,6<br>10:8,25 11:16 |
| 61:10 65:15<br>67:21 | **Commerce**<br>102:20 103:16 | **contact**<br>28:10 62:17 | 3:9,10,22 6:10<br>7:5 8:16 9:5,18 | 12:15,24 13:16<br>16:14,20 17:24 |
| **closer**<br>56:1,15 62:1 | **commission**<br>113:14 114:18 | 63:7 65:22<br>106:20 107:23 | 12:17 13:10,13<br>15:10,22,24 | 18:4 19:13,17<br>19:21 20:13,22 |
| **clothes**<br>90:9 | **commissioned**<br>114:6 | 108:1 109:23<br>**contact's** | 16:15 19:25<br>21:6 23:10 | 21:5 22:18<br>27:4 110:2 |
| **clothing**<br>90:10 | **common**<br>107:1 | 30:25<br>**contacted** | 24:2,17,20<br>25:12,15,24,25 | 114:3<br>**County's** |
| **coat**<br>25:9 | **commonly**<br>91:19 | 45:16 62:14<br>108:6 | 27:14 29:10<br>33:18 35:23 | 29:24<br>**couple** |
| **codefendants**<br>101:19 | **complained**<br>11:14 | **continue**<br>41:22 | 37:9 40:16<br>44:9,12,13 | 22:17 46:19<br>57:17,19 77:12 |
| **cold**<br>30:11 | **complaint**<br>11:7,12,15 | **continuously**<br>80:24 | 45:17 46:13<br>48:1,16,22 | 95:12<br>**course** |
| **college**<br>42:22 | 12:19<br>**complaints** | **control**<br>64:25 65:25 | 49:25 50:1,4,8<br>50:9,13 51:3,6 | 24:15 50:25<br>56:24 105:1 |
| **Colorado**<br>1:1,16,20 2:5,8 | 12:15<br>**completed** | 69:18 73:13,14<br>75:19 77:6,9 | 51:7 54:6,22<br>55:7 56:19 | **courses**<br>15:8 |
| 5:13 37:25<br>114:2,5,21 | 74:21<br>**compliance** | 84:3,4 107:14<br>109:18 | 57:8,9,11,12<br>57:22 58:2,4 | **court**<br>1:1 4:10 5:6,8 |
| **come**<br>8:11 34:24 40:4 | 66:20 76:12<br>**computer** | **controlling**<br>67:6 | 60:13 61:25<br>63:2,3,5,6 | **cover**<br>20:10 46:12 |
| 48:8 52:10<br>68:1 92:15 | 32:5<br>**concern** | **controversy**<br>114:9 | 68:10 69:14<br>71:4,5,9,17 | 47:19,21,24<br>51:22 52:10 |
| 108:4<br>**comes** | 104:16<br>**concerns** | **conversation**<br>12:8 46:7 | 75:12 84:8,24<br>85:1 89:12,15 | **CPR**<br>85:5,15,21 |
| 35:1 42:11<br>108:9 | 104:6<br>**concluded** | **conversational**<br>107:6 | 89:22,23 92:17<br>97:5 102:16 | **cracking**<br>85:12 |
| **comfortable**<br>13:24 | 104:14 112:3<br>**conduct** | **conversations**<br>95:10 101:17,18 | 103:1 105:2,8<br>105:11 107:20 | **crank**<br>59:19 66:9 |
| **coming**<br>52:3,7,12 67:7 | 108:7,9<br>**conducted** | 110:11,18,19<br>**copy** | 109:2,24<br>114:13 | **crazy**<br>18:14 |
| 111:23<br>**command** | 104:18,25<br>**conducting** | 42:12<br>**coroner** | **correctly**<br>28:20 | **criminal**<br>6:22 40:17 |
| 104:8 107:24<br>**command-level** | 105:4<br>**confiscated** | 108:6,6,9 109:8<br>109:17 | **costing**<br>6:15 | **criminally**<br>6:20 |

Deposition of: Travis Turner - June 30, 2021
Sherry Poer v. Sheriff Tim Norton in his official capacity, et al.

Page 5

crisis
28:21
criteria
11:21
Critical
43:11 94:19,22
96:7
CRT
99:2
cuffed
81:14 83:3,7
84:1,4,9,13,25
85:25 86:1
curious
107:6
current
9:14 95:22
currently
5:24 90:21
cursed
66:17
cursing
56:16 66:16
custody
41:8
cycles
74:21

—————— D ——————

D
2:10
dad
14:15,18
Damn
82:15,21
dangerous
56:25
dark
81:5
David
1:15 43:7
111:17
david@fblaw....
1:17
day

27:11 28:23
32:10,15 34:1
34:2 38:22
45:17 58:17
113:12
dead
107:23
deadly
18:17 22:4,9
24:17,25
deal
17:2
dealing
14:17 33:19
44:25
dealt
14:14
death
12:19
Deceased
1:4
December
9:7
decided
51:19,21 52:10
103:17
deciding
47:15 106:14
decision
51:1 99:20
decisions
92:22
decompose
109:12
deescalate
51:13
deescalating
16:1
Defendants
1:10,18
definitely
25:16
definition
19:12,15
degree

44:1
Denver
1:16,20 2:5
114:3
department
6:3 7:8 8:19
43:23 104:7
depend
25:3
depending
24:10
depends
91:24
deployed
43:1
deployment
12:2 71:14
deployments
71:8 73:9
deploys
81:19
deponent
113:1
deposed
3:11 102:6
deposition
1:11 2:2 4:7
30:9 41:21
42:12 58:9,16
66:12 73:7
98:1 112:2
113:2,5,7,8
114:10
deputy
1:7 2:18 8:1,23
9:12,13 10:3
14:20,24 15:1
26:22 27:9
46:22 49:8,10
50:20 52:1
58:16 59:8
78:16 82:16
102:14
described
100:13

detail
91:14 94:13
103:5,23
details
103:6 104:1
detained
41:8
detective
58:11 59:7
102:13,13
determination
108:3,5
devices
43:6
diabetic
103:3
diagnosed
13:23
diagram
2:18 21:22
Dickey
1:7 26:22 27:9
35:21 36:10
44:18 45:4
46:7,11,13,21
46:22 49:6,8
49:10 52:1,23
53:1 58:11
59:8 60:12,17
60:23 65:1,4
69:21 70:4,15
71:10 79:14
81:19 85:7
86:22 92:6
94:6 95:6
98:14 100:16
101:23 103:2
110:1
Dickey's
2:18 30:9 58:16
69:20 73:6
78:6 79:20
102:13,14
died
97:7

difference
54:20 77:4
different
18:17 20:6
21:18 23:11
32:4 33:23
36:3 37:24
47:13,16 48:14
51:21 52:6
59:15 84:1
direct
3:6 102:17,18
direction
63:20
directly
104:4
dismiss
7:1
dismissed
4:5 6:23 102:10
dispatch
29:22 39:3
44:16,17 49:7
dispatcher's
32:3
distance
17:9 51:10,14
distinction
18:22,24 19:2
19:13 33:5
76:21
district
1:1,1 5:24 101:1
disturbed
13:22
Dixon
97:20
DK
45:7
Doctor
89:9
documents
43:15 97:25
98:5
doing

Deposition of: Travis Turner - June 30, 2021
Sherry Poer v. Sheriff Tim Norton in his official capacity, et al.

Page 6

34:9,9,11,11
54:11 55:23
56:5,14 60:3
66:19 71:20
85:9,15,21,21
93:9 105:19
**domestic**
6:16 10:22,23
26:17
**door**
8:10 14:16,18
14:22 17:21
52:24
**Douglas**
5:12,14 29:24
**downloads**
71:6
**dozen**
13:4
**drawing**
58:10,16 59:7
**drinking**
45:12 46:4
**drive**
27:5 60:17
71:11
**driver's**
87:15
**driving**
52:18,19 55:5
87:24
**drove**
96:9 97:17 99:1
99:7,18
**drug**
10:16 44:11
**drugs**
45:12 46:4
**drunk**
45:8
**dude**
72:12
**Due**
47:11
**duly**

3:4 114:8
———————
**E**
**E**
2:10 3:1,1
**ear**
79:4
**earlier**
38:24 39:7 56:7
76:21
**early**
102:7
**earned**
43:25
**echo**
32:21 45:3,24
**effect**
22:11 54:8
55:12 91:17,18
110:9
**effective**
71:17 73:11,12
**eight**
45:24 49:1,20
**either**
48:3 51:4 65:10
95:7
**El**
10:7
**Elaine**
39:25 40:2
44:23 45:11
46:4 49:7
**Elaine's**
35:6 39:23
**Elbert**
5:14 8:19 9:2,4
9:6 10:25
11:16 12:15,24
13:16 16:14,20
17:24 18:4
19:13,17,21
20:13,22 21:5
22:18 27:4
106:14,17,19

106:21 110:2
**elbow**
21:18
**elderly**
14:16
**electrical**
71:15
**electricity**
70:18,19,23
71:3 80:5,6
**Email**
1:17,21
**empty**
50:12
**encounter**
25:14 59:10,25
**ended**
4:5 6:14 7:3
81:7 86:16
90:1 98:21,21
111:7
**Enduring**
43:2
**energy**
77:5
**enforcement**
3:20 7:22,25
38:10,12,13,15
38:16 48:4
89:22 110:7
111:4
**enforcement's**
110:22
**engage**
28:20 46:23
47:5,6,9
**engaging**
12:8 47:3
**Engineer**
42:24
**enter**
46:12
**entering**
45:24 49:18
**entertained**

6:19
**entire**
7:24 59:25
**entitle**
24:17
**entitled**
24:13
**entry**
33:7 34:3
**episode**
103:3
**ES1**
32:19 33:22
34:4 45:24
**ES1's**
33:8 45:25
**Especially**
25:9
**ESQ**
1:15,19
**Estate**
1:4
**et**
21:9 108:23
**Ethics**
43:24
**Evans**
1:19
**Eve**
9:8,9
**evening**
57:14 92:23
**event**
26:18
**events**
74:18 94:14
100:4
**eventually**
6:9 16:13 54:5
62:1 84:9,25
97:7 98:18
102:10 110:1
**evidence**
109:1,13
**ex-wife**

106:12,15
**exact**
46:8 99:6
**exactly**
44:25 65:16
76:22
**examination**
2:3,11 3:6 114:7
**examiner's**
88:22
**excessive**
10:24 11:7,12
11:14,15
**exercise**
72:17
**Exhibit**
30:8 41:21 42:1
45:3 58:9
**EXHIBITS**
2:14,17
**experience**
18:2
**expires**
113:14 114:18
**explain**
39:9 91:14
106:8
**extent**
81:5 91:23
**extremely**
8:9
**eyes**
19:8,9
———————
**F**
**face**
18:21,24 19:4,7
19:14,17 20:8
20:12,12,14
21:3,13 22:13
22:15,19,24
38:7 54:18
57:22 62:18,23
65:18 68:17
74:22,23 75:4

Deposition of: Travis Turner - June 30, 2021
Sherry Poer v. Sheriff Tim Norton in his official capacity, et al.

Page 7

| | | | | |
|---|---|---|---|---|
| 76:11,20,22 | 54:20 57:17,19 | **fire** | **five-second** | **foregoing** |
| 77:17,21 86:14 | 58:1 60:24 | 53:18 96:6,7,12 | 71:8 | 112:2 113:3 |
| 89:1 | 63:15,16 64:7 | 99:18 103:19 | **flailing** | 114:12 |
| **face/head** | 67:4,5,14 | 104:16 | 23:15 24:6 | **forehead** |
| 76:15 | 87:16 | **firearms** | **flashlight** | 76:17 |
| **facedown** | **fell** | 96:18 | 53:20 54:21 | **forensic** |
| 58:18 | 17:23 | **fired** | 57:4 61:14,19 | 108:20 |
| **facing** | **fellow** | 48:25 49:5,9,21 | **flashlight's** | **forget** |
| 54:15,16 87:1 | 36:7 | 70:16,18 96:22 | 54:2 | 18:22 |
| **fact** | **felony** | 103:22 106:2 | **Floor** | **forgiven** |
| 15:21 31:6 | 18:13 | **firing** | 1:16 2:5 | 106:23 |
| 40:12 43:16 | **felt** | 48:24 | **focused** | **forgot** |
| 47:11 50:10 | 103:17 104:14 | **first** | 65:12 | 37:7 |
| 52:1 62:2 66:2 | **female** | 3:4 17:20 27:16 | **followed** | **form** |
| 70:15 75:11 | 36:16,19 97:14 | 27:19 28:10,23 | 79:14 | 12:22 13:1 |
| 100:18 103:24 | **Ferguson** | 29:5 42:19 | **following** | 15:18 16:3 |
| 104:13 | 110:9 111:12 | 54:5,11 56:4 | 43:1 58:17 | 18:7 22:6 |
| **fair** | **field** | 63:7 75:20 | **follows** | 23:16 24:8,21 |
| 4:24 16:2 24:13 | 45:25 46:12 | 83:17 93:1 | 3:5 | 25:1 29:2 |
| 25:2 36:1 | 48:18 49:18 | 95:24 | **foot** | 31:23 38:1 |
| 39:10 49:1 | 51:22 56:6 | **Fisher** | 8:10 17:9,22 | 44:20 45:18 |
| 55:19 56:4 | 87:24 88:3 | 1:15,15 2:4,12 | 59:18 61:8 | 51:25 56:23 |
| 73:3 92:19 | 98:6 99:7 | 3:7 12:13,23 | 64:25 65:2,4 | 58:3 74:17 |
| 93:19 111:2 | **fighting** | 13:2 15:19 | 65:24 67:6 | 81:16 83:4 |
| **familiar** | 22:25 23:1,2,3,6 | 16:5 18:8 22:7 | **footage** | 109:15 114:12 |
| 51:11 | 24:4,11 73:19 | 23:18 24:10,23 | 46:15,16 | **former** |
| **far** | 73:21,21 | 25:2 29:4,22 | **force** | 41:13,18 103:4 |
| 16:21 39:16 | **figuring** | 32:1 37:13,18 | 10:25 11:7,8,12 | **Fort** |
| 49:24 68:9 | 35:14 47:10 | 38:2 41:24 | 11:14,15,17,21 | 42:25 |
| 73:24 76:13 | **filed** | 42:2,6,8,10,13 | 11:24,24,25 | **found** |
| 86:12 107:18 | 4:2 108:8 | 43:9,13 45:2 | 12:14,24 13:9 | 17:25 50:12 |
| **fashion** | **final** | 45:20 52:1 | 13:15 15:22 | 102:23 108:11 |
| 66:12 94:13,15 | 32:2 105:17 | 56:24 58:5 | 16:8,20 18:6 | **foundation** |
| 94:15 | **find** | 74:20 81:18 | 18:17 19:19 | 13:1 15:18 16:3 |
| **fast** | 16:16 103:16,19 | 83:6 100:12 | 22:5,9 24:12 | 22:6 25:1 |
| 31:15 32:16 | **finding** | 101:14,21,22 | 24:17,25 37:20 | 29:21 31:23 |
| 62:16 88:2 | 98:22 | 107:5,7 109:19 | 37:22,22 64:16 | 45:18 109:15 |
| **feel** | **fine** | 111:19,23 | 77:7 102:20 | **four** |
| 16:8 28:23 | 12:9 41:24 79:9 | **fists** | 103:18 104:7 | 13:3 58:10 |
| 36:15 85:13,18 | 79:11 96:1 | 20:8 | 104:12,14 | 72:20 75:1,23 |
| 85:20,20 86:6 | 107:5,7 | **five** | **Forces** | 92:20 |
| 110:15 | **finish** | 13:5 37:13 | 41:19 42:23,24 | **framing** |
| **feels** | 4:9 | 72:20 74:25 | 43:17 | 19:6 |
| 85:17 110:21 | **finishes** | 75:1,14,23 | **forcing** | **Framingham** |
| **feet** | 12:10 | 100:7 103:3 | 83:13 | 44:1 |

Deposition of: Travis Turner - June 30, 2021
Sherry Poer v. Sheriff Tim Norton in his official capacity, et al.

Page 8

frankly
25:7
Freedom
43:2
fresh
99:21 100:5
109:14
front
19:10 36:2 53:4
77:21
fucking
55:11,12,16
80:15 82:23
further
109:23 111:19

**G**

G
3:1
gain
73:13,14 76:12
gained
75:19 77:6
gallantry
43:6
gamut
30:15
gap
73:8
garage
14:19 17:15,18
17:19
gather
108:12
general
25:5 30:23
generally
18:23 102:3,4
107:9
getting
7:4 37:18 38:22
56:1,15 90:1
97:2
give
24:3 66:10

80:14 82:22
92:1 99:20
given
31:1 43:24 47:8
gives
105:17
giving
23:14 41:4 55:9
56:16 61:22
69:1 81:2
103:5,23
glean
51:5
go
4:6,21 9:2 14:11
17:12 21:2
25:5 35:14
36:22 37:15
46:11 47:19
51:21 77:5
81:18 88:3
96:6 97:11
99:7 107:22
goes
31:24 111:4
going
12:5,13 14:18
17:8 18:14
22:10 26:4,19
28:6 37:14
38:1 40:12
41:20 42:3
47:10 52:10
58:8 69:21
70:10 78:20
79:7,15 81:18
82:4 88:2
91:23 92:10
93:10,24 94:25
95:1 101:11
103:18 104:15
107:3,23,23,24
108:1,2,4,21
110:6 111:7,15
good

3:8 36:24 72:11
72:13,17 82:5
Gotcha
43:13 60:12
109:19
gotten
46:3 55:3
grab
62:5,6 78:14
grabbed
62:9 78:16
great
94:13
Green
41:13,18
groan
70:25
ground
14:24 17:23
20:1 48:9
54:12 60:8
64:17
Group
42:25
growl
80:16 82:22
growls
81:3
guess
11:13 41:20
43:14 44:3
50:17 54:19,19
71:21 72:10
82:25 83:9
93:15,16 95:3
105:7 109:21
109:22 111:15
guest
43:24
gun
17:4 24:16,19
24:24,25 25:4
35:7,12 38:25
39:21,23 48:9
50:5,12,21

51:2 54:24
55:4,7 57:8,11
57:13,15,16,17
57:21 58:1,6
60:23 61:2,3
61:23 62:2,4,6
62:9,14,23
63:2 65:14
67:23 68:6
69:10,13 78:7
78:14,16,22
90:21 92:11
gunshots
49:14
guy
6:8 14:1 18:20
22:19 28:5
47:6 64:23
72:5 73:3
82:18 97:21
98:18,25
102:23,25
guy's
59:8
guys
12:8 16:24
26:25 27:3
84:25 86:16
87:18 92:8
98:6,9 99:2,7
100:23 106:24

**H**

half
7:17
Halfway
5:22
Hall
1:19
hand
35:7 53:1 56:13
56:14 57:6,7,8
57:14,15,18,19
57:20 59:20,20
59:21,22 65:25

75:25 76:7,8,9
76:16 77:10,10
77:23 81:8,11
81:12 82:6,7
82:11,23 83:3
83:9,17,19,23
84:1,4,12,17
hand's
83:7
handcuff
23:19 81:20
82:15,21 83:8
handcuffed
17:23 23:2
83:10,13,14,17
handcuffing
11:22,25 13:12
68:20
handcuffs
60:2 90:22
handful
13:14 101:3
103:12
handle
48:15
handled
10:9
hands
17:21 19:7
23:15 24:1,3
48:10 55:11,16
56:12 57:5,5
57:21 61:14,15
61:23 66:10
67:22,25 68:12
71:24 80:15
83:14 84:9
hands-on
19:21
happen
94:24 99:6
happened
6:22 14:13
62:16,19 89:18
89:24 92:21

Deposition of: Travis Turner - June 30, 2021
Sherry Poer v. Sheriff Tim Norton in his official capacity, et al.

Page 9

93:25 95:8
96:3,11,20
97:10 99:4,9
99:16 101:7
106:9 109:20
111:14
**happening**
30:5 65:2
**hard**
14:16 64:19,21
75:2 77:22
85:15
**harder**
76:18
**head**
4:12 14:23 18:5
18:16,20,20,25
19:3,4,14,16
20:8,14 21:13
21:22,22 22:1
22:4,8,13,15
38:5 50:5
54:19,20 57:23
58:21 66:1,3
66:22 67:2,12
69:8 76:20
78:9,23 87:1,3
87:15,21,25
**Heap**
95:4,7
**hear**
4:19 41:14 45:6
70:18,20,23,25
79:2,9,13 80:2
80:5,6,9,13,14
80:25 81:1,8
81:20,24 82:6
82:15,21,22
83:5,22 85:12
94:3
**heard**
41:15 43:20,21
49:9,10,14,15
79:4 80:9,22
104:4

**hearing**
14:23 32:14
35:11 70:19
79:9 80:10
**heavier**
14:2 72:14,15
**heavyset**
72:11,12
**height**
14:1,3 61:3
**heightened**
56:20
**help**
30:18 48:5
**high**
42:21
**higher**
82:18
**highlighted**
30:10
**hire**
106:15
**hired**
5:21 8:1 9:22
104:19 105:22
106:13
**history**
40:18
**hit**
12:3 18:20,20
19:3,4 21:22
21:23 22:19
70:11 75:2,4
76:8,10,14,22
76:23,24
**hold**
12:7 74:13
101:9 107:3
**holding**
60:3 73:24
83:19 87:19
**home**
17:3 26:11 92:9
99:22
**homeowner**

98:24
**homicide**
107:10
**hope**
91:25
**Horizontally**
87:13
**horse**
30:16
**hospital**
89:25 93:25
109:23
**hostage**
48:16
**hour**
34:12,12 112:4
**house**
27:21 39:18
40:23 48:23
**houses**
39:15 49:24
**How'd**
7:18 9:19 86:19
**huge**
17:15
**hurt**
22:11 23:7

———————
**I**
**ice**
109:8
**idea**
28:5 52:5,6 79:8
89:14 91:22
109:25
**identified**
48:4 55:13
**illness**
27:25 28:25
40:20
**illustration**
58:10
**immediately**
80:20
**important**

15:16,25 88:11
**in-custody**
12:19
**inaccurate**
50:23
**inappropriate**
104:12
**inappropriately**
103:18 104:14
**incident**
2:18 9:16 11:10
14:6,12 16:22
34:1 38:22
43:11 44:4
66:14 89:12
90:11 94:19,23
94:25 95:21
96:7,25 97:3
100:4,13
102:15 103:7,9
106:1
**Indiana**
42:21
**indicate**
104:20
**indicating**
19:5 61:6 63:21
63:22 66:6
**indication**
48:21 50:2
**individual**
1:8,8 13:23
16:23
**individually**
1:3
**influence**
44:24
**information**
29:6 35:2 41:7
43:20,21 45:15
46:3 51:6 63:1
63:4 88:11
89:14,17
101:24 108:13
**initially**

6:19 17:8 36:14
40:22 92:24
95:12 96:15
**injured**
97:2,5
**injuries**
96:25 97:1
**inside**
17:18 38:13
**installed**
31:11
**instance**
12:18 21:20
**instances**
13:7 16:19
**instruct**
101:12 107:4
**Instruction**
43:23
**instructor**
15:6,7
**intact**
109:13
**intentional**
76:13
**intentionally**
76:10
**interested**
114:16
**internal**
7:6 19:12,15
**interrupt**
6:2
**interrupted**
93:22
**interview**
96:20 98:4
99:20,22,23
100:1
**interviewed**
89:11,21 90:1
**intoxicated**
44:18
**intoxication**
44:11

Deposition of:  Travis Turner - June 30, 2021
Sherry Poer v. Sheriff Tim Norton in his official capacity, et al.

Page 10

investigate
108:4
investigated
95:1 106:5
investigation
7:7,8,10 96:8
101:2 104:19
104:23 107:24
108:2,7,10,19
investigations
107:10
investigator
97:14 107:15
108:20 109:7
investigators
96:14 97:11
involved
3:18 22:12
36:16 100:15
100:23 102:22
103:6,8 105:9
107:10 110:6
Island
5:23
issue
6:14,16
issues
17:3
it'd
66:13

_____ J _____
jail
36:20
January
43:4
jaw
19:9 75:7
job
5:23 6:11,15,19
7:4,12 8:7,10
9:4 110:16
111:9,16
Josh
59:12 62:6,9

69:17 77:10
82:9 83:23
95:14
jumped
64:22
June
1:12 2:6
justified
17:25 111:2

_____ K _____
keep
72:16 77:25
78:25 100:8,9
108:21 109:13
109:17
Kentucky
42:25
kept
37:1
Kevlar
91:16
key
43:3
kick
17:24 23:8 65:4
kicked
17:22
kicking
24:5 73:20
kill
16:23 43:3
66:10
kind
6:16 7:7 13:9,15
19:11 25:22
28:2 29:1 30:4
30:23 32:17
36:6 51:9 56:4
56:20 58:24
60:13 66:11
80:15,15,24
81:2 85:17
87:5,18 90:3
91:19 104:21

105:9,16
108:13
kinds
5:10 8:4 10:8,10
30:15
Kiowa
8:19,20 9:1,3
knee
21:18
kneeled
67:16
kneeling
67:17,20 70:13
72:3 74:9
knees
67:14
knew
36:2 40:22,24
knife
63:5
knocked
75:9,15 77:1
88:7
know
5:2 13:20 18:12
18:13 20:23
22:10,11 23:23
24:4 25:10,24
28:14,18 29:5
30:16,19,20
31:3 33:25
35:3 36:22
38:23 40:2,13
40:17,20 41:11
41:12,17 42:3
43:11 44:4,10
50:11,14,25
51:2,10 52:7
52:11 65:12
66:8,9 67:11
67:21 73:10
79:5,16,23
84:5,8,9 88:12
92:6 94:24
96:18 98:6,13

99:13 100:3
102:19 103:2,6
103:6,8,24,25
104:22,25
105:3,17,19
106:11,22
108:12,12,16
109:6,12,20
110:1 111:21
knowledge
99:25
known
14:12
knows
43:9
Krav
38:10

_____ L _____
label
29:24 30:23
labeled
29:11,18,20
labels
29:22
Lake
4:1
landed
64:23
lap
53:4
large
17:1
law
3:20 7:22,25
38:10,12,13,15
38:16 48:4
89:22 110:6,21
111:4
lawsuit
11:13 101:8,10
101:11,24
102:1,22
lawyers
101:17

laying
23:25 54:12
56:5,9 61:22
69:7
lead
13:9 97:13
learn
44:8 108:15
learned
50:10,16 102:21
leave
6:11 8:7 9:1
34:4,4
leaving
73:15 93:24
lectured
43:24
left
17:22 27:15
28:12 35:18
54:15 56:13
57:7 58:24
59:9,10,18,20
60:10,11,13,18
60:20 61:4
65:24,25 67:6
67:8,22 68:2,6
68:13,23 69:2
69:6,7,8 75:5,6
75:25 76:1,7,9
84:12 87:2,3
87:15 98:6
109:21,22,25
110:2
left-hand
57:23
left-handed
76:3,4
lefty
76:2
leg
60:18,20 70:4
legs
67:14,16
let's

Deposition of: Travis Turner - June 30, 2021
Sherry Poer v. Sheriff Tim Norton in his official capacity, et al.

Page 11

23:5 37:13
77:11 81:4
82:13 100:7
106:22
**lethal**
22:1
**letting**
109:12
**level**
24:10 66:19
**levels**
21:18
**lie**
6:23
**lied**
7:2
**lieutenant**
94:2,3,4,10 95:4
95:16,19
105:18
**lieutenants**
105:12
**lift**
63:23 72:20
**lifted**
86:19
**light**
54:1 61:20
90:21 98:15
**lighting**
98:8,15
**lights**
35:19 52:2,2
98:20
**listen**
70:20 80:24
81:4,22 82:13
**listened**
98:3
**listening**
97:19
**lit**
61:16
**little**
9:22 11:4 14:13

23:5 26:5 28:6
31:14 78:10
80:7,24 82:13
88:1 97:10
100:20 107:13
107:17 108:16
**Lives**
110:13
**living**
17:3 98:22
**LLC**
1:19
**load**
79:13
**loaded**
35:12 38:25
51:2
**locate**
17:13
**Lone**
3:24 5:24 7:19
**long**
7:16 8:21 10:5
14:10 41:10
87:4 102:8
**longer**
24:19,24 45:8
100:9
**look**
29:12 49:13
97:12 105:24
106:1
**looking**
87:2
**looks**
77:22
**loose**
30:16
**loss**
80:10
**lost**
6:19
**lot**
100:24
**Lots**

10:23
**loud**
4:10,15 55:9
56:16 79:2,10
80:15
**louder**
81:3 82:22
**loudly**
55:19 57:2
**love**
110:16 111:9
**low**
80:7
**lower**
8:11,17 58:24
60:18 63:14
64:11
**lungs**
45:7
**lying**
60:8 77:20

---
**M**

**M**
2:15 42:14
**mag**
90:21
**Maga**
38:10
**magazine**
50:12
**maintain**
7:23
**making**
18:24 31:15
32:16 36:15,16
51:1 92:22
**male**
45:6 97:15,17
**man**
26:8 38:23
103:3
**mark**
1:19 41:20
**marked**

2:17 42:1 58:8
**marks**
60:17,17
**martial**
38:14
**master's**
43:25
**Matter**
110:13
**matters**
114:9
**Matthew**
42:20
**mean**
9:21 10:10
11:24 13:20
20:23 21:17
23:23 28:19
30:2,3,14
32:20,23 33:1
33:8,21,22
34:7 36:7 47:2
47:13 48:14,18
52:13 56:24
64:22 66:4
68:24 73:14
85:16 86:13
89:11 91:24
94:6,14,25
97:21 99:5
100:19,21
101:22 106:7
110:8 111:13
**meaning**
23:1 110:10
**means**
30:13 32:22,24
33:3,9,18 34:8
**meant**
11:14 45:7
79:23
**medical**
41:8 88:21
109:24
**memory**

41:6,9 65:10
83:10,25
**mental**
27:25 28:21,25
40:20
**mentally**
13:22
**mention**
88:25
**mentor**
43:25
**message**
27:15 28:12
**met**
3:9 40:7,10
**metal**
79:2,13,16
87:25
**metals**
44:5
**middle**
25:6 58:23
**military**
41:17 43:23,23
44:5
**mind**
100:5 101:16
**minute**
45:11
**minutes**
33:17 37:13
45:24 46:3
49:1,20 100:7
112:4
**mission**
43:3,5
**mixed**
38:14
**MMA**
38:10
**months**
8:22 9:3
**morning**
3:8
**mouse**

Deposition of: Travis Turner - June 30, 2021
Sherry Poer v. Sheriff Tim Norton in his official capacity, et al.

Page 12

30:6 32:20
43:22 45:3
61:6
**mouth**
111:5
**move**
55:16 70:4,15
85:16
**moving**
24:1
**Mullah**
43:4
**multiple**
21:18
**murder**
5:11
**murders**
8:6 10:18
107:11
**muscles**
71:16 74:13
**muzzle**
66:5 78:5,22
**myriad**
48:14 51:20

_____
**N**

**N**
1:15 2:10 3:1
**name**
31:1,3 39:5
95:24 97:24
**narrative**
31:14
**Natasha**
1:22
**nature**
27:18
**near**
50:3
**nearby**
48:22
**necessarily**
34:25
**necessary**

16:9 22:5 53:18
**need**
18:19 30:18
**needed**
76:23
**needs**
29:1
**never**
3:9 11:15 20:13
21:15 28:17
43:10,19,19
51:16 57:15,16
57:17 89:5
98:19,24
104:12,19
**new**
9:4 30:11 32:5
42:21
**newer**
91:6
**night**
35:4 43:16
53:11 63:8
89:12,18,21
91:1,2 92:4,16
93:13 96:22
97:7 98:22
99:21
**nights**
46:19
**Ninth**
1:16
**nods**
4:11
**noise**
71:3 79:2,3,16
**normal**
11:25 30:17
105:1
**normally**
37:1
**NORTON**
1:7
**nosey**
98:23

**Notably**
43:3
**Notary**
2:7 113:16
114:5,21
**notes**
29:12 32:3
34:24,25
114:13
**notice**
2:1 85:22
**noticed**
92:8
**notification**
107:25
**number**
1:2 31:1,4,7,7
32:21 33:25
39:5 42:1

_____
**O**

**O**
3:1
**oath**
5:5 113:3
**oaths**
114:6
**object**
12:22 16:3 18:7
22:6 23:16
24:8,21 25:1
29:2,21 31:23
38:1 44:20
45:18 51:25
56:23 58:3
74:17 81:16
83:4 109:15
**objection**
4:20,22
**objections**
4:17,18
**objects**
4:18
**obviously**
11:7,12 12:11

13:20 97:5
100:18 102:8
**occasions**
104:15
**October**
114:18
**offender**
26:14,16
**offer**
5:23
**office**
5:22 10:8 55:14
55:15 89:4,6
110:2
**officer**
3:20 7:15 8:24
8:25 15:16
16:1 19:22
23:19 28:13
36:16 51:13
92:20 97:2
107:14
**officers**
1:7 36:8,19
89:22 93:19
95:7 108:11
**offices**
2:4
**official**
1:7,8
**Oh**
35:10 54:8 69:2
78:10 87:7
111:10
**okay**
4:12,13,15,16
4:23 5:2,3,12
6:5 7:12 8:7,17
8:25 11:4
12:13 14:11
15:8 18:22
19:6 20:19
21:4 26:5,6
27:6 28:22
29:8 32:1 33:4

34:21 35:11
36:21 37:15,16
38:4,9,19
41:11 43:21
44:17 45:23
49:19 50:16,19
50:25 53:25
56:15 57:24
58:5,8,12 61:9
65:13,20 66:7
66:16 68:9,19
68:21 72:13,16
74:20 75:17
77:25 78:8,25
79:14,14,18,20
79:20,21 80:11
80:22 81:4,14
82:13 83:9,18
83:20,22 89:17
89:21 91:8
93:2,15 94:9
95:3 96:2,5
97:16 99:16,19
101:17 102:3
103:14 104:25
106:24 110:1
110:17 111:19
**Omar**
43:4
**once**
34:10 77:7
85:18 108:5
**open**
77:23 87:7
**opened**
14:22
**Operation**
43:2
**option**
47:6,21,23
103:21
**options**
47:3,13,16
51:21
**order**

Deposition of: Travis Turner - June 30, 2021
Sherry Poer v. Sheriff Tim Norton in his official capacity, et al.

Page 13

26:14,17 51:13
**outcome**
7:10 114:17
**outer**
91:4
**outside**
17:17 38:10,12
39:18 101:12
**outstretching**
67:21
**outweighs**
72:5
**overall**
19:18
**overheated**
90:6
**overlap**
12:11
**override**
93:19
**owner**
35:7 39:25
98:11,12

――――――――
**P**
**P**
3:1
**p.m**
32:25 34:13
112:3
**PA**
47:25 48:3 51:5
51:20
**PAGE**
2:11,14
**pages**
113:5
**paint**
36:16
**pants**
90:17
**paranoia**
27:25 28:2
**parents**
14:16 17:3,17

**Parker**
50:19 58:17
97:14
**parse**
11:4
**part**
15:16 28:19
38:15,16 63:13
67:2 70:8
71:15 77:11
81:9 108:25
109:1
**participating**
3:20
**parties**
114:10,16
**partner**
26:24 27:2,3,4
**parts**
21:23
**party**
27:13 31:10,15
32:15 34:5
105:5
**party's**
31:11
**Paso**
10:7
**passenger**
52:23 87:16
**passive**
23:21
**Pat**
95:23
**pathologist**
89:7,15,19
**patrol**
6:4,5,7,8,9 8:1
9:13 90:17
**pause**
4:19
**Peak**
3:24 5:24 7:19
**pending**
34:4

**people**
13:11 15:17
20:10 25:14
27:7 28:20
48:22 50:2
89:16 108:16
111:3,13
**percent**
44:25
**perception**
59:15 111:3
**perceptions**
111:14,14,18
**perpendicular**
54:14
**person**
22:22,24 24:24
25:16,23 31:3
47:3,10 93:18
101:4
**person's**
58:21
**personally**
94:8,10
**phone**
27:13,21,23
28:3,8 30:15
30:19 31:1,4,6
31:12 32:11
33:3,6,12 35:6
39:5 41:3
47:22 48:3,13
51:5,20 101:4
**photos**
97:9 99:10,12
**physical**
28:4 63:7 73:21
77:7
**physically**
20:1 23:2,3 24:4
62:14 67:2
71:20 85:24
**picked**
29:9
**pickup**

52:17 86:24
87:1 98:7
**picture**
42:16
**picture's**
69:6
**pictures**
96:16
**piece**
17:1,15 31:14
**pieces**
41:4 91:16
**pinned**
74:8
**place**
29:23 60:2
74:14 83:19
94:5 109:25
114:11
**placed**
4:22 27:21 33:8
33:17,20
**places**
60:23
**Plaintiff**
1:5,14 2:3
**plan**
8:11 100:8
**play**
70:7 77:11 79:7
80:25 81:21
**played**
43:3 77:15 78:2
78:12,19 79:1
79:12,25 80:4
80:12 81:6,23
82:3,14
**playing**
78:1,25
**plenty**
64:21
**PLLC**
1:15 2:4
**plots**
39:13

**Poer**
1:3,4 2:15 28:23
39:18 40:9
42:9,10,14,16
42:20 45:16
48:18 49:23
54:5 60:13
61:22 62:14
63:8 65:2,23
71:1 74:22
89:25 93:25
97:5 98:7
**Poer's**
11:9 59:12
89:18
**point**
20:5 24:23
44:17 47:13
50:7 53:3,6,16
54:22 56:21
57:6,13 62:13
64:1 66:18,24
67:3 68:1
69:20 70:13
74:5 75:9 77:4
79:18 81:15
83:9 84:2,3,20
87:22 94:20,23
95:1 96:5
100:5 106:21
**pointed**
17:4 55:7 65:25
**pointing**
30:9 75:6 86:3
**police**
7:15 8:19 15:16
16:1 19:22
30:10 50:20
51:8 58:17
**policies**
18:4 29:24
**policy**
11:16 12:16,25
92:12
**pop**

Case 1:19-cv-01088-LTB-NRN   Document 85-5   Filed 10/22/21   USDC Colorado   Page 45 of 53

Deposition of: Travis Turner - June 30, 2021
Sherry Poer v. Sheriff Tim Norton in his official capacity, et al.

Page 14

80:9
**portrayed**
110:22
**position**
65:5
**possibility**
25:15
**possible**
15:21 16:6
44:11 51:12
100:9
**POST**
106:13
**pounds**
14:2 72:4 74:8,9
**Powers**
1:22
**preparation**
98:1
**presence**
52:9
**present**
1:22 95:7
**preserve**
107:18
**preserved**
108:22,23 109:4
**preserving**
107:16
**press**
72:21,23
**pressed**
66:2 78:6,7,22
91:17
**Pressure**
20:5
**pretty**
5:4 13:24 14:9
15:15 39:10
55:19 72:16
73:1,3 80:10
81:5
**previous**
14:14 114:7
**PREVIOUSLY**

2:17
**prior**
40:2,17 44:4
104:6 106:16
**priority**
30:12
**Private**
26:8,20 33:1
35:19 39:10
**privileged**
101:20
**probably**
9:23 10:6 12:14
13:5 14:1,7
27:24 28:2
31:22 33:11
53:4 65:15
72:5 82:9 84:1
84:12,17 101:6
**probes**
58:24 59:3,4
71:11
**problem**
68:22,22 104:21
**problems**
16:17
**procedure**
2:2
**Professional**
2:7 114:4,20
**promoted**
9:21,22 95:20
**prone**
60:5
**property**
17:2,5,15 35:6
39:25 98:11,12
**protect**
91:23
**protection**
36:6,24 92:2
**protesting**
23:24 102:23
**protests**
110:10 111:12

**provided**
43:16
**Provo**
4:1
**prudent**
11:18
**PTSD**
41:1
**public**
2:7 5:24 110:22
113:16 114:5
114:21
**pull**
36:4 67:22 68:2
68:12
**pulled**
74:2
**pulling**
71:15 72:6
**pulse**
85:23,24 86:7
86:13,15
**punch**
12:3 20:11,12
20:14 21:12
22:20,24 23:8
**punched**
14:22 74:21,23
79:18
**punches**
21:19
**punching**
14:21 21:2
73:19 80:18
82:24 88:7
**purpose**
21:25 53:25
63:18 64:15
92:1
**purposefully**
100:24
**PURSUANT**
2:1
**push**
87:10

**put**
36:5 37:7 48:9,9
59:18 62:23
65:24 68:9
84:25 86:24
87:11 106:23
109:8 111:5
**puts**
60:12
**putting**
67:13

_____
**Q**
**question**
4:8,15,21 5:1
12:10 101:23
**questions**
26:4 77:12
101:15 111:20
111:22
**quick**
37:14
**quiet**
82:20
**quit**
103:21
**quite**
25:7 34:12

_____
**R**
**R**
3:1
**radio**
31:22,25 34:23
35:24 40:15
49:9 90:21
**rank**
6:3 7:23 9:14
95:22
**rapid**
75:20
**ratchet**
24:12 83:5,8
**ratcheting**
81:20,24

**RATNER**
1:19 12:7,22
13:1 15:18
16:3 18:7 22:6
23:16 24:8,21
25:1 29:2,21
31:23 38:1
41:22 42:5,7,9
43:7 44:20
45:18 51:25
56:23 58:3
74:17 81:16
83:4 100:7
101:9,18 107:3
109:15 111:17
111:22,25
**ratnerm@hall...**
1:21
**rattle**
85:17
**Rattlesnake**
96:6,7,12 99:18
**reached**
14:25 15:2
17:22
**reaching**
57:25
**read**
42:2 43:15,16
97:22 98:4
99:13 113:2
**readvised**
33:10,19
**ready**
37:14 53:18
95:2
**real**
22:10 28:7
37:14
**real-time**
49:10
**realize**
85:3
**realized**
37:11

Deposition of:  Travis Turner - June 30, 2021
Sherry Poer v. Sheriff Tim Norton in his official capacity, et al.

Page 15

**really**
7:21 27:3,24
38:3 46:23
47:6 102:22
111:3,4
**rear**
60:13
**reason**
25:23 45:20
50:22 93:6
**reasonable**
11:18 16:9,17
22:13
**recall**
32:14,17 35:3
44:19 46:21
51:17 65:2,7
70:5 83:12
95:10 97:1,2
98:8
**receive**
20:25 37:20
**received**
19:20 44:5
**receiving**
41:8
**Recess**
37:17 100:11
**recollection**
98:2
**record**
4:22 12:12 19:6
42:5,7 90:13
112:3
**recorded**
26:11 99:23
**recording**
77:15 78:19
**recovered**
65:14
**red**
21:22
**reduced**
114:12
**refer**

95:21
**referred**
91:19
**referring**
11:9
**refresh**
41:6,9 98:1
**Refusing**
24:3
**Regardless**
44:3 101:24
**Registered**
2:7 114:4,20
**regular**
8:1
**relation**
114:9
**relative**
57:17
**relay**
35:2
**relayed**
40:22,24 41:7
45:16 49:4,6
89:14
**remain**
108:21
**remember**
26:15 27:15
29:13,14 31:20
32:13 35:9
41:2,3,10
44:14,23 46:25
50:15 56:11
63:11 67:15
70:19 76:21
79:15 81:9
83:13,19 88:6
95:9,23 96:5
96:10,15,15,19
97:13,21,24
99:15 103:25
**repeatedly**
55:21
**rephrase**

18:19
**replay**
81:9
**report**
31:22,24 32:2
34:22 88:19,21
88:22 97:22
99:13 108:8
**reported**
40:14
**reporter**
2:7 4:11,19
114:4,20
**REPORTER'S**
114:1
**reporting**
27:12 31:10,11
31:15 32:15
34:4
**reports**
43:11,14 50:20
98:5
**represent**
50:19 80:7
**require**
13:15
**required**
92:12
**rerouted**
33:22,23
**reserve**
111:25
**resist**
18:14
**resistance**
23:21 24:11
**resisting**
18:9,11,12 23:1
23:3,4,11,14
23:19 24:5
74:1
**resort**
16:8 18:14
**respond**
28:20 108:6

**responded**
16:24 17:7 29:3
**responding**
17:1 36:13
**response**
24:13 27:12
28:4 29:1
45:10 46:21,22
64:6
**responsive**
85:3
**restraining**
26:13,17
**restroom**
37:14
**result**
4:4
**retiring**
111:8
**review**
13:9,16 97:25
**reviewed**
11:19 12:5,14
12:20,24 16:13
17:24 98:3,5
**reviewing**
44:22
**ribs**
85:9,14
**ridiculous**
6:18 110:14
**riding**
87:18
**rifle**
17:21 53:1,3
54:1 66:1,2
67:24 78:6,6
**rifles**
85:1
**right**
9:25 12:3 14:22
15:4,13 17:14
19:24 21:5
22:1 23:12,19
23:21 25:5,7

26:2,11,20
27:10,13,15
31:1,4,12,22
33:10 34:14
35:6,7,22 37:2
38:25 39:19,21
39:25 40:18,21
40:25 43:22
44:24 45:4,8
46:8,24 47:3
47:14,16,19,22
48:13,19 49:11
49:20,21 50:3
50:5,6 52:3,25
54:7 56:14
57:20 58:21,23
59:12,20,21,22
59:23,25 60:3
60:9,24 61:4,5
61:12,14 62:4
62:7 65:5 66:9
67:10,11 68:2
68:25,25 69:6
69:11,15,18,20
69:22 70:2,7,9
70:23 71:8,12
72:2,6,6 73:9
73:17,20,23,25
74:7,16 75:25
77:6,17,19,20
77:20,23 78:3
78:14 79:4,15
79:21,22 80:5
81:12,14,19
82:1,11,21
83:3,17,23,23
84:4,6,13,17
84:22 85:21
86:17 87:6
88:7,17 90:5,7
90:20 93:16
95:15 98:14,18
98:23 99:2
102:15 108:17
109:1,4,5,9,10

Deposition of: Travis Turner - June 30, 2021
Sherry Poer v. Sheriff Tim Norton in his official capacity, et al.

Page 16

110:25
**riots**
110:10,10
**Road**
26:8,20 33:1
35:19 39:10
**Robberies**
10:12
**role**
43:3
**roll**
63:19,23 64:2
**rolled**
17:7,14,17
**roughly**
28:18
**rounds**
48:24 49:1,5,9
96:20,22
**routes**
36:3
**rules**
2:1 4:6
**rundown**
94:4,18 99:8
**rural**
8:9 39:10,12
48:18 49:23

———— **S** ————

**S**
1:19 2:4 3:1
**safety**
5:24 53:6,7,10
53:12,15 66:24
**Salt**
4:1
**Sam**
32:21
**Sara**
2:6 114:4,20
**sat**
85:22 96:2
106:8
**saw**

49:11 56:13
57:7,13,15,16
57:17 84:12
88:24 99:14
104:12,20
**saying**
4:14 17:18
34:13,21 35:5
46:25 47:2
55:11 66:11,22
78:20 79:14,20
81:10 82:8,22
83:23 104:13
105:15
**says**
32:19 33:11
34:4 35:7
42:13 58:18,23
65:11 69:21
70:25 80:1
**scenario**
25:3,7 94:23
**scenarios**
20:18,20
**scene**
2:18 3:19 32:24
33:1,3,5 35:14
37:10 40:13
41:12 44:10
46:6 49:5,11
63:2 92:10,16
92:20 93:2,24
97:12 99:1
107:14,16,22
107:23 108:17
108:23,25
109:17,22
**schizophrenia**
14:12
**schizophrenic**
13:23
**school**
42:21
**screaming**
66:13,14 71:23

**screen**
32:4 34:23
49:13
**seat**
53:5
**second**
4:19 6:2 8:15
12:7 18:23
101:9 107:3
**seconds**
45:11 73:7,8
**secure**
68:6 107:23
**secured**
62:11,15,23
69:13 78:17
**see**
17:13 28:5,6,6
29:4 30:6,10
30:25 31:7,9
31:13,16 32:20
33:5,7 34:3,16
34:23 42:13
45:2,8,13,23
45:25 48:9
49:2,15 52:3
54:18,19 57:5
57:5,8,11
58:16,18,25
59:5,6,7,19,20
60:12,17,23
61:9,21,22,23
61:23 62:2
69:10 77:16,17
77:19,20 81:5
81:10 84:18
88:19,25 99:6
111:17
**seen**
43:10,19 46:15
46:16 52:13
53:14 58:13
71:6
**sense**
24:7,9 29:16

31:15 32:16
51:14,16 77:4
109:16
**sent**
92:9
**separate**
35:21
**separately**
13:21 95:10
**September**
42:20
**sequence**
74:18
**sergeant**
1:8 3:8 6:4,5,9
9:15,17,19,23
10:1,3 42:19
42:24 46:21
92:16 93:9
**Sergeants**
105:9
**serious**
18:13 73:1
94:25
**served**
43:25
**service**
37:7,8 41:17
44:5
**serving**
26:13 42:24
**set**
32:7,9,11 68:5
**seven**
9:10 10:7
**Seventeenth**
1:20
**severe**
80:10
**sex**
26:14,15,16
**SFC**
2:15 42:13
**shakes**
4:11

**Shane**
96:5
**shape**
72:11,13,17
**Shayne**
94:17,18
**sheriff**
1:7 94:16 95:4
105:12,13,13
105:14,15,16
**sheriff's**
5:22 10:8 55:14
55:15 110:2
**SHERRY**
1:3
**shield**
17:8,10 36:1,23
36:24 37:1,7,8
37:11 46:7
47:11,15
**shit**
54:9
**shock**
103:3
**shoot**
12:4 24:16
46:24 55:12,16
78:20
**shooting**
50:7
**shortly**
5:25 100:3,8
**shot**
36:5 52:14
91:22,24 92:2
**shots**
49:21
**shoulder**
77:20
**show**
21:7 55:11,16
58:8 59:22
63:10 107:15
**showed**
94:2,16 97:18

Deposition of: Travis Turner - June 30, 2021
Sherry Poer v. Sheriff Tim Norton in his official capacity, et al.

Page 17

| | | | | |
|---|---|---|---|---|
| 99:4,16 | 28:3,7,24,25 | **sort** | **spoken** | **station** |
| **shown** | 36:5,24 48:16 | 26:24 28:24 | 100:12 | 96:12 |
| 21:21 | 51:14,19 56:25 | 51:12 72:11 | **spot** | **stationary** |
| **shows** | 74:4 88:14 | 80:20 81:2 | 54:5 55:6 76:11 | 55:24 |
| 108:19 | **situations** | 82:18,22 | 76:13 | **status** |
| **sic** | 16:1 | 110:23 | **spotted** | 30:11 |
| 30:10 58:11 | **six** | **sound** | 53:14 54:11 | **stay** |
| **sick** | 13:5 41:25 | 48:10 70:2,7 | **spread** | 47:21 52:10 |
| 110:5,5,25 | **size** | 71:12 73:9 | 71:15 | **stayed** |
| **side** | 14:10 | 82:2 | **square** | 8:2 60:1 |
| 14:19,23 52:25 | **slow** | **sounded** | 91:22 | **staying** |
| 54:13,15 56:7 | 88:3 | 32:18 | **stack** | 55:24 |
| 60:13,24 61:4 | **slung** | **sounds** | 33:8,17,20 | **steady** |
| 61:5 67:11 | 68:8 | 44:18 45:7 | **staff** | 87:19 |
| 69:17 72:6 | **small** | 51:11 56:19 | 105:6 107:24 | **stealth** |
| 75:5,6 84:6,23 | 66:5 | 70:9 81:7 | **stamp** | 52:11 |
| 87:15,15,16 | **sneak** | **south** | 49:2 | **stenotype** |
| **sides** | 52:7 | 1:16 22:10 | **stamps** | 114:10,13 |
| 19:7 64:4,5 | **softly** | **space** | 45:19,21 | **stepped** |
| **sign-off** | 64:13 | 87:10 | **stand** | 59:18 63:9 |
| 105:18 | **somebody** | **sparking** | 96:13 | **steps** |
| **signature** | 14:12 18:13 | 80:10 | **standard** | 94:24 |
| 111:25 | 20:1 21:12 | **speak** | 71:13 | **stick** |
| **similar** | 22:16 24:15,16 | 29:23 32:12 | **standing** | 86:14 |
| 14:8 17:2 90:10 | 24:19 25:6 | 47:25 48:5 | 47:14 | **stomach** |
| 91:10 | 27:23,24,24 | 56:13 59:4 | **Star** | 54:13,14 |
| **simple** | 28:25 62:6 | 60:22 73:10 | 43:5 | **stomp** |
| 5:4 | 92:10 98:8 | 89:16 106:11 | **start** | 63:18 |
| **simply** | 109:17 | 106:15 | 9:6 48:10 55:9 | **stomped** |
| 47:9 | **somebody's** | **Special** | **started** | 63:12 64:6 |
| **simultaneously** | 24:11 35:11 | 41:19 42:23,24 | 5:16 6:5,6 9:12 | 65:13 |
| 71:11 | 50:5 | 43:17 | 53:14 64:1 | **stop** |
| **single** | **someone's** | **specific** | 93:23 102:23 | 25:18 80:23 |
| 11:2 35:1 | 18:9,11 20:8 | 25:23 51:17 | **starting** | 81:1 |
| **single-man** | 22:11 48:23 | 97:1 | 12:11 63:19,22 | **stopped** |
| 27:5 | **something's** | **specifically** | 63:23 | 77:7,16 |
| **sirens** | 22:10 | 19:18 20:11 | **state** | **stout** |
| 35:19 52:2 | **somewhat** | 21:14 26:5 | 2:8 3:4 44:1 | 72:12 |
| **sit** | 72:13 | 31:20 44:21 | 50:21 56:20 | **strap** |
| 96:12 | **soon** | 51:17 59:17 | 113:3 114:2,5 | 68:7 |
| **sitting** | 42:12 | 101:25 106:12 | 114:21 | **Street** |
| 53:4 66:12 | **sorry** | 110:8,19 | **statement** | 1:16,20 2:5 |
| **situation** | 14:11 46:22 | **spoke** | 44:21 | **strikes** |
| 16:9,10 22:4,9 | 59:8 95:25 | 58:17 101:3 | **States** | 21:8,18,18,19 |
| 24:25 27:4 | 102:14 | 106:11 | 1:1 43:22 | 38:4 65:18 |

Deposition of:  Travis Turner - June 30, 2021
Sherry Poer v. Sheriff Tim Norton in his official capacity, et al.

Page 18

| | | | | |
|---|---|---|---|---|
| 68:17 75:14 | **superior** | **tailgate** | **tall** | 1:17,21 |
| **stripes** | 92:20 | 87:6,8,12 | 73:4 | **tell** |
| 9:24 | **supervisor** | **tailgate's** | **tape** | 5:15 13:18 18:2 |
| **stripped** | 93:15 102:14,17 | 87:7 | 70:8,20 | 18:3 19:2 |
| 90:2 | 102:18 104:17 | **take** | **target** | 34:25 41:6 |
| **strong** | 108:2 | 4:11 9:20 15:8 | 76:20,22 | 54:20 59:16 |
| 73:3 | **support** | 16:12 36:3 | **tase** | 63:16 65:16 |
| **struck** | 43:2 | 37:13 47:2 | 69:21,25 80:1 | 68:24 77:22 |
| 62:18,22 | **supposed** | 53:8,10 99:10 | **tased** | 83:7 86:8,11 |
| **Stueve** | 20:17,17 | 99:12 100:7 | 60:22 62:20,22 | 86:12 89:11,24 |
| 2:6 114:4,20 | **suppressor** | **takedowns** | 71:19 74:15,18 | 91:11,13 |
| **stuff** | 66:4,21 67:1 | 19:24 21:8 | 74:23 83:1 | 103:11,15 |
| 10:11,20,22,23 | 78:22 | **taken** | 88:16 103:3 | 107:13 108:2 |
| 35:9 85:20 | **sure** | 2:3 37:6 93:25 | **taser** | 108:11 |
| 91:3 96:19 | 4:10 12:9,10 | 94:5 114:10 | 12:1 15:2,3,6,7 | **telling** |
| 97:22 104:2 | 24:9,22 34:20 | **takes** | 15:10 16:12 | 71:23 95:7 |
| 105:19 110:13 | 35:1 41:24 | 109:18 | 58:24 59:3,4 | **tells** |
| 111:12,12 | 48:2,7 49:3 | **talk** | 69:21,24 70:11 | 4:20 83:8 |
| **stun** | 53:12 64:24 | 14:15 15:13,17 | 70:16,25 71:6 | **ten** |
| 60:18 71:11 | 73:10 76:19 | 28:7 37:25 | 71:11 73:10,11 | 6:1 8:22 9:3 |
| **subordinate** | 98:25 106:18 | 47:22 51:9,14 | 74:20 80:1,9 | 73:7 |
| 93:19 | 108:22 109:6 | 51:20 94:20 | 80:19,20 81:7 | **tensing** |
| **Subscribed** | **suspect** | 95:1,3 96:3 | 81:19 91:2,3,4 | 74:13 |
| 113:12 | 22:16 23:25 | 101:23,25 | 91:10 | **term** |
| **subsequent** | **swinging** | 106:9,22,25 | **tasing** | 19:3 47:9 57:17 |
| 44:8 | 14:20 | 107:9 108:10 | 65:17 68:15,17 | **terminated** |
| **succession** | **switched** | **talked** | 73:8 82:1 | 6:12 7:4,11 |
| 75:21 | 85:8 | 21:15,17 44:13 | **taught** | **terminology** |
| **sued** | **sworn** | 51:4 89:5 94:8 | 19:12,16 20:7 | 47:5 |
| 1:8 102:5 103:7 | 3:4 113:5,12 | 94:10 95:15 | 20:16,22 21:21 | **terms** |
| **suffering** | 114:8 | 96:14 97:9 | 38:20 51:8 | 11:16 84:17 |
| 27:25 28:25 | **Syracuse** | 98:25 100:14 | **teach** | 107:15 |
| **suggested** | 1:16 2:4 | 100:19 101:10 | 21:12 | **test** |
| 46:13 | **system** | 101:11,15,24 | **teaching** | 9:20 |
| **suggesting** | 32:5 47:25 48:3 | 103:12 104:3 | 20:25 | **testified** |
| 46:22 | | **talking** | **team** | 3:5 5:8,13,14 |
| **suit** | **T** | 11:10 12:1 | 43:12 94:19,23 | **testify** |
| 4:2,4 | **tablet** | 13:11 15:12 | 108:20 | 5:5 114:8 |
| **Suite** | 32:9 | 18:23 31:10,15 | **Team's** | **testimony** |
| 1:20 | **tactic** | 32:15 56:3 | 96:7 | 113:3,5 |
| **summary** | 51:9 | 81:12 82:11 | **technique** | **text** |
| 88:20 94:13,15 | **tactical** | 93:23 98:21 | 20:16,19 | 31:9 |
| 94:15 | 91:12 | 101:16 | **techniques** | **Thank** |
| **summons** | **tactics** | **talks** | 19:21 20:5 21:7 | 111:20,24 |
| 6:25 | 51:13 | 42:19,21 | **Telephone** | **that'd** |

Mile High Court Reporting and Video, Inc.   303-202-0210
contact@milehighreporting.com

Deposition of: Travis Turner - June 30, 2021
Sherry Poer v. Sheriff Tim Norton in his official capacity, et al.

Page 19

45:3
**theory**
51:4,12
**thereof**
114:14
**thin**
91:16
**thing**
35:1 43:10
   48:12 105:10
110:23
**things**
15:9 20:6 24:6
   29:23 32:10
   35:4 38:10
   44:6 66:14
   95:12 97:25
   106:22 111:7
   111:14
**think**
7:21 11:11
   13:19 16:24
   18:10,19 22:19
   22:20 24:16
   32:7 36:13,20
   39:14 45:21
   53:15 55:15
   58:9 59:2 62:4
   62:5 64:11
   67:19 69:24
   75:9,14,17
   77:1 80:18,25
   82:24 85:9,14
   87:21 88:6
   90:25 93:22
   95:23 96:4,10
   96:10,19 98:24
   111:2,8,11
**thorough**
104:18
**thoroughly**
105:25 106:5
**thought**
88:11
**threatening**

16:23
**three**
7:17 58:9 75:23
**thrown**
88:4
**ticket**
5:11 8:6
**TIM**
1:7
**time**
3:12,23 7:22,24
   13:5 14:5,10
   14:15,17 26:13
   26:22,24 27:16
   31:19 32:4
   33:4,11 34:19
   39:17 40:6,10
   41:4,10 44:3
   44:24 45:19,21
   48:25 49:2,17
   50:11 51:1,9
   51:14 53:23
   60:11 65:15
   68:8 72:24
   74:15 89:24
   90:1 91:6,7,10
   91:15 95:16,20
   96:5 98:13
   102:6,8,14
   104:11 111:20
   111:24 112:3
   114:11
**times**
12:23 13:3,14
   13:24 14:14
   22:14,17 72:20
   74:22,25 75:1
   75:11 101:3
   103:4,12
**ting**
79:4,13
**tired**
111:7
**told**
34:22 35:4 39:2

48:8 49:6 62:5
   66:9 69:5 70:4
   71:10 88:6,9
   88:16 94:11
   95:11
**tools**
15:25
**top**
15:1 45:6 58:19
   67:18 74:9
   87:7
**torso**
57:22
**total**
73:7 112:3
**touching**
66:21 67:1,2,5
**town**
8:19
**traffic**
5:11 8:6 10:20
   25:18
**train**
55:4
**trained**
19:13 20:9,13
   28:13,16 54:21
   54:24 57:4
   61:14
**training**
15:8 18:2,3
   19:20 20:11,25
   28:17 37:19,20
   37:21,25 38:9
   38:14,15,16
**trainings**
21:5,11
**trajectory**
5:15
**transcript**
113:3 114:13
**transpired**
94:11
**transported**
107:19,21

109:24
**transporting**
86:16
**Travis**
1:8,11 2:2 3:3
   59:8 113:1,10
**treat**
26:1
**treated**
110:22
**tried**
34:10 51:5
**trigger**
71:12
**truck**
37:2,4,6,8 46:12
   47:11,19,24,25
   51:22 52:2,17
   52:18,19 54:4
   55:1,5,6 86:11
   87:3,10,11
   88:4 94:19
   96:2,9 98:7
**true**
65:11 100:1
   114:13
**truth**
3:4 114:8
**truthfully**
5:5
**try**
11:4 16:5 24:16
   29:6 51:22
   64:17,25 65:25
   66:20 67:22
   68:12 85:5
   86:14 92:1
   98:1 100:9
**trying**
13:19 18:9
   22:11,16 23:7
   23:8 32:7
   51:20 52:13,14
   66:8,18 68:1
   69:17 76:10,12

76:14 96:4
   100:10 108:15
**turn**
52:2 98:15,18
   109:6
**turned**
58:1 98:11,12
   98:19,20
**Turner**
1:11 2:2 3:3,8
   113:1,10
**two**
7:17 16:24 46:3
   49:14 71:8
   73:8,9 74:21
   75:23
**type**
13:9 26:17
   30:10 71:13
**typewritten**
114:12
**typically**
90:23 108:1

**U**

**U-turn**
98:19
**unconscious**
77:8 83:20
   84:15
**underlings**
108:22
**underneath**
60:7,9 69:15
   71:25 72:3
   74:2
**understand**
5:2,6 111:13
**understanding**
18:3,16,18 22:3
   27:18
**understood**
39:17 52:16
**uniform**
9:24 90:14,15

Deposition of: Travis Turner - June 30, 2021
Sherry Poer v. Sheriff Tim Norton in his official capacity, et al.

Page 20

91:5

**uniforms**
96:18
**Unit**
32:19
**United**
1:1 43:22
**University**
44:1
**unlinked**
83:8
**unnecessarily**
109:13
**untrue**
65:9
**upper**
60:20
**use**
11:17,24,24,25
  13:8,15 15:9
  15:22 16:8,12
  17:8 19:18
  20:19 21:21
  22:15 24:13,17
  32:11 37:14,20
  37:22 46:11,11
  47:5 51:13
  52:6 76:7
  102:19 104:12
**use-of-force**
21:4
**user**
15:3,5
**uses**
12:14 16:20
  18:5 103:18
  104:6
**usually**
13:11 15:12
**Utah**
4:1 5:13,18,22
  37:19
**utilized**
20:17,17

---

**V**

**V**
43:5
**vaguely**
51:11
**vantage**
84:20
**vehicle**
45:25 52:25
**verbal**
55:9 66:19 81:2
**verbally**
55:13
**verbiage**
52:6,6
**versus**
18:25
**vest**
90:2,3,4,14 91:4
  91:6,13,16,20
  92:9,14,15
  93:23
**vests**
92:7
**vicinity**
77:14
**video**
73:6 75:12 78:2
  78:12 79:1,12
  79:25 80:4,12
  81:6,23 82:3
  82:14 83:22
  98:3
**videotape**
44:22 56:19
  77:11
**Violent**
10:12
**violently**
18:12 22:25
**visible**
59:24 60:11
**voice**
48:10 82:18

---

**vs**
1:6

---

**W**

**waistband**
61:3 62:11,24
  78:17
**wait**
4:8
**waiting**
107:15
**walk**
17:8 107:17
**walked**
99:5 106:23
**walking**
48:10,23 52:23
**want**
12:12 20:23
  46:23 48:5
  52:14 76:16
  93:9 101:16
  107:8,9 108:10
  109:3,3,6,12
  109:13 111:4
**wanted**
76:24 93:8
  97:11 99:5
  111:6
**wants**
30:19
**war**
43:24 44:6
**wasn't**
11:6 12:18
  26:15 47:11
  48:16 59:23,24
  68:8,22,22
  69:1 73:11,12
  73:19 78:7
  84:3,6 85:23
  92:8 94:15
  105:20 107:19
**watch**
81:4

---

**watched**
46:16
**way**
7:18 8:2 11:19
  35:24 38:23
  46:12 51:23
  59:14 65:10
  70:10 83:12
  87:1,11,21
  98:20 106:23
  110:15,21
  111:16 114:15
**ways**
36:3 48:15 87:4
  87:5
**we'll**
13:21 81:21
  111:15,25
**we're**
52:10,11 66:12
  66:22 80:23
  93:9,10
**we've**
100:19,19
**weapon**
22:22 24:15
  25:7,17,19,20
  25:21,24,24
  53:21 63:5
  90:19
**weapons**
25:14
**wear**
90:23 92:14
**wearing**
90:5,7,10,10,13
  90:25 91:9,15
  91:15 92:4,7,8
**website**
2:15 42:11
**week**
72:20
**weigh**
72:9
**weight**

---

14:3,5 67:13
  74:8,10
**weightlifting**
73:1
**weights**
72:20
**weird**
30:4 32:18
  66:13
**went**
6:1 14:19 17:14
  17:20 31:22
  32:5 35:18
  51:18 58:15
  59:3,4 84:18
  89:18 94:14
  96:6 98:20
  99:22 105:21
  109:22
**weren't**
12:15 28:10
  29:8 59:5
**whatnot**
105:21 107:11
**where'd**
8:18
**whirring**
70:23 71:3
  80:22 81:1
**Whitlock**
36:10 92:6
  100:22
**whoever's**
105:19
**why'd**
8:25
**wider**
71:15
**width**
87:5
**wife**
6:14,17 8:8,12
  8:15
**witness**
37:16 114:8

---

Deposition of: Travis Turner – June 30, 2021
Sherry Poer v. Sheriff Tim Norton in his official capacity, et al.

Page 21

**wooded**
17:2,16
**word**
15:4 51:9
**words**
16:1 46:9 74:1
85:19 111:5
**work**
7:25 8:4,18
26:25 27:9
37:4 90:6
92:15 105:16
**work's**
105:18
**worked**
5:25 7:13,19
27:1 43:22
104:11
**workers**
88:6
**working**
3:23 7:20 9:10
27:11 32:10
36:19
**workout**
72:17
**world**
8:1
**worried**
36:4
**wouldn't**
27:1 67:20
**wrestle**
23:8
**wrestling**
71:21,22
**WRITTEN**
2:1
**wrong**
15:22 45:21
51:9 56:8,20
**www.48sfa.org**
2:15 42:11

——————
**X**

**X**
2:10

——————
**Y**

**yeah**
4:25 6:8 8:3 9:9
9:11,13,21
10:10 12:6
13:22 14:9,22
15:20 19:10
20:6,23 21:17
23:25 28:19
30:2,2 32:9
34:10 35:10,18
38:14,21 39:12
41:9 42:10
43:15,18 45:2
46:20 48:11,14
49:4,10 51:16
52:13,25 56:6
56:7,11 57:19
61:18,20 64:16
64:22 66:15
67:9,19 73:2
73:16 75:1,13
76:8 77:6,22
78:11 79:4
82:2,10,25
83:6 85:8,20
87:9 88:23
91:16 92:12,14
93:4 94:10
95:22,25 99:5
100:19,23
103:5,25
105:16 106:1,7
106:19 107:18
109:16 110:14
111:10
**year**
9:23 10:6 20:11
**yearly**
20:9
**years**
6:1 7:17,17 9:10

10:7 103:13
106:20 111:8
**yelled**
98:14
**yelling**
45:6 55:19 57:2
66:15 71:23
**Yep**
10:19 32:21
73:5 78:15
**yesterday**
30:8 41:23 45:7
58:9,15 71:10
73:7
**you-all**
48:9 49:17
51:19 88:2,16
92:20
**younger**
42:17

——————
**Z**

**zones**
44:6

——————
**0**

——————
**1**

**1**
30:8 32:21
41:21 45:3
112:4
**10:00**
2:6
**10:33**
37:17
**10:37**
37:17
**100**
44:25
**1001**
1:20
**11**
8:22 9:3
**11-minute**

77:13
**11:37**
100:11
**11:50**
100:11
**11:51**
77:17,25
**11:57**
78:13
**12**
26:7 81:18
**12:02**
112:3
**12:03**
81:21
**12:04**
78:25
**12:17**
81:21
**12:19**
81:24
**12:24**
80:25
**12:27**
80:23 81:1
**12:32**
80:23
**16**
111:8
**188**
26:8,20 33:1
35:19 39:10
**18C**
42:24
**1971**
42:20
**1999**
42:23
**19cv1088(LTB)**
1:2

——————
**2**

**20**
113:13
**2002**

43:4
**2008**
6:1
**2010**
6:1
**2013**
9:9
**2018**
9:17 26:7
**202**
31:7
**2021**
1:12 2:6
**2024**
114:18
**21**
45:3,24
**230**
14:7 72:4 74:9
**240**
14:4
**24th**
9:7
**250**
74:8
**26**
114:18

——————
**3**

**3**
2:12,18
**30**
1:12 2:6 33:17
45:11
**300**
1:20 72:25
**303**
31:7
**303)256-6345**
1:17
**303)628-3337**
1:21
**35**
39:14
**35-acre**

Deposition of:   Travis Turner - June 30, 2021
Sherry Poer v. Sheriff Tim Norton in his official capacity, et al.

| | |
|---|---|
| 39:13 | 35:3 |
| **350** | **7:37** |
| 72:10 | 34:13 |
| **4** | **7:52** |
| **4** | 49:14,17 |
| 42:20 | **7:57** |
| **41** | 45:3 |
| 2:15 | **7:58** |
| **45** | 45:11 |
| 112:4 | **8** |
| **4600** | **8:00** |
| 1:16 2:4 | 49:18 |
| **48** | **80** |
| 8:11,17 | 39:14 |
| **5** | **80202** |
| **5:55** | 1:20 |
| 30:25 | **80237** |
| **5:58** | 1:16 2:5 |
| 30:10 | **9** |
| **50** | **90s** |
| 14:2 | 102:7 |
| **576** | **911** |
| 33:22,25 | 43:1 |
| **58** | **96** |
| 2:18 | 5:16 |
| **5th** | **98** |
| 42:24 | 3:14 |
| **6** | **99** |
| **6** | 3:14 |
| 2:15 42:1 | **9th** |
| **6'5** | 2:5 |
| 14:4 | |
| **6:03** | |
| 32:19,25 33:11 | |
| 33:13 | |
| **6:33** | |
| 33:7,10,21 | |
| **6:57** | |
| 34:3 | |
| **7** | |
| **7:30** | |