**Judy Melinek, M.D.**

3739 Balboa Street #102
San Francisco, CA 94121

**E** drjudymelinek@pathologyexpert.com
**T** 415/850/7056
**W** *www.pathologyexpert.com*

October 22, 2021

David N. Fisher
Fisher & Byrialsen PLLC
4600 S. Syracuse St. 9th Floor
Denver, CO 80237

99 Park Ave, Penthouse
New York, NY 10016

**T** 845/721/2157
**E** david@fblaw.org
RE: Poer v Elbert County (Civil No. 19cv1088 (LTB))

Dear Mr. Fisher,

I have reviewed the following material you have sent me regarding the above case:

1. Critical Response Team Report Summary for District Attorney's Office Case #18-2 dated June 19, 2018 (Summary Judgement Motion Exhibit 1 CRT report)

2. Letter to Sheriff Shayne Heap from Elizabeth A. Oldham of the Office of the District Attorney regarding April 12, 2018 - Officer-involved Tasing of Christopher Poer and

3. Coroner's verdict

4. El Paso County Coroner's file for Poer, Christopher #18-0323 (Exhibit #3 in Plaintiff's Motion for Summary Judgement; Poer Autopsy Records) including toxicology report and calibration report, vitreous glucose and electrolyte records, body diagram and notes

5. Microscopic slides (5)

6. Letter from the American Board of Pathology regarding the board certification status of Dr. Daniel Christian Lingamfelter

7. Defense Motion for Summary Judgement (Doc 53) and associated exhibits (6)

8. Plaintiff's Response to Summary Judgement Motion Exhibit 1 Affidavit of David N. Fisher

9. Plaintiff's Response to Summary Judgement Motion Exhibit 2 Affidavit of Natasha Powers

10. Reply in Support of Motion for Summary Judgment from Elbert County Defendants (Doc63) and associated exhibits (3)

11. Audio files (5) including CRT outside interview with Deputy J. Bjork; Dispatch audio; Redacted CRT outside interview with Deputy Tristan Whitlock (2); Redacted interview with Sergeant Travis Turner

12. Redacted audiotaped DA investigator's interview with  Sergeant Travis Turner dated Friday the 13th as part of the CRT investigation

13. Audiotaped interview with Josh Bjork dated April 12, 2018

14. Videotaped interview with with Deputy Dickey

15. Depositions of Deputies Joshua Bjork (8/2/21), Christopher Dickey (6/29/21), and  Sergeant Travis Turner (6/30/21)

16. Amended renewed motion for summary judgment dated 10 September 2021 and response dated October 2021 and associated documents

17. Emails with from Ms. Powers dated  8 and 9 October 2021 regarding her conversation with elected coroner Michael Graef regarding the condition of the body and the post-mortem interval

18. Deputy Christopher Dickey's body camera video

I am a forensic pathologist who works as an independent consultant in both criminal and civil matters. My education is notable for my undergraduate degree from Harvard University (magna cum laude), a medical degree with honors from the University of California Los Angeles School of Medicine, and pathology residency at UCLA Medical Center. I trained in forensic pathology at the Office of Chief Medical Examiner in New

York City from 2001-2003. During that time it was part of my duties to identify the human remains from the World Trade Center terrorist attacks of 9/11/2001. I was an Assistant Medical Examiner at the Office of the Chief Medical Examiner in San Francisco for 9 years. I worked as a contract pathologist for the Alameda County Sheriff Coroner's Office from May of 2013 until June 2020, and for three months I was operating as interim chief in response to the SARS-CoV2/COVID-19 pandemic. I am currently practicing forensic pathology and performing coronial and forensic autopsies in Wellington, New Zealand.

I have published in the medical literature on the topics of pathology, surgical complications, transplantation surgery, toxicology, and immunology. I have been qualified as an expert witness in the fields of pathology, forensic pathology, post-mortem toxicology interpretation, trauma interpretation, and cause of death determination over 190 times in California, New York, Florida, Utah, Colorado, Illinois, Missouri, Iowa, Colorado, and Texas. I am currently licensed to practice medicine in both California and New Zealand. I am board certified in anatomic, clinical, and forensic pathology and I routinely interpret autopsy reports, toxicology reports, medical records, and police reports to determine time of death, mechanisms of injury, and cause of death, and to evaluate the contributory effects of natural disease or intoxicants.

I have investigated many in-custody deaths in my career and I have been qualified in court to opine on the mechanism of injury and the manner of death based on my own and others' autopsy reports, photographs, and scene reports. I have taught forensic pathology to undergraduates, medical students, and residents at New York University, Stanford University, and the University of California San Francisco Medical Center, and have been an invited lecturer at the University of California Hastings College of the Law, the University of California Davis, and at Barts & The London School of Medicine.

After reviewing the above-mentioned sources in this case, it is my opinion that Mr. Christopher Poer died from the combined effects of blunt trauma to the head, restraint, and Taser deployment in the setting of underlying amphetamine intoxication, dilated cardiomyopathy from chronic alcoholism, and hypertensive arteriosclerotic cardiovascular disease with morbid obesity.

The decomposition of the body in the original scene photographs suggests that it was left out many hours after death. This was confirmed by the elected coroner who reported that the body was not refrigerated for over 12 hours. Decomposition can be accelerated in people who are obese, overheated from intense physical exercise, in a warm ambient environment, or in people taking medications that can increase the core body temperature. Allowing the body to decompose in this way after a witnessed death is a violation of proper forensic protocols, as decomposition can alter the levels of drugs in the body. Post-mortem redistribution happens with many drugs and it means that post-mortem drug levels can be spuriously elevated and not representative of the circulating drug levels at the time of death. This also means that it is inaccurate the interpret a specific level of amphetamine measured in a decomposed postmortem blood specimen as "lethal" or "toxic," since that level may normally be easily tolerated in an chronic user and would not have resulted in death in the absence of trauma, physical struggle and/or restraint.

The autopsy report and photos do not indicate whether a layered anterior neck dissection, posterior back and neck dissections, or spinal cord examination were conducted. As such, an upper cervical cord injury can not be completely ruled out as a cause or contributing cause of death. The presence of a left temporal scalp contusion with underlying subarachnoid hemorrhage indicates that Mr. Poer sustained a potentially lethal blow to the left side of his head. In the context of an acute intoxication a head injury such as this can cause a fatal cerebral concussion and/or upper spinal cord injury. Given the temporal relationship between the strike to the head and Mr. Poer's unconsciousness reported by the officer who struck him, this element of blunt

force trauma is a much more compelling reason for his sudden death. The taser deployment to the lower back would not have resulted in cardiac capture based on the location of the barbs and the decedent's body habitus. However, the pain associated with such a deployment, combined with any neuromuscular incapacitation, likely rendered the decedent more vulnerable. Foaming at the mouth occurs in cases where the heart slows down sufficiently to create fluid buildup in the lungs (edema). It is seen in heart failure and neurotrauma. Both played a likely role in Mr. Poer's mechanism of death.

I agree with the autopsy pathologist Dr. Lingamfelter that the manner of death is properly certified as a homicide, because Mr. Poer would not have died when he did were it not for the physical actions of others. This death would not have occurred had officers approached this mentally ill, intoxicated and paranoid man with caution and coordinated de-escalation techniques, rather than with an uncoordinated, reactive and violent response.

The pertinent facts of the case that lead me to these conclusions are:

1. According to the Summary for the District Attorney's Office Critical Response Team report Master Patrol Deputy Chris Dickey used physical force to control subject Christopher Poer and deployed and fired his department issued Taser X26P. Deputy Joshua Bjork used physical force to handcuff Poer. Sergeant Travis Turner used physical force to gain compliance from Poer. On April 12, 2018 at 5:54 PM Poer called the Elbert County Sheriff's Office to report someone had broken into the home and installed cameras and Bluetooth in his phone. Dispatch noted that the caller was not making any sense and talking rapidly. At about 6:57 PM Sergeant Turner made a call and left a message for Poer to call him back. At 7:37 PM Poer called dispatch back advising that the people were currently at the residence. The phone was handed off to Elaine Holt who advised dispatch that Poer was armed with her handgun and that she did not believe that there was anyone else on the property. Deputy Dickey and Sergeant Turner responded Code 3 to the residence. Elaine Holt

had told dispatch that Poer was seeing things and hearing voices. Elaine stayed on the phone with dispatch and reported hearing multiple shots fired. Deputy Dickey heard Poer yelling at the top of his lungs and sounding intoxicated. Deputy Dickey, Sergeant Turner, and Deputy Bjork entered the field using Sergeant Turner's truck as cover. At 8:02:40 PM Poer was at gunpoint. When the officers approached, Poer was lying on the ground on his stomach. Deputy Dickey reported that Poer was lying on his back initially but had rolled on to his right side, facing the deputies. Deputy Dickey, Bjork and Sergeant Turner all gave commands to Poer and he was not complying. He began reaching in the grass, but the deputies could not see what he was reaching for. Dickey said Poer had a "1000 yard stare" and Turner noted that Poer's expression was "creepy." Dickey kicked Poer in the hip to stop his forward movement. Dickey spotted the gun to the right of Poer's right foot and Bjork secured the gun in his waistband. Turner and Bjork started struggling with Poer, who was actively resisting. Poer was pulling his rams under his body. Dickey deployed the Taser and the prongs entered at Poer's back, at either side of his spine, at the waistband. Dickey delivered a drive stun to Poer's left thigh. Bjork, however, said it was to Poer's calf. Dickey's Taser report indicated two 5 second deployments. Sergeant Turner reported that he punched Poer in the left side of his face for about 5 times in an effort to knock him out. Deputy Bjork reported that Poer was tased after Sergeant Turner punched him. At 8:05:35 Dickey called for emergency medical response and noted that Poer was foaming at the mouth. At 8:07:52 Sergeant Turner states that Poer does not have a pulse. CPR commenced and Poer was taken to Parker Adventist Hospital where he was declared dead at 09:06 PM. Elaine Holt reported that Poer had congestive heart failure and that he seemed to suffer from mental health issues, which she thought was PTSD or schizophrenia. Interviews with Poer's family and friends revealed that he was struggling with mental health problems as a result of his military occupational specialty. Sergeant Major Blue reported that Poer had classic PTSD and TBI. Poer also struggled with alcohol.

2. According to the Clearance Letter the District Attorney concluded that the officer's use of force was legally justified. On April 12, 2018 at 5:54 PM Christopher Poer

called the dispatch phone number for the Elbert County Sheriff's Office. He stated that he had been under surveillance by unknown people in a trailer and that these people had placed recording devices and cameras everywhere, including inside his house. At 6:57 PM  Sergeant Turner called Mr. Poer back and left a message. At 7:37 PM, Mr. Poer called dispatch again and claimed he had been robbed. Mr. Poer then put a woman on the phone and she reported that Mr. Poer was having auditory and visual hallucinations and that he had a gun. She thought Mr. Poer was having a delusional episode. Deputy Dickey and  Sergeant Turner responded to the scene with lights and sirens. The woman reported that Mr. Poer had her gun in his hand, that he had pointed the gun at her, and that Mr. Poer then went into the field and she could hear shots fired. The deputies arrived and could also hear the shots being fired. Deputy Dickey reported that he could hear Mr. Poer yelling at the top of his lungs and noted that Mr. Poer sounded intoxicated. At approximately 8:00 PM, Sergeant Turner and Deputies Dickey and Bjork entered the field and could hear Mr. Poer yelling. Two minutes later Deputy Dickey found Mr. Poer lying on his back. As the Deputy approached, Mr. Poer rolled to his side and stared at the Deputies. In the body cam a Deputy yelled "Get your fucking hands up, mother fucker. Put your hands up or I will shoot you. Put your fucking hands up or I'm gonna shoot your ass. Hands up mother fucker. Now. Hands up now or I'm going to shoot you. Sheriff's Office. Hands up or I'm going to shoot. Hands up, do it now. Put your hands up…" Mr. Poer extended his hands "as if reaching for something." The  Sergeant and Deputy Dickey later stated that they felt Mr. Poer was trying to make the deputies shoot him. Deputy Dickey kicked Mr. Poer in an attempt to roll him onto his back. Deputy Dickey observed a handgun near Mr. Power's foot. As Deputy Dickey and Sergeant Turner attempted to take control of Mr. Poer, Deputy Bjork picked up the gun and secured it in the back of his waistband. Mr. Poer continued to disregard commands and struggled to keep his hands under his midsection. They were initially unable to handcuff Mr. Poer. Deputy Dickey deployed his Taser and the prongs entered at Mr. Power's back at his waistband. Dickey also delivered a 5 second drive stun deployment against Mr. Power's leg.  Sergeant Turner struck Mr. Poer on the

head and the Deputies handcuffed him. Poer was foaming at the mouth and the Deputies called for emergency medical response and started CPR. Deputies put Mr. Poer into their patrol truck and continued CPR as they drove him to an ambulance waiting outside the field. At 8:15 PM care was turned over to Rattlesnake Fire Department. Mr. Poer was intubated and transferred to the hospital, where he was declared dead in the emergency department. According to a witness, Mr. Poer was acting very paranoid and was convinced people were surveilling him. A neighbor indicated that she observed Mr. Poer walking up and down the fence line with a gun. He was stumbling, falling down, sitting down and sitting back up , but then laid down in the grass like he was hiding from something. According to the opinion of Elizabeth A. Oldham, Chief Deputy District Attorney, a Taser device does not constitute the use of deadly physical force because the intended, natural, and probable consequence of Taser use is not to produce death. She found that Deputy Dickey acted appropriately when he used the Taser device. She also noted that the Deputies were not aware of the toxic level of amphetamines in Mr. Poer's system and that they were not aware of his chronic health conditions.

3. According to the El Paso County Coroner's Verdict the cause of death for Christopher Poer was listed as "Sudden Death associated with amphetamine intoxication, dilated cardiomyopathy, and Taser deployment" while the manner of death was listed as a homicide. The investigator's narrative indicates that the Elbert County coroner was called on April 12, 2018 at 2144 by Tori from the Douglas County Coroner's Office who stated that the decedent was pronounced dead at 2106 hours. Elbert County Coroner Mike Graeff and Chief Deputy Coroner Sandy Graeff responded to Parker Adventist hospital at 2215 hours Derrick Stuckey and John Incampo from the 18th judicial district requested that the Coroner's office wait for the CBI and the Critical Incident Team. Coroner Graeff bagged the decedent's hands and took photos. The CBI and the critical incident team never arrived at the hospital. The decedent's body was scheduled for autopsy on April 16, 2018 at the El Paso County Coroner's Office.

4. According to the El Paso County Coroner's Report for Poer, Christopher the
   decedent was 46 years old, 5'9" and 213 pounds at death. The autopsy was
   performed on 04/16/2018 at 9:00 AM, 4 days after death. His date and time of death
   were 4/12/2018 at 9:06 PM. He was obese with a Body Mass Index of 31.5 kg/m2.
   The cause of death was determined to be sudden death associated with
   amphetamine intoxication, dilated cardiomyopathy, and Taser deployment. He had
   mild to moderate coronary atherosclerosis, hepatic steatosis and early
   decompositional changes. His medical history was noted to include hypertension,
   obesity, chronic alcohol abuse, and congestive heart failure. The forensic pathologist
   who determined the cause of death noted that per the video observed from body
   camera footage "Taser deployment can be heard, followed immediately by a
   groaning sound by the subject and immediate unresponsive ness, from which he
   never regains consciousness." The manner of death was determined to be a
   homicide. The decedent is described as being decomposed with dark green
   discoloration and marbling of his face, from the of the neck, shoulders, upper chest
   and upper arms. Decomposition of internal organs was also present. Evidence of
   injury included an abrasion at the mid forehead, and lateral bulbar conjunctival
   hemorrhage. Under the scalp there are contusions including a 4-3/4 inch contusion
   at the left temporal area and a 1/2 inch right frontal contusion. Taser marks are
   described as "puncture marks" and are at the lumbar back. They are 25-3/4 inches
   from the top of the head, 2-1/4 inches apart, at either side of midline. Black
   abrasions are at the upper right chest. A 3 inch curvilinear abrasion is at the outer
   left hip. There are numerous abrasions and contusions involving the bilateral lower
   extremities, including injuries at the right knee, left thigh, and bilateral shins. On
   internal examination the heart weighs 640 grams and has 25-40% atherosclerotic
   stenosis of the left anterior descending coronary artery. The heart is dilated.
   Microscopic sections descriptions document myocyte hypertrophy, and mild
   perivascular fibrosis of the myocardium. Lungs had congestion and minimal
   anthracosis. The liver showed mild macrovesicular steatosis. Toxicology of the
   postmortem blood revealed 565 ng/mL of amphetamine, 36 ng/mL of diazepam, 36

ng/mL of nordiazepam, and 773 ng/mL of citalopram. Vitreous electrolytes demonstrated an elevated potassium of 25 mmol/L (consistent with the decedent's decomposed state).

5. The autopsy photos show that the decedent has early putrefactive changes with green skin discoloration on the face and torso and over-hydration of the hands (skin wrinkling). There is a slight purge emanating from the right corner of the mouth. His body habitus is obese with a protuberant abdomen. There is a contusion to his inner lower lip upon reflection of the lip using a forceps. There is congestion of the conjunctiva of both eyes and a right lateral bulbar conjunctival hemorrhage. Two puncture marks consistent with Taser probe marks are approximately 6 cm apart on the lower back. Reflection of the scalp reveals a 9 cm left temporal scalp contusion and a 1 cm right frontal scalp contusion. There is a 4 cm area of left posterior parietal subarachnoid hemorrhage slightly behind and subjacent to the left temporalis contusion. There are contusions to the left thigh, both shins, and an abrasion of the inner left ankle. Notably absent are photos of a layered anterior neck dissection, spinal cord dissection, posterior back and neck dissection.

6. My review of the microscopic slides reveals evidence of post-mortem changes including autolysis and putrefaction of the tissues. There is moderate hepatic steatosis without inflammation. The lungs show pulmonary congestion and edema. Heart sections show myocyte hypertrophy with nuclear enlargement but no significant increase in interstitial fibrosis.

7. The Taser information download in the defense exhibit 1 in the reply to the summary judgement motion shows two 5 second deployments of the X26P Taser belonging to Deputy Chris Dickey at 20:02:51 and at 20:03:58

8. Travis Turner's declaration (defense exhibit 3 to the in the reply to the summary judgement motion) states that he struck Christopher Poer several times at the side of the face with the intent of gaining compliance and that this allowed the officers to gain control of Poer's hands. He wrote that the gloves he used were cloth and did not have any metal inside them. He denied wearing carbon reinforced knuckle

gloves or that he hit Poer with such gloves, with brass knuckles, or with a metal object. A picture of the gloves that he wore was attached as exhibit 2.

9. According to the interview with  Sergeant Travis Turner, he reported that he got a call about a man who called who complained that someone put cameras in his house and put a tracking device on his phone. He had to serve a restraining order with Dep Dickey. He called the phone number of the reporting party at 6:38 PM and left a message. Dispatch reported that a female caller reported that Poer had a gun so they went out Code 3. Dickey got there first. Dispatch then reported that Poer had walked out in a field and was firing the gun. Dickey went out and could see Poer. Poer fired again. Dep. Dickey came on the radio and reported that he could hear Poer firing the gun. Dep. Bjork jumped on the tailgate and they pulled over to Dickey. He "always" has a shield in his truck, but he had some repair work on his truck, and forgot to put the shield back in. So they decided to drive towards Poer (300-400 yards away). They could periodically hear him yelling from a distance but they couldn't see him. They drove toward the area where Dickey had seen him last and it was starting to get dark. Someone came up behind them in an SUV/truck and had his lights on and the officers told him to turn off his headlights but he drove away. Turner then saw Poer, parked his truck, grabbed his rifle and started yelling. Poer laid down in the grass. Turner is yelling at him "Shoe me your fucking hand." They other two deputies were also yelling at him. Turner could see his left hand. Poer made a motion like he was reaching for a gun. He saw a pistol off to the right and he told Bjork to get the gun. Dep. Bjork grabbed the gun. Dep. Dickey put a foot in Poer's back. Dep. Bjork was on Poer's right side trying to get control of his hands. Sgt. Turner put the muzzle at the back of Poer's head and used "colorful" language. Sgt. Turner told Dep. Dickey to "Tase him." Taser was deployed and Poer was still actively resisting. Sgt. Turner punched him with a closed fist on the left side of of his face probably five times. He thinks he knocked him out. He had put his rifle far away. He had grabbed Poer's left hand and cranked it back. He was handcuffed at that point and Turner got back up. He walked back to his truck and put the rifle in the truck. They rolled him over and started searching him. Dep.Dickey noticed that Poer was

frothing from the mouth. They "set him up." Dep. Dickey checked his pulse and Turner said "I think I knocked him out." Turner grabbed gloves to search him. One of the deputies said to take the handcuffs off and then they started chest compressions. Turner then noticed speckled blood on his face and nose, and was thinking he shots himself. Poer's eyes were fixed and dilated. Dep. Dickey called for fire. They realized fire would not be able to get to them quickly so Dep. Bjork drove the truck, and the officers picked Poer up and put him on the edge of the tailgate. They did compressions and Bjork drove slow about 100 yards in, and they moved Poer in further. They shoved him clear up into the truck so they could do chest compressions while they were heading to the ambulance. The "fire guys" then took over. Sgt. Turner said he saw Poer's left hand and he was looking at the officers when he was reaching, and then Turner saw the gun "to the right." They heard Poer yelling in the distance before they approached, but after they engaged with him he didn't say anything. He thought he was "some crazy guy in a field, screaming." He describes how when he looked at them the look was "creepy." Turner was yelling as loud as he could "Show me your fucking hands or I will shoot you." He remembers Dep. Dicky either put a knee or foot on Poer's back and then at one point Turner "stomped him" at the small of his back. Turner put the muzzle of his gun on the back of Poer's neck and threatened to kill him if he didn't give them his hands. Poer was actively resisting. Turner did not notice any change in resistance until Turner punched him. He thinks he hit him probably 5 times and he started "pounding" and that was what allowed them to handcuff him. Turner could only see his left hand. After he stopped hitting him and that was when Dep. Bjork had gained control of his right hand. He described the Tasing as shooting him with prongs and then having a secondary point of contact. He didn't think the Taser had any effect. Afterwards it was found out that Poer was a chronic alcoholic and had congestive heart failure. Turner did not smell any alcohol on Poer.

10.      According to the interview with Deputy Josh Bjork, the Deputy stated that he heard the call on the radio that an individual had a weapon and that he was pointing it at a woman and then left the house. He called into service and went to the

address. While on route he was advised that Poer may have been in the driveway possibly waiting for someone. Then the reporting party advised dispatch that he went into the field and that she could see him. He may have fired a shot. The reporting party said she lost sight of him. As he responded the other officer (Sergeant Turner, EC21) there said he saw the suspect. When he arrived Sgt. Turner said that he could see Poer in the field. Deputy Dickey was also already on scene. He got out, drew his weapon and Sgt. Turner's instructed him to look for his shield at the back of the truck, but Bjork couldn't find it. He sat in the bed of Turner's truck as they drive out to the field. Bjork jumped out of the bed of the truck. It was dark and he couldn't see Poer. Bjork drew his firearm (Glock handgun). Turner decided that they would use the vehicle as cover. The three deputies went out together into the field. Sgt. Turner yelled out "He's over there." Bjork jumped off the back of the truck, and the officers gave him verbal commands as Poer was laying on the ground. They got within 3-4 feet and he was slow to show them his hands. Eventually he put his hands up in front of his head. Dickey and Turner slung their rifles and tried to grab his arms. Bjork holstered his weapon and tried to grab Poer's right arm. Poer "curled" his hands under his body. Turner struck the suspect in the head with his fist about three times. Poer continued to pull his arms into his chest and tried to "ball up into a ball." Poer wasn't saying anything. After he was struck a third time, Dep. Dickey Tased him in the small of the back, followed up with a drive stun to the calf. At that point Poer seized up due to the Taser being deployed for 5 seconds. Poer relaxed and Bjork got him handcuffed and then sat him up, using his chest and knees to prop Poer up. When they sat him up Poer wasn't responding but he was "stiff" and not responding. Dickey said Poer was frothing at the mouth. Dep. Dickey checked for a carotid pulse and there was no pulse. Both Dickey and Turner told Bjork to remove the handcuffs and he did. They laid him back down and started CPR.  When he was laid down he could see the frothing at the mouth and Poer's eyes were "kind of glazed over." As they approached Poer, and Sgt. Turner and Dep. Dickey got on top of him, the officers pointed out a pistol next to Poer. Bjork secured it in his belt behind his back. The slide was locked to the rear. They saw medical

coming up the road, so they decided to load Poer in the truck. They lifted Poer into the back of the truck and Sgt. Dickey and Turner continued compressions in the bed of the truck, and brought Poer to the road so that the fire crew could take Poer to the ambulance. The gun fell out from the small of his back when they were loading Poer into the truck to bring him to medical.

11.     According to the videotaped interview with Deputy Christopher Dickey, the Deputy reported that the original call came in around 6 PM and he had briefly red the CAD notes and he noted that it was a mental health call. Christopher said he was hearing voices and someone had planted devices on his phone. Travis Turner and he were the only ones working and they were waiting on a restraining order. Turner tried calling Poer but didn't get him. Dispatch updated them on the mental health/citizen's assist call. They said that Elaine had called and that Christopher had a gun and that he had pointed it at her. She reported that he was talking crazy and didn't make sense. They went to the scene Code 3 and Elaine reported that she heard shots fired. As he arrived he heard three gunshots when he got out of his truck. He could see a person walking back and forth about 100-125 yards away in the dusk. There were no more gunshots. Travis drove the truck into the field so they could use it as a shield. They saw Poer laying down in the bushes with his head facing South, feet North. Travis had his rifle out. All three officers we're yelling profanity-laced commands "show us your hands," "don't move," "I'm gonna shoot you". When they stopped they were 25-30 feet away. When he first saw him Poer was laying on his back and he had his "hands up" flexed at the elbows (00:27:50). Poer started to roll onto his right side, he looked right at them, but he "was looking right through us." One of his hands was on the ground and he started extending it through the grass and they all started yelling "Don't do it" because Poer was reaching away from his body. Poer continues to reach and so Dickey gave him a "swift kick" in the lower belly to hip area, causing Poer to rotate onto his left arm. Dickey reported that he couldn't see anything in his hand, but his right arm was "tucked up." Josh went to work with the handcuffs and got it on Poer's right wrist and Poer was fighting him. Dickey saw Travis yanking on Poer's arm trying to get his left arm out. Poer was not

compliant and was not cooperating. Dickey deployed his X26 Taser and told Travis to move his leg because Travis had his right knee on Poer's back. Dickey Tased Poer using the probes in the small of Poer's back with a three point drive stun into the back of Poer's quad. During this time Poer did not say a word. He didn't make any noise when he was Tased. He gave him more commands so he did another drive stun. He Tased him at least two times. After the last time, Josh was able to get Poer's hand back. He remembered Travis striking him a couple of times in the neck/jaw area, with his left hand. Poer was laying on his stomach so they rolled him over on his back and Poer's head "flopped back" and he had gray pallor to his face and was drooling out of the corner of his mouth. He recognized these as signs of death. He did a sternal rub and he could see foam saliva coming from his mouth. He felt for a carotid pulse and didn't feel it, so he asked Josh to remove the handcuffs so that they could perform CPR. They ran compressions for a couple of minutes and called for medical. They then decided to "throw him" in the back of the truck to bring Poer toward the road to meet the paramedics. When they approached Christopher and they started wrestling he saw the gun laying there in the dirt. When they picked it up later he saw the slide was back and the magazine was empty. He subsequently heard that Elaine reported that Mr. Poer had a medical history of congestive heart failure, seizures, alcoholism and was on all kinds of medications. When he heard the shots being fired when he arrived he also heard loud swearing, like "Fuck this!" and "Fuck you!" Once Dickey kicked him back over and they saw there was nothing in Poer's hands, he glanced over to Poer's feet and he saw the gun in the dirt. After the Taser deployment Poer was still fighting and resisting. Poer wasn't just laying on his arm, he was "tightening up." After the last Taser deployment Turner finally got Poer's arm yanked out and Josh could get the second cuff on him. He reported that it was after he Tased Poer that "Travis might have struck him a few times." Josh was kneeling in the dirt trying to get Poer's arm back. The gun was lying just off Poer's feet and Josh had said that he secured the gun and had tucked it in the back of his duty belt, but when they were loading Poer up the gun fell out. He said that they tried to be gentle but they heard ribs breaking during CPR and Poer's head flopped back

when he was being loaded in the truck and may have gotten impacted. He was on the tailgate and they could see that Poer's right leg was hanging off the tailgate and in hoisting Poer's back in the truck Poer's head banged against the toolbox in the truck. He reported that his chief concern when Poer was reaching out he was concerned that Poer was trying to get them to shoot him because he was reaching for a gun, but even if he was a reaching for something else, like a cellular phone, he might get shot and he thought they used good judgement in not "lighting him up." He said he "charged him and kicked him back down" to keep Poer from rolling. He described the foam in Poer's mouth as "saliva bubbles" but it may have had a little blood in it.

12.    Deputy Josh Bjork testified that Sergeant Turner was in control of the scene and when he arrived he understood that there was an individual out in a field firing off rounds (p.7). He did not hear the rounds fired off (p.8). The officers approached Poer using the truck for cover (p.13). When the officers were trying to apprehend Mr. Poer, Deputy Bjork found the firearm lying by Mr. Poer's feet so he grabbed it and put it in his waistband (p.14). Deputy Dickey was wearing a body camera that day (p.16). He thought Sergeant Turner struck Poer approximately three times (p.19). The sound on the video of the ratcheting of the handcuffs that follows the Taser deployment he identifies as him putting on one of the handcuffs on Mr. Poer's right wrist (p.20). When Deputy Dickey said "move your knee" he was talking to Bjork, who said that he had his knee in the middle of Poer's back at the time (p.20). According to Bjork the second handcuff went on when he said "Goddamn handcuff" because he was having a hard time closing the second cuff because of his positioning (p.26). Poer stopped resisting after the cuffs were on (p.26). Bjork did not notice Poer going unconscious and only became aware that Poer was unconscious when Dickey told him to take the handcuffs off (p.27). Sergeant Turner hit Poer with his fist (p.30). He hit him in the facial area but he didn't see all the blows (p.32)

13.    Deputy Christopher Dickey testified that when he was serving a sex offender with a restraining order he received a call over the radio. It was a call for service for someone who was experiencing a mental health issue and needed medical help

(p.20). He said he participated in the Crisis Intervention Training (CIT) program as a police officer. He was aware that crisis training involving people having a mental health crisis involved de escalation techniques (p.31). He stated that they didn't use lights or sirens so that they wouldn't become a target to anybody as they came into the area (p.46). Poer sounded intoxicated and Dickey thought he was drunk (p.476). He was then told by dispatch that Elaine Holt had said Poer was not drinking or taking drugs (p.55). It was his decision to use the truck as cover as they approached Mr. Poer. They had no lights or sirens on because they wanted to approach Poer without being seen (p.64). The officers spotted Poer laying in the field and Sgt. Turner lit him up using a flashlight that was on his AR-15 (p.72). The gun and flashlight were pointed at Mr. Poer (p.73). Turner then started yelling loud verbal commands like "Hands up, motherfucker" and "Hands up or I will shoot you" (p.73). Dickey himself also started yelling loud verbal commands. Poer was laying on his back initially, then he rolled onto his side with his hands outstretched (p.75). Dickey could see his hands but not what Poer was reaching for with his hands "in the air" (p.76-77). When he got over to Poer, Dickey kicked him in the left hip as he was rolling toward the deputies in order to get Poer onto his stomach (p.82). After Poer was rolled onto his stomach his hands were underneath him (p.83). The deputies tried to grab his arms, with Turner grabbing at Poer's left arm, while Josh Bjork pulled at his right arm (p.86). The gun was then spotted in the grass behind him, by Poer's feet (p.86). Sergeant Turner had his knee in the way so Dickey instructed him to move the knee so he could Tase Poer. At this point Deputy Bjork was on his right arm and Turner was on his left arm. He identified a ratchet sound on the video being Deputy Bjork deploying a handcuff at Poer's right hand. He saw Sgt. Turner punch Poer one or two times (p.102). Afterwards, Dickey tried to determine vital signs and could not detect any (p.115). He estimated that the amount of time Mr. Poer was prone on his belly with officers pulling at his arms as approximately 45 seconds (p.117). He thought Mr. Poer might have been intoxicated (p.119). He described Tasing Mr. Poer from about six or eight inches away and then following it up with a drive stun in order to be "more effective in the entire body" (p.138). The probes were

in the lower back and the drive stun was applied at the leg at the same time (p.138-139).

14.     Sergeant Travis Turner testified that at the time of the incident his weight was about 230 pounds. He acknowledged that a blow to the head could be lethal. He said that when he received the phone message from Mr. Poer about his phone and house being bugged, he thought it was probably "some kind of paranoia situation." He called Mr. Poer and left a message. He had never had CIT training - training to respond to people having a mental health crisis. When he arrived at the scene he had been told by dispatch that Mr. Poer had Elaine (the property owner's) gun. (P.41) Elaine had reported that Mr. Poer had not been drinking and was not on any drugs (p.46). They entered the field approximately 8 minutes after the last shot was fired (p.50). The officers turned off the lights and sirens so that Poer wouldn't see them coming and the idea was to sneak up on him (p.53). When Sgt. Turner first saw Poer, he was laying on the ground on his stomach. He could only see his left hand and it did not contain a gun (p.57). Poer's right arm was underneath his body (p.60). Bjork secured the gun and put it in his waistband (p.62). Sgt. Turner stomped on Mr. Poer's back because he was starting to roll (p.64). Sgt. Turner then placed his AR15's suppressor against the back of Mr. Poer's head while he yelled at him "I'll kill you. Give us your hands." He then set his gun down to secure Mr. Poer's left arm. He and Deputy Bjork were kneeling on Mr. Poer and that is when Dickey deployed the Taser (p.70). Both he and officer Bjork (who weighs a combined 435 pounds) were struggling with Mr. Poer and Bjork was pulling on his right arm (p.73). Sgt. Turner testified that he works out four or five times and week and bench presses over 300 pounds. HE interpreted Mr. Poer tensing his muscles to hold his right arm in place as resisting the officers' attempts to handcuff him (p.74). After Mr. Poer was Tased Sgt. Turner punched Poer in the face four or five times with his left hand in rapid succession. He hit him on the left side of the cheek. He thinks he knocked him out on the last punch (p.75). After he was unconscious he and Dickey performed CPR and he could hear the cracking as Poer's ribs broke (p.86). After Poer had been

cuffed Sgt. Turner felt for Poer's carotid pulse and didn't feel it. They placed Poer's body on the tailgate of the pickup truck and transported him.

15.     In an email summarizing Ms. Powers' interview with Coroner the Coroner reported that the body was left unrefrigerated for over 12 hours after death.

16.     Deputy Dickey body camera video shows the struggle with Poer. Prior to the struggle Poer is seen to be prone on the ground with his hands on the ground at the level of his head, with his elbows flexed approximately 90 degrees, apparently supporting his upper torso (time stamp 20:14:18-31). Deputy Turner says "There's a gun - grab it" and Bjork says "Done." There is metal clanking sound at the start of the struggle with Poer (time stamp 20:14:42). Deputy Dickey says "We got him." The first Taser deployment and a moan from Poer are heard (time stamp 20:14:53-58) after Deputy Dickey says "Move your knee." Bjork says "Goddamn handcuff" (time stamp 20:15:15) and subsequently a ratcheting sound is audible. Deputy Dickey says "roll him so that he doesn't freakin'" (time stamp 20:15:53) Deputy Turner is heard saying "I probably knocked him out" (time stamp 20:16:06).  Code 4 is called for medical to come. Deputy Turner is then heard to say "He is foaming at the mouth" (time stamp 20:16:41) and then he asked medical to expedite because he is foaming at the mouth. On the video it appears that the officers are holding Poer up in a seated position, he is unresponsive, and his neck is flexed forward. The amount of time that elapses between Poer's reported unresponsiveness (after the second handcuff is put on) and the start of cardiopulmonary resuscitation (chest compressions) at 20:19:42 is approximately  4 minutes.


These opinions are based on my experience and training, as well as my knowledge of the peer-reviewed forensic medical literature. I am relying on the information you have provided me at the present time; thus, my opinions may change if other information is offered to me for review. The forensic methodology employed in my work in this case is identical to the methodology I employ when I perform an autopsy or write a report as part of my job for the medical examiner or coroner's office, or in my work as a medico-legal expert in other cases involving excited delirium, restraint and Tasers. It is

also consistent with the standards of my profession. I review the above-mentioned records and then I analyze that information in the context of the current peer-reviewed medical literature. The peer-reviewed medical literature is searched via an on-line search engine at the National Library of Medicine (http://www.ncbi.nlm.nih.gov/pubmed) for the relevant terminology.

I am available to testify to these opinions in a mediation hearing, deposition or trial, if necessary. Please feel free to contact me at the above address and phone number if you have any questions or need further clarification.

Sincerely,

Judy Melinek, M.D.

Selected References:

Textbooks:

1. Baselt RC. Disposition of Toxic Drugs and Chemicals in Man, Tenth Edition; 2014 Biomedical Publications, Foster City, CA

2. Collins KA. Autopsy Performance & Reporting, Third Edition. 2017 College of American Pathologists, IL

3. DiMaio TG and Di Maio VJM. Excited Delirium Syndrome: Cause of Death and Prevention. CRC Press Boca Raton, FL 2006

4. DiMaio VJ and Dana SE. Handbook of Forensic Pathology. 2007, CRC Press, Boca Raton, FL.

5. DiMaio VJ and DiMaio D. Forensic Pathology Second Edition. 2000, CRC Press, Boca Raton.

6. Dolinak D, Matshes E, Lew E. Forensic Pathology Principles and Practice. 2005, Elsevier Academic Press, Burlington, MA.

7. Dolinak D, Matshes E. Medicolegal Neuropathology: A Color Atlas. 2002, CRC Press, Boca Raton, FL.

8. Ellison D, Love S, et al. Neuropathology: A reference text of CNS pathology, Second edition. 2004, Mosby, Philadelphia, PA.

9. Glick, R.L. Emergency Psychiatry. Lippincott Williams & Wilkins Philadelphia, PA 2008

10. Itabashi HH et al. Forensic Neuropathology: A Practical Review of the Fundamentals. 2007 Elsevier Academic Press, Burlington, MA.

11. Payne-James J, Beynon J, Vieira DN. Monitoring Detention, Custody, Toture and Ill-Treatment: A Practical Approach to Prevention and Documentation. 2018 CRC Press. Boca Raton, FL.

12. Spitz WU. Spitz and Fisher's Medicolegal Investigation of Death, Fourth Edition, 2004, Charles C Thomas Publisher LTD.

13. Wecht CH, Lee HC, Van Blaricom DP, Tucker M. Investigation and Prevention of Officer-Involved Deaths. 2011 CRC Press. Boca Raton, FL.

14. Wetli CV, Mittleman RE, Rao VJ. An Atlas of Forensic Pathology. 1999 ASCP Press. Chicago, IL.


Articles and Abstracts:

1. AMA Executive Summary, Report 6 of The Council on Science and Public Health (A-09) : Use Of Tasers® By Law Enforcement Agencies: www.AMA.org

2. Bell LV, On a form of disease resembling some advanced stages of mania and fever. American Journal of Insanity. 1849, 6:97-127

3. Bell MD et al. Positional Asphyxiation in Adults. *The American Journal of Forensic Medicine and Pathology*. 13;2 1992 pp.101-107

4. Breed D, Meyer LCR, Steyl JCA et al. Conserving wildlife in a changing world: Understanding capture myopathy—a malignant outcome of stress during capture and translocation, *Conservation Physiology*, Volume 7, Issue 1, 2020, coz027, https://doi.org/10.1093/conphys/coz027

5. Chan T et al. The Impact of the Taser Weapon on Respiratory and Ventilatory Function in Human Subjects? *Academic Emergency Medicine* 14:5 May 2007 Suppl. 1 pp. S191-192

6. Gonin P, Beysard N, Yersin B, Carron PN. Excited delirium: a systematic review. Academic Emergency Medicine. 2018 May;25(5):552-65.

7. Grant JR et al. Excited Delirium Deaths in Custody: Past and Present. *The American Journal of Forensic Medicine and Pathology.* 30:1 March 2009 pp.1-5

8. Hick, JL et al. Metabolic Acidosis in Restraint-associated cardiac arrest: a case series. *Academic Emergency Medicine* 6:3 March 1999 pp. 239-243

9. Ho JD et al. Cardiovascular and physiologic effects of conducted electrical weapon discharge in resting adults. Academic Emergency Medicine 2006 Jun;13(6):589-95

10. Ho JD et al. Effect of position and weight force on inferior vena cava diameter – Implications for arrest-related death. *Forensic Science International*. 2011, 212: 256-259

11. Ho JD et al. Lactate and pH evaluation in exhausted humans with prolonged TASER X26 exposure or continued exertion. Forensic Science International. 2009 Jun 16.

12. Jauchem JR. Acidosis, lactate, electrolytes, muscle enzymes, and other factors in the blood of Sus scrofa following repeated TASER1 exposures. *Forensic Science International* 161 (2006) 20–30

13. Kennedy HG et al. Acute excited states and sudden death. *British Medical Journal* 315: 1107-1108 November 1997; associated letter by Ponder, D. British Medical Journal 1998 316:1171-1173

14. Lawrence C et al. Investigator Protocol: Sudden In-Custody Death. *The Police Chief*, Vol. 71 No. 1 2004: 44-52

15. Lee BK et al. Relation of Taser (electrical stun gun) deployment to increase in in-custody sudden deaths. *American Journal of Cardiology.* 2009 March 15;103(6):877-80

16. Marder, SR A review of agitation in mental illness: Treatment guidelines and current therapy. *Journal of Clinical Psychiatry* 2006; 67 suppl. 10: 13-21

17. Marinetti, LJ and Antonides, HM. Analysis of Synthetic Cathinones Commonly Found in Bath Salts in Human Performance and Postmortem Toxicology: Method

Development, Drug Distribution and Interpretation of Results. *Journal of Analytical Toxicology* 2013;37:135–146

18.     Marzuk, PM et al. Ambient temperature and mortality from unintentional cocaine overdose. *JAMA* June 10, 1998 279:22 pp. 1795-1800

19.     Milliken D. Death by restraint. *CMAJ* 1998;158:1611-12

20.     Mitchell RA *et al.* National Association of Medical Examiners Position Paper: Recommendations for the Definition, Investigation, Postmortem Examination, and Reporting of Deaths in Custody. Acad. Forensic Pathol. 2017 7(4): 604-618

21.     MaCCall C, Callender J. Mirtazapine withdrawal causing hypomania. *Br J Psychiatry* 1999; 175:390.

22.     Mash DC. Commentary on: Johnson MM, David JA, Michelhaugh SK, Schmidt CJ, Bannon MJ. Increased heat shock protein 70 gene expression in the brains of cocaine-related fatalities may be reflective of postdrug survival and intervention rather than excited delirium. *J Forensic Sci* 2012;57(6):1519-23. *J Forensic Sci*, March 2013, Vol. 58, No. 2 doi: 10.1111/1556-4029.12081

23.     Mash DC, Pablo J, Ouyang Q, Hearn WL, and Izenwasser S. Dopamine transport function is elevated in cocaine users. *J Neurochem*, 81 :292-300, 2002.

24.     Mash DC, Duque L, Pablo J, Qin Y, Adi N, Hearn WL, Hyma BA, Karch SB, Druid H and Wetli, CV. Brain biomarkers for identifying excited delirium as a cause of sudden death. *Forensic Sci Int*,190(1-3), 2009.

25.     Mash DC, Staley JK, Izenwasser S, Basile M, Ruttenber AJ. Serotonin transporters upregulate with chronic cocaine use. *J Chem Neuroanat.* 2000 Dec;20(3-4):271-80

26.     Narayan V, Haddad PM. Antidepressant discontinuation manic states: a critical review of the literature and suggested diagnostic criteria. *J Psychopharmacol*. 2011 March; 25(3):306-313

27.     NIJ Special Report "Study of Deaths Following Elecro-Muscular Disruption." May 2011.

28.     O'Halloran, RL et al. Restraint Asphyxiation in Excited Delirium. *The American Journal of Forensic Medicine and Pathology* 14:4 1993; pp. 289-295

29.    O'Halloran, RL et al. Asphyxial Death During Prone Restraint Revisited: A Report of 21 Cases. *The American Journal of Forensic Medicine and Pathology*. 21; 1 March 200 pp.39-52

30.    Penders TM, Mash D., Lee J.C. Excited Delirium Following Use of Synthetic Cathinones. Poster Presented at American Academy of Forensic Sciences (AAFS), November 2012.

31.    Penders TM, Gestring, RE, Vilensky DA. Excited delirium following use of synthetic cathinones (bath salts). *General Hospital Psychiatry* 34 (2012) 647–650

32.    Ross DL. Factors associated with excited delirium deaths in police custody. *Modern Pathology.* 1998 Nov 11 (11):1127-37

33.    Samuel E et al. Excited Delirium: Consideration of selected medical and psychiatric issues. *Neuropsychiatric Disease and Treatment* 2009:5 pp.61-66

34.    Scheinin L et al. Sudden death and sickle cell trait: medicolegal considerations and implications. *The American Journal of Forensic Medicine and Pathology.* 2009 Jun;30(2):204-8

35.    Stellpflug SJ, Menton TR, Corry JJ, Schneir AB There is more to the mechanism of unconsciousness from vascular neck restraint than simply carotid compression, International Journal of Neuroscience, 2020 130(1):103-106

36.    Stone MP Understanding the dynamics. *PORAC Law Enforcement News* April 2004 pp.10-13

37.    Stratton SJ et al. Factors Associated with Sudden Death of Individuals Requiring Restraint for Excited Delirium. *American Journal of Emergency Medicine* 19, 9 May 2001 pp. 197-191

38.    Stratton SJ et al. Sudden Death in Individuals in Hobble Restraints during Paramedic Transport. *Annals of Emergency Medicine* 25:5 May 1995 pp.710-712

39.    Strömmer EMF et al. The role of restraint in fatal excited delirium: a research synthesis and pooled analysis. 22 Aug 2020 Forensic Science, Medicine and Pathology https://doi.org/10.1007/s12024-020-00291-8

40.    Strote J et al. Taser use in restraint-related deaths. *Prehospital Emergency Care*. 2006 Oct-Dec;10(4):447-50

41.     The Royal College of Emergency Medicine Best Practice Guideline: Guidelines for the Management of Excited Delirium / Acute Behavioural Disturbance (ABD). May, 2016 (https://www.rcem.ac.uk/docs/College%20Guidelines/5p.%20RCEM%20guidelines%20for%20management%20of%20Acute%20Behavioural%20Disturbance%20(May%202016).pdf)

42.     Verma JK, Mohapatra S. Mirtazapine withdrawal-induced mania. *J Pharmacol Pharmacother*. 20 LS Oct-Dec; 6 (4): 214 - 215.

43.     Vilke GM et al. Physiologic Effects of the TASER on Human Subjects after Exercise. *Annals of Emergency Medicine* 50; 3 September 2007 S55

44.     Vilke GM et al. Excited Delirium Syndrome (ExDS): Treatment Options and Considerations. *Journal of Forensic and Legal Medicine* 19 (2012); 117-121

45.     Vilke GM et al. Excited Delirium Syndrome (ExDS): Defining Based on a Review of the Literature. *Journal of Emergency Medicine* (2012) 43 (5): 897-905

46.     Vilke GM, DeBard ML, Chan TC, Ho JD, Dawes DM, Hall C, Curtis MD, Costello MW, Mash DC, Coffman SR, McMullen MJ, Metzger JC, Roberts JR, Sztajnkrcer MD, Henderson SO, Adler J, Czarnecki F, Heck J, Bozman WP. Excited Delirium Syndrome (ExDS): defining based on the review of the literature. *J Emer Med*, 2011; doi: 10.1 01 6/j.jemermed.2011.02.017

47.     Wetli, CV et al. Cocaine-induced Psychosis and Sudden Death in Recreational Cocaine Users. Journal of Forensic Sciences 30:3 July 1985 pp.973-879

48.     Wetli CV, Mash DC, and Karch S. Cocaine- associated agitated delirium and the neuroleptic malignant syndrome. *Amer J Emer Med* 14:425-428, 1996.

49.     Wolf, Dwayne A. Nontraumatic In-Custody Homicidal Deaths in Harris County, Texas (2015-2019). *Am J Forensic Med Pathol.* May 4, 2021 Published ahead of print