**Powers Police Practices Consulting & Investigations**

**PO Box 1634 , Grand Junction, Colorado 81502**

**650.833.8783**

powersppci@gmail.com

September 10, 2021

**Introduction**:

I was asked to review this case and render my opinions as to any law enforcement conduct in this case. This is my report, and it reflects my observations and opinions, as well as the bases for my opinions.

**Summary of Professional Qualifications**

I was a police officer for 14 years, and retired from the City of Palo Alto, California as a Sergeant. Since my retirement from active policing in 2011, I have been the owner of Powers Consulting & Investigations and Powers Police Practices Consulting & Investigations. As a court-qualified expert in police, security, and public safety practices, I have been retained in more than 250 cases in 5 different states from 2011 to the present and have testified on behalf of defendants as well as plaintiffs numerous times over the years in the United States District Courts, state and county courts, and before a variety of personnel boards. I currently hold the following certifications:

- Certified litigation specialist in police practices, Americans for Effective Law Enforcement (AELE).

- Certified Force Science Analyst, Force Science Institute, Minnesota State University at Mankato.

1

- Certified Defensive Tactics Instructor, FBI Method, Monterey, California.

- Certified Taser Instructor and Armorer, Scottsdale, Arizona

As a former police officer, supervisor and manager, I have been trained in most aspects of policing including the use of firearms and lethal force, pressure point control tactics (PPCT), TASERS, police pursuit driving, police motorcycle operation, traffic investigations, riot control, the use of chemical agents, police batons and truncheon devices, hand to hand combat and arrest control tactics, handcuffing and other restrain devices, and the use of stop sticks. Additionally, I am trained in the investigation of homicides, and officer involved shooting investigations, use of force investigations, and internal affairs investigations, and the writing and revision of use of force police and procedures.

I know how and why police officers are trained, what established police practices are, and how reasonably-trained and prudent police officers perform in the line of duty. This knowledge comes from my education, training, police experience, and my experience working as a court-qualified police practices expert. I have evaluated thousands of police incidents over my career in policing and as a police practices expert. Many of these incidents involved lethal force in officer-involved shootings resulting in serious bodily injuries and fatalities to citizens as well as police officers, and the use of less-lethal force which resulted in minor and serious bodily injuries to citizens and police officers.

I was a defensive tactics instructor for over 12 years of my law enforcement career, and have trained hundreds of police officers on proper and improper tactics. I have written policy on the use of force and developed a curriculum for both block style and scenario based training for inservice police officers and police academy students. I evaluated hundreds of use of force cases and have advised command staff of the results of those investigations.

2

**Education**

I have a B.S. Degree in Political Science from San Jose State University, in San Jose, California. I attended two years of a four year law school program at Lincoln Law School, in San Jose, California and chose to not pursue a career as a lawyer as policing was my true passion. I have a paralegal degree from Boston University, in Boston, Mass. I attended and graduated from the California Police Officers Standards and Training Academy in 1997 and have over 2000 additional hours of training in all aspects of law enforcement. I regularly attend training that is hosted by the International Associations of Chiefs of Police, Police Executive Research Forum, Force Science Research Center, and the National Association of Criminal Defense Lawyers.

**Information and Materials ReviewedInformation Reviewed/Observations**

1. Second amended complaint, United States District Court, District of Colorado, Case No. 19-cv-01088-LTB-MRN.

2. CRT police report prepared by Detective Shannon Brukbacher, Parker Police Department Case No. 2018-1595. This report addresses interviews and/or conversations that Officer Brukbacher conducted or had with the following people:
   - Elbert County Sheriff's Office Lieutenant Patrick Cillo.
   - Elbert County Sheriff Shayne Heap.
   - Elbert County Sheriff's Deputy Christopher Dickey.
   - Pathologist, Dr. Dan Lingenfelder.
   - David Fink.
   - Weston Shellenbarger.
   - Ashley Poer (Christopher Poer's sister).
   - Elaine Holt.
   - Scott Griffin.
   - Rob Saquet.
   - Sergeant Major Eric Blue.
   - Jim Sebastian.
   - Deputy Dickey
   - Sergeant Turner.
   - Deputy Bjork

3. CRT supplemental report prepared by Detective Brukbacher

4. Undated: Miscellaneous CRT notes and emails concerning this case prepared by Officer Brukbacher.

5. CRT supplemental police report prepared by Officer Bryan Faulkner who participated in crime scene measurements.

6. CRT supplemental police report prepared by Holly Oksendahl.

7. "Call for Service Detail-CFS 555" detailing electronic notes by Douglas 911 transmitted to police vehicle mobile data terminals, 5:54:36 pm to 9:58:49 pm. This report summarizes the information conveyed to responding police officers concerning Christopher Poer and Elaine Holt, what was transpiring in terms of Mr. Poer being armed and in a field, and post-incident activities.

8. Dispatch Audio recordings relative to the death investigation of Mr. Poer.

9. Hand-drawn diagram of Mr. Poer's position face down in the field also showing the gun placement below Mr. Poer's right foot. This diagram was reportedly drawn by Deputy Dickey during his CRT interview with Detective Brukbacher.

10. Declaration of Elbert County Sheriff's Office Sergeant Travis Turner. This declaration was submitted, "in support of the Motion for Summary Judgement filed by the Elbert County Defendants, United States District Court, District of Colorado, Case No. 19-cv-01088-LTB-NRN.

11. El Paso County Coroner Autopsy Report prepared by Dr. Daniel Lingamfelter, D.O. regarding the death of Mr. Poer.

12. Officer Dickey's bodycam video of the incident involving the death of Mr. Poer.

13. Letter to Elbert County Sheriff Shayne Heap from Elizabeth A. Oldham, Chief Deputy District Attorney for the 18th Judicial District.

14. Elbert County Sheriff's Office policies, procedures, and rules concerning the use of physical force and deadly physical force.

15. Motion for summary judgment from Elbert County Defendants,, United States District Court, District of Colorado, Case No. 19-cv-01088-LTB-NRN.

16. Plaintiff's third-party subpoena to Town of Parker, Colorado, United States District Court for the District of Colorado, Civil Action No. 19-cv-1088-LTB-NRN.

17. Plaintiff's motion to permit further discovery pursuant to Federal Rule of Civil Procedure 56(d), and response to defendants' motion for summary judgment, United States District Court, District of Colorado, Case No. 19-cv-1088-LTB-NRN.

18. Deposition of Deputy Dickey

19. Deposition of Sergeant Turner

20. Deposition of Deputy Bjork

21. Deposition of Sheriff Heap

**Investigation/Analysis**

1.  **Date, Time, and Location of Incident:** This incident involving the death of Mr. Poer occurred on <u>May 2, 2018</u> at approximately 8:00 pm. The scene of the incident was north of private Road 188 in the vicinity of 4369 and 4570 Private Road 188, in Elizabeth, Colorado, 80107.

2.  **Responding Deputies:** The initial responders to this incident included Sergeant Turner, call sign ES1, Deputy Dickey, call sign EC21, and Deputy Bjork, call sign EC31. These deputies were dispatched to the area of the incident because of a disturbance involving Christopher Poer, who was reportedly armed and in a field located as described in No. 1 above.

3.  **Dispatch Audio:** Prior to arriving on the scene, the responding deputies were provided with verbal information from their dispatcher as to the background and nature of the call, and were also provided with CAD (computer aided dispatch) notes sent to their MDT's (mobile data terminals) in their patrol vehicles. I have reviewed the CAD notes in this case, and they are discussed below @ No. 4.

    - Deputy Dickey arrives in the area on PR 188 standing by (@ marker 1:47).

    - Reporting party just heard two gunshots (@ marker 2:15).

    - Deputy Dickey reports hearing shots also (@ marker 3:01).

    - Deputy Dickey reports hearing at least two gunshots (@ marker 3:12).

    - Deputy Dickey reports not seeing anyone in the area (@ marker 3:48).

    - Deputy Dickey reports that he is taking cover behind a barn structure and a semi-truck trailer (@ marker 4:09).

    - Dispatches that Deputy Dickey might be in the wrong place according to the RP who can see him (@ marker 4:27).

    - Deputy Dickey advised that he is able to see Mr. Poer about 100 yards out into the field. Deputy Dickey advises for the next unit coming in to come in by his truck. (@ marker 4:54).

5

- Deputy Dickey advises that Mr. Poer looks like he is walking towards the residence and is kind of, "hunkered down" (@ marker 6:04).

- Deputy Dickey advised, "No lights, no lights, no siren, no nothing," (@ marker 6:12).

- Deputy Dickey advised that he could hear Mr. Poer yelling and that, "he sounds intoxicated," (@ marker 7:16).

- Sergeant Turner advises that the deputies will be approaching the open area (@ marker 7:23).

- Dispatch advises that per the RP, Mr. Poer has not been drinking or doing any drugs," (@ marker 10:00). The actual time at this point is announced by the dispatcher as being 8:00 pm.

- Deputy Bjork advises that Mr. Poer is at, "gunpoint," (@ marker 12:30).

- Sergeant Turner advises that one is detained, (@ marker 13:38).

- Sergeant Turner advises, "TASER deployed," (@ marker 13:42).

- Dispatch asks Deputy Dickey if he wants medical, (@ marker 13:46).

- Deputy Dickey advises in response, "Negative, he has the gun with him though," (@ marker 13:50).

- Deputy Dickey advises, "Code 4, one in custody, we will need medical…" (@ marker 14:36).

- Deputy Dickey advises, "We don't have a pulse on this individual," (@ marker 17:38).

- Sergeant Turner advises, "CPR in progress," (@ marker 17:54).

- Deputy Dickey advises, "No movement," (@ marker 18:42).

- Deputy Dickey advises, "CPR in progress, eyes dilated." Dispatch advises that fire is en route (@ marker 18:49).

- Sergeant Turner states, "Advise fire that we have him in the bed of my truck, we're still doing CPR, and we will meet them on the road," (@ marker 22:46).

- Deputy Dickey advises that they are rolling up on fire now, still doing CPR, still no pulse, no breathing, doing compression, (@ marker 24:39).

6

It should be noted here that Fire-Rescue was never put in staged standby status close to the scene for this incident.  At marker 13:50 Deputy Dickey advised that he did not need medical to respond.  Approximately 46 seconds later Sergeant Turner advised that he did in fact need medical attention. Consequently, from the time Sergeant Turner advised that he did in fact need medical assistance to respond, (@ marker 14:36), medical did not arrive on the scene for approximately 11-12 minutes.

Had medical been alerted to be on staged standby in the area, this response time could have been reduced to one or two minutes or even less depending on how close to the  scene they staged.  The time lag noted is significant because it indicates that Mr. Poer could have received life-saving and professional medical assistance much sooner than he did if deputies had put medical on staged standby.

4. **CAD Notes:** I have reviewed the CAD notes referenced in this case.

- 5:53:59 pm:  Call location changed to 4570 PR 188 standing by.

- 5:55:49 pm:   Christopher Poer called in and reported that, "Someone broke in and installed cameras and Bluetooths in RP's phone.

- 5:56:03 pm:  Mr. Poer reported that, "It just happened but happened at 1 am."

- 5:56:13 pm:   Mr. Poer reported that, "We picked up the suspect because they called for assistance."

- 5:56:20 pm:  "RP was talking very fast-not making any sense."

- 6:03:01 pm:  "Call marked ready for dispatch."

- 7:37:32 pm:  "Christopher called back saying that they are out there right now."

- 7:38:18 pm:   "Elaine (Elaine Holt) is on the phn/property owner/says he has her gun in his hand right now."

- 7:38:31 pm:  "Gun is a 380/loaded."

- 7:39:09 pm:   "Elaine does not believe that there is anyone else there except her and Chris."

- 7:39:16 pm: "Unit ES1 (Sergeant Turner) "Code 3." (emergent response).

- 7:39:25 pm: "She is in her room/and is staying there until deptys (sic) arrive."

- 7:39:39 pm:  "Unit EC21 (Deputy Dickey) rerouted from call 576."

7

- 7:40:31 pm:  "Thinks that Chris may be in the RV right now/100 ft. from the house."

- 7:40:38 pm:  "Unit EC31 (Deputy Bjork) en route."

- 7:41:00 pm: "Chris just asked Elaine if she had a gun on her."

- 7:41:45 pm:  "Chris keeps going on about what he is seeing and hearing."

- 7:41:55 pm:  "ES1 (Sergeant Turner) adv keep her on line."

- 7:43:11 pm:  "Chris did have the gun pointed at her when he asked her if she had a gun."

- 7:43:54 pm: "Adv Elaine to stay in her room and to not look out the window."

- 7:44:45 pm: "Chris is not currently in the house/poss in the driveway/walking back and forth."

- 7:45:38 pm:  "Elaine thinks that Chris does know that LE has been called and is waiting for them because he thinks they are being robbed."

- 7:46:07 pm:  "Looked out the window and could see him down by the gate."

- 7:46:35 pm:  "He is now walking EB on PR 188/off property/still has the gun.

- 7:47:38 pm:  "Elaine just saw him cross the fence due north."

- 7:47:55 pm:  "Poss 4489 or 4609 PR 188."

- 7:48:48 pm:  "ES1 (Sergeant Turner) what's his phys descript and clothing?"

- 7:48:49 pm:  "Chris in green and blk flannel/jeans/tan baseball hat."

- 7:49:10 pm:  "WM 47yr old 5-10,7:49: 230."

- 7:49:13 pm:  "ES1 (Sergeant Turner) adv he has shield he doesn't want any other dep to turn onto 188 until he is OS (on scene)."

- 7:50:37 pm: "Elaine can still see him/across 188 to the north in a field."

- 7:52:03 pm:  "Elaine can not (sic) see him anymore/thinks he is still in the field."

- 7:52:06 pm:   Unit EC21 (Deputy Dickey) arrived. In secondary location: in area on 188 standing by."

- 7:52:11 pm:  "Just heard  2 gunshots. Just heard another one."

8

- 7:52:59 pm: "ES1 (Sergeant Turner) direction of shots?"

- 7:53:02 pm: "Thinks the sound came from the northwest."

- 7:53:19 pm: Heard 2 more."

- 7:53:28 pm: "Another shot."

- 7:53:54 pm: "EC231 at bend where it turns to go north at gate/shots coming from NW of him/horse and rider on metal statue."

- 7:54:06 pm: "Can see deputy/thinks that he is at the wrong place for where Chris is."

- 7:54:54 pm: "Needs to go to the house at 4369/thinks that's where she thinks the shots were fired."

- 7:55:18 pm: "Subj 100 yards from EC21 (Deputy Dickey) in field/meet at EC21 truck."

- 7:55:24 pm: "Unit ES1 (Sergeant Turner) arrived."

- 7:56:24 pm: "Male now heading back towards residence."

- 7:56:31 pm: "EC21 (Deputy Dickey) no one use lights or siren."

- 7:57:33 pm: "EC21 (Deputy Dickey) can hear male yelling at the top of his lungs/sounds dk/can no longer see him."

- 7:58:02 pm: "Per Elaine/Chris had not been drinking and no drugs."

- 8:00:21 pm: "ES1 and EC21 (Sergeant Turner and Deputy Dickey) will be entering the field in ES1 veh.

- 8:02:03 pm: "Per Elaine/gun had an 8 round mag in it poss heard 5 shots so far."

- 8:02:40 pm: "EC31 (Deputy Bjork) at gunpoint."

- 8:04:04 pm: "ES1 (Sergeant Turner) 1 detained/Tazor (sic) deployed/denied medical."

- 8:05:35 pm: "EC21 (Deputy Dickey) 1 in custody/get medical/req emerg/patient foaming at the mouth."

- 8:05:48 pm: "Notified Elaine that Chris was detained, and she was comfortable disconnecting."

9

- 8:07:52 pm: "ES1 (Sergeant Turner)) no pulse."

- 8:08:07 pm: "CPR in progress per ES1 (Sergeant Turner).

- 8:09:13 pm: "EC21 (Deputy Dickey) Pupils dilated and fixed."

- 8:13:10 pm: "ESl (Sergeant Turner) Adv fire/male in bed of truck/CPR still in progress and they will meet fire on the rd."

- 8:15:04 pm: "EC21 (Deputy Dickey) CPR in progress still/about OS (on scene) with fire."

- 8:26:31pm: "EC21 (Deputy Dickey) Resume normal traffic. (clear the radio frequency for regular radio traffic, emergency status terminated).

5. **Body Cam Video, Deputy Dickey:** I have reviewed the body camera footage from Deputy Dickey's camera in this case. Neither Deputy Bjork nor Sergeant Turner were wearing BWC's during this incident. The following summary is provided from my review of Deputy Dickey's bodycam:

- Deputy Dickey announces that he is on scene in the area on 188. (@ marker :55).
- Deputy Dickey announces that he is just standing by, stops his vehicle, and proceeds to exit. (@ marker 1:59).

- Deputy Dickey advises that he is, "hearing shots also." (@ marker 2:13). He states that he heard at least two shots. (@ marker 2:25).

- Deputy Dickey advises he is at the gate and the shots are coming northwest of his position. (@ marker 2:50).
-
- Deputy Dickey advises that he is taking cover behind a semi-trailer in the area. (@ marker 3:20).

- Deputy Dickey is standing next to a barn-like structure and sees Mr. Poer walking through the field approximately 100 yards away. @ marker 3:55).

- Deputy Dickey has "eyes" on Mr. Poer and sees him walking south. Sergeant Turner is responding to the scene. (@ marker 4:44).

- Deputy Dickey announces to everyone, "no lights, no lights, no siren, no nothing." (@ marker 5:20).

- Deputy Dickey advises that he can hear Mr. Poer yelling and that, "he sounds intoxicated." (@ marker 6:17).

10

- Deputy Dickey advises Sergeant Turner, who has arrived on scene, that they can drive to where Mr. Poer is by utilizing a sheriff's office truck. (@ marker 7:04). Deputy Bjork is also on scene at this point in time.

- Deputy Dickey and Sergeant Turner discuss tactics at this point in time, and Sergeant Turner states, "do you want to drive up?" Deputy Dickey responds in the affirmative and Sergeant Turner then advises, "If I do, we're going to light everything up." Deputy Dickey responds, "That's fine, why don't we wait until we get about halfway up and then we'll light it up." (@ marker 8:15).

- Sergeant Turner then says to Deputy Dickey, "I just don't want to engage somebody who's going to shoot at us if we don't have to." (@ marker 8:24). Deputy Dickey then advises Deputy Bjork to go with Sergeant Turner." (@ marker 8:44).

- Deputy Dickey, Sergeant Turner, and Deputy Bjork start moving towards Mr. Poer riding in the truck being driven by Sergeant Turner. (@ marker 8:51).

- Deputy Dickey then states, "Don't turn on your lights until we get up there." (@ marker 9:28). Note: It is getting darker at this time.

- Sergeant Turner, suddenly yells loudly, "Get your fuckin' hands up, don't move mother fucker. Put your fuckin' hands up or I'm going to shoot your ass." (@ marker 11:16). "Hands up mother-fucker." (@ 11:20).

- Turner then states, "Now, hands up or I'm gonna shoot you." (@ marker 11:23), "Hands up or I'm gonna shoot you." (@ marker 11:29). "Hands up or I'm gonna shoot you." Deputy Dickey then chimes in, and yells, "Hands up, do it now." Turner states, "Hands up or you're gonna get shot. Hands up." (@ marker 11:36).

- Deputy Dickey then announces over his radio, "One at gunpoint." (@ marker 11:39).

- Deputy Dickey and Turner together are yelling at Mr. Poer, with Deputy Dickey yelling, "Don't do it. Don't do it. Don't do it."(@ marker 11:47). Turner is <u>simultaneously yelling commands</u> at Mr. Poer at this point (@ marker 11:46), and it is confusing to the listener. Note: From the time that Deputy Dickey heard the last two shots fired by Mr. Poer to the time that he announces, "one at gunpoint," (@ markers 2:13 and 11:39 respectively), a total of nine minutes and twenty seconds (9:26) elapse.

- The deputies involved then proceed to go hands on with Mr. Poer. (@ marker 11:49). <u>Deputy Dickey can then be heard saying, "There's the gun, grab it," (@ marker 11:56)</u>.

- Note: From the first command to Mr. Poer (@ marker 11:16) to the point in time where the deputies go hands on with him (@ marker 11:49), just 33 seconds expired. Then, approximately seven seconds elapse and Deputy Dickey can be heard saying, "<u>There's

11

the gun, grab it," (@ marker 11:56) for a total elapsed time of 40 seconds from the very first command that was given.

- Deputy Dickey and Turner tell Mr. Poer to put his hands behind his back, and "Put your fuckin' hands behind your back." Deputy Dickey then uses his TASER on Mr. Poer's back (@ marker 12:17), Mr. Poer is then heard moaning. Eventually, from the bodycam video reviewed where the visibility is somewhat limited, Mr. Poer gets handcuffed (@ marker 12:40). During this time period, a clanking sound can be heard, possibly from the handcuffs being used.

- Deputy Dickey declines the offer posed by dispatch to have medical respond (@ marker 13:00) and advises that Mr. Poer, "has the gun with him though." Deputy Dickey asks Mr. Poer, after he was rolled over, if he has any other weapons on you? It appears that Mr. Poer is non-responsive at this point. Sergeant Turner can then be heard saying at this point, "I might have knocked him out." (@ marker 13:23). Deputy Dickey asks Mr. Poer if he is ok, and Sergeant Turner again states, "I probably knocked him out," (@ marker 13:31).

- Deputy Dickey advised dispatch that the situation is, "Code 4," and then states that they do need medical to respond (@ marker 13:45). Deputy Dickey then has Mr. Poer put into a sitting position, and at this point in time, it is noted that Mr. Poer is foaming at the mouth. Deputy Dickey then advises to expedite the medical response as Mr. Poer was, "foaming at the mouth," (@ marker 14:18). In watching the bodycam footage, Mr. Poer is still up in a seated position appearing unconscious leaning against a deputy with his head elevated. (@ marker 15:44). The handcuffs are then ordered to be removed from Mr. Poer's wrists (@ marker 16:04). While Mr. Poer's head is still elevated above his chest, his pulse is checked, and there appears to be no pulse at this time (@ marker 16:53) and (@ marker 17:50).

- Chest compressions by Sergeant Turner commence on Mr. Poer (@ marker 17:02) and it is determined that Mr. Poer's pupils are dilated (@ marker 17:58).

- Mr. Poer is loaded into the bed of a sheriff's office pickup truck (@ marker 20:57) and transportation begins with CPR still being administered. Deputy Bjork is driving the truck and Deputy Dickey along with Sergeant Turner are in the back working on Mr. Poer.

- Mr. Poer is transferred to the custody of fire/paramedics (@ marker 25:00). One of the deputies was briefing fire/paramedics as to what had transpired and did mention that a TASER had been deployed and that Mr. Poer was struck several times in the head and "belly.") (@ marker 24:40-24:55).

- Mr. Poer is loaded into an awaiting ambulance (@ marker 25:45).

12

**Methodology Used in Formulating Opinions**

1.  I apply my familiarity with the facts of this case based on my review of the materials identified in the "information reviewed" section of this report.  Moreover, my familiarity with the Model Police Policies, Procedures, and Rules of the International Association of Chiefs of Police; the Model Policies, Procedures and Rules of Lexipol, Inc; the National Consensus Policy on the Use of Force; and the Guiding Principles in the Use of Force crafted by the Police Executive Research Forum and may as applicable, be utilized in forming my opinions. I also maintain a familiarity with criminal, civil, and clearly established case law that is relevant to police practices, e.g., *Graham vs. Connor* (1989), *Allen vs. Muskogee* (1997)*, Ceballos vs. Husk* (2019), etc., and I may as applicable, utilize these materials in forming my opinions.

2.  I apply my familiarity with current policing news, practices, guidelines, and trends throughout the United States, and actively subscribe to the monthly, "Police Chief" magazine prepared by the International Association of Chiefs of Police (IACP); The "IACP Highlights," which is an internet bulletin produced by IACP daily Monday through Friday; The monthly internet "Case Law Notes, Publications and Notices of Seminars," produced by Americans for Effective Law Enforcement (AELE); The monthly "Tactical Edge" magazine produced by the National Tactical Officers' Association (NTOA); The internet newsletters and announcements from the Institute for the Prevention of In-Custody Deaths; The internet newsletters from the Force Science Institute, Minnesota State University at Mankato; The, "Corrections Daily," publication of the American Correctional Association; The "American Police Beat," produced monthly by the APB Media; The "Law Enforcement Today," daily internet bulletin citing trends and developments in law enforcement; The "CLM," which is the monthly magazine produced by the Claims and Litigation Management Institute; The periodic internet bulletins from the Commission On Accreditation for Law Enforcement Agencies (CALEA);  The "Police One," periodic internet update on criminal justice and policing issues as well as product alerts;  The frequent conversations and dialogue with other practicing police professionals, police practices experts and attorneys; My active, ongoing work as a police practices expert; And my ongoing training in the business of policing.

**Opinions and Bases for Opinions**

**Deputy Dickey and Sergeant Turner's actions were <u>not</u> in concert with generally-accepted police practices.**

1. Sergeant Turner was the on-duty supervisor in this case, and it was his job to supervise both Deputy Dickey and Deputy Bjork.  It was also his job to supervise the scene and make sure everyone had the tools they needed, to make sure everyone was safe, and make sure that the actions of the officers were in compliance with generally accepted police practices.  <u>He failed to do so, and his failure to do so was not in concert with generally accepted police practices</u>.

13

2. The deputies responding to this particular call had more than enough information to conclude that they were going to be dealing with an individual, Mr. Poer, who was experiencing an agitated chaotic event (ACE), who was in an open field, and who was armed with a handgun firing shots. When law enforcement personnel are going to be dealing with people who are experiencing an ACE, be it a mental health problem, an alcohol and/or drug problem, etc., they are or should be trained to recognize that they will be dealing with a probable medical emergency. They need to make sure that medical assistance in the form of fire/rescue personnel are alerted so that they stage close to the scene in order to render medical assistance quickly, especially in cases where an individual experiencing an ACE and/or is armed and firing gunshots. There has to be an awareness that someone is likely going to need medical help. That did not happen in this case. No medical resources were asked in advance to stage near the scene, and as a result, Mr. Poer was denied professional medical help for 11-12 minutes. <u>Failure to stage medical help near the scene, especially given the facts of this case, is not an action that is in concert with generally accepted police practices</u>.

3. As the deputies in this case were moving towards Mr. Poer, Sergeant Turner was driving his duty truck with his lights out, Deputy Bjork was in the bed of the truck, and Deputy Dickey was walking alongside the truck on the passenger side. Sergeant Turner was concerned at that point about turning on the lights of his truck, and stated, "I just don't want to engage somebody who's going to shoot at us if we don't have to." Sergeant Turner's statement at this point was entirely logical and was in fact consistent with generally accepted police practices.

The problem, however, is the fact that Turner let Deputy Dickey talk him into proceeding further towards Mr. Poer, and as a result, he failed to set up further away from Mr. Poer. In this case, the ballistics shield normally carried in the sergeant's truck was not available. It should have been available. Sergeant Turner and his two deputies should have parked a considerable distance from Mr. Poer, turned on their headlights or their spotlight(s) to illuminate the area where Mr. Poer was, and taken up a "high profile" or "felony car stop" position. If they accidentally had gotten too close, as they did with an estimated distance of 25 feet from Mr. Poer, they could have simply backed up creating more distance, taken cover using the truck,, and taken advantage of time to assess what was unfolding and begin crisis de-escalation with Mr. Poer. They failed to adhere to the principles of time, distance, and cover as well as time, talk, and tactics and instead foolishly rushed into this situation. <u>Their tactics were simply not in concert with generally accepted police practices.</u>

4. Deputy Dickey and Sergeant Turner were armed with their assault rifles and Deputy Bjork was armed with his handgun. The deputies would have had the advantage of firepower and accuracy that distance provides had they taken up a safer position. They should have taken up that safer position further away, lit up the area where Mr. Poer was, activated the truck's P.A. system, and attempted contact with Mr. Poer in order to verbally de-escalate the situation. They failed to do so however and instead, at a distance estimated to be 25 feet, <u>they rushed in all shouting commands and created the perceived need to use physical force. Their actions in doing so were not in concert with generally accepted police practices.</u> Why would deputies rush into a situation as they did here knowing that Mr. Poer had been armed and had been shooting his gun? Generally accepted police practices leave no room for such a tactic, except of course in an active

14

shooter scenario inside a building for example where hostages are at risk and there is a measured response initiated. In this case, approximately nine minutes and 26 seconds (9:26) had expired since any shots by Mr. Poer were heard, and there was no evidence to suggest that he was shooting at anyone or had a hostage with him.

5.  As stated, it was not a good tactical decision to rush in as the deputies did.  They should have set up behind the truck at a further distance, and attempted to verbally de-escalate the situation with Mr. Poer. That would have given them the advantage of time, distance, and cover.  They ignored this tactic however and prematurely rushed into the situation creating the perceived need to use physical force. Instead of having one deputy give clear, articulate commands, several of the deputies started giving verbal commands simultaneously, a tactic that should be avoided due to the fact that when multiple, simultaneous commands are given, people have a difficult time comprehending what is being said, especially someone like Mr. Poer who was experiencing an agitated chaotic event at the time.  People in these situations tend to just hear noise, not words. <u>The deputies actions here were not in concert with generally accepted police practices.</u>

6.  Deputy Dicky is a CIT (Crisis Intervention Trained) officer. CIT officers are trained to engage with persons in crisis in a calm manner, in an effort to assure the person in crisis that they are there to help, and to actively listen to the person. <u>Deputy Dickey did not follow his CIT Training in this incident</u>. From the moment these officers engaged with Poer they screamed commands, many of which were conflicting commands at him.  Dickey should have used clear and calm instructions from a safe distance and let Mr. Poer know that they were police officers and that they were there to help.

7. Prior to physically engaging Poer it is visible from the BWC that Poer is on the ground, laying on his side, with his arms out in front of him, offering <u>NO</u> resistance. Deputy Dickey then kicks Poer in the stomach causing Poer to roll onto his belly. He then yells out to another officer to grab the gun. According to the deposition of Dep. Bjork, he does in fact grab the one and only handgun, and secures that gun in the back of his pants. Poer was following the commands that were yelled at him. He offered <u>NO</u> resistance, made no furtive movement for a gun that was by his feet, yet Sgt. Turner used unreasonable and excessive force when he later stomped Mr. Poer on his back. <u>NONE</u> of the defensive tactics methodologies that are taught in any police academy teach stomping someone on their back in such a situation.

8. In his deposition, Sgt. Turner admits that he struck Poer in the head on at least five occasions. At the time of these strikes to the head, Poer was not resisting and was laying on the ground. Poer rolls onto his stomach and Sgt. Turner is kneeling on Poer's back with his AR-15 rifle.  Sgt. Turner also admitted in his deposition that striking any person in the head is never trained through all of the police defensive tactics methods. Strikes to the head could possibly be utilized only in a deadly force encounter, which this was NOT.  Once the gun was found and secured, this was in no way shape or from a deadly force scenario.  Strikes to the head could render any person unconscious and could potentially cause death. Blows or strikes to the head and neck are a prohibited use of force unless faced with a deadly force encounter.  In fact, in his statement to EMS personnel and in deposition Sgt. Turner said he believed the blows to Poer's head rendered Poer unconscious.

15

9. At that time Dep. Dickeky calls out that he has his Taser ready, and tells an officer to move off of Poer, stating, "move your knee." Again, Poer was not resisting, he was not trying to escape, nor was he trying to fight with officers, he was laying on his belly after being kicked in the stomach, stomped on the back and struck in the head at least twice. It appears that one of his arms was underneath him when one of the officers was kneeling on his back. Given Deputy Bjork's physical size as he described in deposition, Poer, if conscious, could not have moved in a manner to give up his other hand that was pinned underneath him.

Further, Dep. Dickey does utilize his Taser against Poer with two distinct 5 second cycles. Officers trained in the use of a Taser are taught to trigger the Taser once for 5 seconds, assess and provide the suspect to comply before pulling the trigger for a second time. It is physically impossible for anyone to move their arms or any part of their body when they are being tased. Poer, if conscious, was never afforded the opportunity to further comply.

10. The use of physical force by Deputy Dickey in the form of two TASER applications on Mr. Poer, and the physical force used by Sergeant Turner, were unnecessary. Sergeant Turner admitted striking Mr. Poer, "several times on the side of the face with the intent of gaining compliance," as he indicated in his formal declaration of September 8, 2020, and in his deposition. He also made statements at the scene where he indicated that he knocked Poer out, and he made statements as well to the paramedic about striking Mr. Poer in the head. Deputy Dickey also indicated in conversation with paramedics that Mr. Poer was struck in the stomach.

Police personnel should avoid striking individuals in the head, neck, spine, and groin because such strikes can cause serious bodily injury, traumatic brain injuries, and death.. Sergeant Turner indicated that he used such strikes to Mr. Poer's head to gain, "compliance." Head strikes can only be justified when you are physically defending yourself from an attack but that was not the case here. "Compliance" head strikes are never appropriate. Sergeant Turner was using these head strikes to gain, "compliance," while he was handcuffing Mr. Poer. I would add that the deputies had found the gun and secured it prior to utilizing the Taser and delivering the head strikes. <u>Again, the actions of the deputies were not in concert with generally accepted police practices.  By rushing in as they did, they created the perceived need to use a TASER, head strikes, and a stomach strike when in reality, these forms of force were not necessary.  This is not what a reasonable police officer would have done given the totality of circumstances.</u>

11. I want to point out also that according to Deputy Dickey's statement to Detective Brukbacher (@ 10 of 22), the location of the gun was noted after he kicked Mr. Poer onto his back, which was before the TASER was used, and after Mr. Poer was kicked onto his back. Why then would Sergeant Turner strike Mr. Poer several times in the face for, "compliance" reasons? From my review of the video, Mr. Poer was complying with commands. At most, he was unable to give his second hand because he was, either unconscious or unable to give the second hand because he was incapacited by the taser and/or his hand was pinned beneath his own body and by the weight of Deputy Bjork's body.

12.  I noted in the materials I have read that Deputy Dickey reportedly is a CIT trained officer (Crisis Intervention Training), which teaches police officers how to deal with people who are in a mental health crisis, and is also or has been a SWAT negotiator.  Why would someone with this kind of reported training act as if they had never received any of this training?  The answer is simple.  Deputy Dickey either forgot his training or ignored it.

13.  Dealing with individuals who are encountering mental health problems requires patience and it requires good tactics. Several professional police organizations have discussed this topic in their model policies to help ensure that these types of encounters are handled effectively and safely for everyone's benefit. For example:

> <u>The International Association of Chiefs of Police</u> (IACP) Model Policies concerning, "Responding to Persons Experiencing a Mental Health Crisis," state, "Take steps to calm the situation. Where possible, eliminate emergency lights and sirens, disperse crowds, lower radio volume, and assume a quiet, non-threatening manner when approaching or conversing with the individual. Where violence or destructive acts have not occurred, avoid physical contact, and take time to assess the situation. Officers should operate with the understanding that time is an ally and there is no need to rush or force the situation. Create increased distance, if possible, in order to provide the officer with additional time to assess the need for force options. Use environmental controls, such as cover, concealment, and barriers to help manage the volatility of situations.  Move slowly and do not excite the individual. Provide reassurance that officers are there to help and that individuals will be provided with appropriate care. Do not threaten the individual with arrest or make other similar threats or demands, as this may create additional fright, stress, and potential aggression."

> <u>Lexipol Inc</u>., an organization that develops police policies, procedures, and rules for consumption by law enforcement agencies throughout the United States addresses the specific issue of, "Crisis Intervention Incidents," in its model policy concerning how to safely handle such encounters. For example, "Officers should consider that taking no action or passively monitoring the situation may be the most reasonable response to a mental health crisis. Once it is determined that a situation is a mental health crisis and immediate safety concerns have been addressed, responding members should be aware of the following considerations and should generally evaluate safety concerns, introduce themselves and attempt to obtain the person's name, be patient, polite, calm, courteous and avoid overreacting, speak and move slowly and in a non-threatening manner, moderate the level of direct eye contact, remove distractions or disruptive people from the area, demonstrate active listening skills, (e.g. summarize the person's verbal communications), Provide for sufficient avenues of retreat or escape should the situation become volatile. Responding officers generally <u>should not</u> use stances or tactics that can be interpreted as aggressive, allow others to interrupt or engage the person, corner a person who is not believed to be armed, violent, or suicidal, argue, speak with a raised voice or use threats to obtain compliance."

> <u>The National Consensus Policy on the Use of Force</u> supports the use of de-escalation and states for example, "An officer shall use de-escalation techniques and other alternatives to higher levels of force consistent with his or her training whenever possible and appropriate before resorting to force and to reduce the need for force. Whenever possible and when such delay will not compromise the safety of the officer or another, and will not result in the destruction of evidence, escape of a suspect, or commission of a crime, an officer shall allow an individual time and opportunity to submit to verbal commands before force is used."

14. <u>In summary, the actions of Sergeant Turner, Deputy Dickey, and Deputy Bjork were not in concert with generally accepted police practices</u>. By failing to stage medical early on, rushing into this situation when it was inappropriate and dangerous to do so, not using time, distance, and cover to their advantage, simultaneously yelling conflicting, threatening, and vulgar commands, and using physical force in the form of a TASER, head strikes, and a strike to Mr. Poer's stomach and his back, the deputies themselves created the perceived need to use the less lethal weaponry they did in this situation. If they had handled the situation in a manner consistent with generally accepted police practices, Mr. Poer might still be alive today.

15. It is also of great concern that Deputy Dickey was hired by the ECSO after he resigned from the Commerce City Police Department due to the fact that he was the subject of a number of use of force complaints, one of which caused the City of Commerce City to pay a citizen a large sum of money after he was he was injured to the unreasonable excessive use of force. It is clear through the deposition of Sheriff Heap that he did not scrutinize these prior uses of force, that he had access to all the prior use of force complaints and then did not give enough care to that information in his hiring decision. The Sheriff is the unequivocal hiring manager, and it is clear he disregarded these glaring red flags that Deputy Dicky would have likely repeated his prior poor decision making regarding use of force and resorted to the use of excessive force again. In this case his Deputy Dickey's actions, along with Sgt. Turner's actions caused the death of a decorated war veteran who was in crisis. Sheriff Heap knew or should have known that an applicant who had several complaints of prior misconduct which were adjudged by use of force instructors at Commerce City to have been use of force violations which should have resulted in Dickey's termination, that there was a substantial likelihood that Dickey's past violations might very well lead to an excessive use of force such as as occurred in this case. This should have been a plainly obvious consequence of such a hiring decision.

Respectfully Submitted,

*Natasha Powers - Marakis*

Natasha Powers-Marakis, Sergeant (Retired)
Powers Police Practices Consulting & Investigations

18