Transcript of the Deposition Testimony of:

# Shayne Heap

**August 20, 2021**

Sherry Poer, et al.

v.

Sheriff Tim Norton, et al.

Civil No. 19-cv-01088(LTB)(NRN)

14143 Denver West Parkway, Suite 100 • Golden, Colorado 80401
(303) 202-0210 • contact@milehighreporting.com
www.milehighreporting.com

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 19-cv-01088(LTB)(NRN)

---

DEPOSITION OF SHAYNE HEAP
August 20, 2021

---

SHERRY POER, as Administratrix of the Estate of Christopher Poer, Deceased, and G.P. and M.P. as Surviving Minor Children of Deceased,

Plaintiffs,

vs.

SHERIFF TIM NORTON in his official capacity, DEPUTY CHRIS DICKEY, and SERGEANT TRAVIS TURNER, both of whom are sued in their individual capacities.

Defendants.

---

PURSUANT TO NOTICE, the deposition of SHAYNE HEAP, called for examination by the Plaintiffs herein, was taken at the offices of Fisher & Byrialsen PLLC, 4600 South Syracuse Street, 9th Floor, Denver, Colorado 80237, commencing at 9:03 a.m., on August 20, 2021, before Aimee S. Reisinger, a Registered Professional Reporter and Notary Public in and for the State of Colorado.

Deposition of: Shayne Heap - August 20, 2021
Sherry Poer, et al. v. Sheriff Tim Norton, et al.

2

APPEARANCES:

ON BEHALF OF THE PLAINTIFF:

DAVID N. FISHER, ESQ.
Fisher & Byrialsen, PLLC
4600 South Syracuse Street
Ninth Floor
Denver, Colorado 80237
303-256-6345
david@fblaw.org

ON BEHALF OF THE DEFENDANTS:

MARK S. RATNER, ESQ.
Hall & Evans, LLC
1001 Seventeenth Street
Suite 300
Denver, Colorado 80202
303-628-3337
ratnerm@hallevans.com

Mile High Court Reporting and Video, Inc. 303-202-0210
contact@milehighreporting.com

Deposition of: Shayne Heap - August 20, 2021
Sherry Poer, et al. v. Sheriff Tim Norton, et al.

3

INDEX

| EXAMINATION: | PAGE |
| --- | --- |
| BY MR. FISHER | 4 |
| BY MR. RATNER | -- |

---

EXHIBITS:

(None were marked.)

Mile High Court Reporting and Video, Inc. 303-202-0210
contact@milehighreporting.com

P R O C E E D I N G S
* * * * * * * * * * * * *

SHAYNE HEAP,

being first duly sworn to state the truth, was examined and testified further as follows:

EXAMINATION

BY MR. FISHER:

**Q. Good morning officially, Mr. Heap.**
A. Good morning.
**Q. Have you ever been deposed before?**
A. I have.
**Q. So you're probably familiar with the process a little bit, so I'll just very briefly go over a couple of rules. Okay?**
A. Sure.
**Q. One simple one is just to make sure I finish my answer before you start yours so the court reporter can take everything down. Okay?**
A. Got it.
**Q. And just try as much as you can to give verbal answers rather than nods of the head or shakes of the head so that she can take everything down. Okay?**
A. Got it.
**Q. When I ask you a question, there may be times**

**where your attorney here objects. Just let him get his objection onto the record, and then, unlike in a courtroom, you can go ahead and answer the question, unless he specifically tells you not to answer the question. Do you understand?**
A. I do.
**Q. What other types of cases have you been deposed in in the past?**
A. Let me see. The first one would have been when I was an undersheriff and inherited some -- inherited a couple cases from the previous administration, all the way to -- I think the most recent one was we sued -- I was part of the lawsuit against Governor Hickenlooper over the magazine ban. So deposed by the AG. So all the way from private firms everything from private firms to the Attorney General's office.
**Q. What is a magazine ban?**
A. It was back when there was a group of sheriffs -- actually, the majority of sheriffs in the state of Colorado sued Hickenlooper in regards to the high-capacity magazine ban and laws that they wanted to institute.
**Q. In other words, even the sheriff's department wasn't allowed to use the high-capacity magazines?**

A. No, we were. Law enforcement was.
**Q. But regular civilians were not?**
A. Correct.
**Q. And law enforcement was opposed to that?**
A. Correct.
**Q. Why is that?**
A. Because it was -- we felt it was unenforceable.
**Q. Okay.**
A. Because magazines don't come with serial numbers, they don't come with -- it's not like we live on an island and you can drive to Wyoming and buy one and bring it back. It's how are you going to enforce something like that?
**Q. I see. So the sheriff's office was the one that had to enforce the law that you felt was unenforceable?**
A. Yeah. This was the sheriffs. So the county sheriffs of Colorado. Like the great majority of the sheriffs, not just my office.
**Q. Gotcha. And some of the other ones you said you inherited when you were undersheriff. That was when you were undersheriff at Elbert County?**
A. Correct.
**Q. And were they --**

A. Personnel issues. Sorry. Go ahead.
**Q. Oh, you go ahead. Personnel issues?**
A. Personnel issues.
**Q. Have you ever been deposed in a civil rights litigation like this one before?**
A. I think the first one that I was deposed in would have been considered a civil rights.
**Q. And were you a -- what was your position at the time?**
A. I was the undersheriff.
**Q. Okay. So it wasn't an incident that you were involved in, but it was an incident one of your subordinates or some of your subordinates were involved in?**
A. Correct.
**Q. Okay. Was it something like an excessive force claim like this?**
A. No.
**Q. What was it?**
A. No. 1984 case.
**Q. Okay.**
**Can you tell me -- what is your current job?**
**MR. RATNER:** So to the -- you can tell him to the extent you feel comfortable with any personal -- personal identifying information. I usually instruct

law enforcement or former law enforcement that they're not going to answer that, just because, you know, you don't want people knowing where you are. But you answer to what you feel comfortable. Does that make sense?
**THE DEPONENT:** Yes.
A. I'm a critical infrastructure security consultant.
**Q. (By Mr. Fisher) And how long have you been doing that for?**
A. Since about two weeks after I left the sheriff's office.
**Q. How long ago was that?**
A. So it's been two -- pushing three years.
**Q. And so that's like a private employment, then, your current job?**
A. It's my company.
**Q. It's a company you started?**
A. Yes.
**Q. And how many employees do you have?**
A. You're looking at him.
**Q. That's kind of like my company. I only have me and my wife and one other employee.**
A. Right.
**Q. So why did you leave Elbert County as**

**sheriff? I'm not sure how it works. Is it elections or not?**
A. Yes. I was term-limited.
**Q. Term-limited. How many terms did --**
A. I only did two. You're only allowed to do two.
**Q. Gotcha.**
**MR. RATNER:** I always found that interesting.
A. Well, in Elbert County you're only allowed to do two.
**Q. (By Mr. Fisher) And so what did you do before you became sheriff at Elbert County?**
**I guess going back in history, you were undersheriff before that?**
A. Yeah. And before that I was a lieutenant, and before that I was a sergeant, and before that I was a deputy.
**Q. So it was your whole --**
A. So I did 18 -- I did 18 years at Elbert.
**Q. And was that the entirety of your law enforcement career?**
A. Yes.
**Q. Okay. And what did you do before you became a police officer?**
A. I was in college at Mesa State, and I was

involved in a pretty serious accident; broke my neck, broke my back. Spent quite a bit of time in rehab. Got out, started working. Did -- worked in the appraisal industry, work in the real estate industry for a while, did some construction stuff, and then went to the academy.
**Q. Okay. When you were sheriff -- you were the sheriff of Elbert County when the incident in this case happened. When I say "the incident," I'm referring to the incident in which Mr. Poer was killed.**
A. I was.
**MR. RATNER:** I'm going to object to that characterization, but go ahead.
**Q. (By Mr. Fisher) Well, when he died in police custody.**
**At that time -- or I was retained to possibly represent his family in a lawsuit, and I've made a request for the body cam video. And originally when I made that request, the sheriff's office department's -- I'm sorry, the sheriff's department's response was that they weren't going to turn it over.**
**Was that something that was your decision?**
A. I worked with George Brauchler on that decision, yes. He was my legal counsel, if you will.
**Q. What was the decision-making process there**

**and why not turn it over?**
A. The District Attorney's office was investigating the case. And in any case, even a traffic case, you don't release that information until that case is complete or that investigation is complete.
**Q. So it was an issue of the DA's office and George Brauchler saying since we still have an investigation going, our CRT investigation, we're not going to release this now?**
A. Correct.
**Q. Okay. My recollection is even after that clearance letter came out, there was still a refusal to turn over the body cam. Do you have a different recollection?**
A. No, I think that's correct.
**Q. And what was the reasoning there?**
A. You know, I don't recall. It was, again, I worked with the DA's office on that, and that was -- they were attorneys, I'm not.
**Q. Okay. Going to the incident in this case, how were you first notified that Mr. Poer had died, that you needed to come to the scene? How did that all go down?**
A. I don't recall if I was on -- actually on

duty or on my way home, but I -- it would have either been over the radio that I heard it or that I was given a call.

**Q. And then since you are the sheriff and it's a police in-custody death, you have to respond, I imagine, right?**

A. I wouldn't have to, but certainly wise to do so.

**Q. Were you one of the -- well, did you get there before/after/the same time as like the CRT folks?**

A. Close to about the same time.

**Q. Some of the officers who have been deposed in this case by me have said that they talked to you some before actually going to that Rattlesnake firehouse and talking to CRT and all that. Do you recall that?**

A. Yes.

**Q. And what -- who did you talk to and what about?**

A. Travis Turner and Chris Dickey. When I got there, I separated them, put them in their vehicles and told them they needed to talk to no one. Not to each other, not to -- they just needed to sit in their patrol cars and wait for the investigators with the DA's office.

**Q. Did you ask them if they were okay? Did you**

**ask them if they were injured? Did you ask them about the incident at all?**

A. I'm sure I asked them if they were all right. Obviously pretty worried about them and the entire situation.

**Q. What about anything about the incident itself?**

A. I don't recall.

**Q. Okay. Is it -- is that protocol that you should separate them and have them not talk to each other before CRT shows up or something?**

A. Protocol as far as like PNP or SOP? I don't think it's written into any of those documents. But as far as, you know, maintaining the integrity of the investigation, absolutely. I had always -- I mean, if somebody -- you have another agency or another entity coming in, you want to protect the integrity of that investigation.

**Q. It's my understanding from doing discovery and depositions in this case that there was a CRT investigation done by outside agencies, not Elbert County, correct?**

A. Correct.

**Q. But there was no internal use of force investigation done by Elbert County. Is that also**

**correct?**

A. I -- no. I -- that is correct. I don't believe there was.

**Q. Is that a decision that you as the sheriff have to make? Is that kind of the standard operating procedure for Elbert County? Because -- I just ask it because I've seen in other cases in other counties where a CRT will do one investigation and the home agency will do their own separate use of force investigation internally.**

**MR. RATNER:** Object to form. Go ahead.

A. I would say that's just standard operating for us that the DA's office was going to do that investigation, and we would stand on their investigation.

**Q. (By Mr. Fisher) So you guys did not do any internal investigation of this matter at all, I guess?**

A. Not that I recall.

**Q. And that was a -- sounds like a purposeful decision, and one you feel is within the standard operating procedures of the Elbert County Sheriff's Office?**

A. Yes.

**Q. Tell me about -- as you were there as a sheriff and an undersheriff for all those years, what**

**is the standard operating procedure in hiring new sheriff's deputies?**

**MR. RATNER:** Object to form.

A. Can you help me a little bit? I'm not sure what you're after.

**Q. (By Mr. Fisher) Sure. Like what -- tell me about the process. How does Elbert County hire new deputies when you were there?**

A. Sure. So obviously individuals put in an application, they fill out the application. Professional standards will, you know, go through those -- those applications, decide if they, you know, meet the requirements based on, you know, whatever they filled out in those apps. Then that process begins with oral boards, background investigations, you know, all the other pieces that go along with that hiring process.

**Q. Is the process any different when you're hiring sort of a brand new deputy versus a -- what's the word I'm looking for -- like a lateral, like Dickey ended up being, coming from another department?**

**MR. RATNER:** Object to form.

A. Would the process be any different? I can't think of any remarkable ways it would be --

**Q. (By Mr. Fisher) I guess the one thing I'm**

**getting at --**
A. -- different.
**Q. -- is like Deputy Dickey came from Commerce City Police Department, correct?**
A. Correct.
**Q. And so he, unlike somebody fresh out of the academy or a brand new applicant, actually has a past at a different agency, correct?**
A. Correct.
**Q. So what does Elbert County do in that situation to obtain that kind of past record, go through it, talk to the past agency, see what's going on with that officer, what went on with him, those kind of things?**
A. Sure. So that would be a responsibility of the professional standards to go and retain those files and talk to those individuals and --
**Q. And so who was that? Who was professional standards?**
A. I can't tell you who it was at the time. I mean, it could have been -- and it wasn't a person. I mean, the size of that agency, the investigations division helped with those -- helps with backgrounds. Patrol commanders help with those background. I mean, all the way up to division commanders.

**Q. So it would have been all employees of Elbert County Sheriff's Office who were under your command at the time?**
A. Yes.
**Q. And how in-depth do they go into the potential officer's former employment at a different law enforcement agency?**
**MR. RATNER:** Object to form and foundation. Go ahead.
A. How in-depth do they go? I'm not sure how to answer that.
**Q. (By Mr. Fisher) So Dickey coming from Commerce City, he had a number of prior allegations of excessive force at Commerce City. Were you aware of that?**
A. Yes.
**Q. And did you become aware of that during the hiring process, or the vetting process?**
A. It wouldn't be really during the vetting process. I mean, my function comes into play at the very end of that process, after they've gone through all of these processes and they've done all this investigation and they've given me a recommendation that we haven't found anything that would put up any red flags or we believe that these things have been

taken care of or there's explanation, and then...
**Q. So I'll talk specifically about Dickey. I know from personal experience that before he was hired by Elbert County, I represented somebody else where Dickey had tased him five times where the man was having a diabetic shock episode. Dickey thought he was drunk. He broke the man's finger, scrapes and cuts all over his body. We sued. Commerce City ended up paying somewhere in the neighborhood of $750,000 total for that case. He was investigated by Commerce City for that. They were going to find that he had violated policy and they were going to fire him for that and another couple incidents.**
**Is that all stuff that you discovered or learned about before hiring Dickey --**
**MR. RATNER:** Object to form.
**Q. (By Mr. Fisher) -- to work at Elbert County?**
**MR. RATNER:** And foundation.
A. I would say no.
**Q. (By Mr. Fisher) Okay. Go ahead.**
A. No.
**Q. And why wouldn't you? Or why do you think that that stuff wasn't learned about?**
A. Well, I would think because of the way you just described it. If they were going to do these

things but they didn't, that's not something another agency would share.
**Q. So I got access to his internal affairs files while doing the lawsuit.**
A. Okay.
**Q. And in those files is -- you have use-of-force trainers doing after-action assessments basically. Are you with me so far?**
A. I am.
**Q. And in that case that I'm talking about, they're writing up their comments. We think this was inappropriate use of force; we think this is inappropriate use of force; he should have done this and that differently; we're recommending termination.**
**And there was that case I just talked about, Mr. Leadholm's case. And there was another case where Mr. Dickey was on body camera approaching a man who was already at gunpoint, laid out prone on the ground, he said, "Ooh, let me tase him," and then went up and put his gun in the back of his neck and pushed it so hard that it went out of battery and left a mark there. And similarly in that one, the use-of-force trainers are looking at it saying: This was not within policy; I think he should be fired, that's what we're recommending.**

**So there was those two cases and one more that -- all that led to a confluence of events where the agency, Commerce City, said to Dickey: We're going to fire you. Here's what we're going to find. You violated policy, but we're going to let you resign in lieu of termination.**

**That decision to let him resign in lieu of termination and those preliminary findings that would have been terminations and would have been use-of-force policy violations, would you not have had access to all that information in those files?**

**MR. RATNER:** Object to form and foundation. Go ahead.

A. Professional standards should have had access to those files.

**Q. (By Mr. Fisher) In other words, they would get those same files that I would have got in the lawsuit, be able to look through them, see all the use-of-force comments and all that and possible -- you know, what was going to be the recommendation and what ultimately happened and all that stuff?**

A. Correct.

**Q. And, again, those are people under your command, professional standards, correct?**

A. They are.

**Q. So did anyone in professional standards bring those issues to you as the ultimate decision-maker?**

A. No, I haven't heard what you just told me.

**Q. Okay. So what I'm telling you, you're hearing all that stuff for the first time?**

A. Correct. I wouldn't say "all that stuff."

**Q. Some of it?**

A. Correct.

**MR. RATNER:** Object to form.

**Q. (By Mr. Fisher) Which of it have you heard before? Like which of some of the things I was just talking about?**

A. Well, pretty common in the industry to have complaints, you know, founded/unfounded, whatever those may be. So, I mean, I would hear -- well, there were some issues, they were these issues, they were unfounded, you know, he resigned. That's how it would have been brought to me.

**Q. And when you were there as sheriff, how would a situation like that where somebody was going to have found to be in violation of policy/going to be fired, but they were given that option to quit instead with no record, how does that affect your decision-making process?**

**MR. RATNER:** Object to form; foundation.

A. You're talking about a lot of years that I have to kind of roll back through here.

In the ones that -- the ones that stick out to me, we didn't do that. I didn't do that.

**Q. (By Mr. Fisher) Meaning?**

A. It wasn't an option.

**Q. You mean at Elbert County?**

A. Yes. Yeah.

**Q. You wouldn't give the option to officers, Hey, we're going to find you in violation, but you can quit instead and have nothing on your record?**

A. Correct.

**Q. That's not something you would have done when you were sheriff?**

A. Yeah. I mean, the ones that I'm thinking of, it was -- no. It was -- as a matter of fact, it was kind of the other way around; you were charged criminally.

**Q. And so -- but somebody at Elbert County, the professional standards folks, would have reviewed these files and seen that there were these issues on Dickey's record at Commerce City which ultimately didn't get founded, ultimately didn't lead to termination, but were on the way to it, right? I mean, somebody at -- from professional standards who reviewed that would**

**have seen all that, right?**

**MR. RATNER:** Form and foundation.

A. That's a fair way to say it.

**Q. (By Mr. Fisher) Would that have raised a red flag with them? With you? Why hire Dickey despite those problems I guess I'm asking?**

**MR. RATNER:** Form and foundation.

A. I don't know that I can answer that.

**Q. (By Mr. Fisher) Why not?**

A. I mean -- why -- why, in spite -- you're asking me to speculate on what someone else, or what -- through their investigation or through their background of the case are talking with, you know, Commerce City or their professional standard folks on why they made the decision they made? I don't --

**Q. (By Mr. Fisher) So I guess when you get the file on your desk, it's just a recommendation from your professional standards people yes or no?**

A. Correct.

**Q. And it doesn't have like a detailed report of like, Hey, there's these issues, but we think it's good enough, or there's these issues? It's just kind of a yes or no?**

A. Basically.

**Q. So the people that made the decision on yes**

**or no is really the people below you? I mean, you made the ultimate decision, but they gave you that recommendation?**
A. Correct.
**Q. And you can't recall who those folks were specifically in this case?**
A. Well, there's so many that -- you know, I could give you a list of names, but, I mean, depends on, you know, work flow and who has got what cases and all that. I mean, you could be pulling in a, you know, veteran deputy to, you know, run across town and pull those records and retrieve that, and he might be -- or she might be the one that retrieves it, yet they give it to, you know, the background investigator to do it. I had background investigators that were reserve officers from other agencies that were retired that had done that same job at other agencies. So, I mean, there's a list.
**Q. The things that I described to you about my -- my assessment of Dickey's -- some of his use-of-force incidents at Commerce City and where they were headed before he was given the chance to resign, had you known those things at the time of hiring, would that have affected your decision to hire him or not hire him?**

**MR. RATNER:** Object to form.
A. Yeah, I don't think I could answer that either. I mean, it's pretty limited information.
**Q. (By Mr. Fisher) What I gave you, you mean?**
A. Correct.
**Q. Like what more would you want to do in order to make the decision?**
A. Talk to the individuals at Commerce.
**Q. Okay. And do you think people at your --**
A. And see if there was anything else associated with those cases, or, you know -- or, you know, with them. With Commerce. You know, did they want him out of there? I mean, I don't know. There's a lot of questions.
**Q. Did anyone speak to Commerce and kind of get those answers in Dickey's case --**
**MR. RATNER:** Object to foundation.
**Q. (By Mr. Fisher) -- regarding the hiring?**
A. That's common practice.
**Q. Okay. So you think that would have happened, but as you sit here today you can't say for sure?**
A. Yeah. I don't even know who talked to him, so, yeah, I can't answer that.
**Q. And ultimately if those -- if those folks had talked to the people at Commerce, they would have**

**folded that into whatever their recommendation was, yes or no, on hiring Dickey, correct?**
A. I assume.
**Q. But I'm just trying to get a better idea, I guess, of what you get on your desk in the end before you make the ultimate decision of whether to hire or not. Is it just like one piece of paper that says we say yes, or what information is in there what you get?**
A. Well, I wouldn't even get anything on my desk if it was a no. I mean, it wouldn't go to that.
**Q. Okay.**
A. It would never go to that stage, right? I mean, if they we had weeded someone out during that process, it would never even come to me, because that -- that very last step of the process is me sitting down with that individual and talking to them more trying to figure out who they are and whether they fit.
I mean, there was a -- I couldn't give you a number, but there was some individuals along the line there along the years that I was like this is not going to work. You know, might have made it all through this process, but this isn't the right agency for you.
**Q. As you're sitting down with them and you're saying personality-wise --**

A. Yeah.
**Q. -- this is not going to work?**
A. You will not fit with this group.
**Q. And when you get the professional standards people's -- do they give you anything on Dickey?**
A. Yeah, there's a file.
**Q. A file?**
A. Right.
**Q. Would there be anything in there that would reference those prior use-of-force incidents from Commerce City?**
A. Most likely, yeah.
**Q. And it's something that you could have -- or what is your practice? Do you go through that entire packet before you sit down with the person?**
A. Depending on what they give me, yeah, you look through it. But, I mean, it's their recommendation, you know, that we've vetted this person, we've been through the process, and...
**Q. And so you never personally spoke to -- I don't know what the head of Commerce City is called. They're not called sheriff.**
A. The chief.
**Q. The chief. Did you ever speak to the chief of Commerce City to say, Hey, I noticed there was some**

**issue on Dickey's prior uses of force, can you tell me about him as an officer? Tell me about whether we want him at our agency?**
A. No. And that's -- that's a good question. Maybe that will help wrap your head a little bit around it.
If I were, he wouldn't know anything either.
**Q. Because you're talking above his pay grade?**
A. Yeah. You're talking about this level that's like asking your admin assistant -- I mean, keeping up with what they did every day, all day long. When you're running an agency, it's not -- there's people that are assigned to do those things.
**Q. Right. And so I guess in this case, in my opinion, the best people to be talked to at Commerce City would have been those use-of-force instructors that were recommending termination and recommending use-of-force policy violations against Dickey for various different cases. Obviously you didn't talk to those folks --**
A. No.
**Q. -- personally?**
**MR. RATNER:** Form.
**Q. (By Mr. Fisher) However, you think your standards and -- I can't remember --**

A. Professional standards.
**Q. -- professional standards people may or may not have interviewed those folks and talked to them about those cases?**
**MR. RATNER:** Form and foundation.
A. They would have gone and got that information.
**Q. (By Mr. Fisher) Okay. As a matter of course, that's how it generally happens?**
A. Correct.
**Q. You can't say with certainty whether that happened in this case?**
A. No.
**Q. And then after having reviewed those files, talking to those folks over there at Commerce City, that's where they make their recommendation yes or no?**
A. Along with the rest of the process, yes.
**Q. Which is, you know, background check, interviews, applications?**
A. Oral boards.
**Q. What's that? Oral boards?**
A. Yeah.
**Q. That's where -- and I think Dickey talked about this in his deposition. At the oral boards would they have questioned him about some of those prior**

**incidents, prior use of force at Commerce City?**
A. Possibly.
**Q. You can't say as you sit here today whether or not that did happen; but as a general matter, that might come up in those oral boards?**
A. I wouldn't have been in that oral board, no.
**Q. Okay. So when you decided to hire Dickey, did you personally know about those prior uses of force that I was talking about earlier?**
A. I knew that there was use-of-force issues that had been brought up.
**Q. And even -- did you even know that Commerce City had been recommending termination and you got to quit in lieu of termination?**
A. No.
**Q. That, you wouldn't have known?**
A. No.
**Q. Is that something you feel now, looking back in hindsight, you feel like you wish you had known, or something you feel you should have known?**
**MR. RATNER:** Object to form and foundation.
A. Again, I would say not enough information.
**Q. (By Mr. Fisher) Meaning?**
A. Well, you're talking about the -- that one piece that -- use-of-force instructors I think you said

is what they were?
**Q. Yeah.**
A. I'm not sure --
**Q. The people who are doing the --**
A. Sure.
**Q. -- assessments --**
A. I'm not sure what that is.
**THE REPORTER:** You guys are really stepping on each other. One at a time, please.
**Q. (By Mr. Fisher) I guess I mean -- all right. So I think this is how it works at Commerce City. If somebody has a use of force, it's going to be reviewed by somebody, right? A baton strike, taser deployment, shooting their gun, whatever. The people that review the force at Commerce City it seemed to be -- looking through Dickey's files -- were predominantly use-of-force instructors, right? Like people who would teach use of force at the agency?**
**MR. RATNER:** Form and foundation.
**Q. (By Mr. Fisher) Do you know what I mean by that?**
A. I do.
**Q. Yeah.**
A. I know what you're talking about.
**Q. Somebody who is teaching like, you know,**

hand-control techniques is going to review Dickey's hand-control techniques in this given case and see if it complied with Commerce City's policies, et cetera?
A. Sure. We call them arrest control instructors.
Q. Okay. So either arrest control instructors are looking at the use of force and then it's going up the chain of command to internal, you know, people who are in charge of internal affairs, and then going all the way up to the chief of police to make the decision on violation of policy or not, termination or not, suspension or not, retraining or not, and all those things.
So -- but that's what's in the actual use-of-force reports is you have these arrest controls or trainers going through and going, Oh, I see this problem or that problem with what Dickey did here, I'm recommending X, Y and Z, and then it goes up the chain of command.
MR. RATNER: Form and foundation. Is there even a question?
Q. (By Mr. Fisher) No, I was just kind of explaining what I meant.
A. Okay.
Q. So do you understand what I mean now?

A. I do.
MR. RATNER: Same objection.
Q. (By Mr. Fisher) So those, you know, use-of-force reviews would have encompassed everything I was just talking about, and that would all come to your professional standards people and they would review that all; right?
MR. RATNER: Form and foundation.
A. Yes.
Q. (By Mr. Fisher) And if they had questions, they could always speak to those use-of-force instructors or the higher-ups who made the decisions at Commerce City, right?
MR. RATNER: Object to form and foundation.
A. Fair.
Q. (By Mr. Fisher) And ultimately, after doing their own investigation, they give the recommendation to you yay or nay?
A. Correct.
Q. All right.
MR. RATNER: Objection to the form.
Q. (By Mr. Fisher) I guess what I was trying to get at earlier is if you were hiring somebody who was going to be fired at another agency for use of force policy violations but was given the option to quit

instead, I assume that that is something you would want to know more about before making the hiring decision?
MR. RATNER: Is that a question?
Q. (By Mr. Fisher) Yeah. I guess it calls for a yes or no.
MR. RATNER: Object to form.
A. Would I like to know more about that? Sure. But I think you're still keeping that pretty much in a bubble there. We're not talking about -- because you're talking about just the arrest control instructors and you're not talking about his supervisors or sergeants or anybody else up the chain, so...
Q. (By Mr. Fisher) Yeah. I'm saying all of that. You would want to know as much as you can about all of that stuff, right?
A. Yes. Yes.
Q. But I guess you, as the more top-level guy, you don't actually learn about all that before you do the hiring decision, the final decision, I guess?
A. No, that would be their jobs to roll through all of those issues. And, like I said, if it would have been a no, you would never get that on your desk in the first place.
Q. But when it's the yes and they give you that

paperwork, do they put some kind of summary of, Hey, there are these red flags or these concerns, but we're passing him through anyway? Like do they tell you anything about those incidents so that you at least know about them?
MR. RATNER: Object to form.
A. Would you mind splitting that into two questions? Because the way you asked this, if you're going to pass them through anyways, well, no, that wouldn't happen. So like, hey, we have these problems, we're going to pass them through anyways. No to that one.
And the other part of your question was --
Q. (By Mr. Fisher) Was when you get this -- I'm calling it a packet --
A. That's correct.
Q. -- correct me if I'm wrong -- some kind of packet on your desk for your ultimate approval, was there or would there typically be anything in there about, Hey, just to let you know, he did have these use-of-force issues at Commerce City, but we found, you know, for X, Y and Z reasons, he's still a proper candidate for --
A. Right. Right. There could be stuff in there that could say that, you know, there was a complaint

about the way someone was spoken to on a traffic incident, unfounded; a complaint, unfounded; complaint, unfounded, or -- so if that helps.
**Q. But like in this case, might there be something that says there was a complaint that he tased an individual who was in a diabetic coma he thought was drunk; the guy was badly injured. He was going to be fired but given the choice to resign anyway. Would there be something of that level of detail?**
**MR. RATNER:** Object to form.
A. No.
**Q. (By Mr. Fisher) Okay. It would be more of like a list of just unfounded, unfounded. And this one might come across your desk as just unfounded because ultimately it was not founded?**
A. Yes. And this is hard, too, because you're talking about like globalizing what it looks like, but agencies have their own way of reporting those things. So what it would look like in that case, yes, it could look like that. But I guess a different professional standards -- whether you're talking about a sheriff's office or a PD or me or whatever, I mean, their professional standards might report that in a different way. So whatever that form looks like, their internal affairs or their internal disciplinary process, it can

look very different, depending on what agency it came from. Just to your specific question about this unfounded, this unfounded.
**Q. Yeah.**
A. So could it have looked like that? Yes, it could have. But it could have looked different, too.
**Q. Whatever paperwork or -- let me ask you this. Is there a record somewhere at the sheriff's office of kind of all of the hiring process paperwork there was for Dickey --**
A. There is.
**Q. -- before he was hired?**
A. There is.
**Q. And who -- who has that paperwork? I guess the sheriff's office is just in control of it, I imagine?**
A. Correct.
**Q. And they have that currently at the sheriff's office, I would imagine, even though he's no longer there?**
**MR. RATNER:** Objection to foundation.
A. When I was there it was there. I don't know whether they've continued to keep those there or they keep them with the county HR now, or if they keep them -- I'm not sure. Because I ran my own HR

internally, which a lot of sheriffs do.
**MR. RATNER:** Which is what I recommend.
A. Yeah. But what you find in the industry is a lot of times when you get a sheriff that comes from a police department, they push back and push their HR through the county instead of keeping it in house.
**Q. (By Mr. Fisher) So if I wanted to do a document request or a subpoena for the kind of file I'm talking about, would that be called Deputy Dickey's personnel file? What would it be called?**
A. Yes. Yeah.
**Q. Okay.**
A. And just to the sheriff's office. So regardless of the physical storage of it, that's not -- I mean, it's kind of inconsequential. But, yes, you would ask for the personnel file.
**Q. And that personnel file would encompass all the paperwork that went into the hiring decision and process, right?**
A. Correct.
**Q. And I guess it would also probably encompass Dickey's personnel records going forward when he was an actual sheriff?**
A. Correct.
**Q. Okay. Did he leave the sheriff's office**

**while you were still sheriff or afterwards?**
A. He did, while I was still sheriff.
**Q. Do you know why he left the sheriff's office and under what circumstances?**
A. What his reasoning was?
**Q. It was -- was he fired? Did he resign?**
A. No, he resigned.
**Q. And do you know what his reasoning was?**
A. No.
**Q. Did you have like an exit interview with him? Did he tell you anything about why he was leaving?**
A. I don't know what his specific reasons were. I'm not going to speculate on them.
**Q. And who would be the most knowledgeable person to talk about kind of how thoroughly Dickey's Commerce City actions were vetted by your agency?**
**MR. RATNER:** Object to form and foundation.
A. I can't answer that.
**Q. (By Mr. Fisher) If we went --**
A. I don't know.
**Q. If we looked -- if we had the personnel file in front of us here, we could -- we could find that answer, right?**
A. You would get that answer.
**Q. Okay. By looking through it to see who did**

**what steps?**
A. Correct.
**Q. Who they talked to, what they did, what they tried to dig up, uncover, et cetera?**
A. Correct.
**MR. FISHER:** Okay. Let's just take five minutes and I probably don't have too much longer.
**THE DEPONENT:** Okay.
(A recess was taken from 9:41 to 9:47 a.m.)
**Q. (By Mr. Fisher) While you were at Elbert County, did you guys do CIT training?**
A. We did.
**Q. And tell me a little bit about what CIT training is and what the purpose of it is.**
A. So we didn't do it in-house.
**Q. Okay.**
A. It was all done through -- which is very common. I think there's -- kind of the large agencies like in the 18th, Douglas/Arapahoe would host those, put them on -- Adams/Arapahoe, for that -- moving up north, as well, some of the bigger ones. So not an in-house training, done by those folks. And it's teaching deputies on the street how to deal with critical situations.
**Q. Including when you're dealing -- when a**

**deputy is dealing with somebody suffering a mental health crisis?**
A. Yes.
**Q. And I don't know if you've ever taken the training yourself or familiar with the curriculum. Deputy Dickey was apparently a CIT-certified officer. Were you aware of that?**
A. I think I recall him being CIT, yeah.
**Q. And in this case, this incident, he was responding to a scene in which he believed and the officers believed that they were dealing with somebody suffering from a mental health crisis. Are you aware of that?**
**MR. RATNER:** Object to form.
A. If that's what he told you he believed, yeah.
**Q. (By Mr. Fisher) Okay. I guess you -- like I said, you never did like an internal assessment yourself of whether or not Turner and Dickey acted appropriately in this case?**
A. No. And so to your previous question, through this entire process, like I pulled myself way out of it from the very beginning and let the District Attorney's office do their investigation.
**Q. It's just because that's the way it has become these days, right; there's an in-custody death,**

**it's handled by somebody else?**
A. Right. Multiple agencies.
**Q. Deputy Dickey became a training officer after this incident with Mr. Poer; is that correct?**
A. For who?
**Q. Where he was training younger officers. I forget what it's called. Do you know what I'm talking about where --**
A. Depends on what you're talking about. I mean, so there's less lethal instructors, firearm instructors, arrest control instructors, taser.
**Q. I want to say it's called CTO or something, where you basically take around a new cop --**
A. FTO.
**Q. FTO, yeah. He became an FTO at some point, field training officer, right?**
A. Yeah, I think he was an FTO.
**Q. And that was after the incident with Mr. Poer, and you don't recall the timing?**
A. If you say so.
**Q. Who makes the decision on who becomes FTOs?**
A. Patrol commanders.
**Q. Okay. Does it have to get ratified all the way to the top?**
A. No.

**Q. Okay. In this case, the -- I will represent to you that the officers testified in their depositions that Sergeant Turner dealt five blows to the head/face area of Mr. Poer after he had already been tased and after the gun had already been confiscated.**
**Would you say that is in line with the policies and the procedures of the Elbert County Sheriff's Office?**
**MR. RATNER:** Object to form and foundation. Also mischaracterizes testimony. Go ahead.
A. That's really hard to answer. I mean, was he resisting? Was he swinging? Was he fighting? Was he kicking? Was he --
**Q. (By Mr. Fisher) According to the officers and what can be gleaned off the body cam -- it's kind of dark and you can't see everything -- he had one hand handcuffed, and the other was still under his body and he was refusing to give that arm -- or, in my opinion, unable to give that arm because it was under his body. He was not hitting any officers, there was no indication that there was another weapon, they simply couldn't get that second arm cuffed at this point.**
**That's my summary of the evidence that I have heard in different depositions and interviews and everything.**

**MR. RATNER:** Is there a question?
**MR. FISHER:** Yeah, I was just answering his question so he could answer mine.
**MR. RATNER:** Form and foundation.
A. Say it again for me, please.
**Q. (By Mr. Fisher) Sure. So at the --**
A. Sorry.
**Q. At the time these blows to the head and face were administered by Turner, Mr. Poer was on his belly, he had one arm cuffed behind his back, the gun had already been confiscated and was in Deputy Bjork's belt. Mr. Poer's other arm was stuck under his body, and they were trying to get it. And according to Turner, he wouldn't give it -- he wouldn't let it out of his body, and so that's when Turner says he basically hit him as hard as he can in the head and face area --**
**MR. RATNER:** Object to form and foundation.
**Q. (By Mr. Fisher) -- to get that hand.**
**MR. RATNER:** Mischaracterizes testimony.
So -- hold on a second. You've got to ask him a question.
**Q. (By Mr. Fisher) Yeah. So my question again, is that in line with Elbert County use-of-force policy?**
**MR. RATNER:** Same objections.

A. Policy would be to use all force necessary to effect the arrest. Use the appropriate force necessary to effect the arrest.
**Q. (By Mr. Fisher) Right. And was this the appropriate force in that case given the facts that I told you?**
**MR. RATNER:** Object to form and foundation.
A. I wasn't there.
**MR. FISHER:** Yeah.
Okay. That's all the questions I have.
**MR. RATNER:** Okay. I'll handle signature. I'm not -- so Colorado law you can review the deposition. So we'll reserve, and you can do it through me.
**THE REPORTER:** Okay. Thank you.
(The deposition concluded at 9:54 a.m.)

AFFIDAVIT

I have read my deposition and it is true and accurate, except for any changes or corrections now indicated by me on the Amendment sheet.

Amendment sheet attached ( )
No changes to testimony ( )

____________________________________
SHAYNE HEAP

SUBSCRIBED AND SWORN to before me this date, ______________________________.

My commission expires __________________

____________________________________
NOTARY PUBLIC

____________________________________
STREET ADDRESS

____________________________________
CITY, STATE, ZIP

Return to: MILE HIGH COURT REPORTING & VIDEO, INC.
14143 Denver West Parkway
Suite 100
Golden, Colorado 80401

CERTIFICATE

I, Aimee S. Reisinger, RPR, Notary Public of the State of Colorado, do hereby certify that prior to the commencement of the examination of SHAYNE HEAP, said witness was sworn by me to testify to the truth in relation to the matters in controversy between the parties hereto; that the said examination was taken in machine shorthand by me and was thereafter reduced to typewritten form, and that the foregoing is a true and accurate transcript of the questions asked, testimony given, and proceedings had.

I further certify that I am not related to any party herein, nor their counsel, and have no interest in the result of this litigation.

IN WITNESS WHEREOF, I have affixed my signature this 7th day of September, 2021.

Aimee S. Reisinger, RPR, CSR
My Commission expires 9/20/2024
Notary No. 19964015065

September 7, 2021

MARK S. RATNER, ESQ.
Hall & Evans, LLC
1001 Seventeenth Street
Suite 300
Denver, Colorado 80202

RE: Sherry Poer vs. Sheriff Tim Norton, et al.
Civil Action No. 19-cv-01088(LTB)(NRN)
Deposition of Shayne Heap
Taken: August 20, 2021

Dear Mr. Ratner,

Attached with your electronic copy of the above-referenced deposition is the signature page from the Court's original transcript.

In accordance with the Rule, please have the witness read and sign his or her testimony, then return the executed signature page and any amendment sheets used to us within 35 days of the date of this letter.

Sincerely,

MILE HIGH COURT REPORTING & VIDEO, INC.

Encl.

cc: Original transcript
David N. Fisher, Esq.

**A**

**a.m** 1:18 40:9 45:16
**able** 20:18
**above-referen...** 48:11
**absolutely** 13:15
**academy** 10:6 16:7
**access** 19:3 20:10,14
**accident** 10:1
**accurate** 46:3 47:11
**acted** 41:18
**Action** 1:2 48:7
**actions** 39:16
**actual** 32:14 38:23
**Adams/Arapa...** 40:20
**ADDRESS** 46:15
**admin** 28:10
**administered** 44:9
**administration** 5:12
**Administratrix** 1:6
**affairs** 19:3 32:9 36:25
**affect** 21:23
**AFFIDAVIT** 46:1
**affixed** 47:16
**after-action** 19:7
**AG** 5:15
**agencies** 13:21 24:16,17 36:18 40:18 42:2
**agency** 13:16 14:9 16:8 16:12,22 17:7 19:2 20:3 26:23 28:3,12 31:18 33:24 37:1 39:16
**ago** 8:13
**ahead** 5:3 7:1,2 10:13 14:11 17:9 18:20 20:13 43:10
**Aimee** 1:19 47:3,20
**al** 48:6
**allegations** 17:13
**allowed** 5:25 9:5,9
**amendment** 46:4,5 48:14
**answer** 4:17 5:3,4 8:2,4 17:11 23:8 25:2,23 39:18 39:23,24 43:11 44:3
**answering** 44:2
**answers** 4:21 25:16
**anybody** 34:12
**anyway** 35:3 36:8
**anyways** 35:9,11
**apparently** 41:6
**APPEARAN...** 2:1
**applicant** 16:7
**application** 15:10,10
**applications** 15:12 29:19
**appraisal** 10:4
**approaching** 19:17
**appropriate** 45:2,5
**appropriately** 41:19
**approval** 35:18
**apps** 15:14
**area** 43:4 44:17
**arm** 43:18,19,22 44:10,12
**arrest** 32:4,6,15 34:10 42:11 45:2,3
**asked** 13:3 35:8 47:11
**asking** 23:6,11 28:10
**assessment** 24:20 41:17
**assessments** 19:7 31:6
**assigned** 28:13
**assistant** 28:10
**associated** 25:10
**assume** 26:3 34:1
**attached** 46:5 48:11
**attorney** 5:1,16
**Attorney's** 11:2 41:23
**attorneys** 11:20
**August** 1:4,18 48:8
**aware** 17:14,17 41:7 41:12

**B**

**back** 5:19 6:13 9:13 10:2 19:20 22:2 30:18 38:5 44:10
**background** 15:15 16:24 23:12 24:14,15 29:18
**backgrounds** 16:23
**badly** 36:7
**ban** 5:14,18,22
**based** 15:13
**basically** 19:8 23:24 42:13 44:16
**baton** 31:13
**battery** 19:21
**before/after/the** 12:10
**beginning** 41:22
**begins** 15:14
**BEHALF** 2:2,9
**believe** 14:3 17:25
**believed** 41:10,11,15
**belly** 44:9
**belt** 44:12
**best** 28:15
**better** 26:4
**bigger** 40:21
**bit** 4:13 10:2 15:4 28:5 40:13
**Bjork's** 44:11
**blows** 43:3 44:8
**board** 30:6
**boards** 15:15 29:20,21 29:24 30:5
**body** 10:18 11:14 18:8 19:17 43:15,17,19 44:12,15
**brand** 15:19 16:7
**Brauchler**

10:23 11:8
**briefly**
4:13
**bring**
6:13 21:1
**broke**
10:1,2 18:7
**brought**
21:18 30:11
**bubble**
34:9
**buy**
6:12
**Byrialsen**
1:16 2:4

**C**

**C**
4:1
**call**
12:3 32:4
**called**
1:15 27:21,22 38:9,10 42:7 42:12
**calling**
35:15
**calls**
34:4
**cam**
10:18 11:14 43:15
**camera**
19:17
**candidate**
35:23
**capacities**
1:11
**capacity**
1:10
**care**
18:1
**career**
9:21
**cars**
12:23
**case**
7:20 10:8 11:3,3 11:4,5,21 12:13 13:20 18:10 19:10,15 19:16,16 23:13 24:6 25:16 28:14 29:12 32:2 36:4,19 41:9,19 43:1 45:5
**cases**
5:7,11 14:7 20:1 24:9 25:11 28:19 29:4
**cc**
48:21
**certainly**
12:7
**certainty**
29:11
**CERTIFICA...**
47:1
**certify**
47:4,13
**cetera**
32:3 40:4
**chain**
32:8,18 34:12
**chance**
24:22
**changes**
46:3,6
**characterizati...**
10:13
**charge**
32:9
**charged**
22:17
**check**
29:18
**chief**
27:23,24,24 32:10
**Children**
1:7
**choice**
36:8
**Chris**
1:10 12:19
**Christopher**
1:6
**circumstances**
39:4
**CIT**
40:11,13 41:8
**CIT-certified**
41:6
**City**
16:4 17:13,14 18:8,10 20:3 22:22 23:13 24:21 27:11,21 27:25 28:16 29:15 30:1,13 31:11,15 33:13 35:21 39:16 46:16
**City's**
32:3
**civil**
1:2 7:4,7 48:7
**civilians**
6:2
**claim**
7:17
**clearance**
11:13
**Close**
12:11
**college**
9:25
**Colorado**
1:1,18,21 2:5,12 5:21 6:19 45:12 46:21
47:4 48:5
**coma**
36:6
**come**
6:10,11 11:23 26:14 30:5 33:5 36:14
**comes**
17:20 38:4
**comfortable**
7:24 8:4
**coming**
13:17 15:21 17:12
**command**
17:2 20:24 32:8 32:19
**commanders**
16:24,25 42:22
**commencement**
47:5
**commencing**
1:18
**comments**
19:11 20:19
**Commerce**
16:3 17:13,14 18:8,10 20:3 22:22 23:13 24:21 25:8,12 25:15,25 27:11 27:21,25 28:15 29:15 30:1,12 31:11,15 32:3 33:13 35:21 39:16
**commission**
46:11 47:21
**common**
21:13 25:19 40:18
**company**
8:17,18,22
**complaint**
35:25 36:2,2,5
**complaints**
21:14
**complete**
11:5,6
**complied**
32:3
**concerns**
35:2
**concluded**
45:16
**confiscated**
43:5 44:11
**confluence**
20:2
**considered**
7:7
**construction**
10:5
**consultant**
8:8
**continued**
37:23
**control**
32:4,6 34:10 37:15 42:11
**controls**
32:15
**controversy**
47:7
**cop**
42:13
**copy**
48:11
**correct**
6:3,5,24 7:15 11:11,16 13:22 13:23 14:1,2 16:4,5,8,9 20:22,24 21:6 21:8 22:12 23:19 24:4 25:5 26:2 29:10 33:19

35:16,17 37:17 38:20,24 40:2 40:5 42:4
**corrections** 46:3
**counsel** 10:24 47:14
**counties** 14:7
**county** 6:18,23 8:25 9:9 9:12 10:8 13:22,25 14:6 14:21 15:7 16:10 17:2 18:4,17 22:7 22:19 37:24 38:6 40:11 43:7 44:24
**couple** 4:14 5:11 18:13
**course** 29:9
**court** 1:1 4:17 46:19 48:18
**Court's** 48:12
**courtroom** 5:3
**criminally** 22:18
**crisis** 41:2,12
**critical** 8:7 40:24
**CRT** 11:9 12:10,15 13:11,20 14:8
**CSR** 47:20
**CTO** 42:12
**cuffed** 43:22 44:10
**current** 7:22 8:16
**currently** 37:18
**curriculum** 41:5
**custody** 10:15
**cuts** 18:7

**D**

**D** 4:1
**DA's** 11:7,19 12:24 14:13
**dark** 43:16
**date** 46:10 48:15
**David** 2:3 48:21
**david@fblaw....** 2:6
**day** 28:11,11 47:17
**days** 41:25 48:15
**deal** 40:23
**dealing** 40:25 41:1,11
**dealt** 43:3
**Dear** 48:9
**death** 12:5 41:25
**Deceased** 1:6,7
**decide** 15:12
**decided** 30:7
**decision** 10:22,24 14:4 14:20 20:7 23:15,25 24:2 24:24 25:7 26:6 32:10 34:2,20,20 38:18 42:21
**decision-maker** 21:2
**decision-maki...** 10:25 21:23
**decisions** 33:12
**Defendants** 1:12 2:9
**Denver** 1:17 2:5,12 46:20 48:5
**department** 5:24 15:21 16:4 38:5
**department's** 10:19,20
**depending** 27:16 37:1
**depends** 24:8 42:9
**deployment** 31:13
**DEPONENT** 8:6 40:8
**deposed** 4:10 5:8,15 7:4 7:6 12:12
**deposition** 1:4,14 29:24 45:13,16 46:2 48:7,11
**depositions** 13:20 43:2,24
**deputies** 15:2,8 40:23
**deputy** 1:10 9:17 15:19 16:3 24:11 38:9 41:1,6 42:3 44:11
**described** 18:25 24:19
**desk** 23:17 26:5,9 34:23 35:18 36:14
**despite** 23:5
**detail** 36:9
**detailed** 23:20
**diabetic** 18:6 36:6
**Dickey** 1:10 12:19 15:20 16:3 17:12 18:2,5,6 18:15 19:17 20:3 23:5 26:2 27:5 28:18 29:23 30:7 32:17 37:10 41:6,18 42:3
**Dickey's** 22:21 24:20 25:16 28:1 31:16 32:1 38:9,22 39:15
**died** 10:14 11:22
**different** 11:14 15:18,23 16:2,8 17:6 28:19 36:20,23 37:1,6 43:24
**differently** 19:14
**dig** 40:4
**disciplinary** 36:25
**discovered** 18:14
**discovery** 13:19
**District** 1:1,1 11:2 41:22
**division** 16:23,25
**document** 38:8
**documents** 13:13
**doing** 8:10 13:19 19:4 19:7 31:4 33:16
**Douglas/Arap...** 40:19
**drive** 6:12
**drunk** 18:7 36:7
**duly** 4:4
**duty** 12:1

**E**

**E** 4:1,1
**earlier** 30:9 33:23
**effect** 45:2,3
**either** 12:1 25:3 28:7 32:6
**Elbert** 6:23 8:25 9:9,12 9:19 10:8

13:21,25 14:6 14:21 15:7 16:10 17:1 18:4,17 22:7 22:19 40:10 43:7 44:24
**elections** 9:1
**electronic** 48:11
**employee** 8:23
**employees** 8:20 17:1
**employment** 8:15 17:6
**Encl** 48:19
**encompass** 38:17,21
**encompassed** 33:4
**ended** 15:21 18:8
**enforce** 6:13,16
**enforcement** 6:1,4 8:1,1 9:21 17:7
**entire** 13:4 27:14 41:21
**entirety** 9:20
**entity** 13:16
**episode** 18:6
**Esq** 2:3,10 48:3,21
**estate** 1:6 10:4
**et** 32:3 40:4 48:6
**Evans** 2:11 48:3
**events** 20:2
**evidence** 43:23
**examination** 1:15 3:2 4:6 47:5,8
**examined** 4:4
**excessive** 7:16 17:14
**executed** 48:14
**EXHIBITS** 3:6
**exit** 39:10
**experience** 18:3
**expires** 46:11 47:21
**explaining** 32:23
**explanation** 18:1
**extent** 7:24

**F**

**face** 44:8,17
**fact** 22:16
**facts** 45:5
**fair** 23:3 33:15
**familiar** 4:12 41:5
**family** 10:17
**far** 13:12,14 19:8
**feel** 7:24 8:4 14:20 30:18,19,20
**felt** 6:7,16
**field** 42:16
**fighting** 43:12
**figure** 26:17
**file** 23:17 27:6,7 38:8,10,16,17 39:21
**files** 16:16 19:3,6 20:11,15,17 22:21 29:14 31:16
**fill** 15:10
**filled** 15:14
**final** 34:20
**find** 18:11 20:4 22:10 38:3 39:22
**findings** 20:8
**finger** 18:7
**finish** 4:16
**fire** 18:12 20:4
**firearm** 42:10
**fired** 19:24 21:21 33:24 36:8 39:6
**firehouse** 12:14
**firms** 5:16,16
**first** 4:4 5:9 7:6 11:22 21:5 34:24
**Fisher** 1:16 2:3,4 3:3 4:7 8:9 9:11 10:14 14:16 15:6,25 17:12 18:17,20 20:16 21:10 22:5 23:4,9,16 25:4 25:18 28:24 29:8 30:23 31:10,20 32:22 33:3,10,16,22 34:4,14 35:14 36:12 38:7 39:19 40:6,10 41:16 43:14 44:2,6,19,23 45:4,9 48:21
**fit** 26:18 27:3
**five** 18:5 40:6 43:3
**flag** 23:5
**flags** 17:25 35:2
**Floor** 1:17 2:5
**flow** 24:9
**folded** 26:1
**folks** 12:10 22:20 23:14 24:5 25:24 28:20 29:3,15 40:22
**follows** 4:5
**force** 7:17 13:24 14:9 17:14 19:12,13 28:1 30:1,8 31:12,15,18 32:7 33:24 45:1,2,5
**foregoing** 47:10
**forget** 42:7
**form** 14:11 15:3,22 17:8 18:16 20:12 21:9,25 23:2,7 25:1 28:23 29:5 30:21 31:19 32:20 33:8,14 33:21 34:6 35:6 36:10,24 39:17 41:14 43:9 44:4,18 45:7 47:10
**former** 8:1 17:6
**forward** 38:22
**found** 9:8 17:24 21:21 35:21
**foundation** 17:8 18:18 20:12 21:25 23:2,7 25:17 29:5 30:21 31:19 32:20 33:8,14 37:21 39:17 43:9 44:4,18 45:7

**founded** 22:23 36:15
**founded/unfo...** 21:14
**fresh** 16:6
**front** 39:22
**FTO** 42:14,15,15,17
**FTOs** 42:21
**function** 17:20
**further** 4:5 47:13

**G**

**G** 4:1
**G.P** 1:6
**general** 30:4
**General's** 5:17
**generally** 29:9
**George** 10:23 11:8
**getting** 16:1
**give** 4:20 22:9 24:8 24:13 26:19 27:5,16 33:17 34:25 43:18,19 44:14
**given** 12:2 17:23 21:22 24:22 32:2 33:25 36:8 45:5 47:12
**gleaned** 43:15
**globalizing** 36:17
**go** 4:13 5:3 7:1,2 10:13 11:24 14:11 15:11,16 16:11,16 17:5 17:9,10 18:20 20:13 26:10,12 27:14 43:10
**goes** 32:18
**going** 6:13 8:2 9:13 10:12,21 11:9 11:10,21 12:14 14:13 16:12 18:11,12,25 20:3,4,5,20 21:20 22:10 26:21 27:2 31:12 32:1,7,9 32:16,16 33:24 35:9,11 36:7 38:22 39:13
**Golden** 46:21
**good** 4:8,9 23:21 28:4
**Gotcha** 6:21 9:7
**Governor** 5:14
**grade** 28:8
**great** 6:19
**ground** 19:18
**group** 5:19 27:3
**guess** 9:13 14:17 15:25 23:6,16 26:5 28:14 31:10 33:22 34:4,18,20 36:20 37:14 38:21 41:16
**gun** 19:20 31:14 43:5 44:10
**gunpoint** 19:18
**guy** 34:18 36:7
**guys** 14:16 31:8 40:11

**H**

**Hall** 2:11 48:3
**hand** 43:16 44:19
**hand-control** 32:1,2
**handcuffed** 43:17
**handle** 45:11
**handled** 42:1
**happen** 30:4 35:10
**happened** 10:9 20:21 25:20 29:12
**happens** 29:9
**hard** 19:20 36:16 43:11 44:16
**head** 4:21,22 27:21 28:5 44:8,16
**head/face** 43:3
**headed** 24:22
**health** 41:2,12
**Heap** 1:4,15 4:3,8 46:8 47:5 48:7
**hear** 21:15
**heard** 12:2 21:3,10 43:24
**hearing** 21:5
**help** 15:4 16:24 28:5
**helped** 16:23
**helps** 16:23 36:3
**hereto** 47:8
**hey** 22:10 23:21 27:25 35:1,10 35:20
**Hickenlooper** 5:14,21
**HIGH** 46:19 48:18
**high-capacity** 5:22,25
**higher-ups** 33:12
**hindsight** 30:19
**hire** 15:7 23:5 24:24 24:25 26:6 30:7
**hired** 18:3 37:12
**hiring** 15:1,16,19 17:18 18:15 24:23 25:18 26:2 33:23 34:2,20 37:9 38:18
**history** 9:13
**hit** 44:16
**hitting** 43:20
**hold** 44:21
**home** 12:1 14:8
**host** 40:19
**house** 38:6
**HR** 37:24,25 38:5

**I**

**idea** 26:4
**identifying** 7:25
**imagine** 12:6 37:16,19
**in-custody** 12:5 41:25
**in-depth** 17:5,10
**in-house** 40:15,22
**inappropriate** 19:12,13
**incident** 7:11,12 10:8,9 10:10 11:21 13:2,6 36:2 41:9 42:4,18

**incidents**
18:13 24:21 27:10 30:1 35:4
**Including**
40:25
**inconsequential**
38:15
**INDEX**
3:1
**indicated**
46:4
**indication**
43:21
**individual**
1:11 26:16 36:6
**individuals**
15:9 16:17 25:8 26:20
**industry**
10:4,4 21:13 38:3
**information**
7:25 11:4 20:11 25:3 26:8 29:7 30:22
**infrastructure**
8:7
**inherited**
5:10,11 6:22
**injured**
13:1 36:7
**institute**
5:23
**instruct**
7:25
**instructors**
28:16 30:25 31:17 32:5,6 33:12 34:11 42:10,11,11
**integrity**
13:14,17
**interest**
47:15
**interesting**
9:8
**internal**
13:24 14:17 19:3 32:8,9 36:24,25 41:17
**internally**
14:10 38:1
**interview**
39:10
**interviewed**
29:3
**interviews**
29:19 43:24
**investigated**
18:10
**investigating**
11:3
**investigation**
11:5,9,9 13:15 13:18,21,25 14:8,10,14,15 14:17 17:23 23:12 33:17 41:23
**investigations**
15:15 16:22
**investigator**
24:14
**investigators**
12:23 24:15
**involved**
7:12,13 10:1
**island**
6:12
**issue**
11:7 28:1
**issues**
7:1,2,3 21:2,16 21:16 22:21 23:21,22 30:10 34:22 35:21

**J**

**job**
7:22 8:16 24:17
**jobs**
34:21

**K**

**keep**
37:23,24,24
**keeping**
28:10 34:8 38:6
**kicking**
43:13
**killed**
10:10
**kind**
8:22 14:5 16:11 16:13 22:2,17 23:22 25:15 32:22 35:1,17 37:9 38:8,15 39:15 40:18 43:15
**knew**
30:10
**know**
8:2 11:18 13:14 15:11,12,13,15 18:3 20:20 21:14,17 23:8 23:13 24:7,9 24:10,11,14 25:11,11,12,13 25:22 26:22 27:18,21 28:7 29:18 30:8,12 31:20,24,25 32:8 33:3 34:2 34:7,15 35:5 35:20,22,25 37:22 39:3,8 39:12,20 41:4 42:7
**knowing**
8:3
**knowledgeable**
39:14
**known**
24:23 30:16,19 30:20

**L**

**laid**
19:18
**large**
40:18
**lateral**
15:20
**law**
6:1,4,16 8:1,1 9:20 17:7 45:12
**laws**
5:22
**lawsuit**
5:13 10:17 19:4 20:18
**lead**
22:23
**Leadholm's**
19:16
**learn**
34:19
**learned**
18:15,23
**leave**
8:25 38:25
**leaving**
39:11
**led**
20:2
**left**
8:11 19:21 39:3
**legal**
10:24
**Let's**
40:6
**lethal**
42:10
**letter**
11:13 48:15
**level**
28:9 36:9
**lieu**
20:6,7 30:14
**lieutenant**
9:15
**limited**
25:3
**line**
26:20 43:6 44:24
**list**
24:8,18 36:13
**litigation**
7:5 47:15
**little**
4:13 15:4 28:5 40:13
**live**
6:11
**LLC**
2:11 48:3
**long**
8:9,13 28:11
**longer**
37:19 40:7
**look**
20:18 27:17 36:19,20 37:1
**looked**
37:5,6 39:21
**looking**
8:21 15:20 19:23 30:18 31:15 32:7 39:25
**looks**
36:17,24
**lot**
22:1 25:13 38:1 38:4

**M**

**M.P** 1:6
**machine** 47:9
**magazine** 5:14,18,22
**magazines** 5:25 6:10
**maintaining** 13:14
**majority** 5:20 6:19
**making** 34:2
**man** 18:5 19:17
**man's** 18:7
**mark** 2:10 19:21 48:3
**marked** 3:7
**matter** 14:17 22:16 29:8 30:4
**matters** 47:7
**mean** 13:15 16:21,22 16:24 17:20 21:15 22:7,15 22:24 23:10 24:1,8,10,17 25:3,4,13 26:10,13,19 27:17 28:10 31:10,20 32:25 36:22 38:15 42:10 43:11
**Meaning** 22:5 30:23
**meant** 32:23
**meet** 15:13
**mental** 41:1,12
**Mesa** 9:25
**MILE** 46:19 48:18
**mind** 35:7
**mine** 44:3
**Minor** 1:7
**minutes** 40:7
**mischaracteri...** 43:10 44:20
**morning** 4:8,9
**moving** 40:20
**Multiple** 42:2

**N**

**N** 2:3 4:1 48:21
**names** 24:8
**nay** 33:18
**necessary** 45:1,2
**neck** 10:1 19:20
**needed** 11:23 12:21,22
**neighborhood** 18:9
**never** 26:12,14 27:20 34:23 41:17
**new** 15:1,7,19 16:7 42:13
**Ninth** 2:5
**nods** 4:21
**north** 40:21
**Norton** 1:10 48:6
**Notary** 1:20 46:13 47:3 47:21
**NOTICE** 1:14
**noticed** 27:25
**notified** 11:22
**number** 17:13 26:20
**numbers** 6:11

**O**

**O** 4:1
**object** 10:12 14:11 15:3,22 17:8 18:16 20:12 21:9,25 25:1 25:17 30:21 33:14 34:6 35:6 36:10 39:17 41:14 43:9 44:18 45:7
**objection** 5:2 33:2,21 37:21
**objections** 44:25
**objects** 5:1
**obtain** 16:11
**obviously** 13:4 15:9 28:19
**office** 5:17 6:15,20 8:12 10:19 11:2,7,19 12:24 14:13,22 17:2 36:22 37:8,15,19 38:13,25 39:3 41:23 43:8
**officer** 9:24 16:13 28:2 41:6 42:3,16
**officer's** 17:6
**officers** 12:12 22:9 24:16 41:11 42:6 43:2,14 43:20
**offices** 1:16
**official** 1:10
**officially** 4:8
**Oh** 7:2 32:16
**okay** 4:14,18,23 6:9 7:11,16,21 9:23 10:7 11:12,21 12:25 13:9 18:20 19:5 21:4 25:9 25:20 26:11 29:8 30:7 32:6 32:24 36:12 38:12,25 39:25 40:6,8,16 41:16 42:23 43:1 45:10,11 45:15
**ones** 6:21 22:3,3,15 40:21
**Ooh** 19:19
**operating** 14:5,12,21 15:1
**opinion** 28:15 43:18
**opposed** 6:4
**option** 21:22 22:6,9 33:25
**oral** 15:15 29:20,21 29:24 30:5,6
**order** 25:6
**original** 48:12,21
**originally** 10:18
**outside** 13:21

**P**

**P** 4:1
**packet** 27:15 35:15,18
**page** 3:2 48:11,14
**paper** 26:7
**paperwork** 35:1 37:7,9,14 38:18
**Parkway** 46:20
**part**

5:13 35:13
**parties** 47:8
**party** 47:14
**pass** 35:9,11
**passing** 35:3
**patrol** 12:23 16:24 42:22
**pay** 28:8
**paying** 18:8
**PD** 36:22
**people** 8:3 20:23 23:18 23:25 24:1 25:9,25 28:12 28:15 29:2 31:4,14,17 32:8 33:6
**people's** 27:5
**person** 16:21 27:15,19 39:15
**personal** 7:24,25 18:3
**personality-wi...** 26:25
**personally** 27:20 28:22 30:8
**personnel** 7:1,2,3 38:10,16 38:17,22 39:21
**physical** 38:14
**piece** 26:7 30:25
**pieces** 15:16
**place** 34:24
**PLAINTIFF** 2:2
**Plaintiffs** 1:8,15
**play** 17:20
**please** 31:9 44:5 48:13
**PLLC** 1:17 2:4
**PNP** 13:12
**Poer** 1:6,6 10:10 11:22 42:4,19 43:4 44:9 48:6
**Poer's** 44:12
**point** 42:15 43:22
**police** 9:24 10:14 12:5 16:4 32:10 38:5
**policies** 32:3 43:7
**policy** 18:12 19:23 20:5,10 28:18 32:11 33:25 44:24 45:1
**policy/going** 21:21
**position** 7:8
**possible** 20:19
**possibly** 10:16 30:2
**potential** 17:6
**practice** 25:19 27:14
**predominantly** 31:16
**preliminary** 20:8
**pretty** 10:1 13:4 21:13 25:3 34:8
**previous** 5:11 41:20
**prior** 17:13 27:10 28:1 29:25 30:1,8 47:4
**private** 5:15,16 8:15
**probably** 4:12 38:21 40:7
**problem** 32:17,17
**problems** 23:6 35:10
**procedure** 14:6 15:1
**procedures** 14:21 43:7
**proceedings** 47:12
**process** 4:12 10:25 15:7 15:14,17,18,23 17:18,18,20,21 21:24 26:14,15 26:23 27:19 29:17 36:25 37:9 38:19 41:21
**processes** 17:22
**professional** 1:20 15:11 16:16,18 20:14 20:24 21:1 22:20,25 23:14 23:18 27:4 29:1,2 33:6 36:20,23
**prone** 19:18
**proper** 35:22
**protect** 13:17
**protocol** 13:9,12
**Public** 1:20 46:13 47:3
**pull** 24:11
**pulled** 41:21
**pulling** 24:10
**purpose** 40:14
**purposeful** 14:19
**PURSUANT** 1:14
**push** 38:5,5
**pushed** 19:20
**pushing** 8:14
**put** 12:20 15:9 17:24 19:19 35:1 40:20

**Q**

**question** 4:25 5:3,5 28:4 32:21 34:3 35:13 37:2 41:20 44:1,3 44:22,23
**questioned** 29:25
**questions** 25:14 33:10 35:8 45:10 47:11
**quit** 21:22 22:11 30:14 33:25
**quite** 10:2

**R**

**R** 4:1
**radio** 12:2
**raised** 23:4
**ran** 37:25
**ratified** 42:23
**Ratner** 2:10 3:4 7:23 9:8 10:12 14:11 15:3,22 17:8 18:16,18 20:12 21:9,25 23:2,7 25:1,17 28:23 29:5 30:21 31:19 32:20 33:2,8 33:14,21 34:3 34:6 35:6 36:10 37:21 38:2 39:17 41:14 43:9 44:1,4,18,20 44:25 45:7,11 48:3,9
**ratnerm@hall...** 2:13

**Rattlesnake** 12:14
**read** 46:2 48:14
**real** 10:4
**really** 17:19 24:1 31:8 43:11
**reasoning** 11:17 39:5,8
**reasons** 35:22 39:12
**recall** 11:18,25 12:15 13:8 14:18 24:5 41:8 42:19
**recess** 40:9
**recollection** 11:12,15
**recommend** 38:2
**recommendati...** 17:23 20:20 23:17 24:3 26:1 27:18 29:16 33:17
**recommending** 19:14,25 28:17 28:17 30:13 32:18
**record** 5:2 16:11 21:23 22:11,22 37:8
**records** 24:12 38:22
**red** 17:25 23:4 35:2
**reduced** 47:9
**reference** 27:10
**referring** 10:9
**refusal** 11:13
**refusing** 43:18
**regarding** 25:18
**regardless** 38:14
**regards** 5:21
**Registered** 1:19
**regular** 6:2
**rehab** 10:2
**Reisinger** 1:19 47:3,20
**related** 47:13
**relation** 47:7
**release** 11:4,10
**remarkable** 15:24
**remember** 28:25
**report** 23:20 36:23
**reporter** 1:20 4:17 31:8 45:15
**reporting** 36:18 46:19 48:18
**reports** 32:15
**represent** 10:17 43:1
**represented** 18:4
**request** 10:18,19 38:8
**requirements** 15:13
**reserve** 24:15 45:13
**resign** 20:5,7 24:22 36:8 39:6
**resigned** 21:17 39:7
**resisting** 43:12
**respond** 12:5
**responding** 41:10
**response** 10:20
**responsibility** 16:15
**rest** 29:17
**result** 47:15
**retain** 16:16
**retained** 10:16
**retired** 24:16
**retraining** 32:12
**retrieve** 24:12
**retrieves** 24:13
**return** 46:19 48:14
**review** 31:14 32:1 33:7 45:12
**reviewed** 22:20,25 29:14 31:12
**reviews** 33:4
**right** 8:24 12:6 13:3 22:24 23:1 26:12,23 27:8 28:14 31:10,13 31:17 33:7,13 33:20 34:16 35:24,24 38:19 39:23 41:25 42:2,16 45:4
**rights** 7:4,7
**roll** 22:2 34:21
**RPR** 47:3,20
**Rule** 48:13
**rules** 4:14
**run** 24:11
**running** 28:12

**S**

**S** 1:19 2:10 4:1 47:3,20 48:3
**saying** 11:8 19:23 26:25 34:14
**says** 26:7 36:5 44:15
**scene** 11:23 41:10
**scrapes** 18:7
**second** 43:22 44:21
**security** 8:7
**see** 5:9 6:15 16:12 20:18 25:10 32:2,16 39:25 43:16
**seen** 14:7 22:21 23:1
**sense** 8:5
**separate** 13:10 14:9
**separated** 12:20
**September** 47:17 48:1
**sergeant** 1:10 9:16 43:3
**sergeants** 34:12
**serial** 6:10
**serious** 10:1
**Seventeenth** 2:11 48:4
**shakes** 4:21
**share** 19:2
**Shayne** 1:4,15 4:3 46:8 47:5 48:7
**sheet** 46:4,5
**sheets** 48:14
**sheriff** 1:10 9:1,12 10:7 10:8 12:4 14:4 14:25 21:19 22:14 27:22 38:4,23 39:1,2 48:6

**sheriff's**
5:24 6:15 8:12 10:19,20 14:21 15:2 17:2 36:21 37:8,15 37:18 38:13,25 39:3 43:8
**sheriffs**
5:20,20 6:18,19 6:20 38:1
**Sherry**
1:6 48:6
**shock**
18:6
**shooting**
31:14
**shorthand**
47:9
**shows**
13:11
**sign**
48:14
**signature**
45:11 47:17 48:11,14
**similarly**
19:22
**simple**
4:16
**simply**
43:21
**Sincerely**
48:16
**sit**
12:22 25:21 27:15 30:3
**sitting**
26:16,24
**situation**
13:5 16:11 21:20
**situations**
40:24
**size**
16:22
**somebody**
13:16 16:6 18:4 21:20 22:19,24 31:12,13,25 33:23 41:1,11 42:1
**SOP**
13:12
**sorry**
7:1 10:20 44:7
**sort**
15:19
**sounds**
14:19
**South**
1:17 2:4
**speak**
25:15 27:24 33:11
**specific**
37:2 39:12
**specifically**
5:4 18:2 24:6
**speculate**
23:11 39:13
**Spent**
10:2
**spite**
23:10
**splitting**
35:7
**spoke**
27:20
**spoken**
36:1
**stage**
26:12
**stand**
14:14
**standard**
14:5,12,20 15:1 23:14
**standards**
15:11 16:16,19 20:14,24 21:1 22:20,25 23:18 27:4 28:25 29:1,2 33:6 36:21,23
**start**
4:17
**started**
8:18 10:3
**state**
1:21 4:4 5:21 9:25 46:16 47:4
**STATES**
1:1
**step**
26:15
**stepping**
31:8
**steps**
40:1
**stick**
22:3
**storage**
38:14
**street**
1:17 2:4,11 40:23 46:15 48:4
**strike**
31:13
**stuck**
44:12
**stuff**
10:5 18:14,23 20:21 21:5,6 34:16 35:24
**subordinates**
7:13,13
**subpoena**
38:8
**SUBSCRIBED**
46:9
**sued**
1:11 5:13,21 18:8
**suffering**
41:1,12
**Suite**
2:12 46:20 48:4
**summary**
35:1 43:23
**supervisors**
34:12
**sure**
4:15,16 9:1 13:3 15:4,6,9 16:15 17:10 25:21 31:3,5,7 32:4 34:7 37:25 44:6
**Surviving**
1:7
**suspension**
32:12
**swinging**
43:12
**sworn**
4:4 46:9 47:6
**Syracuse**
1:17 2:4

**T**

**take**
4:18,22 40:6 42:13
**taken**
1:16 18:1 40:9 41:4 47:8 48:8
**talk**
12:17,21 13:10 16:12,17 18:2 25:8 28:19 39:15
**talked**
12:13 19:15 25:22,25 28:15 29:3,23 40:3
**talking**
12:15 19:10 21:12 22:1 23:13 26:16 28:8,9 29:15 30:9,24 31:24 33:5 34:9,10 34:11 36:17,21 38:9 42:7,9
**tase**
19:19
**tased**
18:5 36:5 43:4
**taser**
31:13 42:11
**teach**
31:18
**teaching**
31:25 40:23
**techniques**
32:1,2
**tell**
7:22,23 14:24 15:6 16:20 28:1,2 35:3 39:11 40:13
**telling**
21:4
**tells**
5:4
**term-limited**
9:3,4
**termination**
19:14 20:6,8 22:23 28:17 30:13,14 32:11
**terminations**
20:9
**terms**
9:4
**testified**
4:5 43:2
**testify**

47:6
**testimony** 43:10 44:20 46:6 47:11 48:14
**Thank** 45:15
**thing** 15:25
**things** 16:14 17:25 19:1 21:11 24:19,23 28:13 32:13 36:18
**think** 5:12 7:6 11:16 13:13 15:24 18:22,24 19:11 19:12,24 23:21 25:2,9,20 28:24 29:23 30:25 31:11 34:8 40:18 41:8 42:17
**thinking** 22:15
**thoroughly** 39:15
**thought** 18:6 36:6
**three** 8:14
**Tim** 1:10 48:6
**time** 7:9 10:2,16 12:10,11 16:20 17:3 21:5 24:23 31:9 44:8
**times** 4:25 18:5 38:4
**timing** 42:19
**today** 25:21 30:3
**told** 12:21 21:3 41:15 45:6
**top** 42:24
**top-level** 34:18
**total** 18:9
**town** 24:11
**traffic** 11:4 36:1
**trainers** 19:7,22 32:16
**training** 40:11,14,22 41:5 42:3,6,16
**transcript** 47:11 48:12,21
**Travis** 1:10 12:19
**tried** 40:4
**true** 46:2 47:10
**truth** 4:4 47:6
**try** 4:20
**trying** 26:4,17 33:22 44:13
**turn** 10:21 11:1,14
**Turner** 1:10 12:19 41:18 43:3 44:9,14,15
**two** 8:11,14 9:5,6,10 20:1 35:7
**types** 5:7
**typewritten** 47:10
**typically** 35:19

**U**

**ultimate** 21:2 24:2 26:6 35:18
**ultimately** 20:21 22:22,23 25:24 33:16 36:15
**unable** 43:19
**uncover** 40:4
**undersheriff** 5:10 6:22,23 7:10 9:14 14:25
**understand** 5:5 32:25
**understanding** 13:19
**unenforceable** 6:8,17
**unfounded** 21:17 36:2,2,3 36:13,13,14 37:3,3
**UNITED** 1:1
**use** 5:25 13:24 14:9 19:12,13 30:1 31:12,18 32:7 33:24 45:1,2
**use-of-force** 19:7,22 20:9,19 24:21 27:10 28:16,18 30:10 30:25 31:17 32:15 33:4,11 35:21 44:24
**uses** 28:1 30:8
**usually** 7:25

**V**

**various** 28:19
**vehicles** 12:20
**verbal** 4:21
**versus** 15:19
**veteran** 24:11
**vetted** 27:18 39:16
**vetting** 17:18,19
**video** 10:18 46:19 48:18
**violated** 18:11 20:5
**violation** 21:21 22:10 32:11
**violations** 20:10 28:18 33:25
**vs** 1:9 48:6

**W**

**wait** 12:23
**want** 8:3 13:17 25:6 25:12 28:2 34:1,15 42:12
**wanted** 5:22 38:7
**wasn't** 5:25 7:11 16:21 18:23 22:6 45:8
**way** 5:12,15 12:1 16:25 18:24 22:17,24 23:3 32:10 35:8 36:1,18,24 41:21,24 42:24
**ways** 15:24
**we'll** 45:13
**we're** 11:9 19:14,24 20:3,4,5 22:10 34:9 35:2,11
**we've** 27:18,19
**weapon** 43:21
**weeded** 26:13
**weeks** 8:11
**went** 10:5 16:13 19:19,21 38:18 39:19
**weren't** 10:21
**West** 46:20
**WHEREOF** 47:16
**wife** 8:23
**wise** 12:7
**wish**

30:19
**witness** 47:6,16 48:13
**word** 15:20
**words** 5:24 20:16
**work** 10:4 18:17 24:9 26:22 27:2
**worked** 10:3,23 11:19
**working** 10:3
**works** 9:1 31:11
**worried** 13:4
**wouldn't** 12:7 17:19 18:22 21:6 22:9 26:9,10 28:7 30:6,16 35:10 44:14,14
**wrap** 28:5
**writing** 19:11
**written** 13:13
**wrong** 35:17
**Wyoming** 6:12

**X**

**X** 32:18 35:22

**Y**

**Y** 32:18 35:22
**yay** 33:18
**yeah** 6:18 9:15 22:8 22:15 25:2,22 25:23 27:1,6 27:12,16 28:9 29:22 31:2,23 34:4,14 37:4 38:3,11 41:8 41:15 42:15,17 44:2,23 45:9
**years** 8:14 9:19 14:25 22:1 26:21
**younger** 42:6

**Z**

**Z** 32:18 35:22
**ZIP** 46:16

**0**

**1**

**100** 46:20
**1001** 2:11 48:4
**14143** 46:20
**18** 9:19,19
**18th** 40:19
**19-cv-01088(L...** 1:2 48:7
**1984** 7:20
**19964015065** 47:21

**2**

**20** 1:4,18 48:8
**2021** 1:4,19 47:17 48:1,8

**3**

**300** 2:12 48:4
**303-256-6345** 2:6
**303-628-3337** 2:13
**35** 48:15

**4**

**4** 3:3
**4600** 1:17 2:4

**5**

**6**

**7**

**7** 48:1
**750,000** 18:9
**7th** 47:17

**8**

**80202** 2:12 48:5
**80237** 1:18 2:5
**80401** 46:21

**9**

**9/20/2024** 47:21
**9:03** 1:18
**9:41** 40:9
**9:47** 40:9
**9:54** 45:16
**9th** 1:17